**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

KATIE ALLEN,

    *Plaintiff*,

    v.

                                            Case No. 2:25-cv-02556-EFM-JBW

RANDY WATSON, in his individual capacity,
and DR. JAKE STEEL, KANSAS COMMISSIONER
OF EDUCATION,
in his official capacity.,

        *Defendants*.

### Motion for Summary Judgment

Defendants move for judgment as a matter of law and submit this brief in support.

### I. Nature of the Case

This is a civil rights action under 42 U.S.C. § 1983 in which Katie Allen asserts a claim of First Amendment retaliatory discharge.

Allen was an unclassified, at-will employee of the Kansas State Department of Education (KSDE) from August 20, 2025, to September 11, 2025. On September 10, 2025, Allen posted the comment "Well deserved" to a Facebook post about Charlie Kirk having been shot. On September 11, 2025, Allen voluntarily and unilaterally resigned her employment.

Allen asserts two claims of First Amendment retaliatory discharge—one against Dr. Watson in his individual capacity for monetary damages, and one against Dr. Steel in his official capacity seeking injunctive relief. *See* Pretrial Order, Doc. 34, ¶ 4.a. Defendants are entitled to summary judgment because:

    (1)    Allen voluntarily and unilaterally resigned. Dr. Watson did not terminate Allen's employment. Thus, Allen's separation from employment did not violate her rights under the First Amendment,

    (2)    Even if Dr. Watson had terminated Allen's employment, the termination would not

1

have violated Allen's rights under the First Amendment because her conduct caused significant, material disruption to the operations of the KSDE such that the employer's interest in efficient operations outweighed Allen's rights under the First Amendment.

(3)    Even if Allen's resignation was ineffective and assuming she was dismissed, Dr. Watson is entitled to qualified immunity because Allen's termination under the circumstances would not have violated clearly established law.

(4)    Dr. Watson is also entitled to qualified immunity based on the advice of counsel.

## II. Statement of Facts

**Allen was hired to head up the new At-risk Funding program.**

1.    Katie Allen was appointed to the position of Senior Education Research Analyst with the Kansas Department of Education (KSDE), position no. K0223839 (position), on the Career, Standards and Assessments Team in the Learning Services Division effective August 20, 2025. Stipulations, Doc. 34, ¶ 2.a.i; Exhibit 16, Allen dep., 32:5-32:11.

2.    Allen's position was specific to the at-risk program established by the Kansas legislature that required KSDE to track the academic performance of students who were below grade level and affected funding with all school districts involved. Exhibit 17, Watson dep., 26:3-27:1.

3.    Allen was to lead the at-risk program for KSDE. Exhibit 17, Watson dep., 26:3-27:1.

4.    Allen was offered the position/appointment on August 14, 2025, via email. Exhibit 2 (Appointment Letter dated 8-14-25), Exhibit 6 (Email with Appointment Letter 8-14-25); Exhibit 16, Allen dep., 29:4-29:15.

5.    Allen accepted the position on August 20, 2025. Stipulations, Doc. 34, ¶ 2.a.viii; Exhibit 2, at 2; Exhibit 16, Allen dep., 29:4-29:15.

6.    Allen signed the position description for the Research Analyst on the Career, Standards and Assessment Services team on August 20, 2025. Stipulations, Doc. 34, ¶ 2.a.ix;

Exhibit 4 (Signed Position Description); Exhibit 16, Allen dep., 29:25-30:15.

7.      The position was an unclassified, full-time position. Stipulations, Doc. 34, ¶ 2.a.ii; Exhibit 16, Allen dep., 30:16-30:25.

8.      Allen understood that, as an unclassified employee, she was an at-will employee. Exhibit 16, Allen dep., 32:1-32:4.

9.      During Allen's employment, Dr. Randy Watson (Dr. Watson) was the Commissioner for the KSDE. Stipulations, Doc. 34, ¶ 2.a.iv.

10.      Dr. Jake Steel became the Commissioner June 1, 2026. Doc. 32 (Notice of Substitution).

11.      During Allen's employment, Wendy Fritz (Fritz) was the Director of Human Resources for the KSDE. Stipulations, Doc. 34, ¶ 2.a.v.

12.      During Allen's employment, Beth Fultz was the Director of the Career, Standards and Assessment Services team of the KSDE. Stipulations, Doc. 34, ¶ 2.a.vi.

13.      During Allen's employment, Julie Ewing was the Assistant Director of the Career, Standards and Assessment Services team of the KSDE. Stipulations, Doc. 34, ¶ 2.a.vii.

14.      Beth Fultz was the director of Allen's department and Julie Ewing was Allen's immediate supervisor. Exhibit 16, Allen dep., 36:9-36:19.

15.      Allen's work days were Monday through Friday. Exhibit 16, Allen dep., 38:23-40:4.

16.      Other than a brief period when Allen's daughter was ill, Allen worked at the KSDE office in Topeka. Exhibit 16, Allen dep., 38:23-40:4.

17.      Allen's position involved working with At-risk funding for school districts which required collaboration and coordination with several KSDE teams, and local education agencies and contractors. Exhibit 16, Allen dep., 40:19-42:6.

18.    Allen also held office as a school board member for USD 383, Manhattan-Ogden, having been elected in 2023. Exhibit 16, Allen dep., 11:14-11:21.

**Allen commented "Well deserved" to a Facebook post about Charlie Kirk.**

19.    On Wednesday, September 10, 2025, after leaving work, Allen commented "Well deserved" on a Facebook post concerning Charlie Kirk being shot. Stipulations, Doc. 34, ¶ 2.a.xi; Exhibit 5 (Facebook Post with Comment) (copy to the right); Exhibit 16, Allen dep., 56:14-57:16.



