IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KATIE ALLEN,
Plaintiff,
vs. Case No. 2:25-cv-02556-EFM-JBW
RANDY WATSON, KANSAS
COMMISSIONER OF EDUCATION,
in his official and individual
capacity,
Defendant.

DEPOSITION OF
KATIE ALLEN,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 1:22 p.m. on the 27th day of April, 2026, at the law office of Dugan Schlozman, LLC, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.



APPEARANCES

ON BEHALF OF THE PLAINTIFF:

Mr. Mark V. Dugan
Dugan Schlozman, LLC
8826 Santa Fe Drive, Suite 307
Overland Park, KS 66212
913-322-3528
mark@duganschlozman.com

ON BEHALF OF THE DEFENDANT:

Mr. David R. Cooper
Crystal B. Moe
Fisher, Patterson, Sayler & Smith
3550 S.W. 5th Street
Topeka, KS 66606
785-232-7761
dcooper@fpsslaw.com
cmoe@fpsslaw.com



INDEX

Certificate ------------------------------ 100

WITNESS

ON BEHALF OF THE DEFENDANT: PAGE
KATIE ALLEN
Direct-Examination by Mr. Cooper 5

EXHIBITS

ALLEN DEPO EX. NO: MARKED
No 1 Job Opening 5
No 2 6/8/25 letter to Marisa Seele from Allen 5
No 3 Resume 5
No 4 Confirmation of appointment letter 5
No 5 E-mail string, ALLEN00002-00004 5
No 6 E-mail string, ALLEN00007-00008 5
No 7 E-mail string, ALLEN00015-00016 5
No 8 E-mail string, ALLEN00017-00018 5
No 9 Printouts of Microsoft calendar meetings or invites 5



No 10 Position description 5
No 11 E-mail from Fultz, ALLEN00001 5
No 12 Charlie Kirk text 5
No 13 9/11/25 e-mail to Fultz from Allen, ALLEN00006 5
No 14 9/11/25 e-mail to Fultz from Allen, KSDE_000004 5
No 15 Out of office automatic reply 5
No 16 Text and phone communications 5
No 17 E-mail string, ALLEN0009-00014 5
No 18 Page out of the Rule 26 Disclosures 5
No 19 E-mail string, Re: Retirement letter 5
No 20 E-mail string, Re: Timesheet reminder 5
No 21 E-mail string, Re: Provisional at-risk program 5

(THEREUPON, Allen Deposition Exhibit No 1 through No 21 were premarked for identification.)
KATIE ALLEN,
called as a witness on behalf of the Defendant, was sworn and testified as follows:
DIRECT-EXAMINATION
BY MR. COOPER:
**Q. Please state your full name.**
A. Katie Lynn Allen.
**Q. Are you a married person?**
A. I'm married.
**Q. How many times have you been married?**
A. Once.
**Q. How many children do you have, if any?**
A. Two.
**Q. Their ages?**
A. 14 and 15.
**Q. Where do you live?**
A. Manhattan.
**Q. How long have you lived in Manhattan?**
A. I think I moved there in 2015, so 11 years.
**Q. Where were you born?**
A. Salina.
**Q. Where did you go to -- graduate high school?**



A. Skyline. It's a south central rural school.
**Q. What year?**
A. 1995.
**Q. Any college or professional training?**
A. Yes.
**Q. Tell me what that consists of start to finish.**
A. I have an Associate's degree from community college in sociology, Bachelor's from KU in history, a Master's from K-State in public administration with a personnel focus, a Doctorate in education leadership. I don't know if it matters, a policy fellowship at George Mason's Mercatus Center, and I'm a What Works Clearinghouse certified reviewer.
THE REPORTER: Give me the last one again.
THE WITNESS: What Works Clearinghouse certified reviewer.
THE REPORTER: Thank you.
BY MR. COOPER:
**Q. Where did you go to community college?**
A. Pratt Community College.



**Q. When did you get your degree from KU?**
A. 2001.
**Q. Your Master's, when did you get that?**
A. I think 2012.
**Q. And your Doctorate?**
A. 2019.
**Q. What does it mean to be a What Works Clearinghouse reviewer?**
A. It is a certification from the institute of education sciences, and what it means for education research is that you understand the, for lack of a better, rules set up to determine if a research study is causal or correlational. And What Works Clearinghouse reviewers are the people who can provide evidence on What Works in education.
**Q. What is your spouse's name?**
A. Billy Allen.
**Q. When did you marry?**
A. 2004.
**Q. All right. You've been doing a great job, Ms. Allen. My name is David Cooper. I represent Randy Watson in the lawsuit that's been filed against him. We're here to take your deposition which is my opportunity to learn what**



**information you have to offer in support of your claims. Our goal for today's exercise is that six weeks or six months or six years from today somebody can read the transcript that's going to be prepared of our -- of the proceedings and understand everything that was said?**
A. Um-hum.
**Q. And that's the first one which is in response to a question, please use a verbal response instead of a verbal segregate. Instead of uh-huh or huh-uh, use a yes or a no if you can, please.**
A. Okay.
**Q. If you don't understand one of my questions, tell me you don't understand. Fair enough?**
A. Yes.
**Q. Will you do that?**
A. Yes.
**Q. All right. If you need a break, tell me. If there's anything I do during the course of these proceedings that bothers you in any way, talk too loud, too fast or just ask you a question that makes you sad, tell me then and there and we'll address it on the record. Fair enough?**

Page 9

A. Yes.
**Q. I presume this happened before I got here, but wait till I get to the question mark in my question so that we don't talk over each other. Can you do that?**
A. Yes.
**Q. I know we can. The real question is whether we actually fulfill that.**
**Are you presently employed?**
A. Yes.
**Q. Who's your current employer?**
A. American Institutes For Research.
**Q. What's your position?**
A. Technical assistance consultant.
**Q. And what do you do in that position?**
A. We work with state and local education agencies to help them identify and implement evidence-based practices.
**Q. Is it a full-time position?**
A. No.
**Q. When did you begin the position?**
A. April 13th.
**Q. What are the hours or working -- what's a work week?**
A. I can have a minimum of 20 hours a week

Page 10

up to 28, and my schedule in general is Monday through Thursday 8 to 2 and Fridays 8:30 to 12:30.
**Q. Is that something that you anticipate can turn into full-time employment?**
A. I hope so.
**Q. At the American Institute of Research?**
A. Correct.
**Q. Okay. And what are the full-time employment positions available there?**
A. None.
**Q. Okay. How large of an employer is the American Institute of Research?**
A. During orientation, they said 1,200 people.
**Q. And you said you hoped that it leads to full-time employment. Is there anything that you learned, been told or suspect that causes you to think it may lead to full-time employment?**
A. Right now, products are funded by U.S. Department of Education, and it's really tentative based on what happens with the Federal Government. The program that I work on is called Comprehensive Centers, and for lack of a better word, we were DOGE'd last year, and the anticipation is they're going to recompete again.

Page 11

**Q. Let me give you what's been marked as Deposition Exhibit 3. If you'd look at both pages of that document, tell me what it is, please.**
A. This is my two-page resume.
**Q. Do you have a more current resume than what we see in Exhibit 3?**
A. Can you clarify?
**Q. In other words, do you have a version of your resume that shows your employment with the Department of Education?**
A. No.
**Q. Okay. Do you hold elected office?**
A. Yes.
**Q. What elected office or offices do you hold?**
A. I am a school board member, and at the lowest level, I'm a precinct committee woman.
**Q. All right. What school board?**
A. USD 383, Manhattan-Ogden.
**Q. When were you elected?**
A. 2023.
**Q. General election?**
A. I'm sorry?
**Q. General election of '23?**
A. It's the municipal off year, so yes,

Page 12

general. There was no primary.
**Q. What does your term, current term end?**
A. It's four years, and I think 2027. The way you're sworn in, I think it lasts till January 2028, so there's some awkwardness from election in November to being sworn in.
**Q. You said you were a precinct committee woman. In what county?**
A. Riley.
**Q. Have you held any other -- what party?**
A. Democrat.
**Q. How long have you held the precinct committee woman position?**
A. I have been a precinct committee woman for probably around 20 years, but I lived in Dickinson County previously.
**Q. What other political offices have you held?**
A. I have been party chair for Riley County.
**Q. When to when?**
A. Oh, it was about a year. It was before I ran for school board, so '22-'23 or '21-'22, somewhere around there.
**Q. Before being employed by the State Department of Education, had you held any other**

**public employment?**
A. I worked at Kansas State University.
**Q. During what times at K-State?**
A. 2012 to 2019 or 2013. I don't remember. '12 or '13.
**Q. Does looking at your resume help you?**
A. Yeah. 2013.
**Q. What was your position or positions at K-State?**
A. My title changed over the time. My main function was their senior development specialist, and I also did research and evaluation, strategy and implementation.
**Q. What does that mean?**
A. Development means you work with clients to -- primarily, we're working on federal grants. So it was building client relationships and then understanding their project needs and then creating the research design and writing a proposal. In the role of research and evaluation strategist, it was similar. Yet, it also included implementing applied research.
**Q. Have you ever held employment outside the education field?**
A. Yes.



**Q. As a college graduate? In other words, I don't care if you worked at Sonic?**
A. As a Bachelor's degree graduate, yes.
**Q. Okay. And what was that?**
A. I worked at -- well, my first job out of college, I worked at Salina Arts Center. After that, I worked at two small non-profits. One was the United Way of Dickinson County, and there was another group called the Quality of Life Coalition.
**Q. You said the Salina Heart Center?**
A. Art.
**Q. Art. Okay. Take a look at Exhibit 3, your resume. And the question is whether your professional experience, whether there's anything not on your resume that -- other than the State Department of Education for employment post Bachelor's degree for you.**
A. Salina Arts Center is not on here.
**Q. During what period of time did you work for Salina Art Center?**
A. 2001 to probably 2008.
**Q. Doing what?**
A. I was their finance and operations administrator.



