IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KATIE ALLEN,
Plaintiff,
vs. Case No. 2:25-CV-02556-EFM-JBW
RANDY WATSON, KANSAS
COMMISSIONER OF EDUCATION, in his
official and individual capacities,
Defendant.

DEPOSITION OF
RANDALL WATSON,

taken on behalf of the Plaintiff, pursuant to Notice to Take Deposition, beginning at 10:03 a.m. on the 30th day of April, 2026, at Fisher, Patterson, Sayler & Smith, LLP, 3550 Southwest Fifth Street, in the City of Topeka, County of Shawnee, and State of Kansas, before Ksenija M. Zeltkalns, RPR, Kansas CCR No. 1461.



APPEARANCES

ON BEHALF OF THE PLAINTIFF:

Mr. Mark V. Dugan
Ms. Heather J. Schlozman
Dugan Schlozman, LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
913.322.3528
mark@duganschlozman.com
heathis@duganschlozman.com

ON BEHALF OF THE DEFENDANT:

Mr. David R. Cooper
Ms. Crystal B. Moe
Fisher, Patterson, Sayler & Smith, LLP
3550 Southwest Fifth Street
Topeka, Kansas 66606
785.232.7761
dcooper@fpsslaw.com
cmoe@fpsslaw.com



ALSO PRESENT:

Ms. Katie Allen
Mr. Scott Gordon, General Counsel
Kansas Department of Education



INDEX

Certificate ------------------------------ 178

WITNESS

ON BEHALF OF PLAINTIFF: PAGE
RANDALL WATSON
Direct-Examination by Mr. Dugan 6
Cross-Examination by Mr. Cooper 172

EXHIBITS

WATSON DEPO EXHIBIT NO.: MARKED
No 22 Screenshot from Katie Allen Facebook Page 60
No 23 Text Messages 66
No 24 Text Messages 71
No 25 Text Messages 84
No 26 September 12, 2025, E-mail From Nancy Walrafen 89
No 27 September 11, 2025, E-mail From Brad Starnes 97

No 28 September 11, 2025, E-mail
From Megan Steele 100
No 29 September 11, 2025, E-mail
From Danny Zeck 105
No 30 September 11, 2025, E-mail
From Michelle Dombrosky 109
No 31 September 12, 2025, E-mail
From Anthony Gaertner 113
No 32 Call Log 142
No 33 September 15, 2025, E-mail
From Deborah Bremer 143
No 34 September 15, 2025, E-mail
From Shane Carter 146
No 35 September 16, 2025, E-mail
From Beth Fultz 160
No 36 September 16, 2025, E-mail
From Wendy Fritz 160
No 37 Text Messages 162
No 38 August 21, 2025, Meeting Invitation 172
.
.
.
.
.
.



RANDALL WATSON,
Called as a witness on behalf of the Plaintiff,
having been duly sworn, testified as follows:
DIRECT-EXAMINATION
BY MR. DUGAN:
**Q. Can you state your name for the record, please?**
A. Randy Watson. My legal name is Randall Watson.
**Q. My name is Mark Dugan. I represent Katie Allen and we're here to -- to ask questions about her lawsuit against you as the commissioner. Have you been deposed before?**
A. Yes.
**Q. How many times?**
A. Four or five.
**Q. I don't need to know the details of those, but can you just kind of give me the context of what were those depositions?**
A. Lawsuits against school districts when I was superintendent.
**Q. Have you been involved --**
A. Lawsuits here as commissioner.
**Q. How many lawsuits have you been involved with as commissioner in which you were a named defendant?**



A. I'd have to ask my general counsel the number.
**Q. A number of them though; you're not sure how many?**
A. No. A number.
**Q. All right. Well, then you're probably familiar with generally how depositions go, but I ask questions and you respond. And you and I should try to not talk over each other because she's taking down our words and if we talk over each other, that's a problem for her. I don't know how long we'll be here. I don't think we'll be here till 5:00 but if you need a break just ask for it and that's fine.**
**There -- Mr. Cooper may make some objections to some of my questions, and for the most part his objection is for the record and you can go ahead and answer the question except in probably the unlikely circumstance that he tells you not to answer the question. Also, if I ask questions that are unclear, which may well happen, I want you to ask me to clarify my question because I want to make sure that you and I are on the same wavelength and that you're answering the question that I intend to ask.**



**What's your current -- are you currently the commissioner of education?**
A. Yes.
**Q. Are you you're intending to retire?**
A. Correct.
**Q. When is your intended retirement date?**
A. June 1 of 2026.
**Q. When did you decide to retire on June 1?**
A. I announced to the state board of education at their regular meeting in September of 2025.
**Q. When was that? When in September?**
A. We meet the second Tuesday and Wednesday of the month so I'd have to look at the calendar, see what that date was.
**Q. How long have you been commissioner of education?**
A. I'm finishing my 11th year. I was actually hired in 2014. I was still superintendent in November of 2014. I did some work, had some vacation time, and then officially began my duties on July 1 of 2015.
**Q. And how did you get that job?**
A. I applied for the job and was selected.

Page 9

**Q. Is it a -- who hires for that job?**
A. State board of education.
**Q. Okay. So you're not a political appointee?**
A. That's correct.
**Q. And does the state board of education have authority over hiring and firing a person in your position?**
A. They have -- yes. Yes.
**Q. Do you have what you would consider a superior in the hierarchy? Would that just be the board of education?**
A. Board of education.
**Q. During your 11 years have you received any pressure from the board of education that you've felt like put your job in jeopardy?**
A. State board -- and I -- and the state board is elected on a four-year cycle, so I've had many state board members over that tenure.
**Q. And they are a political person?**
A. They are political, yeah, and they run partisan so they run as republicans or democrats or independents. They always have opinions. I don't know. So I -- the word pressure I'm not sure, but they always have opinions that they

Page 10

share with me.
**Q. So there have been times when one board member or another has been unhappy with you?**
A. Yes. Or unhappy with something I may have done.
**Q. Do you meet regularly with the school board?**
A. Every month.
**Q. And what -- what do those meetings consist of?**
A. They're a policy-driven board, so we take to them item of policy to implement concerning the schools of Kansas. So those would be around accreditation, licensure of teachers and what we call standards, a lot of people call it curriculum, but it's what would be taught in schools, like should we teach two plus two in second grade, as an example.
**Q. Have you ever worked on a campaign of a board of education candidate?**
A. No.
**Q. Have you ever run for office yourself?**
A. No.
**Q. Are you a Republican or a Democrat?**
A. I'm a registered Republican.

Page 11

**Q. What's your educational background?**
A. How far back do you want me to go?
**Q. What post high school degrees do you have?**
A. I have three, a bachelor's of science in history.
**Q. Where did you get that?**
A. Kansas State. I have a master's in school administration, Kansas State, and I have a doctorate of school administration, also from Kansas State.
**Q. All right. When did you get your bachelor's degree?**
A. 1981.
**Q. And your master's degree?**
A. 1984.
**Q. And your doctoral degree?**
A. 1990.
**Q. Do you have any legal training?**
A. No.
**Q. When you took office in 2015 did you have to take an oath?**
A. I don't recall.
**Q. Do you know who your successor will be?**
A. Yes.

Page 12

**Q. Who will it be?**
A. Dr. Jake Steel.
**Q. What is Constitution Day?**
A. What is Constitution Day?
**Q. Right. Is that something that you've observed?**
A. Both as a teacher, yes, and I've actually been a part of multiple state Constitution Day that's been run here by a judge in Johnson County.
**Q. What is it?**
A. What is that event?
**Q. Yeah. I don't know anything about it.**
A. Okay. Judge Wonnell in Johnson County, his brain child was to conduct a mock trial for a third grade -- of a third grade student running in the hallway and we conduct that for all the third grade classes in Kansas and then they get to decide whether or not the person is guilty. Last year we expanded that to multiple states and this year I know he hopes to have all 50 states involved in that.
**Q. You said you don't have any legal training. What's your understanding of the First Amendment of the Constitution?**
A. Like any other layperson's understanding

Page 13

would be.
**Q. Can you describe that for me?**
A. Which part? The first --
**Q. What does it protect?**
A. Freedom of speech, freedom of religion, freedom of expression.
**Q. Do you know what the limits are on freedom of speech?**
A. No.
**Q. Do you know what First Amendment rights you have yourself in your position?**
A. Generally.
**Q. What are your First Amendment rights?**
A. That I have the right to express myself.
**Q. Do you have the right to criticize a politician in your official position?**
A. I think there are limits to that.
**Q. Do you know what the limits are?**
A. I would seek counsel advice on that.
**Q. Do you think you have rights separately, not as a person in your official position but as a private citizen?**
A. I, again, I think there's limits on that.
**Q. What are the limits on that?**
A. Again, I'd seek legal counsel on that.

Page 14

**Q. Would your answer be the same if I ask you what you think Katie Allen's First Amendment rights are? And let me clarify, what were Katie Allen's First Amendment rights when she was employed at the department of education?**
A. Oh, I think she -- if you're asking whether she has First Amendment rights, is that your question?
**Q. Yes.**
A. Yes, she has First Amendment rights.
**Q. Do you think she had a First Amendment right to comment on Charlie Kirk?**
A. I think she has First Amendment rights.
**Q. We'll come back to that. How would you describe your job, your function, as commissioner of education?**
A. My job is to advise the state board of education. My job is to advise the state board of education on policy matters involving operation of schools in Kansas and also we run an agency at the same time to do that work.
**Q. Do you promote the interests of the agency?**
MR. COOPER: Object to form. Vague. Go ahead.

Page 15

A. The word promote, I don't know that I promote the agency. I -- I work with the agency. I promote education in general in Kansas.
BY MR. DUGAN:
**Q. Do you -- do you work with the legislature to try to promote funding for public education?**
A. Oh, yes.
**Q. How do you do that?**
A. During the legislative session, I delegate some of this, so we have people that are over there every day, but I, from time to time I'm there on any number of bills including funding for education.
**Q. Who else in the department of education does that kind of work?**
A. Frank Harwood's the deputy commissioner. He's assigned to do that work, so he is our legislative liaison and he's the one that's there every day during the legislative session.
**Q. Frank Harwood is his name?**
A. Frank Harwood, and his analyst is Gabby Hull. She would join him.
**Q. Okay. So these, with respect to the legislature anyway, Frank Harwood, Gabby Hull and**

Page 16

**you are kind of the face of the agency. Is that fair to say?**
A. Well, there would be other people from time to time. So Frank Harwood and Gabby Hull would be there on a daily basis because that's their job duties. I would be there if I so desired or was requested as would, we have another deputy commissioner, Renee Nugent, and that would be true for her. And from time to time there are directors who are asked to go testify on a particular part of a bill that they have particular expertise in, like for example an assessment, a state assessment.
**Q. You know Katie Allen, I take it?**
A. Yes.
**Q. And how -- you've worked with her?**
A. Yes.
**Q. Worked with her when she was employed at the department of education?**
A. Yes.
**Q. And you worked with her also before she was a --**
A. Yes.
**Q. -- department employee?**
A. Yes.

**Q. What -- describe that to me?**
A. Yeah. So the federal government has two major entities, I'll call them, that serve all states, and one of those entities is called a Comprehensive Center, and they're awarded the ability then to work with states on priorities that the state has.
**Q. I'm sorry. You're talking about a federal agency?**
A. It's a federal -- it's a federal -- it's not an agency. So it works for the U.S. Department of Education. They let the grants, I'll call them grants, to Comprehensive Centers. That can be universities, it can be entities such as education interest entities, and then they get those contracts and those are up every several years. I don't know the cycle. And so the Comprehensive Center of the last cycle, prior to this cycle, was done primarily through McREL, the organization of McREL in Colorado, and then they can sublet to other agencies throughout that, and they did that through several things and I got to know Katie during that time. She did some work for them.
**Q. When she was a McREL employee?**



A. I don't know who employed her because again, there's some sublets. I just know -- I just call it the Comprehensive Center.
**Q. How long have you known her?**
A. Without looking at records I don't know, but a number of years.
**Q. Were you involved in the hiring of Katie Allen at the department of education?**
A. No.
**Q. Did you know about it?**
A. Yes.
**Q. Did you offer input?**
A. I offered that she had done good work at the Comprehensive Center and when the position came open, that that might be someone they would be interested in talking to.
**Q. Who made the decision to hire her?**
A. Beth Fultz and Julie Ewing.
**Q. What's Beth Fultz's job?**
A. She's the director of career standards in assessment.
**Q. What's Julie Ewing's job?**
A. She's assistant director of assessments.
**Q. Is it your understanding that the two of them made a decision together to hire Katie Allen?**



A. They would have made a recommendation. How they arrived at that, they may have had a team involved in that interview. I'm not sure of their interview process. They would have made a recommendation to human resources and then human resources would have probably offered the job.
**Q. Okay.**
A. The only people I get involved with hiring are the deputy commissioners.
**Q. How many deputy commissioners are there?**
A. Two.
**Q. Who are they?**
A. Frank Harwood and Renee Nugent.
**Q. When HR makes an offer then to the person, is that kind of a rubber stamp operation?**
A. I'm unclear by your definition of rubber stamp, so if you could be.
**Q. Well, you said Beth Fultz and Julie Ewing and whoever else they work with on the committee would make a recommendation to HR. In a situation like that, does HR generally make the offer to the person who's being recommended?**
A. Generally; yes.
**Q. You offered your resignation as commissioner to the board of education in 2023.**



**Is that correct?**
A. I don't believe that is the correct date.
**Q. When was it?**
A. Again, I would need to look so I'm -- it may have been 2022.
**Q. Okay. Why did you do that?**
A. Because I had given a virtual presentation and I had said something that may have offended some people and I tenured my resignation to them.
**Q. You -- I've read a little bit about it and you said I think something to the effect of, "People coming to Kansas from someplace else, California maybe, should be more afraid of Indians than they are of tornados." Is that about what you said?**
MR. COOPER: Object to form.
A. No, but.
BY MR. DUGAN:
**Q. What did you say?**
MR. COOPER: I objected to form. You can answer the question. Go ahead.
A. I had some family members who were talking and I was making a reference to young kids coming to Kansas and I'd made reference to Native

Page 21

Americans and that was the context of it, of what they said.

BY MR. DUGAN:

**Q. What's inaccurate about the way I described it?**

A. I don't think you portrayed maybe the entire sequence of what happened.

**Q. Was what I described, though, the central statement that upset some people?**

A. If you could rephrase that I'll be happy to answer that.

**Q. You made a presentation, I think a virtual presentation or an online presentation?**

A. That's correct.

**Q. To a group, and in that you described family members coming to Kansas, that people that were afraid of tornados. Is that right?**

A. Correct.

**Q. And I think you were saying well, tornados the danger is not that big maybe. You should be more afraid of attacks by native --**

A. They had said both of those. That was their concern coming from California.

**Q. They mentioned both tornados?**

A. Yeah.

Page 22

**Q. And Indian attacks?**

A. Yeah.

**Q. And you were saying -- you were downplaying the damage of tornados. Is that right?**

A. No. I don't remember that being that way. No.

**Q. What do you remember about it?**

A. I think I just told you what I remember about it.

**Q. Why were people upset about it?**

A. I think some people thought that that was not of a proper statement to represent Native American population.

**Q. Some people thought it was racist?**

A. I don't know whether people thought that was true or not.

**Q. Did you think it was racist?**

A. I thought it was inappropriate.

**Q. When you offered your resignation did you write a letter?**

A. Yes.

**Q. What did you say in the letter?**

A. That I resign, that I tenured my resignation.

Page 23

**Q. Did you say why?**

A. I don't have it in front of me so I don't remember exactly what I said.

**Q. The board of education did not accept your resignation; correct?**

A. They voted not to accept my resignation.

**Q. Do you know why they did that?**

A. You'd have to ask them.

**Q. Did you have discussions with them before they voted to do --**

A. No.

**Q. -- to not accept -- you did not?**

A. No.

**Q. Did anyone describe their vote, the reason for their vote to you?**

A. No.

**Q. Did you ever talk with any board of education members about that?**

A. About their vote?

**Q. About the whole episode, your comment, your resignation, their vote?**

A. I talked to them about tendering my resignation. I mean when I handed it to the -- to the board.

**Q. Do you remember --**

Page 24

A. Or to the board chair.

**Q. Did you tell them why you were resigning?**

A. I don't remember that conversation.

**Q. Did you tell them you didn't really want to resign but you were offering it?**

A. No. Because that was not my intent.

**Q. Your intent was to resign?**

A. That's correct.

**Q. Did you -- did you have any intended job prospects after that?**

A. I wasn't thinking about that.

**Q. So they, the board did not accept your resignation offer and -- but they suspended you. Is that right?**

A. They took that action. Correct.

**Q. How -- for how long did they suspend you?**

A. 30 days.

**Q. When you retire from your position as commissioner of education, do you have plan to do any other work or do you -- what are your plans for retirement?**

A. I don't know. It's one time in my life I don't know what I'm going to do when I grow up.

**Q. Do you have any political ambitions?**

A. No. Zero.

Page 25

Q. During the episode of your comment and resignation and the board's not accepting it, were there any calls by the public for you to resign or be fired?
A. I don't know.
Q. Not that you're aware of in any event?
A. Not that I'm -- well, I'm aware of the governor's statement that I should resign.
Q. Governor Kelly said that?
A. That's correct.
Q. Did any -- anyone write to you or call you and say, "I think your statement was inappropriate and you should resign"?
A. Yes.
Q. How many -- who did that?
A. Some individuals.
Q. Private individuals?
A. Yes, I mean.
Q. Other than the governor did any public officials say that you should resign?
A. Not to my knowledge.
Q. Did any of them say that you should be fired?
A. Again, I would -- I'd have to go back and read the governor's statement, but that may have

Page 26

been part of her statement. I would have to check that.
Q. What was Katie Allen's job when she was hired at the department?
A. She was a data -- in technical terms she was a data analyst in our research department, specifically assigned to at-risk and there would be some other things but primarily. An at-risk bill had been passed and we needed someone to lead that work.
Q. And do you remember what --
A. I probably need to define what at-risk is.
Q. Yes.
A. Yeah. So there was a bill passed in the Kansas legislature that established that -- that we had to track the academic performance of students who were below grade level, that would be the term at-risk, and it was going to be tied to some funding. It was a very complicated mechanism and so we'd set up a pilot group of school districts that were going to try some things out that would lead then to where we're at today which is more -- all school districts being involved with, and Katie was going to lead that effort.