20.    Allen deleted the comment a few minutes later. Exhibit 16, Allen dep., 57:17-57:23.

21.    Allen does not know why she posted the comment in the first place. Exhibit 16, Allen dep., 58:18-58:19.

22.    Allen went to work in Topeka on Thursday, September 11, 2025 around 7:30 a.m. Exhibit 16, Allen dep., 58:20-59:12

23.    Allen had a doctor's appointment in Manhattan the afternoon on that day. Exhibit 16, Allen dep., 58:20-59:12.

24.    Allen never returned to the KSDE offices after leaving for her doctor's appointment on September 11, 2025. Exhibit 16, Allen dep., 71:3-71:7.

25.    Allen received threats via Facebook and then, later Thursday afternoon or evening (September 11), anonymous phone calls about her Facebook comment. Exhibit 16, Allen dep., 61:11-62:13, 61:24-62:6.

26.    Allen received death threats and was fearful for her life. Exhibit 16, Allen dep., 66:3-67:14, 79:17-80:2.

27.     Allen received threatening voicemails. Exhibit 16, Allen dep., 83:15-83:21.

28.     Allen learned that her personal phone number had been circulated on social media. Exhibit 16, Allen dep., 61:11-62:13.

29.     Allen reached the point she wouldn't leave her house. Exhibit 16, Allen dep., 74:2-74:5.

**Resignation: Allen voluntarily and unilaterally resigned but nobody from KSDE saw Allen's resignation email until Tuesday, September 16, 2026.**

30.     Allen sent an email to Beth Fultz, on September 11, 2025, at 9:55 p.m. Exhibit 16, Allen dep., 65:6-65:19; Exhibit 6 (9-11-25 Resignation Email from Allen). The email reads as follows:

> **(no subject)**
> 1 message
> **Katie Allen** <klallenedd@gmail.com>          Thu, Sep 11, 2025 at 9:55 PM
> To: Beth Fultz <Beth.Fultz@ksde.gov>
>
> Hi Beth,
>
> Please accept my resignation as of today when I left for my doctor appointment in MHK at noon. I regrettably posted mean words online (then deleted and apologized) the other day, and have brought on the hate from a whole bunch of people. Today has been filled with stress and threats of violence against me, and I don't want to bring that negativity to the agency.
>
> My apologies.
>
> Katie

Exhibit 6.

31.     Allen personally typed the email and sent it to Fultz. Exhibit 16, Allen dep., 66:3-67:14.

32.     Allen meant what she said when she sent the email. Exhibit 16, Allen dep., 66:3-67:14.

33.     Allen received an out of office reply from Fultz' email account. Exhibit 7 (09-11-

Out of Office Reply from Fultz), Exhibit 16, Allen dep., 67:19-67:22.

34.    Fultz flew to California on vacation on September 11, 2025. Exhibit 19, Fultz dep., 14:23-15:8

35.    Fultz didn't check her work email until Tuesday September 16, 2025, when she began checking emails while at the airport preparing to fly back to Kansas City. Exhibit 19, Fultz dep., 20:8-21:11.

36.    Fultz didn't return to the office until September 17, 2025. Exhibit 19, Fultz dep., 20:8-21:11.

37.    Fultz forwarded Allen's resignation email to Fritz on Tuesday, September 16, 2025. Exhibit 8 (9-16-25 Email Fultz to Fritz with Resignation email); Exhibit 9 (9-16-25 Fritz Email forwarding Resignation to Watson); Exhibit 18, Fritz dep., 53:20-54:23; Exhibit 19, Fultz dep., 20:8-21:11.

38.    The email forwarded by Fultz was first time Fritz learned of Allen's resignation email. Exhibit 18, Fritz dep., 53:20-54:23.

39.    Fritz then forwarded the resignation email to Dr. Watson. Exhibit 9; Exhibit 18, Fritz dep., 55:5-55:12; Exhibit 17, Watson dep., 160:14-161:6.

40.    Fritz sent an email to Allen on September 16, 2025, confirming receipt of Allen's September 11 resignation. Exhibit 16, Allen dep., 67:23-68:24; Exhibit 10 (9-16-25 Resignation Confirmation):

> **Resignation Confirmation**
> 1 message
> **Wendy M. Fritz** <Wendy.Fritz@ksde.gov>        Tue, Sep 16, 2025 at 4:47 PM
> Katie Allen <klallenedd@gmail.com>
> To: Beth Fultz <Beth.Fultz@ksde.gov>
>
> Katie,
>
> The Kansas State Department of Education has received and accepted your

resignation, which you submitted to your director via email on Thursday, September 11, 2025, at 7:55 p.m.

As stated in your email, your resignation was effective as of Thursday, September 11, 2025. I have attached the "Benefits Checklist for Employees Leaving KSDE" document for your reference.

There were no personal belongings in your cubicle other than a few food items. During our phone conversation yesterday, you stated that you didn't want the food items returned to you.

Please ensure your KSDE employee ID is returned to our office by the end of the workweek

Wendy

Exhibit 10.

**Allen never returned to work after leaving at noon on September 11.**

41.    Allen did not have access to her work computer or work email after she left the office on September 11, 2025. Exhibit 16, Allen dep., 69:5-69:17.

42.    After leaving work on September 11, the only contacts Allen had with anyone at KSDE consisted of text messages with Julie Ewing on September 12 (Friday) and September 15 (Monday); text messages with HR Director Fritz on Tuesday, September 16, and phone calls with Dr. Watson and Wendy Fritz on Monday September 15. Exhibit 11 (Allen Communications with KSDE after 9-11-25); Exhibit 16, Allen dep., 69:18-71:2.