**Q. The business Flint Hills Research and Evaluation, is that anybody besides you?**
A. No.
**Q. Okay. Does that business still exist?**
A. Yes.
**Q. Is it a sole proprietor or LLC?**
A. It's sole proprietor. I do a 1099. Is that what it's called? W-9.
**Q. What is the employment on the first page of Exhibit 3 prior to the Flint Hills Research, the McREL International?**
A. Um-hum.
**Q. Is that how it's pronounced?**
A. Correct.
**Q. What is that business?**
A. They are now out of business. They formed in the 1960's as a outshoot of the civil rights movement operating regional education labs, and the business focus is a nonprofit education research firm.
**Q. Was it merged, purchased? How did it go out of business?**
A. I was not there for that part because they let most of us go, but my understanding there were two pieces of it. One is professional



learning which is proprietary materials, and that went to Texas Education Service Center 13, and then research work and then these Comprehensive Center Programs, they went to the University of Chicago, NORC.
**Q. So is your current employer a derivative or recipient of any of the leftovers of McREL?**
A. No.
**Q. Okay. How did your current employment differ from what you did for McREL?**
A. At McREL, I was director of the center, and now I'm a technical assistance consultant.
**Q. And in terms of the work actually performed by the entity, does it differ?**
A. I'm working on Comprehensive Centers again, so it -- each state differs. The projects are determined by the state chief school officer.
**Q. What I'm really asking, are you back to doing what -- whether at a different level, but are you back to doing what you did when you worked for McREL?**
A. Correct.
**Q. Except you're currently in more or less the equivalent of an entry level position?**
A. Correct.

Page 17

**Q. And are you shooting for a directorship again?**
A. I just started. I would love that, but I'm on week two and a half.
**Q. What brought your employment with McREL to an end?**
A. The Department of Governmental Efficiency cancelled for convenience on February 19th all contracts for Comprehensive Centers because they no longer effectuated this administration's priorities.
**Q. That sounded like a quote?**
A. It is.
**Q. Of 2025?**
A. February 19th, yep, 2025.
**Q. Other than your Flint Hills Research and Evaluation business, did you have any employment from the time you got DOGE'd in February of '25 until you started for the Department of Education?**
A. Not employment.
**Q. What did you do during that period of time?**
A. Looked for a job, volunteered other places.
**Q. How frequently does the Manhattan school board meet?**

Page 18

A. The first and third Wednesday's of each month.
**Q. How did you come to apply for a position with the State Board of Education? I really should say State Department of Education?**
A. My role at McREL, in addition to being center director, I was co-lead of our work with Kansas. So from 2020 to 2025, I worked with various staff at the State Department of Education. When the contract from the U.S. Department of Education ended, I was looking for jobs. I am certain there was somebody from KSDE who I had spoken to, I don't recall if it was Beth Fultz or whom, to get a sense if they had anything available. So I just kept looking. I signed up for the -- because I got an unemployment. I signed up for the Workforce thing and the e-mail list for state jobs and just kept looking for something from KSDE to become available.
**Q. These are out of order in terms of deposition number, but I'm going to try to do them chronologically. Let me give you what's been marked as Allen Deposition Exhibit 7. Is Exhibit 7 a string of e-mails all occurring on July 15, 2025 between yourself and Beth Fultz?**

Page 19

A. I'm sorry, were you talking to me?
**Q. I was.**
A. I'm sorry.
**Q. The question was is Exhibit 7 a string of e-mails between yourself and Beth Fultz on July 15, 2025?**
A. Yes.
**Q. On page 2 of Exhibit 7, the earliest in the string is an e-mail from Miss Fultz to you, Good morning, Katie, I'm checking to confirm if you are no longer interested in reviewing for the senior research position we have open at KSDE. So using that as a place marker, tell me what happened between February of '25 to July 15 of '25 to get to the point of this e-mail?**
A. When I saw a job opening at KSDE, I applied. And I sent in my information. At some point, I got either a phone call or an e-mail from -- I think it was Mady, somebody in HR, who said they had updated the job announcement and was I still interested in it. And I looked online. And what I saw as the job update was they had simply updated veteran status. And I told whomever at the time, yes, I was still interested in the job. And I never heard anything back until I got this e-mail from Beth saying that she heard I was no longer interested.

Page 20

**Q. Then your e-mails say what they say, and you expressed your interest?**
A. Correct.
**Q. Let me give you what's been marked as Allen Deposition Exhibit 1. I want you to look at the eight pages of that exhibit and tell me if that's a printout of information that you put into the online portal for your application as an education research analyst?**
A. Yes. This does look like the information, although I've never seen this format before.
**Q. On the last page, it speaks to documents. I think it carries over from the previous page. It says Title, Katie Allen, two-page resume, June 2025 and a file name, a pdf file name, and then another file named Katie Allen cover letter, KSDE research analyst. Did you upload a letter and resume along with your application?**
A. Yes.
**Q. Okay. Let me give you what's been marked**

**as Allen Deposition Exhibit 2. Is Exhibit 2 a copy of the June 8, 2025 cover letter that you submitted?**

A. Yes.

**Q. And is Exhibit 3 which we've already discussed a copy of the resume that you uploaded with that application as well?**

A. Yes.

**Q. Is there anybody that you knew at the Kansas Department of Education prior to applying that you spoke with other -- that you can recall their name at least in terms of discussing availability of a position?**

A. Other than either Marisa Steele (sic) or Mady calling with that change, Beth Fultz is the only person I recall having a conversation with.

**Q. Okay. Who's Mady?**

A. She is the -- I don't know her title, but she sat at the HR window. She'd be like the general admin assistant who answered the phone. I think she worked with the HR Department.

**Q. You said you spoke with Beth Fultz. Over what period of time?**

A. After she contacted me via e-mail, so it would be this around July 15th time.



**Q. The one where she asked if you were still interested?**

A. Correct.

**Q. And in person or by phone?**

A. By phone.

**Q. Tell me what the conversation was?**

A. I don't recall a lot. Just generally trying to find out if I was still interested and when I could come for an interview.

**Q. Okay. And did you interview for that research analyst position?**

A. Yes.

**Q. Did you get it?**

A. Yes.

**Q. Let me give you what's been marked as Allen Deposition Exhibit 5. This is another e-mail string between yourself and Beth Fultz. The beginning one is from you to Beth dated July 22, 2025, and the most recent is July 31, 2025. Do you agree?**

A. Yes.

**Q. The July 22 e-mail from you to Beth follow your telephone conversation with Beth?**

A. That's my recollection.

**Q. Because you begin thank you for the**



**opportunity to share my background. Did you share your background any other way than talking with Beth on the phone?**

A. My resume I submitted or whatever it was that I had submitted previously.

**Q. Well, Beth responded on page 2 of Exhibit 5, Hi, Katie, I enjoyed our conversation. So you had conversed prior to the 22nd. Do you agree?**

A. Yes.

**Q. On page 1 of Exhibit 5 at the bottom, in an e-mail dated July 31, 2025 at 3:49 p.m., there's an e-mail from Beth to you speaking about another opportunity and wanting to visit. Do you know what is being referred to in that e-mail?**

A. My understanding was that I had applied for the senior research job. No one got back with me. Mady contacted me about the change, the veterans preference, and I said, yes, I was still interested. I still never heard from anyone. And then I heard from Beth again, and what my understanding was was this was another research analyst job. They had another opening. That's all I know. I don't know what happened in the background with HR at KSDE.

**Q. Okay. And that's where I'm going is, is**



**it your understanding that the research analyst position to which you were hired is different from the one to which you applied originally?**

A. That is my understanding. I don't -- it was confusing for me because I applied for the senior research position. They told me the change was veterans status. Then later they said, no, it's a whole new job. But I looked and it looked the same to me, so I just -- I don't know what they were really actually referencing was different.

**Q. Do you know what the salary range for the original position was?**

A. No.

**Q. Do you know what the salary range for the position to which you were hired was?**

A. I know the start.

**Q. Which was?**

A. 84,000.

**Q. Do you know when you interviewed for -- well, first off, how many times did you interview with the Department of Education?**

A. Just once.

**Q. With whom did you interview?**

A. The interview was a group of I want to

Page 25

say three or four individuals. And my recollection, Julie, and I blank on her last name. There was another research analyst. He's -- I apologize, he's Chinese background. I don't know his name. Maybe there were one or two other people in the room, but I just can't remember who it was.

**Q. Was Beth Fultz part of your interview panel?**

A. No. I spoke to her after the interview?

**Q. Are you talking about Julie Ewing?**

A. Yes.

MR. COOPER: E W I N G.