Page 27

Q. You said she was going to lead it. Who worked with her on that?
A. Well, there would be many people that would work with her on that. Top person that would lead that effort would have been Frank Harwood and -- and Renee Nugent but her direct supervisor, Beth, would have led the work.
Q. And you said Beth's job was the director of career standards and assessment. Is that right?
A. Assessment. Um-hm.
Q. What does that mean? What did she do?
A. She oversees the curricular standards of the agency. She oversees -- the divisions or the teams that report to her are the standards which are mathematics, social studies, career and tech ed. She also has all the state assessments, ACT, SAT, all the assessments students would take, and then she leads the research and design team, which Katie would have been a part of.
Q. Okay. So that team is -- Beth Foltz leads that team?
A. She's the head of that team. Correct.
Q. I want to show you what was marked yesterday as Allen Exhibit 10. This is a position

Page 28

description for Katie Allen's job as a research analyst; correct? Actually, let me give you a different one. I might have written on that one.
A. I apologize. Did you have a question?
Q. Did I identify that correctly? Is that what it is?
A. You're saying this is the job description for?
Q. Yes.
A. It appears that that is correct.
Q. The current classification job title in the upper right corner of the first page says Research Analyst, below that it says proposed job title if title change, Senior Education Research Analyst. What -- what does that mean?
A. That's just the title of the position that she was going to have. They changed -- they changed the title of the position at the time this was written.
Q. So she was hired in as senior education research analyst. Is that right?
A. That would be my understanding of this; yes.
Q. Does that fit your recollection?
A. I don't really have a recollection of the

Page 29

job title exactly.
**Q. But that would be your guess based on what's on this job description?**
A. That would be what I would assume based upon that. Correct.
**Q. Have you ever seen this job description before?**
A. Yes. I see every job description. I would have signed this job description. I don't draft the job description but I do see them.
**Q. Who does draft them?**
A. This would have been drafted within her department, Beth Foltz, HR, and maybe because her direct supervisor is listed as Julie Ewing too, Julie would have had some input into this too. But it comes from the department of which the job is posted.
**Q. Julie Ewing is Beth Foltz's supervisor?**
A. No. No, Julie is under Beth Foltz as an assistant director.
**Q. Can you turn to the second page of this, please? There's a table in the middle of the page that lists percentages of things that the person in the job would do. Have you reviewed this before?**

Page 30

A. Only at the time that I would have approved it.
**Q. All right. If you would please take a minute to just look at those percentage in the descriptions and let me know if that is accurate and according to your understanding?**
A. When you say accurate according to my understanding, accurate according to what's on the paper?
**Q. I want to know if what is on the paper is an accurate or fair description of what Katie Allen's job was?**
A. I believe that to be correct.
**Q. All right. So the top two categories there, evaluates educational policy and research and then designs and coordinates research and program evaluation of projects, those are essentially research categories that a person could do in a room or in a -- without meeting with people. Is that correct?**
A. No.
**Q. Why not?**
A. Well, coordinate, as it says you're going to be coordinating that research with other people within -- within -- you're going to be

Page 31

coordinating that.
**Q. With other people on the team?**
A. Well, designs and coordinates research and program evaluation projects would include coordinating broader than just the team. Project can include multiple teams, could include school districts.
**Q. The next, the second from the last box here says, "Provides guidance to Kansas school districts in the use of at-risk funds"?**
A. Um-hm.
**Q. What does that mean?**
A. She's the primary person that would help establish for school districts how they're going to use the at-risk funds. At the current time that this position went into effect we were at a pilot phase. The pilot phase has since ended but she would be the point person. I don't know if that's the correct term. She would be the lead person on giving that guidance to school districts and working with school districts to make sure that they use those funds in accordance with the law.
**Q. Do you know how much contact she had with school districts?**

Page 32

A. Well, I do not. I would assume very little just because of her length of tenure with us.
**Q. If she had stayed for a longer period of time, do you know how much contact she would have likely had?**
A. Yes. I can tell you what -- the person currently in that job has -- at least 25 percent of their time is directly working with school districts to make sure that they're in compliance with the law and they're in compliance with -- and the law has changed a little bit this year, even, in the legislative session.
**Q. Who is the current person in that position?**
A. Brooke Wells.
**Q. Was she hired from within the agency or from outside?**
A. Outside.
**Q. Did you ever hear of any complaints about Katie Allen by anyone from school districts that she worked with?**
A. No. But again, there's a limited time, but that's not unusual one way or the other.
**Q. What's not unusual?**

Page 33

A. I mean for school districts to comment on employees is not something that gets to my level a great deal.
**Q. You wouldn't -- you would be unlikely to hear about that?**
A. Well, sometimes, but it's not standard procedure.
**Q. Who evaluated or would have evaluated Katie Allen's performance?**
A. A combination of Julie Ewing and Beth Foltz.
**Q. During the time that she was there did they prepare any performance evaluations of her?**
A. I am unaware of that.
**Q. Are you --**
A. I don't know.
**Q. Are you aware of what they thought of her performance?**
A. No.
**Q. Did you have an opinion of her performance?**
A. No.
**Q. How much did you work with her while she was there?**
A. I didn't work with her at all. I met

Page 34

with her a few times but I didn't work with her.
**Q. Did she do any traveling in that job?**
A. In the time that she was employed with us?
**Q. Yes?**
A. I'm not -- I don't know. I don't have any knowledge one way or the other.
**Q. Does Brooke Wells do any traveling in her job?**
A. Yes.
**Q. What did -- tell me about that?**
A. She meets with school districts. She meets -- she, in fact, last two Fridays ago met with all the curriculum leaders in the state of Kansas to go over the at-risk funding model and -- and how they were to adhere to the law. She led that discussion.
**Q. Was Katie Allen in a position where she was promoting the interests of the agency to the public?**
A. That would have been a part of her position. That's the 25 percent.
**Q. The 25 percent were about working with school districts?**
A. Correct. That would have been her role.

Page 35

**Q. And that, just to clarify what that is, that would be -- that would involve communication about use of at-risk funds. Is that right?**
A. Well, it's a whole -- so the at-risk -- the law is tracking a set of cohort groups. So school districts have to identify students who are not doing mathematics or language arts at grade level. That's called a cohort. They had established a cohort. They then had to track that over time and they had to use at-risk funding for that. And if that group of students over time didn't make significant gains in the current law, then funding would be removed going forward for those school districts. Katie's job was to design that research, conduct it, and make sure school districts were in compliance with that and articulate that to them.
**Q. So make sure they knew what they needed to do to maintain funding. Is that right?**
A. Well, it's bigger than that, but that's part of it.
**Q. Okay. How's the agency funded? By the legislature, I take it?**
A. It's funded by resources that -- the Kansas legislature provides money. The U.S.

Page 36

Department of Ed, or I'll just use -- say federal because some of our money, like in child nutrition and wellness comes from department of agriculture, and then we have some grant money.
**Q. Grant money from foundations, private foundations?**
A. No.
**Q. Who -- who gives grant money?**
A. Federal department of education. During COVID there was a series of money released. So they're usually somewhat -- sometimes competitive, sometimes noncompetitive, grants released to states to do certain purposes.
**Q. Do you or does someone else in the agency lobby the legislature for funding?**
A. Doctor Harwood leads that effort.
**Q. Did -- who prepares the budget for the agency?**
A. Oh, Dr. John Hess.
**Q. All right. And then --**
A. For the operation of out agency. So we are also a flow through for all the dollars that go out to school districts. So that money is allocated by the Kansas legislature or the federal government, comes to us, and then it flows out to

Page 37

school districts. That is not part of our -- that is separate from our agency budget.
**Q. The agency budget is -- the money that's used to pay you, to pay employees, to run the office, that kind of thing?**
A. (Nodding.)
MR. COOPER: You need a verbal response there.
BY MR. DUGAN:
**Q. That's another thing I forgot to say that you --**
A. I didn't know there was a question.
**Q. Well, in any event, if I do ask a question, try to respond yes or no rather than nodding your head.**
A. I hope I've been doing that.
**Q. You have been.**
A. Okay.
**Q. But if you don't, it's hard for her to take that down.**
A. Okay.
**Q. Although now I'm --**
MR. DUGAN: Can you tell me what my last question was?
THE REPORTER: Question: The agency

Page 38

budget is -- the money that's used to pay you, to pay employees, to run the office, that kind of thing?
BY MR. DUGAN:
**Q. I was on the way to a question. That money to run the agency, to maintain the agency's budget, Frank Harwood works with the legislature to make sure that that funding is in place?**
A. Dr. John Hess crafts that budget and then he would -- he would present that in the Kansas legislature along with Doctor Harwood.
**Q. Does someone work --**
A. Each year.
**Q. Does someone work with the U.S. Department of Education to make sure that that funding is secure?**
A. Yes.
**Q. How does that work?**
A. Well, we get an allocation from both the federal government each -- each legislative session as the state legislative session, and that process is authorized by Congress.
**Q. Do you or does someone else in the agency work with Congress, either Kansas representatives or Kansas senator, to make sure that funding is**

Page 39

**secure?**
A. Yes.
**Q. Who does that?**
A. Well, on a big stage there's an organization called the -- the acronym is CCSSO, Chief Council of State School Officials I believe is the title, and they represent all state agencies, so that. Directly in our agency, Dean Zajic is our federal liaison to the federal side.
**Q. What's his job?**
A. He's federal liaison for the federal money that comes in to the agency.
**Q. Oh, that is his job?**
A. Um-hm.
**Q. The federal liaison. All right. Did Katie Allen have any role in securing funding from either the federal government or the legislature or from grants?**
A. No.
**Q. Katie Allen at some point made a comment on Facebook about on somebody's post about Charlie Kirk. You're aware of that I take it?**
A. I never saw that post but other people have said that.
**Q. Have you still not seen the post? Even**

Page 40

**today?**
A. Have I -- I've seen what people have sent me. I've never seen -- you're asking me if I saw the Facebook post or the Instagram or wherever it was originally posted, no.
**Q. All right. I'm going to show you then what was marked earlier in the deposition. This is Allen Deposition Exhibit 12. Have you seen this as part of an e-mail that anyone sent to you or any place else?**
A. Yes.
**Q. When did you first see this?**
A. It's kind of blurry.
**Q. It is kind of blurry.**
A. So I'm assuming, but in general in looks like something that was sent to me in an e-mail.
**Q. Well, I was going read it to you but it's a little blurry. What -- when did you first see this?**
A. I believe it was sent to me in an e-mail, I believe, late in the evening on September, excuse me, September 10th.
**Q. The evening that she posted it?**
A. I have no idea because I never saw the original. I'm just, I think you asked me when I

Page 41

knew of it.
**Q. Right. And do you remember who sent you the first e-mail that you saw about it?**
A. I do not.
**Q. Do you remember whether it was a member of the public or a public official?**
A. It was a member of the public. It was someone I did not know.
**Q. And when you saw it, what was your reaction?**
A. That we probably need to investigate this further. People e-mail me or text or call me on a variety of issues, so that was my first kind of thought. "Oh, need to look into this further," to this person's complaint.
**Q. Before this post happened, did you know who Charlie Kirk was?**
A. I was -- I knew of Charlie Kirk; yes.
**Q. What did you know about it?**
A. That he -- he went to college campuses and that's about it. I didn't know a whole lot about him.
**Q. Did you ever see any videos of him talking or conversing at college --**
A. That's not something I follow.

Page 42

**Q. And we need to make sure, just to keep a clear record, I want to make sure that I get my complete questions out --**
A. Oh, I'm sorry.
**Q. -- before you respond because that's hard for her to take that down.**
A. I apologize.
**Q. I think you said you have not seen videos. Is that right?**
A. I have not. I'm sorry.
**Q. And you even now since Charlie Kirk died, you haven't seen videos of him on college campuses?**
A. I have since then. I've seen videos of his assassination since then, the actual assassination itself.
**Q. Have you seen any video of him, before this, the assassination, talking with students?**
A. No. I have not.
**Q. Do you have an opinion about Charlie Kirk?**
A. I do not.
**Q. Once you looked into this matter, did you have an opinion about what Katie Allen said about Charlie Kirk?**

Page 43

A. I'm not the one that did the initial investigation into that. So when I got it --
**Q. And to be clear, when I'm talking what about she said, I'm talking about this comment that you can kind of read here that says, "Well deserved".**
A. Okay.
**Q. Who did the investigation into that situation?**
A. I turned that over to three people to look into, Wendy Fritz, our director of human resources; Denise Kahler, our director of communication since it was a -- seemed to be some kind of social media post; and our legal counsel, Scott Gordon.
**Q. Sorry, Scott Gordon?**
A. Scott Gordon, legal counsel, general counsel for the agency.
**Q. Is Scott Gordon an employee of the department of education?**
A. He is.
**Q. Why did you turn it over to an investigative team?**
A. My schedule was really busy. This came in. It's pretty typical, someone complains, I

Page 44

usually refer it to a department that it was in. In this case it was a social media post so I asked our people to look into it and tell me what they find -- what they found.
**Q. Does the department of education have a policy about use of social media by employees?**
A. I don't know without looking.
**Q. What exactly did you ask this investigation group to do?**
A. Just exactly that. Please look into this.
**Q. And when did you make that request?**
A. I believe, believe it would have been the morning of September 11th, early morning. I get to the office pretty early.
**Q. How early do you get to the office?**
A. Usually about 5:30.
**Q. Where is your office in the building?**
A. It's on the sixth floor of the Landon Building.
**Q. How many other persons have offices on the sixth floor?**
A. I have no idea. Many.
**Q. Is most of the department of education on that sixth floor?**

A. No. We're spread out throughout that building.
**Q. Was Katie Allen on the sixth floor?**
A. Yes.
**Q. Do most of the people on the sixth floor come in early like you do?**
A. No.
**Q. Do you know when they come in?**
A. Some come in, start coming in around six o'clock, but most show up around eight o'clock.
**Q. Do you know when Katie Allen generally came in to work?**
A. I have no idea what her time frame was.
**Q. All right. Did the investigative committee, if I could call it that, did they get back to you on what -- after looking into it?**
A. I wouldn't phrase it as an investigative committee, it was just people I asked to investigate it. I didn't form a committee.
**Q. Did you ask them to investigate it together or separately?**
A. I just asked them to look into it.
**Q. Okay.**
A. That was what I'll say. I believe to my recollection what I asked them to do.