43.    Julie Ewing texted Allen on Friday, September 12. Allen did not respond that day. There was no further contact until Ewing texted Allen again on Monday, September 15. Exhibit 11; Exhibit 16, Allen dep., 71:18-73:6.

44.    On September 12, 2025 at 1:59 p.m., Fritz reached out to Allen asking if Allen was okay—Fritz texted Allen saying: "Katie, this is Wendy Fritz with KSDE HR. No one has heard from you today. Please reach out so we know you're ok." Exhibit 11; Stipulations, Doc. 34, ¶ 2.a.xii; Exhibit 16, Allen dep., 73:7-75:4.

7

45. Allen September 12, 2025, Allen responded to Fritz's text, saying: "Hi Wendy. I am ok. Receiving threats to my personal safety so better to not leave the house. Thank you for checking. I appreciate it and my apologies." Exhibit 11; Stipulations, Doc. 34, ¶ 2.a.xiii; Exhibit 16, Allen dep., 73:7-75:4.

46. There was no further communication between Allen and Fritz until 7:48 a.m. on Monday, September 15 in which Allen asked to talk with Fritz. Exhibit 11; Exhibit 16, Allen dep., 73:7-75:4.

47. Fritz replied and arranged a time for a call with Allen. Exhibit 11; Exhibit 16, Allen dep., 73:7-75:4.

**Disruption: Allen's comment prompted a strong, adverse public reaction.**

48. KSDE experienced disruption to its ordinary activities from thousands of emails and phone calls. Exhibit 17, Watson dep., 52:2-52:7.

49. Beginning the morning of September 11, 2025, the Department phone lines were inundated with calls from people calling about Allen's Facebook comment. Exhibit 15, Seele Declaration; Exhibit 14, Carpenter Declaration; Exhibit 13, Bremer Declaration; Exhibit 20 Auldridge Declaration.

50. Of the calls and emails known to Dr. Watson all but one was negative with respect to Allen. Exhibit 17, Watson dep., 91:12-91:16.

51. Generally, people said that Allen should resign or be fired. Exhibit 17, Watson dep., 61:16-61:21.

52. Staff reported to Dr. Watson that they were unable to get any of their usual work done and that no calls other than those related to Allen were getting through to the Department. Exhibit 17, Watson dep., 125:25-126:7, 129:16-129:23, 130:6-130:12, 135:22-136:11.

53. Dr. Watson understood the disruption was caused by, or a result of, a reaction to

Allen's social media post. Exhibit 17, Watson dep., 137:13-138:11.

54.     The disruption included the fact that Dr. Watson's office phones were overwhelmed, his personal assistant worried about her own personal safety, and the agency was unable to conduct normal business because of the volume of calls, especially considering his direct line is not a public number. Exhibit 17, Watson dep., 117:12-117:23.

55.     The volume of calls interfered with the Department's ability to conduct business, because staff were occupied fully answering constituents' complaints for multiple days, all related to Allen's comment. Exhibit 17, Watson dep., 118:19-119:3.

56.     The main switchboard was overrun with calls, the phone was already ringing before a call was finished. The three personnel assigned to Human Resources, Dr. Watson's assistant (Makayla Auldridge), the Board's assistant (Deborah Bremer), and staff in teacher licensing were fully occupied answering phone calls. Exhibit 17, Watson dep., 119:17-121:13; Exhibit 13, Bremer Declaration; Exhibit 15, Seele Declaration; Exhibit 20 Auldridge Declaration.

57.     The disruption was such that no other tasks were accomplished by Department staff because they were fully occupied with the calls and correspondence about Allen. Exhibit 17, Watson dep., 123:11-123:24; Exhibit 18, Fritz dep., 31:9-31:21, 32:6-32:11; Exhibit 15, Seele Declaration; Exhibit 14, Carpenter Declaration; Exhibit 20 Auldridge Declaration.

58.     For example, Human Resources Professional Marissa Seele and Human Resources Administrative Specialist Mady Carpenter were unable to perform their normal duties because they were assisting with incoming calls for at least three business days. Exhibit 15, Seele Declaration; Exhibit 14, Carpenter Declaration.

59.     Calls to the Teacher Licensure Department were disrupted because their number diverts to the first open representative, but all of the phone lines were occupied by calls about Allen's Facebook post. Exhibit 15, Seele Declaration.

60.    The complaints began on Wednesday September 10 and continued through Tuesday of the following week (September 16), when they began to diminish. Exhibit 17, Watson dep., 123:11-123:24.

61.    Department staff found the phone calls threatening and feared for their safety and security. Exhibit 15, Seele Declaration; Exhibit 14, Carpenter Declaration; Exhibit 20 Auldridge Declaration.

62.    Dr. Watson received an email on Friday, September 12 that read:

"If she's not removed, I will make it my job to spread the physical address of your immediate family and all innocent young females in your family. We will not tolerate this shit and if you don't think we are serious, then please don't remove Katie. Thanks, very upset and angry American."

This, and similar emails caused Dr. Watson to be concerned for himself and his family. Exhibit 17, Watson dep., 113:16-114:18; Exhibit 12 (9-12-25 Email to Watson re spreading address of family).

63.    On Monday, September 15, 2025, Fritz reached the conclusion that there needed to be a separation from the agency by Allen. Exhibit 18, Fritz dep., 24:20-26:1; 26:18-26:21.

64.    Fritz concluded the disruption warranted Allen's separation. Exhibit 18, Fritz dep., 24:20-26:1.

65.    Fritz advised Dr. Watson that Allen be given the option of resigning. Exhibit 18, Fritz dep., 24:20-26:1.

66.    Dr. Watson received recommendations from both his Human Resources Director (Fritz) and his General Counsel (Scott Gordon) that there should be a separation of service with Allen. Exhibit 17, Watson dep., 151:4-152:1; Exhibit 18, Fritz dep., 24:20-26:1.