BY MR. COOPER:

**Q. Okay. So you spoke with Beth Fultz before July 22 of 2025 when you expressed your continued interest in a position. Then you spoke with her a second time -- or at least again after you interviewed for the position, true?**

A. I'm sorry, say that again.

**Q. You spoke with her to express your interest before July 22nd. You spoke with her again after your interview?**

A. Correct.

**Q. Any conversations with Beth Fultz between**

Page 26

**those two conversations?**

A. Speaking with her was directly after my panel interview --

**Q. Okay.**

A. -- where she took me around the office and showed me some different things and just gave me a general overview.

**Q. The reason I'm asking is that in Exhibit 5, the top most e-mail is an e-mail from Ms. Fultz telling you that -- actually giving you her cell phone number and saying that she would call you, and I'm wanting to know if that call happened?**

A. I don't recall, but probably.

**Q. What recollection, if any, do you have of speaking with Ms. Fultz about this -- another -- this other opportunity that she's referencing in the e-mail?**

A. My recollection would be just a general she told me what the job is and asked if I would come in for an interview.

**Q. And what's your understanding of what that job would be?**

A. A research analyst. In general, they told me I would be working on at-risk accountability.

Page 27

**Q. Which means what?**

A. There's a statute for the education finance formula, and schools get additional funding for students that are considered at risk. Part of what they have to do with that money is spend it on programs that are evidence-based. KSDE had two post-legislative audits that they did not pass related to at-risk accountability. So they asked me to come help kind of figure out how to move forward, because with the What Works Clearinghouse background, I understand the difference of what's evidence-based and what is not. So, in general, that was what my understanding was. When I actually started the job, there were several pieces of it. One was that they had a list on their website of approved programs that was a little out of date, and I was to fix that. Another was if schools didn't have a program from that list, they could provide their own evidence that it worked. So I was to kind of go through and look and see if they provided proper information and then follow up to ask them to provide what might be needed to get their program approved. So that was the generality of it.

Page 28

**Q. What do you recall your conversation with Beth Fultz after your interview panel?**

A. Can you say that again?

**Q. What do you recall of your conversation with Beth Fultz after the interview with the panel?**

A. Just in general, optimism and she was showing me around the office and just gave me a little bit of update on projects. I don't remember specific parts of the conversation.

**Q. Had you been offered the job at that point in time?**

A. No.

**Q. Okay. Did you have an expectation based on your encounter with Ms. Fultz that you were going to be offered the position?**

A. I was uncertain.

**Q. I'm going to give you what's been marked as Allen Deposition Exhibit 6. There's two e-mails in Exhibit 6, the first being from Wendy Fritz to you on August 14, 2025 and then the top most is you replying the next day, true?**

A. Yes.

**Q. And handing you what's been marked as Exhibit 4. Okay. Is Exhibit 4 a copy of a**

Page 29

letter dated August 14, 2025 to you confirming your appointment as a research analyst?
A. Yes.
Q. Okay. Now, to be clear, Exhibit 4 is not in the form in which it was e-mailed to you, true? In other words, it didn't come to you with your signature on it?
A. Correct.
Q. But it came to you as an attachment to the e-mail that we marked as Exhibit 6?
A. Correct.
Q. And you later signed the letter acknowledging your acceptance of the position, the appointment?
A. Yes.
Q. Is that something you printed and mailed back or did you go to the -- go into the office to sign?
A. I printed it and most likely I took a picture and sent it back, but I don't recall. I have a printer at home.
Q. Okay. Your signature is dated 20 August, 2025?
A. Yes.
Q. Okay. I'm going to give you what's been

Page 30

marked as Exhibit 10 which is is Exhibit 10 a copy of the position description that you signed on August 20, 2025?
A. It's signed August 5th.
Q. Well, I want you to look at your signature in the last page?
A. Oh, correct, August 20th.
Q. The August 5 signature is by Ms. Fritz, true?
A. Correct.
Q. Okay. Is Exhibit 10 a true and correct position -- copy of the position description for the job that you were hired to by the Department of Education?
A. This is the job description I was given.
Q. Okay. On page 1 of Exhibit 10, we can probably -- we'll probably have to bounce back and forth between documents. There's a box that says Position, classified and unclassified, and unclassified is checked, top third, left side. Do you see where I'm at?
A. Yes.
Q. Sing you agree it says the position is unclassified?
A. Correct.

Page 31

Q. What understanding, if any, do you have as to what an unclassified position is?
A. In that case, my understanding is it's the difference between hourly and salary based on your level of work.
Q. How about FLSA status exempt versus non-exempt? Do you have an understanding what the difference there is?
A. Yes.
Q. What's that? What's your understanding?
A. Exempt meant that I wasn't paid overtime if I worked past 40 hours a week.
Q. In your prior employment with K-State, were you a classified or unclassified position, if you know?
A. Unclassified.
Q. And do you understand that a classified position differs from an classified position in that classified positions are covered by the Civil Service Act?
A. No.
Q. Okay. Do you have any understanding of what the Civil Service Act is or does for state employees?
A. No.

Page 32

Q. Did you understand that as an unclassified employee you were an employee at will?
A. Yes.
Q. In Exhibit 4, the appointment letter, the rate of pay, bi-weekly rate of pay is in the second paragraph, true?
A. Yes.
Q. And it noted that your appointment was effective August 20, 2025, true?
A. Yes.
Q. The second bullet point addresses being paid via direct deposit. I skipped over the first one about Forms I-9. The third one explains that this is an exempt position and the fact that you would not be paid overtime, true?
A. Yes.
Q. Then the fourth bullet point speaks to being on a one-year probationary period based on the -- an administrative regulation. Did you go look up and read that regulation?
A. No.
Q. Okay. It's the fifth bullet point speaks about eligibility for health insurance day one of employment, true?

A. Yes.
**Q. Did you avail yourself of the health insurance?**
A. Yes.
**Q. Employee only or some other plan?**
A. Certainly employee. I may have had my kids there, too.
**Q. Between February of '24 and August -- excuse me, in between February of 2025 and August of 2025, were you on a health plan?**
A. No.
**Q. Okay. So were you on a health plan before you were DOGE'd?**
A. Yes.
**Q. Did you avail yourself of a COBRA plan?**
A. No.
**Q. Was one offered to you?**
A. Yes.
**Q. And why did you not take it?**
A. I didn't have income.
**Q. The second to last bullet point gives you a link to look up other benefits. The last bullet point talks about showing up at HR at 8 o'clock on August 20. First question, did you show up at 8 o'clock August 20?**



A. Yes.
**Q. Is that when you signed your appointment letter?**
A. Maybe. I don't recall.
**Q. Is that when you signed your position description?**
A. Maybe. I don't recall.
**Q. Let me give you a copy of what has been marked as Allen Deposition Exhibit 11. Is Exhibit 11 a true and correct copy of an e-mail from Beth Fultz to several people including yourself dated August 27, 2025?**
A. Yes.
**Q. The text of the body of the e-mail begins now available, ELA, math and sciences in AMOSS and that's an acronym, AMOSS test environment. What is this e-mail about?**
A. This -- the state changed their cut scores for state assessments, and this new test environment showed individual student data from the new cut scores.
**Q. Okay. Exhibit 11 is from Ms. Fultz at a KSDE.gov e-mail account to your Gmail account, true?**
A. Correct.



**Q. Do you know why it was to your Gmail and not KSDE.gov e-mail account?**
A. I remember this one specifically, because I told her I never got the information because she'd asked me if I'd had time, and then she realized it was my personal e-mail that she sent it to.
**Q. So you did, in fact, get it. You just didn't read it?**
A. I went back and found it later when she told me that it was there.
**Q. And your lawyers have provided to us a series of documents called Rule 26 Disclosures. This e-mail was included in the Rule 26 Disclosures. Did you provide to your lawyers all of your e-mails to your personal account that had anything to do with your employment with the Department of Education?**
A. Yes, except for I don't think I gave the like preapplication stuff.
**Q. Let me give you what's been marked as Allen Deposition Exhibit 8. It's an e-mail string between yourself and Beth Fultz -- well, it's not -- withdraw. The e-mail string is between yourself and Julie Ewing, true?**



A. Yes.
**Q. You originally copied Beth Fultz on the original e-mail about your daughter being in a bike accident, true?**
A. Yes.
**Q. Monday, September 21, 2025, that would have been Memorial Day?**
A. I don't recall.
**Q. Okay. You copied both Beth Fultz and Julie Ewing on the original e-mail, and it was Julie who replied to you. What positions did Miss Fultz and Ms. Ewing hold with respect to your employment?**
A. Officially on paper, Julie was my supervisor. Beth was the director of the department. So Beth I think was trying to give me a broader sense of what the whole department did, but my understanding was Julie would give me tasks.
**Q. Okay. So as between the two, if either, if you were going to be gone for a day, for instance, as occurred because of your daughter's bike accident, who was it you needed to notify or did you know?**
A. No one told me the protocol.

**Q. Which yields the question of why did you e-mail those two as opposed to anybody else?**

A. That's who I'd worked with mostly when I'd started. They were about the only people that I had any kind of interaction other than like, hey, I'm so and so or, you know, a brief meeting.

**Q. I want you to describe for me the onboarding process on August 20?**

A. I showed up that morning to the HR office. I don't fully remember all of it other than I think that it started with sitting with either Wendy or Marisa and they went over HR benefits. At some point, I think Mady took you -- no, Marisa -- I don't know. Somebody took you in the other room to take your picture for your badge. I don't recall the full day, but I can tell you what onboarding was like because I just finished that with my other job. Onboarding was about 30 minutes of an online module that was for all state employees that you clicked through.

**Q. Okay. Did you make any elections like your health insurance election?**

A. When I sat with Julie or Marissa -- or, no, Wendy or Marissa, they gave me that paperwork. I don't know if I filled it out then or later.



**Q. Okay. KPERS elections, did you get that as well?**

A. Probably.

**Q. Were you still part of KPERS from your K-State employment?**

A. We don't do KPERS at K-State. KBOR has a different plan.

**Q. Did you get your e-mail access on August 20, your onboarding day?**

A. It's possible. But to be honest, they gave me a laptop that was probably 10 or 15 years old that was constant getting help from tech support. I think they gave me several replacements in the meantime, so I can't tell you when I actually got access.