**Q. Did any of them get back to you about it?**
A. Yes.
**Q. Who?**
A. All three at various times over the next few days.
**Q. Okay. When Scott Gardner got back with you about it --**
A. Scott Gordon.
**Q. Gordon. Sorry.**
A. I'm sorry I interrupted you.
**Q. No. When he got back with you, would you characterize your communication was in the nature of legal advice?**
A. Yes.
**Q. When -- when did Denise Kahler get back with you?**
A. I don't remember the exact time.
**Q. Would it have been the same day or some time later?**
A. Probably. I don't want to be speculating. I don't know.
**Q. Was it while Katie Allen was still employed at the agency that she got back to you?**
A. Denise Kahler?
**Q. Yes.**



A. Yes.
**Q. All right. When she got back with you what did she say?**
A. That this had been a post on social media.
**Q. Did she have any other commentary about that?**
A. That there seemed to be a lot of reaction to the post.
**Q. And what did she say about that?**
A. That it was primarily negative to people talking about the -- the death of Charlie Kirk.
**Q. Did you have an understanding whether when Katie posted this comment, "Well deserved," she knew that Charlie Kirk was dead?**
A. I have no knowledge one way or the other.
**Q. All right. She doesn't say in this comment that she knows one way or the other whether he was dead; correct?**
A. I don't know how to answer that.
**Q. I'm just, it's just a question at face value. She doesn't say that he's dead; correct?**
A. She says, "Well deserved," it appears.
**Q. And this post doesn't say that he's dead; right?**



A. I can't read the post.
**Q. In the bigger writing under Charlie Kirk's face, says, "Charlie Kirk, right wing activist and media personality, shot in Utah: Report," so the post says that he was shot but it doesn't say he was dead; correct?**
A. The post also says some other things I can't read, so I'm not going to comment.
**Q. Well, I can tell you the quote above his head is a quotation of something he had said earlier.**
A. Okay. But I'm not going to comment on something I can't read.
**Q. Okay. As far as you know though this doesn't -- you can't identify it --**
A. From what I can read.
**Q. From what you can read you can't identify anything in this post that says that Charlie Kirk was dead?**
A. Correct.
**Q. Do you know when Charlie Kirk died in relation to when he was shot?**
A. I do not.
**Q. Did Denise Kahler make any recommendation about what should be done about this post?**

Page 49

A. No.
**Q. When did Wendy Fritz get back to you?**
A. Again, I don't know the specific time.
**Q. Generally when was it?**
A. All three of those people I mentioned would have had conversations with me over the next two or three days at various times.
**Q. When Wendy Fritz talked with you about it, what did she tell you about it?**
A. The initial was we're still looking into it. Unfortunately, we had a longstanding employee that day that we were all at a funeral at that lasted most of the -- of the day in a celebration of her life, so it was in passing, I know at least one of the conversations as we were actually going to that funeral, that it did appear to be a social media post and kind of collaborating what Denise Kahler told me, that they were still looking into it.
**Q. Did she have any recommendation about what should be done?**
A. At that -- no. Not at that -- not at that time.
**Q. Did she ever?**
A. Yes.

Page 50

**Q. What did she say?**
A. Are you asking at any time did she give some advice?
**Q. Yes?**
A. Yes.
**Q. And what was her advice?**
A. That given the disruption to the agency, that we may want to consider no longer having her employed.
**Q. Consider terminating her?**
A. Consideration of that would be a possibility.
**Q. Did she express a personal opinion about the post?**
A. No.
**Q. When was it that Wendy Fritz made that recommendation?**
A. Sometime between the time that I received this -- or that I'd asked her in the early morning, that Thursday early morning, sometime over the next two or three days.
**Q. So her first reaction -- first report to you she just said this is a social media post and she didn't have any particular recommendation, but later then she did have a recommendation. Is that --**

Page 51

A. She didn't tell me she had a recommendation or not. We were walking into a funeral and she just said, you know, "I'm sure we'll talk about it later but it does look like it was indeed a social media post."
**Q. Did she tell you why she was making that recommendation?**
A. Later on?
**Q. Yes?**
A. Not -- okay. We're talking about two different --
**Q. When she recommended that there be a separation, did she say why?**
MR. COOPER: Object to form. Misstates prior testimony. Go ahead.
A. Yes. She -- she did -- she did tell me her rationale.
BY MR. DUGAN:
**Q. What was her rationale?**
A. Severe disruption to the agency operations.
**Q. Anything else? Any other reason for her recommendation that she expressed to you?**
A. Just she went on to explain the

Page 52

disruption to the agency to me.
**Q. Did you experience that disruption yourself?**
A. Yes.
**Q. What did you experience?**
A. Thousand of e-mails, phone calls, comments.
**Q. Did you catalog those e-mails and phone calls? And by you -- let me rephrase that question.**
A. Okay. Thank you.
**Q. Did anyone at the agency catalog those phone calls and e-mails?**
A. I need a definition of catalog if you don't mind.
**Q. Do you -- did someone make a list of who called or e-mailed?**
A. I'm not aware of that.
**Q. You say thousands. Did you count?**
A. No.
**Q. Was that mostly phone calls or e-mails?**
A. I don't know how I would separate the two so I, I don't know the classification of which one would be more.
**Q. Do you manage your own e-mail files?**

Page 53

A. No, not solely.
**Q. Who does that.**
A. My assistant. I mean, I do, but not solely.
**Q. Did you read all the e-mails that came in about this post?**
A. I would have seen all the e-mails. I don't know that I read each one in depth but I -- I looked at each one.
**Q. And how many people called you?**
A. That is difficult for me to answer because my direct line is unaccessible to the public so that -- that is going -- that's going to my assistant or to the switchboard or to other people. It's not -- it's not coming directly to me.
**Q. When you say your direct line, are you talking about a land line at the agency?**
A. Correct.
**Q. Did anyone -- do you have a cell phone, I take it?**
A. I do.
**Q. Did anyone call you on your cell phone?**
A. Not to my knowledge. Not to my --
**Q. About this, I mean.**

Page 54

A. Not to my recollection.
**Q. Did anyone text you about this?**
A. Not to my --
**Q. On your cell phone?**
A. There may have been a Wendy Fritz or Denise Kahler may have texted me.
**Q. Okay. People who had your number --**
A. Yes.
**Q. -- and worked with you, but no one outside the agency texted you?**
A. Not to -- not to my knowledge.
**Q. Did you listen to any voice messages that people left?**
A. I did not.
**Q. What did the agency do with the e-mails that came in?**
A. I'm not sure I understand your question.
**Q. Well, I take it they did not delete the e-mails; correct?**
A. I don't know the policy. Our legal counsel would know, but those are not deleted. I mean those are accessible.
**Q. Well, a lot of those e-mails have been produced to us. Do you know whether there are any left that have not been produced?**

Page 55

A. I assume -- I do not know. I assume of whatever records you asked for, we've given again. I would advise -- I would give that to our legal counsel to make sure that we were in compliance.
**Q. Who was responsible for gathering those e-mails to be produced to us?**
A. Scott Gordon, his office, and he may have authorized our IT department to assist in that, but he would have overseen that.
**Q. Did Scott Gordon have access to your -- to these e-mails himself?**
A. As legal counsel, yes, he has access to all agency e-mail.
MR. DUGAN: We've been going about an hour. Let's take a short break and then and reconvene.
(THEREUPON, a recess was taken.)
BY MR. DUGAN:
**Q. Okay. Let's go back on the record. I meant to ask you at the beginning, how did you prepare for your deposition today?**
A. Had a meeting with legal counsel. They gave me some preparation in terms of just generally how depositions go.
**Q. With Mr. Cooper and Ms. Moe?**

Page 56

A. Yes.
**Q. Did you meet with Scott Gordon?**
A. Yes.
**Q. When --**
A. But I meet --
**Q. You meet with him regularly?**
A. Yes.
**Q. When did you meet with Mr. Cooper and Ms. Moe?**
A. Yesterday.
**Q. How long did you talk with them?**
A. I think they were here, I'm -- I'm going to say my memory, which may not be accurate, was about an hour, 45 minutes to an hour.
**Q. Did you talk with anyone else to prepare for today?**
A. No.
**Q. Did you have any conversations with Wendy --**
A. Oh, well, I've had conversations with Wendy Fritz; yes.
**Q. When have you had conversations with Wendy Fritz?**
A. Again, could you clarify when do I --
**Q. Within the last week --**

Page 57

A. Yes.
**Q. -- have you had conversations with her?**
A. Yes.
**Q. About your deposition?**
A. About the -- the details of this case.
**Q. And --**
A. Not specifically about today.
**Q. Do you remember how long you talked with her about the case?**
A. My recollection is that was probably about 30 minutes.
**Q. When was that?**
A. Yesterday.
**Q. Was that -- was she kind of giving you information about the case or was it more of a discussion about what the two of you recall?**
A. It was more of a discussion of the sequence of events that had occurred.
**Q. Did you look at any documents with her?**
A. No.
**Q. I'm sorry?**
A. No.
**Q. Did she state any opinion about Katie Allen's lawsuit?**
A. No.

Page 58

**Q. Did you?**
A. No.
**Q. When did you learn about the lawsuit?**
A. When it was filed. My legal counsel Scott Gordon informed me.
**Q. I don't want to know what you talked about with Scott Gordon or with the attorneys here at Fisher Paterson, but what was your reaction to the lawsuit?**
A. Probably had multiple thoughts.
**Q. Were you angry?**
A. No.
**Q. What were your multiple thoughts?**
A. You have to -- I'm slowing down for her because I asked her at break and she said I maybe want to pause a little bit more. I -- sad. Here's another lawsuit. I get sued more frequently than I would like on behalf of the agency. That was probably the thoughts I had.
**Q. Did you have any thoughts about whether her claims were correct?**
A. Certainly.
**Q. What were those thoughts?**
A. They were not correct.
**Q. Why did you think they were not correct?**

Page 59

A. You're asking for my lay opinion?
**Q. Yes.**
A. Because I don't believe that I did anything to violate her First Amendment rights.
**Q. Why do you say that?**
A. Because I didn't take any action based upon her First Amendment rights.
**Q. If you had -- if you had just said to her, "You're fired," do you think that would have violated her First Amendment rights?**
MR. COOPER: Object to form. You can answer.
A. No.
BY MR. DUGAN:
**Q. Why not?**
A. Well, first I didn't fire her so this is a hypothetical. You're asking me a hypothetical; correct?
**Q. Okay.**
A. If we separated from service and that separation of service was because of the disruption to the agency and the ability for her to do her position.
**Q. We'll come back to that. I want to show you a document that was produced to us -- oh, and**

Page 60

**this is not marked so we should mark this one.**
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 22 for identification.)
BY MR. DUGAN:
**Q. Okay. You've been handed Exhibit 22. Have you seen this before?**
A. No.
**Q. Have you heard that Katie Allen posted an apology for her comment?**
A. I -- have I heard --
**Q. Yes.**
A. -- that she did? To the best of my recollection I think she may have told me that.
**Q. All right. So in this post she says, "There's never a rationale for violence of any kind. Gun violence especially has taken a dramatic toll on young lives in the American psyche," and then in the third paragraph down she says, "For anyone who was offended by my words, I deeply apologize." Is this the first time you've seen this or read this post?**
A. That is correct.
**Q. Does either reading this now or knowing about it because she told you about it affect your**

**view of her comment on the Charlie Kirk post?**
A. I don't know that ... I don't know that I have a view on her post or this post.
**Q. Did you ever have any anger about what she said?**
A. No.
**Q. Clearly a lot of people had anger about it; right?**
MR. COOPER: Object to form.
A. I don't know that to be true.
BY MR. DUGAN:
**Q. You got a lot of angry e-mails about it; right?**
A. I got a lot of passionate posts or passionate comments about it. Correct.
**Q. People who were angry about what she posted and said that she should resign or be fired. Is that fair to say?**
MR. COOPER: Object to form.
A. That would be part of, yes, what was called and sent to us.
BY MR. DUGAN:
**Q. But you -- did you share any of that anger?**
A. I didn't have any anger. I thought I



just said that.
**Q. You said earlier that you had met with Katie Allen on a small number of occasions?**
A. Correct.
**Q. Right. I want to show you what was marked as Exhibit 9. Actually, let me trade with you again. This is two pages that were produced to us, one dated September 4, '25 and one dated September 5, 2025, Organizers: Makayla Auldridge. Is Makayla Auldridge your secretary?**
A. Yes. She's my executive assistant.
**Q. Required Attendees: Randy Watson, Katie Allen. So looking at first at this September 4th on the first page, there was a meeting with you that you had with Katie Allen on that date. Is that right?**
A. Correct.
**Q. Do you remember what that was about?**
A. I believe I do; yes.
**Q. What was it?**
A. She had requested a meeting with me to discuss that she was contemplating running for political office beyond her current service on the --
**Q. Okay.**



A. -- and at the school board.
**Q. There was a meeting also on September 8th which is reflected on the second page?**
A. Correct.
**Q. I may have said the 5th. Do you know which one of those was that meeting about talking about running for office?**
MR. COOPER: Object to form. Assumes facts. Go ahead.
A. Both of those were.
BY MR. DUGAN:
**Q. All right. Was any part of either of these meetings having to do with any kind of like welcome to the agency kind of meeting with her?**
A. That was an additional meeting that took place before this time.
**Q. Okay. So there were two meetings, you're saying, about the possibility of her running for office?**
A. Correct.
**Q. Why did you have two meetings about that?**
A. We discussed in general in the first meeting that she was contemplating running for Congress. She had some concerns about the finances, that people were starting to lend some



support and she was probably getting some financial help with that and at some point she would either have to declare or decide and wanted to know kind of have a discussion about employment. I said I'd like to think about it. Complimented her, as I remember, on wanting to do public service and do that.
And then our second meeting which was short, right before our board meeting, I believe I told her that given the nature of running for federal office, the nature of her work, I didn't think she could stay employed with us. We talked about resignation, timing of resignation. Again she indicated, you know, that that decision had to be made fairly quickly because of campaign contributions that may or may not be coming in and what she would have to do with those. And so I wished her well and congratulated her if she went down that road and that was the end of that conversation.
**Q. She hadn't made a decision at that point whether to actually run. Is that correct?**
A. I left the second meeting with the impression she was going to run and that she was going to tenure a resignation to do so. That was

Page 65

my impression.
**Q. Did you ever hear anything more about that from her?**
A. No. But you can look at the sequence of events, timeline.
**Q. And as far as you know she has not filed to run for public office; correct?**
A. I have no knowledge one way or the other.
**Q. Okay. So that second meeting with her was on September 8th; correct?**
A. I apologize. I'm looking at the date. That is correct.
**Q. When did you next meet with Katie Allen, or did you ever meet with Katie Allen again?**
MR. COOPER: Besides today.
BY MR. DUGAN:
**Q. Besides today.**
A. I was going to say I believe this may have been the first time since then that we've actually seen each other.
**Q. Okay. When did you next have a phone conversation with her?**
A. I believe I had a phone conversation with her the following Monday.
**Q. All right.**

Page 66

(THEREUPON, the court reporter marked Watson Deposition Exhibit No 23 for identification.)
BY MR. DUGAN:
**Q. You've been handed Exhibit 23. This is a document that produced -- that was produced to us. This looks like a copy of a cell phone with text messages. Is -- this is not your phone, I take it; right?**
A. I don't know whose phone this is. I have no idea.
**Q. Do you remember this text exchange as you look at it?**
A. No.
**Q. Would you be surprised if I told you it was Wendy's, or someone told you it was Wendy's text stream with you?**
A. No. I know I would have had a text with Wendy during this time.
**Q. Okay. All right. The text in the large blue box says, "Julie hasn't heard from her today. She's going to text her with just the haven't heard from you today question." Do you know what that means?**
A. No, because I don't -- I don't know. I

Page 67

don't know who sent that.
**Q. All right. The date here on, at least in the lower text says Friday, September 12, at 1:33 p.m. So that text that I just read was maybe that day or maybe a previous day; right?**
A. Yes. Prior to the phone call.
**Q. All right. And Randy, that's you, right, with that picture?**
A. That is correct.
**Q. All right. And then your words would be the one in -- the words in gray; right?**
A. I don't know that but I'll assume that. I don't generally look at screenshots of other people's phones.
**Q. How much do you text?**
A. I do text; how often, I don't know how to answer that question.
**Q. Well, assuming that it was you who said good to the -- to the comment she's going to text her with just the haven't heard from you today question. Does that, seeing that, your response saying good, does that refresh your recollection at all about what this was about?**
A. I have a recollection of what we tried to do on Friday.

Page 68

**Q. What -- what did you try to do on Friday?**
A. We tried to find out why she has not come to work. We had not heard from her. And I was extremely worried because not in the too distant past, we had an employee who actually passed away in his home and we didn't know about it for a week and then we found him and -- and we hadn't -- we had not -- no one had heard from her. She had not shown up to work. On Friday I was inquiring with people have we heard, has anyone heard from her. I was doing that with several people.
**Q. Why did you notice that she wasn't there?**
A. Why did I notice?
**Q. Right.**
A. That she wasn't there?
**Q. Yes.**
A. I don't understand that question.
**Q. Were you thinking about her because of people's responses to her post?**
A. No. I was thinking that she wasn't at work and we had -- and we had no knowledge at that time why she was not at work.
**Q. Okay.**
A. And I was ascertaining if her supervisor

-- had anyone heard from her, because when someone's not at work, you -- I generally ask their supervisor or their supervisor comes to me and says I -- Randy's not as work today, as an example, and I haven't heard from him.