67.    At the first USD 383 Board meeting following Allen's comment, USD 383 the Board of Education passed a resolution asking Allen to resign her board seat. She resigned the

position of Board Vice-President, but declined to resign her seat. Exhibit 16, Allen dep., 86:22-87:15.

**Advice of Counsel**

68.    KSDE General Counsel Scott Gordon gave Dr. Watson legal advice. Exhibit 17, Watson dep., 46:1-46:14.

69.    Dr. Watson was advised by Gordon that there had been a serious disruption and that if the Department moved forward with a separation of service for Allen, the decision could be defended. Exhibit 17, Watson dep., 152:9-152:25.

70.    Gordon informed Dr. Watson the disruption was significant and invasive and had gone on for days and staff were not able to get their work done as was verified by Human Resources. Exhibit 17, Watson dep., 152:9-152:25.

71.    Dr. Watson, in consultation with Human Resources and his general counsel, decided on Monday, September 15, 2025, there would be a separation from service with Allen. Exhibit 17, Watson dep., 59:20-59:23, 153:10-153:20.

72.    However, Dr. Watson wanted Allen the chance to resign if she chose to do so. Exhibit 17, Watson dep., 153:10-153:20.

**Contacts with Allen after September 11**

73.    On Monday, September 15, 2025, Allen spoke with Watson on the phone twice. Stipulations, Doc. 34, ¶ 2.a.xiv.

74.    Allen called Fritz at about 11:51 a.m. on Monday, September 15 and spoke for about four minutes. Fritz expressed concern for Allen's well-being and wanted to schedule a time for Allen to speak with Dr. Watson. Exhibit 16, Allen dep., 74:25-75:20.

75.    Fritz arranged for Allen to answer a call from Dr. Watson. Exhibit 16, Allen dep., 76:3-81:22.

11

76.     Dr. Watson called Allen about 12:04 p.m. and the two spoke for about 11 minutes in which Allen:

a.      relayed the threats and calls for her resignation she had received,

b.      explained why she hadn't returned to work,

c.      told Dr. Watson that she did not feel safe leaving her home,

d.      said she wanted to talk to legal counsel.

Exhibit 16, Allen dep., 76:3-81:22; Exhibit 17, Watson dep., 71:5-71:8.

77.     Dr. Watson informed Allen "that he had had thousands of calls and emails" and that he was going to need to do something quickly. Exhibit 16, Allen dep., 76:3-81:22; Exhibit 17, Watson dep., 71:5-71:8.

78.     Dr. Watson called Allen a second time on September 15, 2025, at 2:15 p.m., the call lasted five minutes. Exhibit 16, Allen dep., 81:23-83:14.

79.     Fritz was present with Watson and participated during the second phone call. Stipulations, Doc. 34, ¶ 2.a.xv.

80.     Watson told Allen, "We're going to have to do something" and encouraged Allen to resign. Exhibit 16, Allen dep., 81:23-83:14.

81.     Dr. Watson ended his participation in call by telling Allen they would be "parting ways" and gave the phone to Fritz. Exhibit 16, Allen dep., 81:23-83:14.

82.     Fritz spoke with Allen about end of employment matters such as return of her badge and whether there was anything in her office she wanted returned. Exhibit 16, Allen dep., 81:23-83:14.

83.     Allen's employment with KSDE ended in September 2025. Stipulations, Doc. 34, ¶ 2.a.xvi.

84.     Dr. Watson did not terminate Allen's employment with KSDE. Exhibit 17, Watson

12

dep., 155:17-155:23.

85.    Dr. Watson learned from Wendy Fritz that Allen had already resigned. Exhibit 17, Watson dep., 83:24-84:7.

86.    Dr. Watson did not learn of Allen's emailed resignation until September 16. Exhibit 17, Watson dep., 168:10-168:12.

### III. Issues Presented

1.    Allen cannot show a violation of her rights under the First Amendment.

    a.    Allen's voluntary and unilateral resignation precludes her from being able to show an adverse employment action motivated by her speech.

    b.    KSDE's interests in promoting the efficiency of the public service outweigh Allen's free speech interests in her Facebook comment.

2.    Dr. Watson is entitled to qualified immunity. Even if Allen's resignation wasn't effective and assuming she was dismissed by Dr. Watson, the dismissal does not violate clearly established law.

    a.    It is not clearly established that Allen's post was on a matter of public concern as opposed to a matter of purely personal interest or animus.

    b.    It is not clearly established that KSDE's interest in efficient and effective government operations did not outweigh Allen's free speech interests.

    c.    Dr. Watson justifiably relied upon the advice of counsel.

### IV. Argument and Authorities

Allen voluntarily and unilaterally resigned from her employment with KSDE. Dr. Watson and KSDE did not terminate Allen's employment. Allen's resignation was effective immediately and did not require acceptance by, or acknowledgment from, anyone at KSDE. While Allen did not attempt to rescind her resignation, any attempt to do so would have been ineffective as the resignation was immediately effective. Allen's voluntary and unilateral resignation precludes her from being able to show the adverse employment action motivated by her speech necessary to sustain a First Amendment retaliatory discharge claim.

Even if Dr. Watson had terminated Allen's employment, the termination would not have violated Allen's constitutional rights. Allen's comment caused immediate and substantial disruption to KSDE's regular operation. KSDE's interests, as employer, in promoting the efficiency of the public service outweighed Allen's free speech interests.