**Q. Okay. Did you have a desktop PC?**

A. Yes -- no. No. It was a laptop.

**Q. OKAY. Did you have an office or A cubicle?**

A. Cubicle.

**Q. And when did you get your cubicle?**

A. Probably the day I came in.

**Q. Okay. What were your work days?**

A. Monday through Friday.

**Q. And how many, if any, were required to be in-person AND in the office?**



A. All of them.

**Q. Okay. Did you do any work from home during your tenure with the Department of Education?**

A. Yes.

**Q. How much?**

A. I don't recall, but I think it was when my daughter was sick. Because I remember they said I could take the laptop home, but they didn't give me a cord for the laptop. So it took another day for IT to find me a cord.

**Q. So that's two days work from home that you've identified. Were there more than the two?**

A. I don't -- I don't recall the two.

**Q. Okay. Well, you said you were allowed to take the laptop home to work from home while your daughter was sick. You didn't have a cord on one of the days?**

A. It may have been -- yeah, I don't recall how not having -- it may have been that I took the computer home and didn't have a cord and then had to tell them later. I don't recall. But I don't recall how many days that I actually worked at home.



**Q. Well, as between working from home or working in the office, was there one more than the other or even split?**

A. In the office was the primary.

**Q. Okay. In Exhibit 4 on the acceptance portion, it reads I accept the unclassified research analyst position on the career standards and assessment services team offered at a bi-weekly rate of $3,258.49 effective August 20, 2025. I understand this is exempt position. I'm going to read that again. I understand that this is exempt position, and I will serve a one-year probationary period. I think there's a word and missing in that sentence. We've already discussed that it's was an exempt position. What understanding, if any, did you have regarding it being a one-year probationary period?**

A. None.

**Q. When you came in and signed -- or when you signed your position description and signed the acceptance of the appointment, what was your understanding of what you would be doing for the Department of Education?**

A. My understanding was really just based on what it said on paper when I walked in. No one

Page 41

had given me any further information at that point.
**Q. You've mentioned that it was with respect to at-risk curriculum for school districts, right?**
A. At-risk funding.
**Q. Okay.**
A. But it is related to evidence-based programs which can include curriculum.
**Q. On Exhibit 10, part of the position description, the second paragraph, this position requires professional education work of a specialized nature including and there's five itemized things. The next sentence, this works requires collaboration and coordination with several KSDE teams as well as with local education agency and contractors. I want to focus on that in terms of what understanding did you have, if any, with respect to the collaboration and coordination that was going to be required with KSDE teams, local education agencies and contractors?**
A. I would say I have a general understanding, and most of it was based on my experience at the Comprehensive Center because that's what we did. We coordinated and

Page 42

collaborated with teams at KSDE, local education agencies and contractors. So it could mean a really wide varied of things. But in general, it's an understanding that there's other people engaged in work that you'll often have to work with.
**Q. I'll give you what's been marked as Allen Deposition Exhibit 9. First off, these are printouts of looks like Microsoft calendar either meetings or invites. First question, Makayla Auldridge, who is she, if you know?**
A. Randy Watson's secretary.
**Q. And Exhibit 9 has two calendar entries, one for September 4 at 9:45 and one for September 8 at 1 o'clock. My first question is was there one or more than one meeting with Mr. Watson?**
A. Two.
**Q. Okay. One on each of these dates?**
A. Yes.
**Q. Okay. Why were these meetings scheduled, if you know?**
A. I believe the first one was a general meeting that all employees have with Randy Watson to meet him and be welcomed to the agency. And the second meeting was the result of a

Page 43

conversation with Beth Fultz where I had shared that I had been previously considering running for office, and she had found some information from HR and said that sounds great. You just need to talk to Randy Watson.
**Q. How many occasions total through today's date have you met with Randy Watson?**
A. I couldn't tell you the number.
**Q. Had you met with Randy Watson prior to becoming employed with the Department of Education?**
A. Yes.
**Q. In what capacity?**
A. In my role as the Comprehensive Center co-lead for the Kansas project for five years.
**Q. Okay. Excluding that work while you worked for McREL, how many times have you met with Randy Watson after February of 2025?**
A. In person?
**Q. Yes.**
A. Two. Except for I saw him at the elevators and that was just a chance meeting.
**Q. How about how many times have you talked to him since February of 2025 either in person or on the phone?**

Page 44

A. An additional two times on the phone.
**Q. Okay. So you met with him in person prior to September 10 of 2025?**
A. Yes.
**Q. And the two phone calls were after September 10 of 2025?**
A. Yes.
**Q. All right. On Exhibit 9, the first meeting on September 4, you said that essentially a meet and greet with the commissioner?**
A. Yes.
**Q. Who was present besides yourself?**
A. Randy Watson.
**Q. Anybody else?**
A. No.
**Q. How long was that meeting?**
A. This says 30 minutes, but I don't remember it being that long. It seemed fairly brief.
**Q. And that's fair enough, because I know the meeting was scheduled for 30 minutes, but my question was how long did it last?**
A. Maybe 15.
**Q. And what do you remember of that meeting?**
A. Him kicking himself back in the chair and

Page 45

showing me his big window view. Just being friendly generally and welcoming me to the agency and talking about constitution day because he knew somebody, judge somebody or other, that was going to give a presentation. It was just a general friendly conversation.

**Q. Okay. You mentioned between the September 4 conversation and -- or meeting and the September 8 meeting you had a conversation with Beth Fultz about running for office. Was that one or more than one conversation with Beth Fultz?**

A. One.

**Q. Where did it take place?**

A. In her office.

**Q. How long was your meeting with her?**

A. Ten minutes.

**Q. Okay. A few minutes anyway?**

A. Yeah. Maybe ten minutes. Not terribly long.

**Q. And was it -- in other words, was there a separate work reason for the meeting or was it to discuss your desire to run for office?**

A. To talk to her about that, yes.

**Q. Why did you -- well, first off, who initiated the conversation?**

Page 46

A. Me.

**Q. Why did you initiate the conversation?**

A. Prior to taking that job, in the interim between losing my job at McREL and taking that job, I had been, for lack of a better word, engaged in a lot of community advocacy and various people encouraged me to run for office. So in those few months prior to starting KSDE, I had considered the idea and a talked to some folks and a couple people give me a donation. But then taking my job, I wasn't quite sure, so I wanted to have a conversation with Beth Fultz about expectations, and her conversation was very encouraging. She said, oh, yeah. It's great. You should do that. Let me go talk to HR.

**Q. Did you have a subsequent conversation with Miss Fultz about what she learned from talking to HR?**

A. A brief one, yes.

**Q. So what else -- I want to go back to the original conversation where you expressed a desire to run for office. What else do you remember either telling Miss Fultz or her saying to you during that meeting?**

A. Just a general that I had been thinking

Page 47

about it prior and I wasn't really sure what I should do, and then taking this job, I still wasn't sure. I had some interest but I didn't know what the rules were about it, and so that's what I was asking her.

**Q. And was it a particular office that you were interested in?**

A. There were two I had talked about.

**Q. Okay. And what two? What did you talk about?**

A. With her, I specifically had mentioned the interest in running for the senate seat currently held by Roger Marshall.

**Q. Have you only spoke with Miss Fultz about running for senate?**

A. That's my recollection.

**Q. Okay. What's the other position that you were interested in or gave thought to?**

A. For a while, in my district, I'd been encouraged to run for the house representative position.

**Q. And who holds that seat that you would have run for had you done so?**

A. Angel Roeser.

**Q. What's the district?**

Page 48

A. 67 or 66. I don't remember. I think it's 67. Sidney Karlin's the other one.

**Q. Okay. In the subsequent conversation about running for office with Beth Fultz, was that in person or otherwise?**

A. In person.

**Q. You said it was brief. Tell me what you remember.**

A. She walked by my desk. My cubicle faced her office. And she smiled and said, hey, I talked to Wendy and basically that you can be a state employee and run for office. And that I just need to have a quick conversation with Randy Watson.