**Q. I actually don't know who this text exchange is with. Would it be Beth Fultz?**

A. I ... possibly. Beth was out of the office on vacation and was very difficult to get to, and in fact had had a very rough period in August with some issues with the board and I told her when she left, "Don't read your e-mail, don't -- don't," you know, get away.

**Q. Okay. So it's likely that this is Wendy's texts; correct?**

A. I -- I'm not even going to speculate.

**Q. All right. Did you have discussions with Wendy that day about how to approach Katie?**

A. I had discussions that day as trying to find out if anyone had talked to Katie as to why she wasn't there.

**Q. You had discussions with whom?**

A. I would have talked to HR and possibly Julie Ewing.

**Q. Remind me what Julie Ewing's job was?**



A. Assistant director. Would have been Katie's direct supervisor.

**Q. And did you have discussions with them about different ways to approach Katie to see if you could figure out where she was?**

A. I'd sent an e-mail to Katie that morning asking to meet with me and she had not responded.

**Q. Why did you ask her to meet with you?**

A. Because I was wanting to discuss the issue with her.

**Q. Did you have an idea about what you wanted to say or what you thought the result of that meeting would be?**

A. No.

**Q. You just wanted to talk with her?**

A. Correct.

**Q. Did you --**

A. And --

**Q. Sorry. Go ahead.**

A. Well, I wanted to finish the answer to your question. And I asked the people that I thought she would have called or responded, "Have we heard from her," and I believe I probably would have said to HR at some point, "If we haven't heard from her, I'm going to try to reach out to



her at some point." And again, my concern was we had not seen her. We had not heard from her. And that's unusual for an employee not to show up to work and not notify us as to why.

**Q. Did you later learn why she wasn't there?**

A. In my phone conversation with Monday, she indicated that she did not feel safe leaving her home.

**Q. Did you hear anything about that before your phone conversation with her on Monday?**

A. No.

MR. DUGAN: I want to mark another one.

(THEREUPON, the court reporter marked Watson Deposition Exhibit No 24 for identification.)

BY MR. DUGAN:

**Q. You've been handed Exhibit 24. This is a slightly larger blown-up text exchange. Is this a text exchange between you and Wendy?**

A. I don't know.

**Q. Okay. Well, it says Randy at the top so that's you, right, same blue tie?**

A. I believe so. It's cut off, but I believe so.

**Q. Okay. And then the blue text says,**



**"Received this morning from Katie. Hi, Wendy," and then there's some text?**

A. Correct.

**Q. And so that suggests that this is Wendy's text to you; right?**

MR. COOPER: Object to form.

A. It may suggest that; yes.

BY MR. DUGAN:

**Q. And we don't see the date exactly but it says Monday, so that's presumably the Monday after this the post happened and the letters started to come in, Monday September 15th. Is that correct?**

MR. COOPER: Object to form.

A. I'm not sure I understand your question.

BY MR. DUGAN:

**Q. When did this text happen?**

A. I assume it happened on a Monday.

**Q. What Monday?**

A. I have no idea.

**Q. You assume it's the Monday that you had a meeting with Katie?**

MR. COOPER: Object to form.

A. I don't know that I can make that assumption.

BY MR. DUGAN:

Page 73

**Q. Your response in blue text is, "Stop by my office." Why did you say that?**
A. For us to have a conversation about this text. If that's -- if that's me responding, that would be why I asked her to stop by my office.
**Q. All right. What was your intention with respect to Katie Allen on Monday morning?**
A. Still trying to reach out to her and see how she was doing and see if she was okay, why she wasn't at work.
**Q. On Monday did you have conversations with Wendy about asking Katie Allen to resign?**
A. Yes. Later in that day.
**Q. What do you mean by later?**
A. Well, to my recollection there were two phone conversations with Katie. The first was to talk to her, to ascertain if she was okay. How she was doing. Why she hadn't been at work. I was concerned. And that was -- that was the -- that was the, as I remember, the status of the first conversation.
**Q. First to see whether she was okay?**
A. Yes.
**Q. And once you determined she was okay, what was your plan in speaking with her?**

Page 74

A. Well, that was my plan, just to find out why she hadn't been at work and she was okay and what was happening. Up until that time no one had talked to Katie to my knowledge. Again, Beth was out of town so I didn't know if she had or not.
**Q. Okay. I want to show you what was marked previously as Exhibit 16. And this is kind of a conglomeration of a document of some texts but if you could turn to the third page.**
A. Okay.
**Q. This is a text that Katie Allen produced to -- to your attorneys and it looks like it's a text with Wendy. And Monday, September 15, at 1:47 p.m. Wendy says, "Are you available for a phone call with Randy and I at 2:15?" And she says yes. Do you remember that?**
A. Do I remember the text?
**Q. Do you remember -- well, no. Do you remember scheduling a phone call with Katie Allen?**
A. Yes.
**Q. If you could turn to the next page, this is call logs it looks like. The second one is Randy Watson, incoming call at 12:04 p.m., 11 minutes. Did you call Katie Allen at 12:04 p.m.?**
A. I made contact with her that day. I

Page 75

don't know the exact time but I'm not disputing this time.
**Q. All right. And then the second one doesn't say Randy Watson but it has 785.296.3202 number. Is that your number?**
A. Correct.
**Q. And there's an incoming call. Did you call her then at 2:15?**
A. Correct.
**Q. Okay. So you had two conversations with her that day?**
A. Correct.
**Q. Okay. And what did you talk about in the first conversation?**
A. I think I answered that. I think I gave you that answer.
**Q. Okay. I understood you to say your intent was to find out if she was okay?**
A. Correct.
**Q. Okay. And did you talk about that in your first conversation with her?**
A. Yes.
**Q. All right. What else did you talk about in that conversation?**
A. What was going on with her, how she felt,

Page 76

the communication that we were getting in the office, communication she was getting, things that were just happening.
**Q. And what did she tell you about how she felt?**
A. My recollection that she felt threatened.
**Q. And did you respond to that?**
A. Did I respond?
**Q. Did you -- what did you say to her when she said that?**
A. I don't recall that I said anything except acknowledged her feelings.
**Q. All right. Did she tell you she wanted to find legal counsel?**
A. She did say she was seeking legal counsel.
**Q. What was your understanding about why she wanted legal counsel?**
MR. COOPER: Object to form. Assumes facts. Go ahead.
A. I don't know that we went into why she was seeking legal counsel. I do know that we talked a lot that she felt threatened and that she -- that people maybe had even threatened to harm her or her family. I don't know that we discussed

Page 77

why she was seeking specifically legal counsel.
BY MR. DUGAN:
**Q. And in that first conversation did you ask her to resign?**
A. I don't believe I did. I don't have --
**Q. You asked her to resign in at least one of those conversations; correct?**
A. I -- no, not explicitly.
**Q. Tell me why you say not explicitly?**
A. Are you asking about the second conversation now?
**Q. Either conversation did you ask her to resign or suggest that she should resign?**
MR. COOPER: Object to form. That's compound. Go ahead.
A. Okay. That's a different question. I told her in the second phone call that we were going to separate from service and if she wanted, she had the opportunity to resign and we would take that under consideration but that we were going to separate from service.
BY MR. DUGAN:
**Q. Okay. You're saying either way you're going to separate from service, but you were giving her the opportunity essentially to save**

Page 78

**face by resigning. Is that a fair characterization of what you said?**
MR. COOPER: Object.
A. I'm not going to characterize it. I'll tell you what I said to her. I don't know offering to save face, I wouldn't use those words. I gave her -- I told her she had the option to -- she had the option to resign and that was her decision to make, but that we were going to separate from service.
BY MR. DUGAN:
**Q. Why did you give her the opportunity to resign?**
A. Because I wanted her to have that opportunity.
**Q. And did she tell you whether she would or would not resign?**
A. She told me some extent, I don't remember the exact words, you're going to have to fire me.
**Q. So she did not agree to resign at that point; correct?**
MR. COOPER: Object to form.
A. I don't -- I don't remember the talk about resignation. It seems to me my recollection was, "You're going to have to fire me." She may

Page 79

have said that. I don't recall that specifically, that specific language, but.
BY MR. DUGAN:
**Q. Do you remember asking her how much time she would need to find legal counsel?**
A. I think in the -- in the first phone call I asked what the -- what the timeline was. Or I think we had a conversation and she said she had left a message with legal counsel and no one had gotten back to her. I don't think I asked specifically, "What's the length of time it's going to take you to get legal counsel?"
**Q. Do you remember how long the second conversation was?**
A. It was pretty short.
**Q. Okay. And it's not really a trick question. On the document we just looked at it said five minutes. Does that sound right to you?**
A. It was a short duration. I would -- I would assume that to be correct.
**Q. Okay. And did that discussion about we're going to a separation or resignation, that happened during that five minute conversation?**
A. That is correct.
**Q. How did that conversation end?**

Page 80

A. With -- I turned the end of the conversation over to our director of human resources, Wendy Fritz. She was present in my office when we made that.
**Q. Was she present during the first conversation with her?**
A. No.
**Q. So the first conversation was just you and Katie Allen; the second conversation was you Katie Allen and Wendy Fritz?**
A. Correct.
**Q. On your cell phone?**
A. No.
**Q. On your office phone?**
A. Correct.
**Q. On speakerphone?**
A. Yes.
**Q. And Wendy was in the room?**
A. Correct.
**Q. Did she --**
A. I --
**Q. Sorry.**
A. I didn't answer your first question, if you want me.
**Q. Yes, I do although -- yes. I don't**

Page 81

**remember what my first question was.**
A. I'll wait then.
**Q. What question did you intend to answer?**
A. Well, you asked me what was the end of the conversation, I think.
**Q. Yeah. Okay. What was the end of the conversation?**
A. I turned it over to Wendy Fritz who then walked her through what -- what do you have in the office. What, you know, what personal belongings if any do you have, and there were some conversations about those type of things.
**Q. And why did you turn it over to Wendy Fritz?**
A. Because she's our director of HR.
**Q. And the reason that you turned the conversation over to the director of HR was because there needed to be arrangements for a separation from service?**
A. Well, it was first did she have our devices at her home, because sometimes people take their laptop and things home. So it was more of what did she have here and what did we have there, and yes, at some point we were going to move to separation of service.

Page 82

**Q. The HR person had to take care of essentially the logistical aspects of separation from service?**
A. That is correct.
**Q. Did she tell you in either conversation that she was receiving death threats?**
A. In the first conversation yes. To her and her family.
**Q. Did you think at that point that there was anything that you could do to protect her from that?**
A. I -- I didn't think in those terms of protecting her from -- from those threats. I didn't see there was anything I could do to, to protect her from those threats. Certainly had empathy for her.
**Q. When talking with her about the need that she be separated from service, did you say that that needed to happen quickly?**
A. No. I was giving her time to decide if she wanted to resign.
**Q. How much time did you intend to give her?**
A. We didn't specify a time.
**Q. Did you tell her at the end of the conversation that she would be receiving a letter**

Page 83

**or some communication by the end of the day?**
A. No. Not to my recollection I don't.
**Q. Did you talk with Wendy Fritz after that conversation?**
A. Yes. But Wendy and I have multiple conversations around lots of things every day, so.
**Q. What did you and Wendy Fritz say to each other with respect to Katie Allen after the phone call involving the three of you?**
MR. COOPER: And again, object to form. Vague. On the 15th?
MR. DUGAN: On the 15th; yes.
A. I don't know that we had any immediate conversation after that phone call.
BY MR. DUGAN:
**Q. Did you talk with her at any time for the remainder of that day?**
A. I don't have -- I don't remember.
**Q. Did you talk with her the next day?**
A. Again, my conversations with multiple people that report to me, I talk to them multiple times a day, a week, so I don't know if I did the next day or not. Have to look at my calendar.
**Q. After that conversation, regardless of when it happened, did Wendy Fritz ever make any**

Page 84

**comments to you about Katie Allen's separation from service?**
A. Yes.
**Q. What did she say?**
A. That at some point, again, I don't know if there were other conversations, she -- she let me know that Katie had resigned previously.
**Q. Okay. I'm going to show you Exhibit -- what we'll mark as Exhibit 25.**
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 25 for identification.)
BY MR. DUGAN:
**Q. This is -- well, first of all you've been handed the document. What is it?**
A. What is it?
**Q. Yeah.**
A. I have no idea what it is.
**Q. Do you know somebody named David F.?**
A. Yes.
**Q. Who is that?**
A. I know a David Fernkoph.
**Q. Fernkoph? How do you spell that?**
A. F-E-R-N-K-O-P-H. I don't know. I may be butchering that name.

Page 85

**Q. He's a friend of yours?**
A. He -- he was an employee of ours.
**Q. At the time, or a former employee?**
A. I don't know when this was sent.
**Q. Well, that was one of my questions too. I don't know either. Presumably it was sent sometime after Katie Allen's separation because there's a reference to that. He says, "It has been crazy here. The amount of teachers that have been having issues has definitely risen. Freedom of speech has not gone away but it's definitely being treated differently." Do you remember what he was talking about?**
A. I think you'd have to ask David that.
**Q. Well, my question though is about your memory of it.**
A. I -- I have no memory of this until you presented this to me.
**Q. Now that I've presented it to you, does it refresh your recollection about this conversation with him?**
A. Yes. In general.
**Q. What was the context?**
A. He was asking to meet with me. David was asking for a meeting with me.

Page 86

**Q. Why?**
A. Pardon?
**Q. Why?**
A. We frequently meet after he left us. He's the executive director of the Kansas National Education Association, and so we frequently meet to talk about a variety of topics, education topics. So looking at this, it's probably our attempt to try to set up a meeting, talk about a variety of topics.
**Q. Okay. In that first paragraph that I read he said, "Freedom of speech is not going away," is that in the context of some larger conversation you had with him?**
A. No.
**Q. So you don't remember what he meant about freedom of speech being treated differently?**
A. I think you would have to ask him. Whatever he was going through in his work.
**Q. All right. And then he says, "I was so sad to hear about Katie Allen. She had such great potential. I understand that the damage was done but goodness, one poor step can sure change the direction of one's career." Do you remember seeing that text?**

Page 87

A. I do not.
**Q. As you see it now, do you know what he meant about what happened to Katie Allen?**
A. No, I do not.
**Q. Okay. In your response you say, "Definitely changing times." What did you mean by that?**
A. I don't remember.
**Q. All right. And you don't say anything in your response that we see here about Katie Allen. Do you remember about why you didn't respond about Katie Allen?**
MR. COOPER: Object to form.
A. Because based upon what you're giving me and having no recollection of this, I want that to be clear, David and I oftentimes say we need to get together for a variety of topics. A, I'm not going to comment on a personnel issue with anyone. It is a privilege to have that. And two, I'm just assuming that David is giving me his thoughts and I'm not responding to that.
BY MR. DUGAN:
**Q. Did you have dinner with him after this text exchange?**
A. We -- I don't remember. We met but I --

Page 88

it seems that we had coffee and not dinner.
**Q. All right. What'd you talk about at that meeting?**
A. He was concerned about teachers and -- or if I remember right, licensure issues and whether we were being too tough on teachers in pulling licenses and that type of thing. Whether -- whether our process, legal process, was being too difficult on and nitpicking on teachers, I believe. We -- we have conversations around a lot of topics, and I don't see a date on this so I'm just kind of going by what I'm reading right now.
**Q. And so he was concerned about teachers because he's the head of the teacher's union; right?**
A. Correct.
**Q. During that meeting did he -- did the topic of Katie Allen come up?**
A. I don't recall.
**Q. You're not saying it didn't, you're saying you just don't recall whether it did?**
A. I don't have any recollection of that.
**Q. I want to look at some, there've been quite a lot of e-mails produced to us that people sent in to you or to the agency about Katie Allen.**

Page 89

**Can't look at all of them but I want to look at a few of them and so let's start with this one.**
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 26 for identification.)
BY MR. DUGAN:
**Q. So you've been handed Exhibit 26 and you can read it if you want, but the e-mail address at the top is Nancy Walrafen to Deborah Bremer. Do you know who Nancy Walrafen is?**
A. No. I do not believe so.
**Q. Who is Deborah Bremer?**
A. She is the administrative assistant for the state board of education.
**Q. Is -- is she an employee of the board of education, or the department of education, or is that the same thing?**
A. She is an employee of the state board of education.
**Q. And is her office near yours or your desk near yours?**
A. It is.
**Q. How frequently do you talk with Deborah Bremer?**
A. Generally multiple times a day if I'm in

Page 90

the office.
**Q. And why do you talk with the administrative assistant for the board of education?**
A. Because I also work for the state board of education.
**Q. You have your own administration -- administrative assistant as well; correct?**
A. Correct.
**Q. Do you remember seeing this e-mail or any e-mail like it? And by an e-mail like it, I mean a forward from an e-mail from Ty Masterson?**
A. As I mentioned -- excuse me. As I mentioned, we received thousands of correspondence and so I don't know if I saw this or not.
**Q. And you saw them all but you may not have read them all. Is that what you said?**
A. I would have looked at the contents of each one that came to me, to my e-mail address. I did not study them in detail.
**Q. Did you either keep track on paper or make a mental note of how many of these responses were wanting Katie Allen to be fired or for her to resign and how many of them were in support of her?**

Page 91

A. I kept some mental notes of what came in to me and what I saw, but things like this didn't come to me.
**Q. Because you don't --**
A. Some phone calls didn't come to me, they came to other people in the agency, and I would have no knowledge of those.
**Q. Of --**
A. In general who were positive and who were negative. I can speak to what came in to my e-mail address.
**Q. Okay. Of what came in to your e-mail address or your phone, how many were positive and how many were negative with respect to Katie Allen?**
A. All were negative except one.
**Q. Who was the one?**
A. I don't remember. It came later in the cycle. I don't know without looking.
**Q. What was your reaction -- strike that.**
**What did you think about these communications when they came in?**
A. So -- so I -- it's not unusual for patrons to e-mail us on a variety of topics that they feel passionate about. What was very

Page 92

different about this was the volume. We had never seen volume to this extent. And I'll use this as an example, oftentimes when people e-mail or are passionate about a cause, you can tell that they've copied and pasted and -- and these were almost to a person signed by the person or with a -- with an address or a phone number, and that doesn't usually happen when people complain. So oftentimes I can't tell do they live in Connecticut, do they live in Kansas. If I wanted to get back and answer them, I don't know without doing some investigation. The volume was much greater than anything in my 11 years, almost 11 years as commissioner. And the personalization, and I mean they wrote in almost a personal way of what they felt was very different than anything else I've ever experienced.
**Q. You mentioned Connecticut. Did you -- were most of the responses you got here from people in Kansas?**
A. Yes. Because that's an assumption. And again, I'll use this example you gave me, if someone said, "I live in Leawood, Kansas," I'm assuming, we didn't investigate all those, that that was coming from Leawood, Kansas.