Though Dr. Watson did not terminate Allen's employment he had decided before learning of her resignation that he would terminate her employment if she elected not to voluntarily resign. Dr. Watson is entitled to qualified immunity for that decision. Based upon the balancing tests involved, Dr. Watson could reasonably conclude that Allen's speech was not protected and/or that KSDE's interests outweighed Allen's free speech interest. Further, Dr. Watson sought and secured the advice of counsel before reaching that decision. Dr. Watson was advised by counsel that the disruption experienced by KSDE was sufficient that the agency's interest in efficient operations outweighed Allen's interest in free speech. Dr. Watson relied on the advice of counsel in reaching his decision. Dr. Watson's conclusion that the agency's interests outweighed Allen's interest in free speech was objectively reasonable even absent the advice of counsel.

A.    **Standards of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The district court is to "view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016) (quotations omitted).

"[The] defense of qualified immunity … shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (citations and internal quotation marks and

14

ellipsis omitted). Motions for summary judgment based on qualified immunity are treated differently than other summary-judgment motions, after a defendant asserts a qualified-immunity defense, the plaintiff must meet the "heavy two-part burden," *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (internal citation and quotation omitted), of showing that "(1) a reasonable jury could find facts supporting a violation of a constitutional right, [and] (2) [the constitutional right] was clearly established at the time of the defendant's conduct," *Gutierrez*, 841 F.3d at 900-01 internal citation and quotation omitted). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995)).

**B.     There was no violation of Allen's rights under the First Amendment.**

The framework to evaluate First Amendment retaliation claims brought by public employees against their employers derives from *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and *Pickering v. Board of Education*, 391 U.S. 563 (1968). Courts apply the now-familiar *Garcetti/Pickering* test:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017) (quotations omitted). The test balances "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

15

The first factor, whether the speech was made pursuant to an employee's official duties, is not an issue in this case. While defendants contend Allen's comment "Well deserved" was not speech was on a matter of public concern, defendants do not rely on that issue for summary judgment (on the first prong of the qualified immunity analysis). Nor do defendants rely on the fifth factor (whether the defendant would have reached the same employment decision in the absence of the protected conduct) for summary judgment.

Allen cannot prevail on the third and fourth factors. These issues will be addressed herein in reverse order. Summary judgment against Allen on either basis is fatal to both her § 1983 claim against Dr. Watson for damages and her claim for injunctive relief against Dr. Steel.

**1.    Allen cannot demonstrate her speech was a motivating factor in any adverse employment action. There was no adverse employment action. Allen was an at-will employee who unilaterally and voluntarily resigned. The resignation was effective on its transmission by Allen. Watson and KSDE needed to take no action to accept it.**

The plaintiff bears the burden of showing that her speech was a motivating factor in an adverse employment action. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1207 (10th Cir. 2007); *Trant v. Oklahoma*, 754 F.3d 1158, 1166 (10th Cir. 2014).

> Under the fourth-prong of *Garcetti*, plaintiffs bear the burden of establishing both a detrimental employment decision (adverse employment action) and "causation— that is, that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment."

*Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1236 (10th Cir. 2009) (quoting *Maestas v. Segura*, 416 F.3d 1182, 1188 & n.5 (10th Cir. 2005)). Here, there was no adverse employment action. Allen was not terminated. Rather, Allen voluntary and unilaterally resigned.

"Kansas adheres to the employment-at-will doctrine, which holds that employees and employers may terminate an employment relationship at any time and for any reason." *Pfeifer v.*

*Fed. Exp. Corp.*, 297 Kan. 547, 554, 304 P.3d 1226 (2013). *See also Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 176, 872 P.2d 252 (1994). "[U]nder Kansas law, public employment is presumptively at-will." *Farthing v. City of Shawnee*, 39 F.3d 1131, 1136 (10th Cir. 1994). Under Kansas law, "employees in the unclassified service serve at the pleasure of their appointing authority and may be terminated at will." *Bruce v. Kelly*, 316 Kan. 218, 227, 514 P.3d 1007 (2022). "When the term of any public office is not determined by the constitution, statute or contract, the office is held at the pleasure of the appointing authority, and no property right attaches to such a position." *Stoldt v. City of Toronto*, 234 Kan. 957, Syl. ¶ 2, 678 P.2d 153 (1984). *See also* Kan. Const. art. 15, § 2 ("The tenure of any office not herein provided for may be declared by law; when not so declared, such office shall be held during the pleasure of the authority making appointment.").

Allen acknowledges she was an unclassified employee and knew she was an at-will employee. As noted, an aspect of at-will employment is the unilateral right of either the employer or the employee to terminate the employment at any time for any reason. Allen exercised her unilateral right to terminate her employment by resigning via email at 9:55 p.m. on September 11, 2025. Allen's resignation explicitly stated it was effective at noon on September 11, 2025. Allen received confirmation her email was delivered via an out-of-office reply from Fultz' email at 9:55 p.m. on September 11, 2025.

In the Pretrial Order, Allen concedes she sent the resignation. Doc. 34, at 5 ("The next night, September 11, at 9:55 p.m., Allen sent a panicked email to Beth Fultz, the Director of her office, saying she was resigning, … ."). Allen does not contend she attempted to rescind her resignation. Allen does not contend her resignation email was ineffective. Rather, Allen simply notes that neither Dr. Watson and Fritz knew about her resignation email while communicating with Allen on Monday, September 15 when Dr. Watson was encouraging Allen to resign. The fact

of the matter, however, is that Allen had already resigned.

As a matter of law, Allen's resignation was effective when she sent it. There was no requirement that anyone from KSDE acknowledge, accept, or take any other action with respect to the resignation. "[A]n unconditional resignation to take effect immediately cannot be withdrawn even with the consent of the power authorized to accept it." *McCluskey v. Lansdell*, 571 So. 2d 312, 313 (Ala. Civ. App. 1990). A written resignation stating the resignation was effective immediately is immediately effective and later attempts to withdraw the resignation are ineffective. *Britton v. City of Trinidad*, 687 P.2d 523 (Colo. App. 1984).