**Q. Did you have a -- subsequently have a conversation with Mr. Watson about running for office?**

A. Yes.

**Q. When was it?**

A. Most likely on this August 8th date.

**Q. Okay. Where did it take place?**

A. In his office.

**Q. How long did the meeting last?**

A. Maybe 15 minutes at the most. Not very long.

Page 49

**Q. Okay. Tell me what you recall being said during that second meeting with Mr. Watson?**
A. Basically, the same thing that I had told Beth Fultz, that I had had some interest and conversations prior to taking the job. I wasn't really quite sure what I wanted to do, but folks had given me money so I kind of need to figure out. And he said, oh, yeah, he was very encouraging. He started calling me Senator Allen.
**Q. Anything else you remember of that conversation?**
A. That's the most of it.
**Q. Did you discuss with Randy Watson the fact that -- in other words, basically I know I just started here but I may have to -- I'm interesting in running for office?**
A. I did say, yeah, I wasn't sure when I started, but I am interested in exploring because people had encouraged me, but I'm still not sure what I want to do.
**Q. And did you discuss the fact that if you had to open a campaign account that you would resign from your employment?**
A. If I had to open a campaign account?
**Q. Yeah.**

Page 50

A. No.
**Q. Did you discuss with Randy Watson the possibility of resigning employment with the Department of Education to run for office?**
A. I told Randy Watson I was not sure what I wanted to do.
**Q. I appreciate that, but that did not answer my question. Did you discuss with Randy Watson the potential of resigning to run for office?**
A. I never discussed the potential of resigning to run for office.
**Q. Did you discuss the potential of resigning at all?**
A. No.
**Q. What, if any, understanding did you have as to what requirements applied to you as a Department of Education employee running for national office?**
A. My understanding was what Beth Fultz had told me and that there was no conflict and that was the most information that I had.
**Q. Was anybody besides yourself and Randy Watson present for the conversation on -- the second conversation in his office?**

Page 51

A. No.
MR. COOPER: We've been going a little better than an hour. Let's take a short break.
(THEREUPON, a recess was taken.)
BY MR. COOPER:
**Q. All right. We're back after a short break, Ms. Allen. What's your husband do for a living?**
A. He is the head of security at the Eisenhower Presidential Library.
**Q. Who is technically his employer?**
A. It's called ADC Limited.
**Q. How long has he been -- worked there?**
A. Almost 20 years.
Before we proceed, can I clarify from the last question?
**Q. If you feel you need, sure.**
A. You had asked me about a conversation with Randy Watson and discussing my resignation, and I'd like to clarify my response.
**Q. Okay.**
A. When we had a conversation, it wasn't in my idea talking about my resignation. What he said if I decided to move forward with seeking that seat, I would have to quit and I acknowledged

Page 52

that response.
**Q. Okay. Let me give you what's been marked as Allen Deposition Exhibit 19 which is a e-mail string between yourself and Randy Watson on September 10, 2025 originating from Mr. Watson to all department staff advising of his intention to retire, true?**
A. Yes.
**Q. And the top e-mail you replied to him on the same day, true?**
A. Yes.
**Q. Where were you when you replied?**
A. At my desk.
**Q. Okay. Let me give you what's been marked as Allen Deposition Exhibit 21. Exhibit 21 is an e-mail thread originating on September 5, 2025 from you to a Mena Patrone, M E N A, Patrone, P A T R O N E, true?**
A. Yes.
MR. DUGAN: I'm sorry, what's the number on this one?
MR. COOPER: 21. It's on the bottom.
MR. DUGAN: Oh. Thanks.
BY MR. COOPER:
**Q. There's a series of e-mails back and**

**forth with Ms. Patrone about scheduling a phone call or a meeting. Who is or was Miss Patrone as you understood it?**
A. I don't know her title, but she clearly worked at USD 287 and was in charge of their at-risk programs.
**Q. Okay. And do you know who or where USD 287 is?**
A. My recollection is it's one of the small schools out west, but I don't really know.
**Q. It's West Franklin. Do you know where West Franklin School District is?**
A. No. I got the west, though.
**Q. I've read this and I don't understand it, so tell me what the conversation, both the e-mails and what the purpose of the conversation was going to be?**
A. So let me look back. Ms. Patrone must have submitted an application to get their program, whatever it was, approved to be on the evidence-based list for at-risk funding. And my recollection was I was given some Excel sheets with a bunch of data that didn't have headers or labels or anything. So the conversation I was going to have with her was helping her understand



what the requirements were for submitting evidence to be placed on that provisional list. And so I think we tried to schedule a meeting once, but then her thing on Friday the 5th said she needed more time or more information to prepare which is when I told her at 1:40 what I was doing. And then we tried again to schedule a meeting.
**Q. And essentially, this is schedule a meeting to say here's what I really need?**
A. Correct.
**Q. Okay. And this at-risk program, was it your understanding that part of your responsibilities were going to be in assisting local districts in the tracking of performance of at-risk students over time?**
A. I'm not sure. I think because I was given access to that AMOSS that there may have been something, but it was not clear to me.
**Q. All right. So by September 10, roughly 20 days from when you started, which is a little less than three full work weeks?**
A. Um-hum.
**Q. What had you done in the interim period of time, excluding the Memorial Day holiday?**
A. I updated their at-risk list that's on



their website. I went through every single one of the programs to find evidence that either has to be on the What Works Clearinghouse evidence for ESSA or had to find a study, an independent study online that met the criteria. That took quite a long time. I had a whole Excel sheet where I found the evidence for each program that was already on the list and matched that up. And then I updated their list that they had already on the website because it was full of programs that were not evidence-based, and I remember working with somebody to format that and get it put up there. That was the bulk of what I'd been doing.
**Q. You used an acronym ESSA. Tell us what that is.**
A. Elementary and Secondary -- Elementary and Secondary Act? What is it? Elementary -- it's the federal law, ESSA. Elementary and Secondary Student Act or something like that.
**Q. I was just looking for how many letters is in ESSA. And are they the ones that we think they are, because it's not always the case?**
A. Well, somebody called it Every Student Succeeds Act, and I know that's not true which is why I always get mixed up.



**Q. Looking back again on Exhibit 12 (sic), so you had scheduled a meeting for Friday, true?**
A. The last on here I had tried to. I don't think she responded.
**Q. Do you know if you had a meeting scheduled with Ms. Patrone?**
A. My recollection is we had one scheduled, and then she asked to reschedule to have more time to prepare.
**Q. Do you have a recollection one way or the other of actually setting a meeting with Doctor Patrone on Friday afternoon?**
A. I never scheduled a meeting with her.
**Q. Exhibit 12 is an enlargement of -- well, some sort of social media post. What social media platform was it?**
A. Facebook.
**Q. And the post was somebody posting the People Magazine report of Charlie Kirk's death, true?**
A. It says he was shot.
**Q. Okay. Well, did you know that he was dead?**
A. No.
**Q. Okay. And you -- what time of day --**

**well, withdrawn. Let's get this -- let's get this out there in terms of the chronology. You posted a comment on the Facebook post in which you wrote well deserved. Is that true?**
A. Yes.
**Q. What time of day did that occur?**
A. It was late afternoon when I had left work. I was experimenting with times to arrive because of all the traffic, so I don't really quite recall when I left work. But it was on the way out on the way to my car. I'm guessing sometime around 4.
**Q. So on the afternoon of September 10?**
A. The late afternoon, yes.
**Q. Yes. You weren't at work, true?**
A. Correct.
**Q. All right. You subsequently deleted the post, true?**
A. Yes.
**Q. How long after you posted it did you delete it?**
A. From when I posted to walking to my car, probably about five or so minutes.
**Q. And during that period, interim period of time, somebody screenshotted it and circulated it**



**online?**
A. That's my understanding.
**Q. Well, the screenshot with both the post and your comment has a timestamp of 3:17. Would that mean that somebody west, in a time zone west of us?**
A. I'm not a computer --
**Q. In other words, are you doing it at 3:17 -- between 3:15 and 3:20 after work or are you confident it was after 4 o'clock?**
A. I'm confident -- I'm confident it was after work when I had left the building, because I was walking out the door when I saw this, because I didn't fully even really understand what it was and I posted. And then I walked back to my car and looked, and I was like, oh, that's what that is, which is why I deleted it.
**Q. Why did you post it in the first place?**
A. I don't know.
**Q. Did you come to work on the 11th?**
A. Yes.
**Q. What time?**
A. Again, I was kind of experimenting because of the traffic. Sometime around 7:30 is my guess.



**Q. You had a doctor's appointment on the 11th, true?**
A. Yes.
**Q. What time?**
A. In the afternoon, but I don't recall what time.
**Q. Where was your doctor's appointment?**
A. Lab Quest in Manhattan.
**Q. And was it for you?**
A. Yes.
**Q. Any -- what was the appointment for?**
A. Lab draws for an annual wellness check.
**Q. Okay. Let me give you what's been marked as Allen Deposition Exhibit 20. The first is an e-mail from the Marisa you've been talking about, correct? When you said Marisa, it's Marisa Steele (sic)?**
A. It's Seele, S E E L E.
**Q. Okay. Thank you. And she works in HR?**
A. Yes.
**Q. And you forwarded the e-mail from Marisa to yourself. Is that accurate?**
A. Yes.
**Q. Why?**
A. I don't know. Maybe to have the link.



Because it says remember as long as you have Internet access, you do not need your computer to complete and submit your timesheet.
**Q. Okay. And first off, the e-mail begins timesheets are due tomorrow, no later than 10 a.m. Supervisors need to approve time sheets no later than tomorrow at 5 p.m. What's the time cutoff for the timesheets as you understood?**
A. It says 5 p.m.
**Q. No. What I'm really look -- what was the work week ending?**
A. I don't recall.
**Q. In other words, would you be putting in -- if you worked on Friday the 12th, would that day of work be on your timesheet even if you didn't leave till 5? In other words, this required that you be done by 10 a.m. So if you were planning on working till the end of day, would you put in your eight hours for the Friday even though you still had half your day to go?**
A. That's my understanding of the protocol.
**Q. Okay. I'm not criticizing. It's just or are you recording what you did last week?**
A. I don't think so, but I don't recall. There's just...