Page 93

**Q. So whatever knowledge you had about where they came from is your -- your assumption based on, for example, how they signed e-mails?**
A. Correct. In some cases they gave us addresses and phone numbers.
**Q. Or if they told you they lived in such and such town?**
A. Yeah. "I'm a grandmother of five kids in Wamego," as an example.
**Q. Were you aware that Ty Masterson sent out a mass e-mail to people?**
A. It became aware to me after the fact. I was told by our communications director.
**Q. And who's your communications director?**
A. Denise Kahler.
**Q. When did she tell you that?**
A. I could not tell you.
**Q. When all these responses came in, people talking passionately about Katie Allen, did it irritate you?**
A. No. It saddened me. But again, in my position people comment on a lot of things, so personally irritated about the comments? No. Because people are passionate about a lot of topics and so I try not to be emotional myself

Page 94

about any of those.
**Q. As commissioner you try to remain dispassionate about these things?**
A. Correct.
**Q. Do you know Ty Masterson?**
A. Yes.
**Q. How do you know him?**
A. He's the president of the Kansas Senate.
**Q. So you -- and you work with the legislature and as part of that you work with the president of the senate?**
A. That is correct.
**Q. Do you have any kind of personal relationship with him?**
A. No.
**Q. You're not friends with him?**
A. No.
**Q. You're aware he's running for governor?**
A. I am aware of that.
**Q. Have you done anything to support his campaign?**
A. I have not.
**Q. If you'd turn to the second page, so this e-mail on the first page to Deborah Bremer from Nancy Walrafen, I believe, forwards an e-mail from**

Page 95

**Ty Masterson. And on the second page he writes, "Charlie Kirk was killed for sharing his faith and expressing his political views. No one should face violence for their beliefs and no one should celebrate it. Our children deserve leaders who model respect and integrity, not division. Senator Brad Starnes, who represents Manhattan, joins me in calling for accountability and we're calling for Allen's immediate removal from her role as the Kansas Department of Education -- at the Kansas Department of Education."**
**Did you have an awareness that Ty Masterson and Brad Starnes were asking -- were demanding that Katie Allen be separated from service?**
A. Yes. I was aware of that.
**Q. How did you become aware of that?**
A. Our communications director had indicated that.
**Q. What else did she tell you about that?**
A. I believe just that, that there had been some kind of communication or social media post or something that came from Senator Masterson and Senator Starnes, I believe also that Senator Starnes may have sent me to me in an e-mail.
**Q. We will get to that. While we're here**

Page 96

**though, the photo of the post that we looked at earlier was very blurry and this one is less blurry?**
A. Yes.
**Q. So could you take a moment read the quote that says Charlie Kirk, 2023, at the top of that post?**
A. You want me to read what's on the post?
**Q. Well, no. Just read it for yourself.**
A. Okay.
**Q. So that you know what it is. And then at the bottom you can see Katie Allen comments, "Well deserved". Do you have any knowledge about who made this screenshot?**
A. No.
**Q. Had you seen this quote before about the cost of gun deaths and Second Amendment rights?**
A. From Charlie Kirk?
**Q. Yes?**
A. No.
**Q. Have you ever seen that before today?**
A. I may have seen it within this post that was forwarded to me. I don't remember reading it to that extent.
**Q. Do you think that Charlie Kirk's**

Page 97

**quotation is inappropriate?**
A. I have no opinion on Charlie Kirk.
**Q. Do you think that Katie Allen's comment is inappropriate?**
A. I have no opinion on that.
**Q. Why not?**
A. I have no opinion on what an employee has to say on social media.
**Q. You mentioned Brad Starnes so let's look at one from him. And this will be 27.**
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 27 for identification.)
BY MR. DUGAN:
**Q. This is an e-mail from Brad Starnes, September 11, 9:11 p.m. Who is Brad Starnes, first of all?**
A. Brad Starnes is a senator and former superintendent in Kansas.
**Q. And he sends this to a number of people including you. Are these people members of the state board of education?**
A. One of them is.
**Q. Danny Zeck is?**
A. That is correct.

Page 98

**Q. Who are the others?**
A. I don't know. I can tell you who I know.
**Q. Okay.**
A. I know Eric Reid is the superintendent in Manhattan.
**Q. Okay.**
A. I know Megan Steele is a representative, and I know of some of the others but I don't know them, so.
**Q. Do you remember receiving this e-mail from Brad Starnes?**
A. I do.
**Q. Did you see it that night when he sent it or the next day when you went to work?**
A. I -- I don't have any knowledge of when I read it.
**Q. Was it your understanding that Brad Starnes was calling for Katie Allen's firing and removal -- excuse me, firing and removal from the USD 383 board?**
A. When I read this, I -- I thought what he said in the first paragraph of his e-mail was different than what was said in what he forwarded to us.
**Q. How do you mean?**

Page 99

A. Well, he obvious -- he says, "As a former superintendent of schools, I understand personnel matters are private but their statements are a public record." What he forwards calls for the firing and removal.
**Q. Okay. So you understood that he was calling, whether in this e-mail or in the press release that he forwarded, he was calling for her firing and removal?**
A. That was my assumption when I read this.
**Q. Did you have any conversations about this issue with Brad Starnes?**
A. I did not.
**Q. Do you know Brad Starnes?**
A. I do.
**Q. Did you have any conversations with Ty Masterson about it?**
A. I did not.
**Q. Did you have any discussions with Jeff Colyer about it?**
A. I did not.
**Q. Did you have any discussions with Megan Steele about it?**
A. I did not, but I believe I received an e-mail from Megan Steele.

Page 100

**Q. What do you remember -- sorry. Let's -- strike that. Let's go to that.**
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 28 for identification.)
BY MR. DUGAN:
**Q. What do you remember Megan Steele e-mailing you about?**
A. Katie Allen.
**Q. And do you remember, you can refresh your recollection here if you want, but do you remember without looking at that what Megan Steele wanted to happen about Katie Allen?**
A. Not without re-reading it. However, again, as I said before, the volume of e-mail that we received, and all those were calling to some extent for her resignation and termination or for some action to be taken, so.
**Q. Did you have any conversations with Megan Steele about this?**
A. No.
**Q. Did you have an e-mail exchange with Megan Steele about this?**
A. Not to my knowledge; no.
**Q. You don't recall responding to her e-**

**mail?**
A. I do not.
**Q. All right. She says, "Doctor Watson, Charlie Kirk was brutally assassinated for standing firm in his faith and political views. KSD employee Katie Allen's remark that his murder was well deserved is disgusting and inexcusable. Anyone who believes a person deserves to die for their faith or political views has no place working for the State of Kansas or any place near our children's education." You said Megan Steele is a Kansas House representative. Is that right?**
A. That is correct.
**Q. Were you aware that she had said any place that Charlie Kirk's murder was well deserved?**
A. I didn't understand your question.
**Q. Had you ever seen any place where Katie Allen said that Charlie Kirk's murder was well deserved?**
A. No, I had not.
**Q. Are you aware of any place where Katie Allen ever said that someone deserved to die for their faith and political views?**
A. No. I'm not aware of that personally.



**Q. Did you say anything to correct or question Megan Steele about these statements?**
MR. COOPER: Object to form. He's already answered that question. You can answer it again.
A. I don't believe I responded to any of the e-mails that we received during that time frame, best of my recollection.
BY MR. DUGAN:
**Q. Do you remember receiving other e-mails from people who had received e-mails from Megan Steele about this issue?**
A. I do not remember, but I will say that a lot of people forwarded me e-mails similar to this or what the statement that Brad Starnes that you gave me.
**Q. Um-hm. And you're also pointing to the Ty Masterson e-mail?**
A. I'm pointing to the Ty Masterson, or the statement that Brad Starnes and Ty Masterson, there were a lot of people that forwarded me things like that.
**Q. All right. Did you have discussions about Katie Allen with members of the board of education?**



A. Yes.
**Q. Who did you talk to -- talk with?**
A. I would have talked to the board chair, Cathy Hopkins, and the board vice chair, Danny Zeck.
**Q. Okay. How many conversations did you have with Katie Hopkins?**
A. Cathy.
**Q. Sorry, Cathy Hopkins.**
A. I don't recall.
**Q. What was the nature of those conversations?**
A. Cathy Hopkins and Danny Zeck and I talk on a given week dozens of times about issues pending before the state board.
**Q. Okay. Do you remember what you talked about with respect to Katie Allen?**
A. I remember generally what those conversations were.
**Q. What do you remember generally about them?**
A. That they were also getting e-mails, and you produced one of those to Brad Starnes that went to Danny Zeck. They were getting e-mails similar to what we were getting. And they were --



and I was keeping them abreast of what we were doing, what we were looking into. They were sharing just the volume that they were getting and they were appreciative of being kept up to date on it.
**Q. Did either Cathy Hopkins or Danny Zeck suggest that Katie Allen should lose her job?**
A. I don't remember that that occurred.
**Q. Were -- did they give you a reaction to her post on social media?**
A. I don't recall that. I just recall discussing at various times over those days just what was happening.
**Q. Did they express any anger or frustration? Sorry.**
A. I want to say this.
**Q. Okay.**
A. A lot of people expressed to me on various phone calls opinions one way or the other so when I -- I don't have any recall of that, but just know that a lot of people are expressing their opinions.
**Q. Did Cathy Hopkins or Danny Zeck express any frustration or anger at Katie Allen?**
A. Not that I remember.

Page 105

**Q. Did either of them express any frustration or anger about the volume of people writing in?**

A. I think they were surprised by the volume and wanted me to know, "Are you getting the same kind of volume we're getting?"

**Q. When you say surprised, were they exasperated?**

A. I don't want to put words in their mouth as to how they felt. I think what they expressed to me was they were surprised by the volume.

**Q. I'd asked it because I think people use the word surprised in different ways sometimes. Did you think that they were displeased about it?**

A. I don't know. Again, I think you'd have to ask them.

**Q. Okay. I want to show you an e-mail from Danny Zeck, and this will be 29.**

(THEREUPON, the court reporter marked Watson Deposition Exhibit No 29 for identification.)

BY MR. DUGAN:

**Q. This looks like on September 11 at 11:56 a.m. Danny Zeck forwards to you and Cathy Hopkins an e-mail from someone named Cameron Ward at USD**

Page 106

**383. Do you know who Cameron Ward is?**

A. I do not, but Cameron Ward I believe was the first e-mail I received on September 10th, if my recollection is correct. As you can see, I received the same e-mail that went to Mr. Zeck.

**Q. In the third paragraph down of Cameron Ward's e-mail he says, "Ironically, Ms. Allen's exercise of free speech was the celebration of the death of a young father who was assassinated because of his life's mission to engage in productive dialogue and free speech." Did you understand what Katie Allen said in her social media post to be a celebration of his death?**

A. I -- I'm having trouble understanding your question because I would have received the same e-mail from Cameron Ward and then forwarded me the next morning, before I had seen anything from our communication other than what was sent to me. So I was forming no opinion at that time.

**Q. Did you read this e-mail from Cameron Ward?**

A. I did.

**Q. But you didn't form an opinion about whether -- an opinion about whether Katie Allen was celebrating Charlie Kirk's death?**

Page 107

A. Again, patrons e-mail me on a variety of causes and they're passionate sometimes. I'm taking that in to find out what is your point of view and I'm not forming any opinion at that point. I'm just gathering information. So that was not my -- I was not thinking anywhere along those lines, making any opinion one way or the other.

**Q. The e-mail from Cameron Ward was sent out to you and others at 9:21 p.m. on September 10th and then Danny Zeck forwards it to you and Cathy Hopkins, although I think you had both received it the next morning or just before noon the next day, September 11. Danny says, "Randy, we need to visit today about this e-mail. Let us know what a good time to talk, Danny." So then you met with Danny after that?**

A. Would not. I don't remember meeting with them. Danny lives in Leavenworth and Cathy lives in Hays.

**Q. Did you have a phone conversation with one or both of them?**

A. I don't recall, but during this time frame I would have had multiple conversations with them, and I'd have multiple conversations with

Page 108

them weekly.

**Q. Did you have conversations with him about what should be done about Katie Allen?**

A. No. I had conversations with him about what he had received and what we -- and what we were seeing in the agency and then what we were -- how we were processing at that time.

**Q. What do you mean how you were processing it?**

A. Well, that I had asked HR and our communications and our legal counsel to -- to review and give me some recommendations back to what we were seeing especially at this time.

**Q. Why were you having these -- I mean you're saying you were having conversations to figure out what to do. Why were you having conversations at all? Why not just ignore it?**

A. Because the state board, my -- one of my roles with the state board is to keep them apprised of issues that may come before the state board. So any issue that comes, and this went to the state board, also went to me, then I apprise them as to what we're doing as an agency relative to whatever event or situation that is.

**Q. Aside from the fact that this is sent to**

Page 109

**members of the state board, why is this an issue that would go before the state board?**

A. It's not an issue that would go before the state board. I mean as a -- as a personnel issue, but obviously they're being contacted because many of the people don't know that Katie works for the agency and not the state board, that's a common misperception, much like local people will be upset with something that happens in their local district and they'll e-mail all the state board members and myself wanting some recourse to discipline behavior of a child because they believe that the state board oversees that. So there's often misunderstanding of their role.

(THEREUPON, the court reporter marked Watson Deposition Exhibit No 30 for identification.)

BY MR. DUGAN:

**Q. You've been handed Exhibit 30. This is, it looks like it's a forward of the same e-mail from Cameron Ward. This one is from Michelle Dombrosky to Cathy Hopkins and Danny Zeck of the board and then you as a cc. Is Michelle Dombrosky a member of the board of education?**

A. Yes, she is.

Page 110

**Q. Do you know her?**

A. Yes, I do.

**Q. Do you have conversations with her?**

A. Yes. As I do all ten members of the state board of education.

**Q. Okay. She says in her e-mail forwarding the Cameron Ward e-mail, "I hope," in the middle, "I hope we're able to look deeply into this and act swiftly on it. This wasn't just an opinion that she had and shared, it was a celebrated post regarding a killing (I would call it an assassination) of an American citizen who lost his life while speaking to a large crowd of people who attended this event to listen to him speak, or who might want to exchange in dialogue that had differing opinions."**

**I got a little lost in that sentence but was it your understanding that Michelle Dombrosky was advocating that Katie Allen be terminated?**

A. I think you'd have to ask Michelle Dombrosky what her intent was.

**Q. Did you ask her?**

A. No.

**Q. Did you respond to this e-mail?**

A. I -- I do not know if I responded or not.

Page 111

**Q. Did you speak with her?**

A. At some point I would have probably spoken to all the board members, but I don't remember if I spoke to her specifically about this e-mail.