> A public officer or public employee may relinquish his office at his pleasure. *People ex rel. Rosenberg v. Keating*, 112 Colo. 26, 144 P.2d 992 (1944); *Locke v. City of Central*, 4 Colo. 65 (1878). Absent a valid enactment or contract providing otherwise, acceptance of a resignation is not required to make the resignation effective. A resignation therefore takes effect upon the date specified in the resignation, *Hamm v. Santa Ana*, 273 Cal.App.2d 84, 78 Cal.Rptr. 102 (1969), and cannot be withdrawn after its effective date. *Smith v. Brantley*, 400 So.2d 443 (Fla.1981); *Hamm, supra*; *People ex rel. Coker v. Owen*, 116 Ill.App.3d 506, 71 Ill.Dec. 867, 451 N.E.2d 1021 (Ill.App.1983).

*Britton v. City of Trinidad*, 687 P.2d 523, 525 (Colo. App. 1984). Like other contract communications, a resignation is effective when delivered. *See* Restatement (Second) of Contracts § 68 (1981) (the written communication "is received when the writing comes into the possession of the person addressed, or of some person authorized by him to receive it for him, or when it is deposited in some place which he has authorized as the place for this or similar communications to be deposited for him.").

Allen's comment was posted on Wednesday, September 10. Allen left work at noon on Thursday, September 11, for a doctor's appointment. Allen never again reported for work. Rather, Allen's written resignation was delivered at 9:55 p.m. on that same evening. The resignation was effective as of noon on that day—*i.e.*, it was immediately effective. Nobody at KSDE needed to do anything for Allen's resignation to be effective. Nobody at KSDE spoke with Allen about her

18

comment or about the calls that began to inundate the KSDE phones before she resigned. Allen does not, because she could not, contend her resignation was coerced or involuntary.

Because Allen resigned voluntarily and unilaterally, there was no adverse employment action. Allen cannot meet her burden of showing her speech was a motivating factor in an adverse employment action. Accordingly, defendants are entitled to summary judgment on all claims— both the claims against Dr. Watson for money damages and the claim against Dr. Steel for injunctive relief.

> **2.      KSDE's interests, as employer, in promoting the efficiency of the public service outweigh the plaintiff's free speech interests.**

Determining whether a public employee has been discharged in violation of her First Amendment free speech rights utilizes a case-by-case inquiry on two levels. *Connick v. Myers*, 461 U.S. 138 (1983), requires separate fact-specific considerations of (1) whether the speech is constitutionally protected and (2) if so, whether the discharge can be justified in order for the public office properly to perform its function. *Id*. at 148–50. In First Amendment retaliation cases, courts must therefore balance the First Amendment interest in protecting an employee's freedom of expression against the government's interest in maintaining discipline and efficiency in the workplace. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). "[I]f the employee spoke as a citizen on a matter of public concern, we must weigh 'the interests of the [employee], as a citizen, in commenting upon matters of public concern' against the State's interest 'as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir. 1998) (quoting *Pickering*, 391 U.S. at 568). The *Pickering* balancing test asks whether the public employer "has an efficiency interest which would justify it in restricting the particular speech at issue." *Id*.

19

To assess whether the speech disrupts workplace functioning, "considerations include 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1207 (10th Cir. 2007) (quoting *Rankin*, 483 U.S. at 388). "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151-52,

A court will generally "defer to a public employer's reasonable predictions of disruption," as long as the predictions are supported by specific evidence. *Cragg*, 143 F.3d at 1347; *see also Weaver*, 458 F.3d at 1100. The Supreme Court explained it is unnecessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152. A public employer does not "have to wait for speech actually to disrupt core operations before taking action." *Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995). Rather, courts "consistently given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." *Waters v. Churchill*, 511 U.S. 661, 673 (1994). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418.

Here, the disruption was immediate and significant. Allen's comment was shared broadly on social media and captured the public's attention. Allen testified that the reaction to her comment was swift and substantial. Allen received a significant amount of hate emails and threatening phone calls and voicemail which caused her to fear for her life to the point she refused to leave her house.

20

KSDE was similarly impacted. The switchboard was so overwhelmed by the negative callers that Department staff devoted days to addressing the calls and were unable to do any other work. Some calls and emails were threatening, causing staff and Dr. Watson legitimate concern for their safety and welfare.

Even had Dr. Watson elected to dismiss Allen, the State's interest in promoting the efficiency of the public services it performs outweighed Allen's free speech interests. Thus, even if had Allen not resigned, her dismissal would not have violated the First Amendment and defendants are entitled to summary judgment.

## C.    Dr. Watson is entitled to qualified immunity.

Government officials are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

> "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 573 U.S. 228, 243 (2014) (internal quotation marks omitted). The protection extends beyond mistakes of law. It "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). A mistake of fact must, of course, be a reasonable one. *See Deutsch v. Jordan*, 618 F.3d 1093, 1099 (10th Cir. 2010).

> "When a defendant raises the defense of qualified immunity, the plaintiff bears the burden to demonstrate that the defendant violated his constitutional rights and that the right was clearly established." *Id*. at 1027. The law was "clearly established" only if it "was sufficiently clear that every reasonable official would understand that what he [was] doing [was] unlawful." *District of Columbia v. Wesby*, [583 U.S. 48, 63] (2018) (internal quotation marks omitted). To make such a showing in our circuit, the plaintiff "must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Callahan v. Unified Gov't of Wyandotte Cty*., 806 F.3d 1022, 1027 (10th Cir. 2015) (internal quotation

21

marks omitted).