**Q. Because you used it all of three weeks?**
A. Yeah.
**Q. How many paychecks did you get from the State of Kansas for working for the Department of Education?**
A. I don't recall. It was direct deposit, so I never paid attention.
**Q. You left work on Thursday, September 11 for your doctor's appointment, true?**
A. Yes.
**Q. When did you leave work?**
A. I don't really recall. I think it was afternoon. I don't remember if my appointment was like at 2 or 3, but it takes me about an hour to get home. So somewhere, somewhere around that noon, 1, before 2, I think. I don't really recall.
**Q. When did you learn things had blown up over your post on Facebook?**
A. Thursday night.
**Q. Okay. What time-ish?**
A. In the evening. I don't really recall what time.
**Q. How did you learn?**
A. I think I saw -- well, what really



happened is there was some threatening things sent to me on Facebook, and then I started getting phone calls and I think that was afternoon, Thursday afternoon.
**Q. Phone calls from?**
A. Anonymous people.
**Q. Any idea how your phone number was out there for people to call?**
A. Yes.
**Q. Tell me?**
A. Ty Masterson gave it to everybody.
**Q. And how do you know that?**
A. I saw it on social media.
**Q. Okay. How do you know Ty Masterson, if you do?**
A. I don't.
**Q. Okay. Do you have any understanding as to how Ty Masterson would know who you are?**
A. Yes.
**Q. And what's your understanding of that?**
A. It's speculation.
**Q. Tell me what you suspect.**
A. Betty Ebert who ran for school board a couple times before and is currently the chair for the Riley County Republicans either contacted him



directly or Brad Starnes directly is what I think happened.
**Q. Have you done a postmortem to figure out who screenshotted your comment?**
A. I have a general idea based on what people have said.
**Q. Tell me what -- tell me what you understand, understanding that you don't have personal knowledge.**
A. At public comments at school board meetings, a man named Frank Beer came to public comments. He got three minutes, and he came three or four times and really his whole obsession was that post. And just like you have the timestamps. It didn't match his computer. And he just went on and on and on about this. He's the only person that cared about the screenshots which tells me it was him.
**Q. Any other basis for believing that he's the source of the screenshotting it and circulating it?**
A. General speculation.
**Q. Which is what?**
A. He's part of a Facebook group that, for lack of a better word, likes to harass local women



and other like elected people.
**Q. Okay.**
A. He also ran for school board as well.
**Q. Who was your opponent in the race again?**
A. It's not necessarily opponents. There -- we have at-large seats, and depending on the cycle, there's either three seats or four. And the year I ran, there was a whole handful, but Frank Beer was in that group and so was Courtney Jane Hochman.
**Q. Other than being a precinct committee woman in both Dickinson and Riley County, and the Riley County Democratic chair, have you been politically active otherwise?**
A. Can you define that?
**Q. Holding office?**
A. I've never held another office, no.
**Q. Okay. Supported candidates?**
A. Yes.
**Q. Other than sending campaign -- as in campaigning for somebody? How did you support people for office?**
A. Mostly by helping with things like knocking on doors or as party chair helping them connect with the right people. I ran my own

campaign, so I've talked to other people before about my own strategy and really suggestions of how to look at data. I've probably donated here and there $25 to a candidate, although I couldn't tell you who it is.

**Q. I'll hand you Deposition Exhibit 13. Is this a true and correct copy of an e-mail that you sent to Beth Fultz, September 11, 2025 at roughly 9:55 p.m., true?**

A. Yes.

**Q. Did you know where Beth Fultz was at the time?**

A. No.

**Q. Had you seen her earlier that day?**

A. I don't recall.

**Q. And why did you direct the e-mail to Beth Fultz?**

A. Because she was the person I had kind of the most relationship with at that organization.

**Q. I'll give you what's been marked as Allen Deposition Exhibit 14 which is that same e-mail, but this one has an KSDE.gov warning about external e-mail on it, true?**

A. Yes.

**Q. In other words, this would be what Miss**



**Fultz' e-mail would have looked like?**

A. Okay.

**Q. Who typed the e-mail that we see as Exhibits 13 and 14?**

A. Me.

**Q. And you sent it to Miss Fultz, true?**

A. Yes.

**Q. I'm going to read it, and I want you to tell me if I read it correctly. The body of the e-mail reads Hi, Beth, Please accept my resignation as of today. When I left for my doctor appointment in MHK at noon, I regrettably posted mean words online (then deleted and apologized) the other day and have brought on the hate from a whole bunch of people. Today's been filled with stress and threats of violence against me, and I don't want to bring that negativity to the agency. My apologies, Katie. Did I read that correctly?**

A. Yes.

**Q. All right. Did you mean what you said when you wrote it?**

A. When I wrote it, I was receiving death threats and I was fearful for my life. And what I thought is if I gave them what I wanted, resign



or die, that maybe they would stop threatening me and my family. And my idea was if I gave them what I wanted and I told Beth, it would all stop, but it didn't because there was an out of office reply and she didn't get the message.

**Q. Okay. I appreciate all that information, but you didn't answer the question I asked. Did you mean it when you wrote it?**

A. When I wrote it?

**Q. Yeah.**

A. I was scared.

**Q. That still doesn't answer my question. Did you mean it when you wrote it?**

A. I meant that I didn't want to be killed and if that's what it took, then yes.

**Q. Okay. Was anybody from the Department of Education threatening your life?**

A. Not that I know of.

**Q. Allen Deposition Exhibit 15 is an out of office reply that you got from Miss Fultz' e-mail account, true?**

A. Yes.

**Q. Allen Deposition Exhibit 17 is an e-mail along with -- actually, it's a pair of e-mails. So I want you to follow along with me so that**



**we're talking the same language. On the lower left-hand side of each of these, there's the deposition exhibit number and a page blank of blank and this is of 6?**

A. Um-hum.

**Q. So pages through -- 1 of 6 through 4 of 6 is one e-mail. 5 of 6 and 6 of 6 is the second e-mail. Do you agree?**

A. Yes.

**Q. Okay. So the first e-mail, meaning pages 1 of 6, is an e-mail to you from Wendy Fritz dated September 16, 2025?**

A. Yes.

**Q. Subject line says resignation confirmation, true?**

A. Yes.

**Q. And there was an attachment to that e-mail which had a benefits checklist for employees leaving, true?**

A. Yes.

**Q. And those -- a printout of that attachment is also -- is pages 3 and 4 of Exhibit 17. Do you agree?**

A. Yes.

**Q. All right. Then the second e-mail is**

Page 69

from Ms. Fritz to you on Monday September 22 inquiring about returning your ID card. Is that true?
A. Yes.
Q. Okay. Did you access your work e-mail, your KSDE.gov e-mail account at any time after leaving the office on September 11, 2025?
A. The only access I had to the e-mail was through the work laptop, and it was at the office.
Q. Okay. So that's a no?
A. Correct.
Q. And so you didn't have your work laptop when you left on September 11?
A. Correct.
Q. And you never had it again after that. Is that a true statement?
A. Correct.
Q. I'll go ahead and give you Allen Deposition Exhibit 16 which when I look at it, it looks like this is basically three different things. The first one are text messages that you had with Julie Ewing, first page?
A. Yes.
Q. Second page is text messages you had with Wendy Fritz. Is that true?

Page 70

A. Yes.
Q. And then the last are screenshots of your phone calls with people at KSDE on September 15 of 2025. Is that true?
A. Yes.
Q. Okay. I'm lining these up hopefully so that I understand. So I've got Exhibits 13, 14, 15, 16 and 17, and we can break this down if we need to, but my question is do these exhibits illustrate all of your contacts with anybody from the Department of Education after you left work for your doctor's appointment on September 11th?
A. Yes.
Q. Is there anybody else at the Department of Education you spoke with or communicated with in any way that's outside of this handful of exhibits?
A. I don't recall speaking with anyone else.
Q. Okay. Did you actually speak with Julie Ewing?
A. No.
Q. Did you speak with anybody other than Wendy Fritz and Randy Watson?
A. No.
Q. And you spoke with both Wendy Fritz and

Page 71

Randy Watson, true?
A. Yes.
Q. Okay. Did you ever go back to the office at the Kansas Department of Education after leaving for your doctor's appointment on September 11, 2025?
A. No.
Q. Okay. Your e-mail in Exhibit 13 and 14 says when I left for my doctor appointment in MHK at noon, why did you make your resignation effective at noon as opposed to any other time?
A. I was just scared for my life and I was thinking, oh, they'd see my badge check out. And if she correlated that, she could tell them that that was the last time I was there. And in my mind, I thought that would stop them from harassing me.
Q. Now, on Exhibit 16, page 1 of 4 in Exhibit 16 are screenshots, three screenshots of text messages between yourself and Julie Ewing. Is that correct?
A. Yes.
Q. Julie texted you on Friday September 12 and you didn't respond that day. Is that true?
A. I did respond that day.