**Q. Do you mean you would have spoken with all the board members individually or as a group?**

A. No, I would have -- I would have spoken to the chair and the vice chair and then we would have let them know at some point that we had separated service from Katie Allen.

**Q. Did you -- so those conversations happened after she was separated?**

A. I don't recall any conversations with Michelle Dombrosky prior to separation of service.

**Q. Do you recall any conversations with any members of the board of education before she was -- before Katie Allen was separated?**

A. Yes.

**Q. What do you recall?**

A. That Cathy Hopkins and Danny Zeck, I was apprising them of the status of the investigation and where we were at going along the way. So early on it was the number of -- of e-mails, phone calls, comments that were happening, and that we

Page 112

had -- and that she was not at work and we had not heard from her. That was the early -- early days.

**Q. Did you have any conversations with Hopkins, Zeck, or anyone on the board before Katie Allen's separation about whether she should be separated?**

A. Not to my knowledge.

**Q. Did you have an understanding of what board members thought about whether she should be separated?**

A. I don't recall what Cathy and Danny's personal thoughts were, but people were giving me a lot of their personal thoughts during that time.

**Q. All the people you mean who were calling and e-mailing?**

A. Correct. So they may or they may -- but I don't recall -- I was calling to update them on the process because they were -- because of the volume they were getting and that's -- so they were asking for updates.

**Q. You said earlier that it was going to be necessary that there be a separation. Whose decision was that?**

A. That was a recommendation to me, and

Page 113

ultimately I agreed with that recommendation.
**Q. A recommendation by Wendy Fritz?**
A. And legal counsel.
**Q. And you agreed with it, meaning you were the decision maker on that?**
A. We were all --
MR. COOPER: Object to form.
A. We were all decision makers in that. I would say the final decision we all were a part of that, but obviously discussion with legal counsel was a heavy part of that.
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 31 for identification.)
BY MR. DUGAN:
**Q. You've now been handed Exhibit 31 which is an e-mail from someone named Anthony Garber -- Gaertner at weber health to you, September 12, Friday, September 12th, 5:45 p.m. Do you remember receiving this e-mail?**
A. No.
**Q. Do you know who Anthony Gaertner is?**
A. No, I do not to the best of my knowledge. And I say that because I meet so many people that it's possible that we would have met somewhere and

Page 114

I don't remember who that person is.
**Q. Anthony Gaertner says, G-A-E-R-T-N-E-R, "If she's not removed, I will make it my job to spread the physical address of your immediate family and all innocent young females in your family. We will not tolerate this shit and if you don't think we are serious, then please don't remove Katie. Thanks, very upset and angry American." Did you receive -- do you remember this e-mail at all?**
A. I -- I do not remember this specific e-mail but there were e-mails similar to this.
**Q. Were you concerned about this or e-mails similar to this?**
A. I can tell you in general the discourse in our state, in America, has made me concerned about myself and my family on various occasions. This would be one of those occasions.
**Q. Were you scared about it or did you think it would pass?**
A. No, I was -- I mean we take -- take serious precautions.
**Q. Did you talk any steps to protect yourself or your family?**
A. Yes.

Page 115

**Q. What did you do?**
A. The hesitation to disclose what I do for the security of my family.
**Q. Fair enough. Did you report this to the police?**
A. Report it to our legal counsel.
**Q. Did this e-mail or e-mails like it have any kind of influence on -- on your understanding of the situation with Katie Allen?**
A. I'm not understanding your question. Sorry.
**Q. Did this have any influence on your thinking about whether Katie Allen should be separated from service?**
A. This particular e-mail?
**Q. Or e-mails like it.**
A. No. The -- what prompted our thoughts around this were the volume of e-mail and whether or not she could do her job in her current position, not any particular e-mail or any particular thought.
**Q. Okay. The volume and whether she could do her job.**
MR. DUGAN: I'm well over halfway but why don't we take a break for lunch and then come

Page 116

back. We're not going to be here till 5:00.
THE REPORTER: Do you want to go off the record?
MR. DUGAN: Yeah. Let's go off the record.
(THEREUPON, a recess was taken.)
BY MR. DUGAN:
**Q. Doctor Watson, we are back on the record. Do you have anything that you feel like you need to clarify from what we talked about previously?**
A. I do.
**Q. What's that?**
A. I believe I mentioned one of our researchers is Brooke Wells. Brooke Wells was a student of mine. Brooke is her first name and I can't remember her last name, so.
**Q. Okay. So she's Brooke something?**
A. Yes.
**Q. You're talking about the person --**
A. I apologize.
**Q. You're talking about the person who is in Katie Allen's old job?**
A. Well, she's in our research, and she's taken over that part of the job; yes.
**Q. Okay. It's not exactly the same job but**

Page 117

**she's some of the same function anyway?**
A. Correct. So I apologize. I don't think her last name is Wells.
**Q. Okay. Anything else?**
A. No.
**Q. You talked about the volume of calls and I think you talked about the disruption in the workplace. Is that right?**
A. Yes.
**Q. From this situation?**
A. Yes.
**Q. What was the disruption?**
A. It was that my office, my assistant, and Deborah, because those two offices get called, as you gave with the e-mail, oftentimes they don't know which one to respond to, were overwhelmed. My assistant was worried about her own personal safety. So we had to do some safety to our -- our offices up on the sixth floor. The -- we weren't able to conduct business, normal business, because of the volume. And that was as reported to me. As I mentioned, my direct line is not a public number, so.
**Q. Your assistant, is that Makayla?**
A. Makayla.

Page 118

**Q. And what's her last name?**
A. I'm sorry. I'm going to pause. I told her I'd be better. Makayla is my assistant. Auldridge.
**Q. Okay. Why was she afraid for her safety?**
A. I think you would have to ask her that question.
**Q. It sounds like maybe she was afraid somebody would come to the office to do violence?**
A. I can tell you what she told me.
**Q. What did she tell you?**
A. She indicated that she'd never seen the volume of people who were as unhappy as what she saw with this incident and some of them were like this, like the e-mail that you produced in Exhibit 31.
**Q. The guy threatening your family?**
A. Yes.
**Q. You said interfered with your ability to conduct business. Explain that a little more to me. What couldn't you do?**
A. We had several people in the office, they couldn't do their normal duties, several -- I mean many people in the office, because all they were doing were answering constituents' complaints on

Page 119

multiple days.
**Q. Just about this issue?**
A. Just about this issue.
**Q. Okay. There've been a lot of documents produced to us but very few that show any responses to any of these complaints. Who was responding to these complaints?**
A. I don't believe anyone was responding to the e-mail complaints. The phone complaints were just told that they would -- thank you. Your complaint's being, you know, recognized and if someone deems it necessary, someone may get back in contact with you if you'd like to be contacted. So there was no one directly responding to those complaints. There were too -- and no one could have responded to them.
**Q. So when you're talking about people dealing with constituent complaints, you're talking about telephone calls?**
A. Telephone calls, e-mails, our main switchboard was overrun.
**Q. What do you mean overrun?**
A. The phone call after phone call, just hang up, phone was already ringing, hang up, phone was already ringing.

Page 120

**Q. You said several people couldn't do their duties. Who could not do their duties?**
A. HR department.
**Q. Everyone in HR?**
A. Yes.
**Q. How many people was that?**
A. Three.
**Q. That would be Wendy Fritz?**
A. Correct.
**Q. And who else?**
A. Marisa Seele, and I'm pausing because the other person has changed and I'm not sure when that person would have changed, so there would have been a third person.
**Q. What's your best guess about --**
A. It could have been Mandy, and I forget Mandy's last name, but she's no longer with us.
**Q. Is there a Maddy?**
A. Maddy. I'm sorry. Thank you for correcting me. The switchboard of which Maddy has primarily responsibility to.
**Q. Does --**
A. Legal --
**Q. Sorry. Go on.**
A. Legal counsel and -- was tied up for the

Page 121

most part in dealing with this. Our communication team was constantly looking at social media and tracking and posting or tracking posts and reporting to HR and then to some extent, you know, my work, but not 100 percent.
**Q. Anybody outside of HR besides you and counsel?**
A. Switchboard, counsel, our communications team, and then my office. And my office would be myself, Makayla Auldridge and Deborah Bremer.
**Q. And Deborah Bremer is the board of education administrative assistant?**
A. Yes. That is correct.
**Q. And you said switchboard. Are there people whose job it is just to handle the switchboard?**
A. That's correct. Maddy is the primary person but that -- there are other people that take on that duty when she has to be away for other duties and those could be multiple people, so I don't know who those people would have been.
**Q. All right. So answering the phone with constituent comments or complaints is part of their job; right?**
A. Correct.

Page 122

**Q. And part of counsel's job is to deal with problems that arise; correct?**
A. That is correct.
**Q. And part of your job is to deal with problems that arise; right?**
A. That is correct.
**Q. And most people did not respond to e-mails; correct?**
A. No, to my knowledge no one responded to -- responded to the e-mails.
**Q. But people were answering the phone. Were they told what to say if somebody calls in and is angry?**
A. They have general training about people who are upset.
**Q. And that's -- that's not with respect to this; that's general training?**
A. That is correct.
**Q. Because people call that are upset about various issues; right?**
A. That is correct.
**Q. I was asking you earlier about some of the e-mails that came in and you said we get a lot of e-mails from people about all kinds of issues; right? Some of which don't have anything**

Page 123

**to do with the department of education or the state board of education; right?**
A. That is correct.
**Q. People call about their own local board of education.**
A. That is correct.
**Q. So people in your office then are dealing with calls from people who are upset about one issue or another all the time; right?**
A. On a frequent basis. That's correct.
**Q. What tasks were not completed because of this volume of calls?**
A. During several days of this issue, there were no other tasks being completed by many of those people. This was -- this was 100 percent of what they were doing. That was the intensity of the correspondence that was coming in.
**Q. For how long did that last?**
A. It started with the e-mail that you have given me, you've referenced in Exhibit 30 from Cameron Ward on Wednesday night and continued through around Tuesday of the following week, and then at that point it started to diminish off slowly.
**Q. Did you know that Ty Masterson had asked**

Page 124

**people to call you?**
A. I did not. I did not at the time that he did it. Subsequently communications again shared some of his posts with me.
**Q. And he -- he, Ty Masterson, suggested that people contact Katie Allen, suggested that people contact you; correct?**
A. I believe that's correct. I'd have to see it again but that was my general understanding.
**Q. Did Brad Starnes also suggest that people contact you?**
A. Other than his statement with Senator Masterson, and I'd have to go back and re-read that, I don't believe he did. I think he referenced that it should be handled but I don't know that he asked for people to contact. He may have. I'd have to go back and read.
**Q. Did you have any communication during this period with Jeff Colyer?**
A. No.
**Q. Do you know Jeff Colyer?**
A. I do, yeah, Governor Colyer when he was the governor.
**Q. Do you have any ongoing relationship with**

Page 125

**him since he's been governor?**
A. I do not.
**Q. Are you aware that he posted about Katie Allen?**
A. I was made aware that he had.
**Q. How were you made aware of that?**
A. Our communication team was monitoring that, posts around Katie Allen during that time for things that were being said.
**Q. What does the communications team do as a general matter?**
A. They produce communications for the agency which include internal and external communications so things like newsletters, podcasts, social media feed, etc.
**Q. Okay. Are there newsletters that did not get produced because of this situation?**
A. I don't know if that occurred or not.
**Q. Were there any podcasts that did go out because of this situation?**
A. We only do a podcast once a month, so it wasn't during this time.
**Q. Okay. So it didn't interfere with that?**
A. No.
**Q. Were the communications people able to**

Page 126

**still maintain the social media feed?**
A. I think you'd have to ask them that specific question. What was reported to me is, "We're not getting any of our work done. This volume is so massive we're not getting any of our work done." That's what was reported to me by the people I noted to you.
**Q. Have you ever been in a similar kinds of situation since you've been commissioner where people get upset about some controversial issue?**
A. Yes, I have.
**Q. Tell me about that?**
A. That's a fairly regular occurrence, that someone is upset about something, so I'm not quite sure how to answer when you ask, "Tell me about that," it's not a --
**Q. So it happens frequently in any event?**
A. That is correct.
**Q. What's an example of a controversial issue that you hear from people about?**
A. They may be upset about a law that was passed. They may be upset about, again, something that happened in a school that their child perceived being bullied and they want something to be done about it. Could be a situation around

Page 127

special ed, complaints of law, so there are multiple reasons.
**Q. Lots of things will upset people and when they get upset, they contact the department of education. Is that right?**
A. Often -- oftentimes.
**Q. Oftentimes.**
A. If it's related to education.
**Q. When an issue comes up like that and there's a lot of contact, how long does that contact usually last?**
A. Usually it's a person or two or three people and it -- it depends. It can last a short, be a one-time incident or it can go on for years and lead to lawsuits. I mean, it depends.
**Q. Can you think of any that have gone on for years?**
A. Yes.
**Q. What?**
A. We have lawsuits pending, so those have gone on for years. I would have to defer to legal counsel on the specifics.
**Q. Okay. Well, I don't mean to ask necessarily about lawsuits themselves but I'm asking about members of the public calling in to**

Page 128

**complain, either calling or e-mailing. Is there usually a period where people call and then it slows down and then eventually teeters out?**
A. Again, I think every incident is a little different. So we have incidents of people that call often to complain about similar type of things and they -- they go on for years and then -- and then we have people that call for a specific incident.
**Q. When you were talking --**
A. Or e-mail.
**Q. When you talk about it going on for years you mentioned lawsuits, so aside from whatever is happening in the lawsuits, what is an example of some -- of an issue where people call in about a controversial issue and those calls go on for years?**
A. A sense of discrimination. A sense of they haven't gotten a resolution to whatever their issue was.
**Q. So somebody might call about a specific issue and not get -- not be satisfied and they might call again in a month and maybe in the next month?**
A. Or the issue evolves and grows over time

Page 129

and they're dissatisfied with a response, so they have a response, then they're dissatisfied with that response so it's -- it evolves over time.

**Q. And it's the responsibility of the communications team to deal with those kinds of inquiries?**

A. Not always. They often are looking at media inquiries, so if the media is inquiring about something. Social media, so they're looking at social media all the time to ascertain what's being said about the agency or something about that and some of those would come to them, other of those go to HR, some go our legal counsel, some come to me, some go to our deputy commissioners. It's a variety of people.

**Q. You said that during there was a certain intense period where people were calling about this Charlie Kirk issue and people were unable to do their jobs. They had to just focus on this. Can you identify any specific tasks that went undone because of it?**

A. No, because the reports to me were that they were just not able to do their regular job.

**Q. But you're not able to identify anything -- anything specifically that someone did not do**

Page 130

**because of this?**

A. Well, I don't monitor people's daily work so I couldn't tell you even today what people are -- whether they're doing their normal job or not unless something is reported to me.

**Q. Well, do you know or did anyone report to you that anything went undone, any specific thing went undone because of the Charlie Kirk and Katie Allen issue?**

A. What was reported to me is that they could not get any other work done because of the volume of correspondence.

**Q. Okay. I understand that. I'm trying to drill down a little bit and see if we can find something specific that went undone. And maybe we can't, but can you identify anything specific?**

A. I cannot identify. I think if you interviewed those people, they could possibly tell you within their job duties.

**Q. Are there people within the department of education that you know of who were upset with Katie Allen?**

A. I don't remember anyone.

**Q. You're not aware of her -- of relationships between Katie and anybody else in**

Page 131

**the office being ruined or disrupted?**

A. I'm not understanding your question. I must have understood it differently the first way. If you could restate your question.

**Q. Yeah. Are you aware of anyone, any relationship between Katie Allen and anybody else in the department of education that soured because of what she posted?**

A. I don't know what relationships Katie had with anyone in the office.

**Q. Is there anyone who said that they couldn't work with Katie in the office?**

A. I don't recall anyone having a conversation where anyone said that type of language to me.

**Q. No --**

A. I did have people outside clearly state that.

**Q. Lots of people were upset outside?**

A. I -- I had school people express to me concerns.

**Q. Okay. Earlier I think I asked about school districts and whether any school districts had reported problems with her and I thought you said you didn't know of that?**

Page 132

A. If I did, I misunderstood the context of that.

**Q. So tell me what you mean --**

A. I thought you were asking about her employment and if there were concerns about her employment. I think my response was, at least to the best of how I remember that conversation, is that her tenure with us was short and I didn't have any negative comments come from the school districts that she would have been serving because just, it was too short of an employment. So I was -- if I'm -- if we misunderstood each other, it was because I was referring to her employment time, not the specific situation around Charlie Kirk.