*Singh v. Cordle*, 936 F.3d 1022, 1033–34 (10th Cir. 2019).

> In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." [*Ashcroft v.*] *al–Kidd*,[ 563 U.S. 731, at] 741 (2011). This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

*District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). For the reasons set forth in § IV.B. 1 and 2, *supra,* the inquiry can end with the conclusion that Allen's rights under the First Amendment were not violated. The United States Supreme Courts cautions that "lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." *Wesby*, 583 U.S. at 62 n.7.[1]

First Amendment speech protections involve a series of case-by-case balancing tests. A consequence of the case-by-case balancing required under the *Garcetti/Pickering* test carries significant implications regarding the qualified immunity of public officials whose actions are alleged to have violated an employee's First Amendment rights.

The first balancing test is whether the speech at issue is speech pursuant to the employee's official duties. That test is not at issue herein. The next two balancing tests are at issue in this case. Those are the *Connick* public concern test and the *Pickering* balancing test which balances the employee's speech interest against those of the government employer in promoting efficient public services. Dr. Watson is entitled to qualified immunity on both tests.

> There will rarely be a basis for *a priori* judgment that the termination or discipline of a public employee violated "clearly established" constitutional rights. *Connick* and *Rankin* exemplify the difficulty of delineating any bright-line constitutional rule that might furnish a test for denying qualified immunity in such actions. *Connick* held constitutionally unprotected a questionnaire distributed within a district attorney's office that inquired, inter alia, whether the employees thought the office was politically influenced and whether it was properly performing its job. In

---

[1] This is not intended to discourage this Court from being belt and suspenders sure the case is appropriately adjudicated. This is especially true because the injunctive relief claims against Dr. Steele, in his official capacity, cannot be disposed of on qualified immunity.

22

*Rankin*, however, the Court held that a derogatory personal remark about President Reagan, uttered in a private intra-office conversation, was constitutionally protected.

*Noyola v. Texas Dep't of Hum. Res.*, 846 F.2d 1021, 1025 (5th Cir. 1988) (citations omitted).

### 1.    *Connick*: It is not clearly established that Allen's post was on a matter of public concern as opposed to a matter of purely personal interest or animus.

First comes the *Connick* balancing test. A public employee who speaks as a citizen on a matters of personal interest (as opposed to a matter of public concern) will rarely be protected by the First Amendment. *Connick*, 461 U.S. at 147. Whether speech is on a matter of public concern is "determined by the content, form, and context of a given statement, as revealed by the whole record." *Id*. at 147–48. The determination may consider "the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000). While statements revealing official impropriety usually involve matters of public concern, speech that simply airs "grievances of a purely personal nature" typically does not involve matters of public concern. *Id*. at 1224-1225. "If an employee's principal purpose was to air a personal dispute, … his speech was not entitled to protection even if it touched on a matter of general concern." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1188 (10th Cir. 2010) ) (*Brammer-Hoelter II*). "Speech regarding matters of mere personal interest are not subject to protection under the First Amendment." *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996). Vitriolic comments on matters of personal interest. are not protected. *Finn v. New Mexico*, 249 F.3d 1241, 1248 (10th Cir. 2001).

Dr. Watson "is entitled to qualified immunity if a reasonable administrator could have believed that Plaintiff was motivated primarily by personal grievance. This belief may have been wrong, but so long as the error was reasonable, he is immune." *Singh v. Cordle*, 936 F.3d at 1036.

> In short, (1) [Dr. Watson] reasonably could have believed that Plaintiff's primary motive in [posting her comment] was a personal grievance and (2) in light of our precedents it was not contrary to clearly established law to punish Plaintiff for such speech, even though the [comment] also addressed an issue of public concern.

*Id*. Thus, Dr. Watson "is entitled to qualified immunity." *Id*.

### 2.   *Pickering*: It is not clearly established that KSDE's interest in efficient and effective government operations did not outweigh Allen's free speech interests.

Next comes the *Pickering* balancing test. The *Pickering* balance questions whether the employee's speech interests outweigh the government employer's efficiency interests. *Cragg*, 143 F.3d at 1346. "The *Pickering* analysis requires us to ask whether the City, acting as a public employer, has an efficiency interest which would justify it in restricting the particular speech at issue." *Id*. *See also Brown v. City of Tulsa*, 124 F.4th 1251, 1267 (10th Cir. 2025) ("*Pickering* balancing, requires the court to balance the employee's right to free speech against the government's interests as an employer").

This test also applies to disruption caused by speech occurring off the job and unrelated to any internal functioning of the government employer. *Brown*, 124 F.4th at 1267; *Flanagan v. Munger*, 890 F.2d 1557, 1562 (10th Cir. 1989). The government employer has a legitimate interest to avoid direct disruption, by the employee's speech itself, of the employer's internal operations. *Brown*, 124 F.4th at 1267. Where the adverse action follows soon after the speech, the employer's intent to avoid actual disruption will suffice. *Id*. at 1267–68; *Kent v. Martin*, 252 F.3d 1141, 1145 (10th Cir. 2001). Courts generally defer to a reasonable prediction of disruption supported by specific evidence. *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1279 (10th Cir. 2007); *Cragg*, 143 F.3d at 1347.

It is undisputed that Allen's Facebook comment had been widely shared on social media and caused a swift and substantial negative reaction. Allen was, herself, attacked online. She faced threats to her physical safety. She feared leaving her house.