Page 72

Q. Okay. And how did you respond to Julie?
A. My first response says who is this?
Q. Okay. If we're looking at this, she reaches out to you --
A. Oh, okay. You're right.
Q. -- on September -- Friday, September 12?
A. Correct.
Q. There's no response from you on that day. She reached out to you again on Monday, September 15, correct?
A. Correct.
Q. And just to close the loop, you had no contact with Julie Ewing between Friday, September 12th and Monday, September 15?
A. Correct. I had to turn off my phone because it was overloaded with spam calls, and so I did not see that message.
Q. And have you had any contact with Julie Ewing -- well, withdraw. Let me ask this. When Julie texted you on Monday, September 15 and you responded who is this and she said sorry, Julie Ewing, there's a long text message after that. Doesn't show that's a different day. How long after, in other words, over what period of time were you exchanging text messages on Monday the

Page 73

**15th with Julie Ewing?**
A. My recollection was it was just this one response.
**Q. Okay. And there's no huge delay between the two?**
A. I don't think so.
**Q. Okay. If you turn the page to 2 of 4 on Exhibit 16, pages 2 of 4 and 3 of 4 are screenshots of your text messages with Wendy Fritz?**
A. Yes.
**Q. Okay. And when I talk about the big break, so if we look on page 2 of 4, the middle picture, there's a -- it shows there was a text from you to Wendy at 7:48 on Monday the 15th, and then a text from Wendy to you at 11:41. It shows timestamped a break in the conversation?**
A. (Nods head up and down.)
**Q. And so what I was getting at on the first page, there's no similar timestamp showing a break in the conversation?**
A. Gotcha.
**Q. All right. So Wendy Fritz reached out to you via text on Friday, September 12 asking if you were okay?**

Page 74

A. Yes.
**Q. All right. And you responded that day about what was going on and that you weren't leaving the house?**
A. Correct.
**Q. All right. Did you have any communication with Ms. Fritz between the text thread at roughly 2 o'clock on Friday afternoon and her reaching out to you at 7:48 on Monday the 15th?**
A. I reached out on 7:48 but I did not have any other communication between then.
**Q. Okay. So hi, Wendy is your voice?**
A. Correct.
**Q. Your 7:48 call is -- or text message, if I need to talk to you, please let me know when -- or let me know when a good time to call is. And the next communication in the thread is at 11:41 a.m., are you available to talk? If so, give me a call.**
A. Yes.
**Q. Okay. And you responded about I'm driving home. Give you a call in ten minutes?**
A. Yes.
**Q. All right. If we look at page 4 of 4,**

Page 75

**your screenshot of your phone call shows a call of up to four minutes with Wendy Fritz on September 15 at 11:51 a.m., agreed?**
A. Yes.
**Q. I don't need to ask what the text messages said, but what was said during your phone call with Wendy Fritz at 11:51 on the 15th?**
A. She was generally concerned with my well-being and wanted to make sure that I was okay and also figure out if I could schedule a time to talk to Randy Watson.
**Q. Anything else you remember specifically being said at that time?**
A. No.
**Q. Okay. I don't want to belabor this and I'm not trying to make things difficult, but this is my one time to talk to you. But I need to know everything you remember being said in that phone call?**
A. That's my recollection.
**Q. Okay. I can't pump the information into you -- well, let me ask. Did you record the call?**
A. No.
**Q. Okay. Make notes from the call?**

Page 76

A. No.
**Q. The phone call was up to four minutes, and I got two things or general topics from your answer which is she was checking to see if you were okay and could you schedule a call with Randy?**
A. That's my recollection.
**Q. Okay. Did you schedule the call with Randy at that point?**
A. Yes.
**Q. Okay. And meaning -- how was it arranged that the call -- that you would talk to Randy?**
A. She said -- I think she generally asked if I was going to be available and that he would call me.
**Q. Okay.**
A. And I recall, well, what phone number because I was not answering calls that I did not know where they were from. And I will say, too, this day that morning, I had gone to get a prescription because I was having extreme panic attack. I'd just been terrorized for days, so my recollection may not be the great because I was just beyond myself terrified.
**Q. In terms of recognizing phone numbers,**

**because if we look at page 3 of 4 in Exhibit 16, there's an exchange about scheduling a call with Randy at 2:15 and she gave you the number that he would be dialing from?**

A. Yes.

**Q. When we look at 4 of 4 in Exhibit 16, the phone call at 12:04 p.m. that appears to be an incoming call, meaning Mr. Watson called you?**

A. Correct. I think that was his cell phone.

**Q. And his name's in your phone?**

A. I put it in afterwards so I would recognize it when they called back thinking that they might have used that same number.

**Q. Okay. From what you've told me thus far, I would conclude that in your call with Wendy Fritz, she gave you Randy Watson's number so that you would know what number he was calling from?**

A. Correct, because I remember telling her I wasn't answering calls unless I knew who they were from.

**Q. So in the phone call with Wendy Fritz, you told her that you weren't answering calls from numbers you didn't recognize. She gave you Randy Watson's number, and you had input it in your**



**phone before Randy called you?**

A. I think after, but I don't recall.

**Q. Okay. Meaning she gave you the number. When you saw that number you --**

A. Answered.

**Q. Okay.**

A. Yes.

**Q. All right. The screenshot says that call was up to 11 minutes. Tell me what -- well, first off, I skipped something on the call with Wendy Fritz. Was anybody else on the line that you know of when you spoke with Wendy?**

A. Not that I know of.

**Q. Okay. So you weren't on speaker phone?**

A. Not that I know of.

**Q. Okay. The next call with Randy Watson at 12:04, was anybody on the line that you know of besides yourself and Mr. Watson?**

A. I'm uncertain.

**Q. Okay. Could you tell whether -- do you know whether either party was on a speaker phone?**

A. I'm certain on the last call I could tell, but this one I'm not sure.

**Q. Okay.**

A. And I don't recall anybody other than



Randy Watson talking on that call, but that's just my recollection.

**Q. Meaning the call at 12:04?**

A. Correct.

**Q. And so that this will make sense when we read this later, the third call happened at 2:15 p.m.?**

A. Correct.

**Q. And that one you believe he was on a speaker phone?**

A. Correct.

**Q. Did you know whether anybody else was in the room with him?**

A. Wendy Fritz.

**Q. Okay. And how do you know that?**

A. I think he told me and I heard her talk.

**Q. Fair enough. I'm going to now for the 12:04 call with Randy Watson, I want you to tell me everything you remember being said during that conversation.**

A. The general beginning of it, I was trying to describe to him what was happening on my end and the threats that I had received and why I hadn't been back, I mean that I was scared, that I had had death threats coming my way, that what I



was seeing, like I'm not sure what's happening on my end. The phone calls were all anonymous or spoofed. The e-mails that I saw were just all kinds of -- some of them were real, some of them weren't, some of them were just, hey, you need to resign, some of them were awful. So I didn't know what he had seen and what he had experienced. And I remember letting him know like I'm getting death threats, and he was pretty indifferent about it. And I remember telling him that I'm not sure what is going on. I wanted to talk to legal counsel. And he was asking me like how long is that going to take, and I said I don't know. I don't have anybody to call. He was trying to tell me that he had had thousands of calls and e-mails. And when I was describing to him like what I was experiencing, that it was some kind of harassment and a lot of fake stuff. He told me he, oh, he'd verified everything that had came to him, every phone call, every e-mail and he's going to need to do something quickly. How soon could I talk to somebody, legal counsel. I kept telling him I don't know. And he said something to the effect, well, I'll let you figure that out and then we'll talk again soon. That was the basis of the

conversation. I don't recall anything else other than him telling me he's got to do something quickly. And we did not speak about anything with a resignation, nothing. It was just about what had happened and how to move forward.
**Q. Okay. Did you take any notes of the conversation?**
A. I probably did.
**Q. Do those notes still exist?**
A. Maybe. I've got a whole pile of different little scrap paper here and there all over my office.
**Q. Okay. Did you record the call with Randy Watson?**
A. No.
**Q. The 2:15 call, did you record that call?**
A. No.
**Q. This is closing a loop, so it's going to sound like a dumb question. Did you hear anybody else's voice during your 2 -- 12:04 phone call with Randy Watson?**
A. I don't recall anyone else.
**Q. Okay. I've got a text message from Wendy Fritz at 1:47 asking to schedule a call from -- or with Randy at 2:15, true?**



A. Yes.
**Q. And you got a call from the number Wendy Fritz told you he would be calling from?**
A. It wasn't that number. But because it was 2:15, I answered it.
**Q. Did you hear any voices besides Randy Watson's and Wendy Fritz' during the 2:15 phone call?**
A. Not to my recollection, no.
**Q. Okay. Tell me everything you remember being said during the 2:15 phone call.**
A. It was pretty brief. Randy was saying we're going to have to do something. You need to resign. And I said, no, I'm not resigning. He said, well, we need to do something. I need to do something quickly. I said I'm not resigning. And that went back and forth for just a couple minutes. He kept telling me you need to resign, and I said no. And then he just ended it with we're parting ways, and he handed the phone over to Wendy.
**Q. Okay. What else was said when he handed the phone over to Wendy?**
A. That they would send me a letter today or that day about my end of my employment. And I



asked them, well, what are you going to put in that letter, and he refused to tell me but he said I would get it at the end of the day. And then he had Wendy start telling me about things that needed to happen to end my employment. Beyond the letter, she needed my badge back and was there anything in my office that I needed, and I told them there was some food there that was in the drawers but I didn't want it back.
**Q. When you say he handed the phone to Wendy, again, was it --**
A. He stopped talking.
**Q. You anticipated my question. Thanks.**
A. Sorry.
**Q. That's fine. On page 4 of 4 of Exhibit 16, across all of the screenshots on that page, the voice mail icon shows 43 voice mails. Is that typical for you?**
A. I typically have some, but there were way more in here, because some of them people threatening me did leave voice mails.
**Q. Okay. So what's typical for the number of accumulated voice mails on your phone versus what we see at the 43?**
A. I have a friend that likes to leave a



voice message every few days, and I usually check it once a week. I don't clear them off very often. Sometimes I read them and I don't clear them. I don't know. At least 20 or so voice mails.
**Q. I'm looking at mine. I've got 31 right now.**
A. Yeah. Text messages, I've got a thousand something.
**Q. But on mine, my desk also rings over to my cell phone, and if I don't pick it up, my voice mail is the caller you are, I get the voice mail notification, so I have dozens of those things, probably three of them today.**
**You said you were going to -- the conversation entailed getting a letter by the end of the day. Did you get a letter by the end of the day?**
A. No.
**Q. Okay. Was there any discussion in either phone call about a suspension?**
A. I asked for one.
**Q. Okay. In which phone call?**
A. I don't remember.
**Q. Did you mention in any of your phone**