**Q. All right. And a minute ago you said, I believe, that you did hear from school districts. Do you mean specifically about the Charlie Kirk comment?**

A. Yes. That's correct.

**Q. Who did you hear from?**

A. I do not remember. I do remember that some superintendent said to me that, something to the effect of can't believe an employee would make that -- those kind of comments.

Page 133

Q. Did the superintendent say that they thought she should be terminated?
A. They did not specify one way or the other.
Q. Did they say that they didn't think you should tolerate somebody who would make comments like that in the workplace?
A. No. Most superintendents don't offer employment advice to me. They just give me their opinions on things.
Q. That's probably good. Did anyone that Katie Allen worked with outside of the department comment, as far as you're aware, that they didn't want to work with her because of this?
A. It was reported to me that that -- that that had occurred.
Q. What was reported to you?
A. That there had been a few comments made by people who had reservations about working with her in the future.
Q. Do you know what persons those were?
A. No, I do not.
Q. Do you know how I could find out?
A. I think some of the people you're probably going to interview may have some

Page 134

knowledge of that.
Q. You said a few people that said they had reservations about working with her. What do you mean by a few?
A. It's just what was reported to me, that a few people out in the field, for us that means education people, were sharing some reservations with some of our staff, that they might have reservations working with her going forward. I took that to mean a small number.
Q. Are there babies in the office sometimes?
A. Yes.
Q. How often?
A. Depending on -- we have a bring your infant to work policy.
Q. How does that work, that policy?
A. So for the first several months after birth, and I'd have to look at the policy, I want to say six months but then I would probably be wrong, but for the first several months of a birth you are able to bring your child to work if your supervisor okays it and there's no disruption to the environment.
Q. Isn't it always disruptive, though, if somebody brings a baby?

Page 135

A. No. We're in education. We're all about students. So if it's disruptive as a supervisor would deem it to the operations of that unit, then they can deny it.
Q. If a baby cries, that's disruptive; right?
A. I wouldn't call that disruptive.
Q. It's distracting. Is that a word that fits?
A. Depends on where the baby is at when it's crying and who's around it.
Q. Are there any babies in the office now?
A. I do not know.
Q. Have there ever been -- can you think of a situation in which there's been more than one baby in the office?
A. Yes.
Q. How many at once?
A. I do not know that number. We are spread out over multiple floors, in multiple buildings at large and so that's why I don't know.
Q. And when you said that people had -- were unable to do their work, some of the people's job was to answer phone calls, like people who worked at the switchboard; right?

Page 136

A. (Nodding.)
Q. So they were doing their work by answering calls; right?
A. What was reported the to me was that they were -- no other calls -- there was no other -- so we get a lot of calls traditionally around licensure. "I need to renew my teaching license, my principal license." What was report to me was that there was no other calls getting through other than these calls at this point.
Q. But whatever calls came in, they answered them because that's their job; right?
A. That is correct.
Q. And they can't control what calls come in or don't come in; right?
A. That is correct.
Q. How long did this disruption last?
MR. COOPER: Object to form. Asked and answered. Go ahead.
A. I started with the e-mail that I referenced which is, again, indicated in Exhibit 30, which is the e-mail from Cameron Ward late on the evening of September 10th, and it started to subside later or in the next week around Tuesday or Wednesday.

Page 137

BY MR. DUGAN:
**Q. Do you know why it stopped?**
A. No, I do not know.
**Q. You said that the people were saying that most of the calls they received were -- concerned this issue. Did anyone outside the agency report to you that they couldn't get through on the phone?**
A. Not to me directly.
**Q. Do you know whether anybody reported that to anyone?**
A. I do not have any knowledge of that.
**Q. What's your understanding of what caused this disruption?**
A. A -- that there was a some action on social media that Katie had some action with and that people responded to it.
**Q. Okay. So the disruption was people calling. It wasn't necessarily the post itself, it was people calling in about the post; correct?**
A. I don't know how to answer that, when you say it wasn't the post itself. Post is a -- it's an object isn't it? I don't understand your question.
**Q. Can you identify any way in which, aside**

Page 138

**from the fact that a lot of people called and e-mailed, can you identify any way that her comment on social media disrupted the workplace?**
A. I'm sorry. I really don't understand the difference between those two.
**Q. I think you're saying that means that you connect the two, her post and the responses. Is that right?**
A. I think there was a post and a response, and that generated a lot of people then to call or e-mail or text or -- us.
**Q. Okay.**
A. I think that was -- I think there was an event.
**Q. All right.**
A. That occurred.
**Q. And if you can distinguish between parts of this event, on one hand there is Katie Allen's two-word comment on social media, and on the other hand there is the reaction of a lot of angry people to that comment. If you can separate those two, what caused the disruption?**
A. I don't think I can separate those two.
**Q. They go together in your mind?**
A. Well, I don't -- I don't -- I've never

Page 139

analyzed what caused the disruption to that extent. I just know what the disruption was and I know what the events were, but I don't think I've ever analyzed, in your question, what was the specific cause of that disruption. So I've not really thought about that to even answer.
**Q. The disruption you cause is people not being able to do their jobs because of the volume of communications coming in; right?**
A. That's correct.
**Q. Did anyone say, "I can't do my job because I am upset by what Katie Allen said"?**
A. No. They said, "I'm upset because" -- upset's not the right word. "I cannot do my job because of the disruption to the environment."
**Q. And the disruption to the environment was all the communications that came in?**
A. That is correct.
**Q. Is there any other disruption to the job that you can identify?**
A. I'm not sure I understand that question.
**Q. Well, and I don't -- I'm not going for anything in particular. I'm just saying okay, I want to know if there's something else that caused some other disruption in the workplace besides all**

Page 140

**these communications coming in? And there may not be. I don't know of any. But can you identify anything else?**
A. Nothing other than what I've already articulated around this event, if you're just, if you're talking about this event.
**Q. And did the substance of her post impair any operations of the department?**
A. I don't -- I don't know how to answer those questions because you're asking me to form a judgment around the post or the reaction to the post and I have never thought in those contexts. I'm trying to ascertain what I believed was reported to me, and what I saw during that time was an inability of our office to function properly. So I have never spent time trying to analyze the exact question. I think, I believe you're trying to ask me whether it was the post and her response, or the reaction to the response. If I'm understanding you correctly.
**Q. We talked earlier about funding of the agency?**
A. Um-hm.
**Q. And some of it comes from the legislature and some of it comes from the federal government.**

Page 141

**Are there deadlines you have to meet, you, the agency, has to meet in order to secure that funding?**
A. I want to also add that we also have grant funding so there's three sources.
**Q. Okay.**
A. Yes, there are deadlines. Grants would have specific deadlines and reports that we have to do or we have to apply for. Federal government has certain cycles of deadlines, and they vary depending on what part of the federal government that money is coming from. The state cycle happens in the fall where we have to submit our budget in the August-September-October time frame.
**Q. All right. Well, this happened in September. Did -- did this situation cause the agency to miss any deadlines with respect to any of those funding sources?**
A. With respect to funding sources, I don't believe there were any deadlines missed.
**Q. You say with respect to funding sources. Do you mean -- were any other deadlines missed?**
A. Well, you asked that earlier and I don't know. In relation to other people's work, they indicated to me that their work was not being

Page 142

done, and since I don't know what they were doing on that daily basis, I don't know what work they missed. I don't believe we missed any funding deadlines.
**Q. I want to ask about a few other documents.**
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 32 for identification.)
BY MR. DUGAN:
**Q. This -- you've been handed Exhibit 32. Have you seen this before?**
A. I do not believe I have.
**Q. In looking at it, do you know what it is?**
A. No, I do not.
**Q. It looks to me like, I mean at the top it says Calls/E-mails About the Katie Allen Situation. It's dated September 15 and then there are five people listed and then with what the results are, apparently, of their communications. Quinton Nusz wants her to resign. Mike Johnson says she should be fired. Walt Pesaresi says she should be fired. Nancy Walrafen thinks she should not be fired. Steve Wilkins wants to know if your institution supports violence. Was someone asked**

Page 143

**to keep track of these kinds of -- of this information?**
A. I don't have any knowledge of that. I did not ask anyone to keep this information, but I don't know if anyone else did or not.
**Q. You -- and you didn't ask anyone and you don't know who would do it?**
A. Again, I mean, I delegated a lot of work to other people so I don't know who would have asked someone to do this. I don't know who did this.
**Q. Do you have any guess about who would be likely to do it on their own?**
A. I don't know that anyone did it on their own. They may have done it under direction of someone or not. I do not know.
**Q. Okay.**
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 33 for identification.)
BY MR. DUGAN:
**Q. Now I've handed you an e-mail from Debbie, Deborah Bremer to Cathy Hopkins. Deborah Bremer, if I remember correctly, is the administrative assistant for the board. Is that**

Page 144

**right?**
A. That is correct.
**Q. And Cathy Hopkins is the president of the board or chair of the board?**
A. That is correct.
**Q. Have you ever seen this e-mail before?**
A. I have not.
**Q. Okay. The date of this e-mail is September 15 at 8:56 a.m. September 15, that's the same day as the phone calls that you had with Katie Allen that we talked about earlier; correct?**
A. I'm sorry, say that again?
**Q. September 15 is when you and Katie Allen had phone calls?**
A. I believe that to be correct. Without looking back, I'd believe that to be correct.
**Q. All right.**
A. It was that Monday. Yeah, Monday.
**Q. Okay. So this e-mail is the same day and she says, "Lots of closed-door meetings around here." I know you haven't seen this e-mail before but what does that mean, lots of closed-door meetings around here?**
A. Means lots of closed-door meetings.
**Q. Who was having closed-door meetings?**

Page 145

A. I have no idea.
**Q. Were you?**
A. I'd have to go back and look at my calendar.
**Q. Do you remember having closed-door meetings with anyone on that day?**
A. I had conversations with legal counsel that day and conversations with HR that day. I'm not -- so.
**Q. Okay. And --**
A. There's many people around her that could be having closed-door meetings, so I don't know.
**Q. And Deborah Bremer as the assistant administrative assistant would be somebody who would take calls if people were calling in. Is that right?**
A. It could be one of the -- she's not the main line that they would go to, but if they were calling the state board line, it would come to her.
**Q. Okay. And she says, "I haven't had many calls complaining about Katie Allen, just one this morning." By the 15th do you think that was a common experience?**
A. No.

Page 146

**Q. Other people were still getting calls?**
A. Yes. It also referenced that -- she arrives at work at eight o'clock and this was sent at 8:56, so that's less than an hour that she would have been at work.
**Q. Do you know, did you have any conversations with Deborah Bremer about calls she had received earlier about Katie Allen?**
A. I don't recall whether I did or not.
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 34 for identification.)
BY MR. DUGAN:
**Q. You've now been handed Exhibit 34 which is an e-mail from Shane Carter to a list of persons. Who is Shane Carter?**
A. Shane Carter is the director of teacher licensure.
**Q. And who are -- if you look through the list of recipients, who are these people?**
A. These are the people that work in teacher licensure under his guidance.
**Q. Were teacher licensure people receiving phone calls about Charlie Kirk or Katie Allen?**
A. I do not know if that's true or not, but

Page 147

I can tell you what happens if the switchboard gets overrun, oftentimes other phone calls will roll to individuals in teacher licensure, because on a normal day many of the phone calls we receive are around teacher licensure. And I should say, when I say teacher licensure, that's licensure of all certified personnel, so there would be other people involved in schools too.
**Q. He lists five things to -- five ways for people to handle calls that come in about this, about Charlie Kirk. Is this -- do these five pieces of advice come from any policy, any written policy?**
A. I'm not -- I don't -- I don't know that.
**Q. Have you ever seen this e-mail before?**
A. I have not.
**Q. Did you have discussions with anyone in the office about what to do in these calls, document the call, remain calm, don't engage any further, ending the call?**
A. No, I did not. But again, I would delegate those duties out to other people.
**Q. Did you have any calls yourself that you picked up about this issue?**
A. No. As I mentioned, my direct line is

Page 148

not public, so the calls were going out to people in the agency and not to me directly.
**Q. Either to someone else or to voicemail?**
A. Well, generally -- our general policy is we like to answer the phone, so it may roll several times before it finally goes to voicemail because we don't like to do that. That's why I assume in Exhibit 34 that you handed me, it's why he's commenting. Because on Monday the 15th at the end of the day he's saying phones are still rolling to us from the switchboard, and if you get that call here's maybe how you want to respond.
**Q. Do you know who Mina Patron is?**
A. I guess I didn't hear.
**Q. Mina Patron, do you know who she is?**
A. Mina Patron?
**Q. Uh-huh?**
A. I don't believe I do.
**Q. Have you heard any situation about somebody who missed a meeting that was scheduled with Katie Allen?**
A. Yes.
**Q. What do you know about that?**
A. There was a scheduled meeting on Friday that she was to start to have with one of the --

Page 149

part of her duties, and we had to call and apologize and cancel that meeting according to what was reported to me.
**Q. Who called and canceled the meeting?**
A. I do not know that.
**Q. You didn't, obviously; right?**
A. No, I did not.
**Q. Okay. Do you remember what Mina Patron's reaction to that was?**
A. No. And I apologize, I didn't even know her name.
**Q. Okay. I'm sorry. Assuming that that was who it was, do you remember -- strike that.**
**Do you remember what the action was of the person who -- who had the meeting that was postponed?**
A. No, I do not.
**Q. Do you know what kind of meeting it was that was scheduled?**
A. I do not. I don't know the nature of the meeting other than it must have been within the sphere of her job duties and -- and I don't know, other than I was told that there was a meeting that she missed and had to be -- someone had to call, cancel and reschedule.

Page 150

**Q. If it was a meeting within the scope of her job duties, it would likely have something to do with at-risk funding; correct?**
A. Research or within the job duties that she had, I would assume. Again, I don't know without looking at the, whatever the meeting date was or whatever the meeting calendar invite was.
**Q. If there's a meeting like that, it's usually probably likely to be someone from a school district where they may not be complying with at-risk funding criteria. Is that right?**
A. No, that's not correct. That -- I think you're jumping way down the road. Again, her limited employment with us may not have taken us that far yet to that part of her job. It may have been an introduction. It could have been for a variety of reasons. It would have probably related to the scope of her work, but I wouldn't categorize it as you did.
**Q. Okay. You don't know what the meeting was about though; right?**
A. I do not.
**Q. And you don't know how the person reacted when the meeting was postponed; right?**
A. I do not.

Page 151

**Q. Do you know if the meeting was eventually held?**
A. I do not.
**Q. All right. You said earlier that at the recommendation of HR you agreed with -- which you agreed with, you believed that there should be a separation, Katie Allen should be separated from the agency; right?**
A. No, that's not what I said.
**Q. What did you say?**
A. I said upon recommendation of HR and legal counsel.
**Q. She --**
A. That I -- that they were in agreement, and I was too, that there should be a separation of service.
**Q. I'm sorry. I couldn't understand the last.**
A. I apologize. That there should be a separation of service. That was their counsel to -- that was legal counsel to me, and that was also HR's opinion.
**Q. I don't want to know about what legal counsel told you, but why did you agree with that?**
A. Because I rely on advice from legal

Page 152

counsel.
MR. COOPER: Mark, to be fair here so that you understand, he's told you that he got legal advice and what that legal advice is. You need to understand his qualified immunity defense includes an advice of counsel defense. You can inquire as to what that advice was.
BY MR. DUGAN:
**Q. All right. What advice did you get from legal counsel?**
A. That there'd been a serious disruption to the environment and that if we move forward with a separation of service, he believed he could defend that.
**Q. And when you say he, who are you referring to?**
A. Scott Gordon, general counsel for the agency.
**Q. What did he tell you about the disruption to the environment?**
A. That it was significant. It was invasive and it was -- and it was -- was going on for days and days and people were not able to get their work done as was -- that was verified by HR too, or at least reported to me.