By the third business day following Allen's post, Monday, September 15, Dr. Watson had concluded that KSDE had experienced sufficient disruption to the agency and had negatively affected Allen's ability to perform her position to warrant her separation from service. Dr. Watson had received an email threatening his family. Dr. Watson's office phones, which were not a publicly available number, were overwhelmed. His personal assistant worried about her own personal safety. The agency was unable to conduct normal business because of the volume of calls. This specific evidence suffices to support Dr. Watson's reasonable conclusion that Allen's Facebook comment undermined and disrupted KSDE's efficient performance. *See, e.g.*, *Jantzen v. Hawkins*, 188 F.3d 1247, 1258 (10th Cir. 1999) (at the time of the events rather than months later, specific evidence supported the reasonable prediction of undermining efficient performance); *Moore v. City of Wynnewood*, 57 F.3d 924, 934-35 (10th Cir. 1995) (defendants articulated specific concerns of negative impact).

Allen's Facebook comment was of no import to any public discourse. *Cf. Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998) (the greater the import of is to the public discourse, the greater the burden on the employer to justify responding adversely to it). Allen briefly occupied a position responsible for being the public face of KSDE to school districts across the state implementing the new legislation on at-risk funding. *See id.* (government interest in addressing an employee's speech depends on the extent of authority and public accountability of the employee).

Dr. Watson was required to decide, in real time, whether Allen's interest or KSDE's interest outweighed the other. Considering the State's substantial interest in maintaining the efficient operation of the KSDE and given the level of disruption to KSDE operations caused by Allen's Facebook comment, the balance tips heavily against Allen. Plaintiff cannot show Dr. Watson violated a clearly established constitutional right.

**3.     Dr. Watson justifiably relied upon the advice of counsel and is entitled to qualified immunity.**

Apart from and in addition to the arguments set forth in § IV.C.1 and 2, *supra*, Dr. Watson is also entitled to qualified immunity based upon the advice of counsel. Advice of counsel is an "extraordinary circumstance" warranting qualified immunity even if the court were to determine the defendant violated clearly established law. "[R]eliance on the advice of counsel in certain circumstances rises to the level of extraordinary circumstances" sufficient to justify a grant of qualified immunity. *V-1 Oil Co. v. State of Wyo., Dep't of Env't Quality*, 902 F.2d 1482, 1488 (10th Cir. 1990). "Whether reliance upon legal advice 'bars our imputation to [the defendant] of constructive knowledge concerning the laws allegedly violated by his conduct' depends upon the circumstances of each case." *Id*. at 1489 (citation omitted). Relevant factors include: (1) how unequivocal and specific the advice was; (2) how complete the information provided to the attorney giving the advice was; (3) the prominence and competence of the attorney; and (4) the time between the dispersal of the advice and the action taken. *Id*.

In *V–1 Oil*, qualified immunity was granted based on a conclusion the state officer's reliance on advice of counsel "prevented [him] … from knowing the relevant legal standard," even though the relevant Fourth Amendment principle was "clearly established." *Id*. at 1488–89. Specifically, the Tenth Circuit said:

> We hold that a reasonable officer in [defendant's] position—that is, an officer who conducts a warrantless search on the same day he was advised by fully informed, high-ranking government attorneys that a particular statute, which had not yet been tested in any court, lawfully authorized that particular search—should not be expected to have known that the search was unconstitutional.

*Id*. at 1489.

If this Court concludes Dr. Watson is entitled to summary judgment based on the arguments in § IV.B (that he didn't violate Allen's rights) and/or §§ IV.C.1-2 (the right was not clearly

26

established), the Court need not address the advice of counsel defense. *Gomes v. Wood*, 451 F.3d 1122, 1138 n.6 (10th Cir. 2006) (in light of holding law was not clearly established law, court would not consider arguments for qualified immunity based on advice of counsel).

In this case, Dr. Watson did not reach the conclusion that Allen needed to be separated from employment until the Department had endured serious disruption for several consecutive days. And he reached that conclusion only after securing advice and recommendation from both his legal counsel and his Human Resources Director that the disruption was sufficiently severe that separation from service was appropriate.

### V. Conclusion

For the foregoing reasons defendants are entitled to summary judgment, to wit:

1.  Plaintiff cannot show a violation of her rights under the First Amendment:

    a.  Allen's voluntary and unilateral resignation precludes her from being able to show any adverse employment action motivated by her speech.

    b.  Even if Allen's resignation was ineffective if she was dismissed, KSDE's interests in promoting the efficiency of the public service outweigh Allen's free speech interests in her Facebook comment.

2.  Dr. Watson is entitled to qualified immunity. Even if Allen's resignation was ineffective if she was dismissed by Dr. Watson, termination does not violate clearly established law:

    a.  It is not clearly established that Allen's post was on a matter of public concern as opposed to a matter of purely personal interest or animus;

    b.  It is not clearly established that KSDE's interest in efficient and effective government operations did not outweigh Allen's free speech interests; and

    c.  Dr. Watson justifiably relied upon the advice of counsel.

**Fisher, Patterson, Sayler & Smith, LLP**
3550 SW 5th Street | Topeka, Kansas 66606
Tel: (785) 232-7761 | Fax: (785) 232-6604
dcooper@fpsslaw.com | cmoe@fpsslaw.com

**s/David R. Cooper**

David R. Cooper                                                #16690
Crystal B. Moe                                                 #29168
*Attorneys for Defendants*

## Certificate of Service

On July 1, 2026, the foregoing was e-filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record:

Heather J. Schlozman, KS Bar #23869
Mark V. Dugan, KS Bar #23897
DUGAN SCHLOZMAN LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
Tel: (913) 322-3528 | Fax: (913) 904-0213
heathis@duganshlozman.com
mark@duganschlozman.com
**Attorneys for Plaintiff**

s/David R Cooper

28