Page 85

**calls on September 15 the fact that you had e-mailed a resignation to Beth Fultz on the 11th?**
A. No.
**Q. Okay. Why not?**
A. Because I got that out of office reply. And by Saturday when I realized what had really happened with Ty Masterson and others doxing me, I realized that I didn't have to resign because I wasn't actually going to be killed.
**Q. Do you have any basis for the suggestion that Randy Watson knew of your resignation e-mail to Beth Fultz when you were talking to him on the phone on the 15th?**
A. No.
**Q. Do you have any reason to suggest that Wendy Fritz knew of your resignation e-mail to Beth Fultz when you spoke with her on the 15th?**
A. No.
**Q. Okay. When we look at Exhibit 17, this one, page 1 of 6 on Exhibit 17, Ms. Fritz' e-mail to you on September 16 and it's timestamped at 4:47, the text, the first paragraph in the body of the e-mail, the Kansas State Department of Education has received and accepted your resignation which you submitted to your director**

Page 86

**via e-mail on Thursday, September 11, 2025 at 7:55 p.m. Central Time, you submitted your resignation at 9:55 p.m., true?**
A. Correct.
**Q. So 7:55 would have been Pacific time?**
A. Probably, yeah.
**Q. Do you know where Beth was?**
A. No.
**Q. Did you know she was on the West Coast?**
A. No.
**Q. Okay. How long after September 10, 2025 did people address your comment at school board meetings at Manhattan?**
A. I'm sorry, can you say that again?
**Q. How long did people address your Facebook post during school board meetings?**
A. There were four different meetings where at least one person commented.
**Q. Okay. So each meeting for two months? You meet twice a month?**
A. Correct.
**Q. Allen Deposition Exhibit 18, this is a page out of the Rule 26 Disclosures provided to me by your counsel. At the top of Exhibit 18, it's No. 4, this appears to be a screenshot and**

Page 87

**enlargement of a, I still call it a tweet, from Ty Masterson's account, true?**
A. Yes.
**Q. Okay. And it's referring to a vote by the school board asking you to resign. Is that the first school board meeting after the events of September 10 and 11?**
A. Yes.
**Q. Okay. So at the first board meeting back, the board voted to ask you to resign, true?**
A. They passed a resolution.
**Q. Okay. Did you resign?**
A. No.
**Q. Did you resign any position on the board?**
A. Vice president.
**Q. Okay.**
MR. COOPER: Let's take another short break. I'm going to pull up another set of questions. This is going to be a topic shift for you. So don't need a long break.
(THEREUPON, a recess was taken.)
BY MR. COOPER:
**Q. Back on the record after a break. What effort at reemployment did you make aside from securing your current part-time employment at the**

Page 88

**American Institute of Research?**
A. I applied for jobs that whole time. I couldn't tell you how many different resumes I put in, but mostly through LinkedIn and Indeed. I had been previously connected to a group called Hiring Our Heroes for military spouses, and they had provided like different things you could read for tailoring your resume, how to get your resume seen through AI, those kinds of things, just the general what kind of help can I get to figure out how to get a job and applying through LinkedIn, maybe Indeed.
**Q. How many applications did you put in?**
A. A wild guess, 20 to 30.
**Q. Doing what?**
A. Most everything, I tried to find something that was related to my professional background, so working in education, but there's not much left. So there was some Ed tech things I applied for. Anything that was kind of online, remote work that was research related. I think there was a job at Gallop. Once I applied for a place called -- I forget what it was but it's Jonathan Haidt. He wrote the Anxious Generation. He has a non-profit. I applied for that. Amazon

Page 89

warehouse in Manhattan was about -- there was one or two that I went for that weren't related to my background but that would have been local, the Area Agency On Aging was local. Yeah, and really anything I could find online that somewhat matched my background.
**Q. Did you apply for unemployment?**
A. After KSDE?
**Q. Yes.**
A. No.
**Q. Why not?**
A. I felt traumatized. I didn't want to get back online and deal with anything that had to do with KSDE.
**Q. Were you offered any employment other than the American Institute of Research?**
A. No. I had a contract that I started in 2024 that finally came through, and so I spent a few months finishing that project.
**Q. For your consulting business?**
A. Yes.
**Q. How much was that contract for? I'm needing to determine how much, if any, it offsets with respect to your KSDE employment.**
A. The total was 18,000.

Page 90

**Q. Okay. And then over what period of time did you work on that $18,000 contract?**
A. Really started in 2024, but there was a series of events that made it so we never signed the contract and I stopped work. And then they reached out again maybe in October. So I'd say the total amount of time from initial to end was probably two months.
**Q. Okay. And how much after September 15 of 2025?**
A. Can you clarify?
**Q. How much time did you work on it after September 15 of 2025?**
A. Probably half of it.
**Q. Have you seen a physician or other healthcare professional for any damages you claim to have sustained as a result of your separation of employment from the Department of Education?**
A. Yes.
**Q. Who?**
A. Dr. Bradley Harrison.
**Q. And what is -- who's Doctor Harrison to you?**
A. My general physician.
**Q. How many times have you seen Doctor**

Page 91

**Harrison since September of '25?**
A. Twice.
**Q. For what?**
A. So the first time was that annual wellness check. I had already had that scheduled with him on that Tuesday, the 16th. I had a conversation with him that Monday morning because I was having a severe panic attack, so he gave me a prescription for Propranolol. And then after that he advised therapy, but I don't have health insurance or anyway to pay for that. And then the last time I saw him was, again, I think it was a wellness check, but it may have been for -- I don't remember what it was for.
**Q. The conversation about getting the prescription, was that on Monday morning?**
A. Yes. And that's where I was when I told Julie -- Wendy I was driving. Walgreens drive-thru.
**Q. So you were filling the prescription you'd already been given by Doctor Harrison?**
A. Correct. And he takes a subscription model which is why I get to see him without health insurance.
**Q. Have you had any communication with any**

Page 92

**employee of the State Department of Education since September 16 of 2025 -- withdraw. Let me -- that's not fair because you had the e-mail from Wendy Fritz about your badge. How did the badge get returned?**
A. I put it in the mail maybe about a week later.
**Q. Did you have any communication with anybody from the Department of Education since that September 22 e-mail from Wendy?**
A. One way communication.
**Q. Which was what?**
A. In a professional capacity reaching out to Jake Steele to see about scheduling a meeting for services which he never responded to. And that was a few weeks ago.
MR. COOPER: Let's go off the record.
(THEREUPON, a discussion was had off the record.)
MR. COOPER: We're back on the record after a short break where I went through and made sure we have Exhibits 1 through 21.
BY MR. COOPER:
**Q. Ms. Allen, what damages are you claiming in this action?**

Page 93

A. Lost wages and future wages.
**Q. Are you claiming emotional distress damages?**
A. I don't -- I don't recall.
**Q. Okay. If I'm to assume that you're claiming emotional distress damages, what do you believe your emotional distress would be based on?**
A. Multiple things. One would be just the severe harassment that happened in advance, and the other would be the reputation damage based on all the information that was put out about Randy Watson firing me.
**Q. Okay. That's a fair point. Do you have any information, meaning personal knowledge, that Randy Watson ever told anybody that you'd been fired?**
A. I don't have any personal knowledge.
**Q. Okay. And in fact, he didn't fire you but he accepted your resignation, right?**
A. That's not the conversation we had.
**Q. Well, is there anything more to that conversation that you haven't already told me?**
A. He asked me to resign multiple times and I said no. As you mentioned, too, we did have the conversation about being suspended. I asked

Page 94

him if he could do that instead of letting me go, and he just wouldn't answer. And then he kept trying to tell me to resign and I said no, multiple times over and over, and he ended it with we're parting ways.
**Q. Who put in the world anywhere the fact -- words to the effect that you had been fired?**
A. I saw it first on social media, and I think it was Ty Masterson or a media report.
**Q. Okay. Do you agree that the Department of Education did not put out any press release regarding using the words to the effect that you had been fired?**
A. I never saw a press release from KSDE.
**Q. Okay. Are you able to refute the following statement: The only public statement made on behalf of the Department of Education was that you were no longer employed by the department?**
A. I believe that's all I've seen from their quotes.
**Q. Okay. I asked you earlier if we -- if I did anything to bother you in any way to bring it to my attention then and there. You haven't brought anything to my attention. Have we gotten**

Page 95

**along?**
A. Yes.
MR. COOPER: Those are my questions. Thanks.
(THEREUPON, the deposition concluded at 4:13 p.m.)

Page 96

SIGNATURE

The deposition of KATIE ALLEN was taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the deponent will read and sign the transcript of said deposition.

Page 97

AFFIDAVIT

STATE OF ______________________________:
COUNTY/CITY OF ______________________:

Before me, this day, personally appeared, KATIE ALLEN, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition, along with the attached Errata Sheet, if changes or corrections were made.

___________________________
KATIE ALLEN

SUBSCRIBED and SWORN to before me this __________ day of ___________________, 2026 in the jurisdiction aforesaid.

___________________ _________________
My Commission Expires Notary Public

Page 98

DEPOSITION ERRATA SHEET

RE: APPINO & BIGGS REPORTING SERVICE, INC.

FILE NO.: 79375

CASE: KATIE ALLEN vs.
RANDY WATSON, et al.

DEPONENT: KATIE ALLEN

DEPOSITION DATE: 04/27/2026

To the Reporter:
I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.

Page 99

PAGE:LINE FROM TO REASON

SIGNATURE:__________________ DATE:_________
KATIE ALLEN

Page 100

CERTIFICATE

STATE OF KANSAS
COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the parties, and attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 11th day of May, 2026.

___________________
Sandra S. Biggs, C.C.R No. 0716