Page 153

**Q. Is your knowledge of the disruption that you've talked about primarily from Scott Gordon, from your own experience, or from other people?**
A. Combination.
**Q. All of those things?**
A. That is correct.
**Q. When you say disruption to the environment you mean to the office --**
A. The work environment.
**Q. All right. So you -- you made the decision that Katie Allen would be separated from the agency; right?**
A. That decision was made jointly between legal counsel, HR, and myself.
**Q. All right. And any issue of resignation aside, that would have happened; correct? Based on the --**
A. We were going to separate service. We wanted her to have the opportunity to resign if she chose to do that.
**Q. And her post about -- this was not a performance-based termination; right? Her -- by performance, I mean this is not based on the way that she did her work; right?**
A. Well, it was having an effect on that

Page 154

work.
**Q. The post she made about Charlie Kirk where she said well deserved on that social media post, that post was a primary factor or a substantial factor in the decision --**
A. No.
**Q. -- to separate her?**
A. No. That post had no factor in my decision.
**Q. Why do you say that?**
A. Because it had no factor in my decision on how to factor -- what was factored in my decision was the impact it was having on the agency and what other people were telling me about the amount of work that was not being done.
**Q. All right. Had she never made that post, that impact wouldn't have happened; correct?**
A. Well, I mean that's an assumption I think we all can make.
**Q. Well, the impact that you saw to the agency came from people who were upset about that post; right?**
A. That is correct.
**Q. Would you say that 100 percent of the input you got were people who were upset about**

Page 155

**that post?**
MR. COOPER: Object to form. He's already answered that. Go ahead.
A. No. 100 percent were related to the post. Had everyone read the post? I don't know that to be a fact, or whether they were just responding to someone else's interpretation on social media of the post.
BY MR. DUGAN:
**Q. Okay. Regardless of -- sorry.**
A. But it was around the topic of Charlie -- of that -- of the post.
**Q. They were all around the topic of the Charlie Kirk post and Katie Allen's comment about it; right?**
A. That is correct.
**Q. You didn't terminate her because she wasn't good at her job; right?**
A. I didn't terminate her.
**Q. Okay. But you weren't planning to terminate her because she wasn't good at her job; right?**
A. I didn't terminate her.
**Q. All right. But you weren't planning to; right?**

Page 156

A. I -- we were going to separate from service.
**Q. Okay. But you were not going to do that because of the way that she had been doing her job; right?**
A. A factor in this was that she did not report to work. She missed a meeting. And then the disruption to the environment were all mitigating factors.
**Q. When I asked about termination you said you didn't terminate her and you said there was going to be a separation. How do you differentiate between those two words?**
A. Because Katie had the opportunity to resign, and at that point I did not know what she was going to do, so what I told her there'd be, we were separating from service. She had the opportunity to resign and we would give her some time to determine if she wanted to do that.
**Q. All right. And she told you that she wouldn't do that; right?**
A. She -- I believe her words to me were, "You're going to have to fire me."
**Q. Did she suggest to you that you suspend her rather than have her separation?**

A. I have some memory of -- of that, but I don't remember if it was during the conversation or someone that was suggested later. But there's some memory that I have that there was something brought up at some point about a suspension, and I can't specifically recall whether or not that occurred in our conversations or someone had suggested that that had come up some other way.
**Q. Why didn't you offer that to her?**
A. On advice of legal counsel and HR, we agreed to separate service.
**Q. Did you advocate with legal counsel or HR that -- that she be suspended instead?**
A. We -- we looked at all options.
**Q. So yes?**
A. We looked at all options.
**Q. You considered suspending her and decided not to. Is that what you're saying?**
A. I don't know if we considered suspension but we looked at all -- we weighed all options of her employment.
**Q. What other options did you weigh?**
A. Allowing her to stay employed.
**Q. What else?**
A. Separation from service, ability to



resign, termination of service, all those were discussed.
**Q. Okay. And I asked this and maybe I didn't -- wasn't clear on your answer. You listed separation from service and termination as separate items. How are those separate?**
A. Separation of service for me meant that the reason for separation was left for Katie to determine.
**Q. Okay. And she could -- you offered her -- in that context you offered her the opportunity to resign; right?**
A. That is correct.
**Q. But you didn't offer her the opportunity to stay?**
A. That is correct.
**Q. Did you consider during this process that you had been suspended three years before?**
A. No.
**Q. Did you ever consider that in -- did you ever consider whether your situations were parallel?**
A. No.
**Q. Why did you reject the option to let her stay?**



A. Because again, we felt that her short duration with us, the intense nature of the response that had disrupted the work environment, that she had not reported to work, nor the scheduled meeting, nor let us know why were all reasons that we contemplated in making that decision.
**Q. Did you ever consider making a public statement about the impropriety of all the comments coming in?**
A. No. I rarely make public statements around political things.
**Q. Did you think that those statements coming in, people demanding her termination, were proper and appropriate?**
A. That's not -- that was not my thought process at all. My thought process were people were complaining like constituents complain.
**Q. Did you have a desire to defend her from the people who were calling in?**
A. I don't know, again, if I had that -- that frame of mind. I was receiving input is the way I viewed it.
**Q. You learned at some point that Katie Allen had submitted an e-mail saying she was**



**resigning; correct?**
A. That is correct.
**Q. Do you remember when you learned that?**
A. I believe it was in an e-mail from HR on Tuesday, but I'm not certain of that.
**Q. Okay. I want to show you what will be marked as Exhibit 35. Actually, and let's do 36 at the same time.**
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 35 and No 36 for identification.)
BY MR. DUGAN:
**Q. As a practical matter, we can ignore 35 because it's all on 36. At the bottom of Exhibit 36 is Katie Allen's e-mail to Beth Fultz; correct?**
A. That's what it appears to be; yes.
**Q. Where she says, "Please accept my resignation as of today"?**
A. That is, yes, that's what it says.
**Q. All right. And she identifies stress and threats of violence against her and she says, "I don't want to bring that negativity to the agency." This was forwarded from Beth Fultz to Wendy on Tuesday, September 16th; correct?**
A. That's what the e-mail says.

Page 161

**Q. All right. And then Wendy forwarded it to you at 3:20 p.m. on Tuesday; correct?**
A. I don't see that.
**Q. Up at the top of Exhibit 36?**
A. Oh, I apologize. Yes, that's what it says.
**Q. So you said a few minutes ago that you think -- you believe you learned of this resignation e-mail on Tuesday the 16th, so that's consistent with what we're seeing here; right?**
A. That is correct.
**Q. Do you remember what your reaction was when you saw this e-mail?**
A. I was surprised.
**Q. Why were you surprised?**
A. Because that it -- that she hadn't said anything to me when we talked about it.
**Q. And in fact she said she -- you'd have to fire her; right?**
A. That's what she said on the second phone call, yes, but even the first one she didn't mention anything to me.
**Q. And you didn't mention resignation, her resignation either because you didn't know about this e-mail; right?**

Page 162

A. I did not know about it till, I believe this was the first time I knew about it.
**Q. Okay.**
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 37 for identification.)
BY MR. DUGAN:
**Q. You've been handed Exhibit 37. This is another text stream between, is this between you and Wendy?**
A. I have no idea.
**Q. Okay. It's -- you're involved with it; right? That's your name at the top?**
A. That is me at the top.
**Q. All right. And then the date here is September 15 at 1:50 p.m. That's shortly before your call with -- your second call with Katie Allen. Is that right?**
A. I believe that to be correct. I'd have to look back but it seems like there was a call around two o'clock.
**Q. All right. And the text in blue responded that, "She's available and I gave your office number." You say, "Thank you. Are you coming up?" Does that refresh your recollection,**

Page 163

**does that mean that you were texting Wendy?**
A. I don't know.
**Q. Why don't you know?**
A. Because you handed me something I don't remember with no name on it.
**Q. Given the context though, is there anybody else you would text, "Are you coming up," at that time on that day?**
A. Could have been legal counsel, could have been our communication team, could have been my assistant. Could have been Wendy.
**Q. Who came up to your office when you had that second phone call with Katie Allen?**
A. Wendy was with me. She was present when the phone call was made.
**Q. Was anybody else present?**
A. No.
**Q. All right. Then those texts we were just talking about were at 1:50 p.m. There's a text at 3:21 p.m., this is one minute after you received Wendy Fritz's forward of the resignation e-mail. At 3:21 you say, "So she resigned before we called her?" What did you understand the implication of that fact to be?**
A. I don't understand that question.

Page 164

**Q. Why did you say, "So she resigned before we called her?"**
A. If this is my text to Wendy, and I'm not -- I don't know that it is but I'm going with your assumption that that's -- that that is true, then I would have been responding to the e-mail as you see it.
**Q. Okay. At that point you'd you decided, you told Katie Allen on the 15th that there would be a separation; right?**
A. That is correct.
**Q. One way or another?**
A. That is correct.
**Q. On September 16 did it matter to you whether she resigned or not?**
A. Yes. Because I'd left it as to whether or not she wanted to resign.
**Q. At that point did you and Wendy have a discussion about how to communicate with her, with Katie Allen?**
A. No. Not to my recollection.
**Q. Did you suggest to Wendy anything that she might say to Katie Allen?**
A. Concerning -- I don't understand the question.

Page 165

**Q. Let me show you the next one.**
A. Okay.
MR. DUGAN: Oh, this one was actually marked.
THE REPORTER: Oh.
BY MR. DUGAN:
**Q. Let me show you what was marked as Exhibit 17 previously. What is Exhibit 17?**
A. It appears to be an e-mail from Wendy Fritz to Katie Allen.
**Q. All right. And her first sentence is, "The Kansas State Department of Education has received and accepted your resignation which you submitted to your director via e-mail on Tuesday, September 11th, at 7:55 p.m."**
A. Thursday. I believe you said Tuesday.
**Q. Did I say Tuesday?**
A. Yeah.
**Q. Thursday, September 11. Who decided to send Katie Allen an e-mail saying we accept your resignation?**
A. Wendy Fritz.
**Q. You didn't have any discussions with her about that?**
A. I don't remember any discussion

Page 166

specifically to this document.
**Q. Okay. After September 15 and 16 what was your understanding of the department's relationship with Katie Allen?**
A. Well, there are two different -- I want to make sure that I answer your question. So my thoughts on the 15th are different than my thoughts on the 16th related to that.
**Q. Explain that to me?**
A. On the 15th we indicated that we were going to separate from service and she had the opportunity to resign if she so desired and we would give some time for her to make that decision. On the 16th we discovered that she had resigned, and that started a clear, in my perspective, of why she decide attend work or attend the meeting that was scheduled that rest of that week. So I was just thinking differently about it.
**Q. Well, that's not what she told you about why didn't come to work; right?**
A. Well, when we initiated the phone call with her, she said that she was scared to leave the house and had threats of violence against her.
**Q. Do you --**

Page 167

A. She had not contacted us at that time.
**Q. Did you come to think that that was untrue, that she was scared?**
A. No, I did not think -- no. I believed Katie.
**Q. So how did your thinking change, if you believed that she was telling the truth, that she was scared and that's why she wasn't coming to work, how did the September 16th reframe your thinking?**
MR. COOPER: Object to form. That misstates his testimony. You can answer the question.
THE WITNESS: Answer the question?
MR. COOPER: Um-hm.
A. Because from the rest of that week previous, she had not come to work. She had not notified us of why she was not coming to work, which is against practice. The resignation, once we found that out on the 16th, in my opinion that was justifying why she didn't come to work, because she had resigned. So she wasn't coming to work the rest of that week.
BY MR. DUGAN:
**Q. All right. By that point though you had**

Page 168

**had discussions with her, and Wendy Fritz had had discussions with her at least by text about why she wasn't there; right?**
A. I had conversations with her. That's correct.
**Q. And as far as you know she didn't say to either you or Wendy Fritz, "I am not coming to work because I resigned"?**
A. She did not make that statement.
**Q. You never learned about her e-mail resignation until September 16; right?**
A. That is correct.
**Q. There was an objection a few minutes ago that my question misstated your evidence -- I mean, your testimony. I don't know if you remember the question now but did I misstate something about what you said?**
A. I don't even know what ...
**Q. Okay.**
A. What reference that would be.
**Q. We've had some discussion about post statements and e-mails by Ty Masterson, Brad Starnes, Jeff Colyer, Megan Steele, federal or state legislators; right? I guess they're all state legislators?**

Page 169

A. There's four -- no, Jeff Colyer is running for office but he's not currently in office.
**Q. He's running for governor currently; right?**
A. I believe that to be correct.
**Q. For the ones who are current legislators, their statements that you're aware of about Charlie Kirk and Katie Allen, this is not part of their legislative function; right?**
A. I don't know what their legislative function is.
**Q. Well, they weren't -- when they were making these statements they're not -- they're not proposing legislation; right?**
A. They're not proposing legislation.
**Q. They're essentially making political comments; right?**
A. They're making opinion comments.
**Q. And political or opinion comments, that's especially true for Ty Masterson and Jeff Colyer who are running for the Republican nomination for governor; right?**
A. If you're asking me what the intent was of Jeff Colyer and Ty Masterson, I think you'd

Page 170

have to ask them.
**Q. Don't mean to be asking so much about their intent but just about their function. Is what they did --**
A. I don't know.
**Q. -- a political act?**
A. Oh, I have no -- I don't -- that's for other people to judge. It's not for me to judge whether it was a political act or not.
MR. DUGAN: I'm about finished. Let's take a short break and come back and I want to look at my notes and we can wrap up.
THE WITNESS: Okay.
(THEREUPON, a recess was taken.)
BY MR. DUGAN:
**Q. Are you aware of anyone who lost their professional license because of this event?**
A. In the state of Kansas?
**Q. Yes?**
A. I'm not, but again, I would defer to legal counsel because he handles all those cases.
**Q. Why did you not ask Ty Masterson to take down your number or board of education's number from his post?**
A. I -- I don't interact with politicians in

Page 171

that manner.
**Q. But did you consider that you could have stopped some of this disruption by asking him to take down the number?**
A. No, I never thought I could stop the disruption or that I had any impact on the disruption one way or the other.
**Q. But Ty Masterson had an impact on it; right?**
A. I don't know. I don't know to what extent any of those individual actions had. All I know is what the disruption was. I don't know what the impact of Governor Colyer or Brad Starnes or any -- any of the e-mails that you've presented to me had, but I know collectively what that was.
**Q. Were you aware that Ty Masterson published phone numbers to call?**
A. I was not at the time. I was aware of it after the fact.
**Q. And that was why people were calling, because they had numbers that they could call; right?**
A. I -- I don't know that to be true for carte blanche because people -- our numbers are public information. My number, my office number

Page 172

is public information. State board, reason they get so many calls, they put their name and their address publicly and other people don't, so it's fairly easy to access those publicly.
**Q. For people who followed his social media posts though, he made it easy by giving them the number, right, so they didn't have to look it up?**
A. He posted the number. That's what we know.
MR. DUGAN: That's all I have. Thanks. I don't know if Mr. Cooper has questions.
(THEREUPON, the court reporter marked Watson Deposition Exhibit No 38 for identification.)
CROSS-EXAMINATION
BY MR. COOPER:
**Q. You have before you what's been marked as Exhibit 38. Can you describe what we're seeing in Exhibit 38?**
A. You're asking me?
**Q. Yep.**
A. This is a calendar invite from my assistant Makayla Auldridge, so she's printed it and it's -- well, yeah. She printed -- Makayla printed this.

**Q. Okay.**
A. And the request came from Marisa Seele, who is in our HR department, to meet Katie Allen. I smile because Katie and I already knew each other, but to meet her when she -- when she started her employment.
**Q. And the subject line reads?**
A. Meet new employee Katie Allen, and the location was to be my office.
**Q. On what day at what time?**
A. Thursday, August 21, at eleven o'clock.
**Q. Assuming Katie's first day at the department of education was August 20, that would have been on her second day of employment?**
A. If that -- if the 20th was her first day, that's correct.
MR. COOPER: That's all I have.
MR. DUGAN: I have nothing further.
MR. COOPER: Read and sign.
(THEREUPON, the deposition concluded at 2:56 p.m.)



SIGNATURE

The deposition of RANDALL WATSON was taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the deponent will read and sign the transcript of said deposition.



AFFIDAVIT

STATE OF _______________________________:
COUNTY/CITY OF _______________________:

Before me, this day, personally appeared, RANDALL WATSON, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition, along with the attached Errata Sheet, if changes or corrections were made.

____________________________
RANDALL WATSON

SUBSCRIBED and SWORN to before me this __________ day of ___________________, 2026 in the jurisdiction aforesaid.

___________________ _________________
My Commission Expires Notary Public



DEPOSITION ERRATA SHEET

RE: APPINO & BIGGS REPORTING SERVICE, INC.

FILE NO.: 79520

CASE: KATIE ALLEN vs.
RANDY WATSON, et al.

DEPONENT: RANDALL WATSON

DEPOSITION DATE: 04/30/2026

To the Reporter:
I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.

PAGE:LINE FROM TO REASON

.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.

SIGNATURE:____________________ DATE:__________
RANDALL WATSON



CERTIFICATE

STATE OF KANSAS
COUNTY OF SHAWNEE

I, Ksenija M. Zeltkalns, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 14th day of May, 2026.

____________________
Ksenija M. Zeltkalns, C.C.R. No. 1461