IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

KATIE ALLEN,
Plaintiff,
vs. Case No. 2:25-cv-02556-EFM-JBW
RANDY WATSON, KANSAS COMMISSIONER OF EDUCATION, in his official and individual capacities,
Defendant.

DEPOSITION OF
WENDY MICHELLE FRITZ,

taken on behalf of the Plaintiff, pursuant to Notice to Take Deposition, beginning at 10:05 a.m. on the 1st day of May, 2026, at the law offices of Fisher Patterson Sayler & Smith, 3550 S.W. 5th Street, in the City of Topeka, County of Shawnee, and State of Kansas, before Douglas R. Stone, RPR, Kansas CCR No. 1518, Missouri CCR No. 1035.



APPEARANCES

ON BEHALF OF THE PLAINTIFF:

Mr. Mark V. Dugan
Dugan Schlozman, L.L.C.
8826 Santa Fe Drive
Suite 307
Overland Park, Kansas 66212
913-322-3528
mark@duganschlozman.com

ON BEHALF OF THE DEFENDANT:

Mr. David R. Cooper
Ms. Crystal B. Moe
Fisher, Patterson, Sayler & Smith
3550 S.W. 5th Street
Topeka, Kansas 66606
785-232-7761
dcooper@fpsslaw.com
cmoe@fpsslaw.com



ALSO PRESENT:

Mr. Scott Gordon, General Counsel
Kansas State Board of Education



INDEX

Certificate ------------------------------ 76

WITNESS

ON BEHALF OF THE PLAINTIFF: PAGE
WENDY MICHELLE FRITZ
Direct-Examination by Mr. Dugan 5

Page 5

WENDY MICHELLE FRITZ,
called as a witness on behalf of the Plaintiff, was sworn and testified as follows:

DIRECT-EXAMINATION

BY MR. DUGAN:

**Q. Can you state your name for the record, please?**

A. Wendy Fritz.

**Q. And what's your address?**

A. My home address.

**Q. Yes.**

A. 9100 Southwest 21st Street, Topeka, Kansas.

**Q. My name is Mark Dugan. We've just met, but I represent Katie Allen in this matter. And so I'm taking your deposition today, and so I'll be asking you questions. And because he's taking down what we say --**

A. Uh-huh.

**Q. You and I need to try to make sure that we don't talk over each other. Have you had your deposition taken before?**

A. No. I have not.

**Q. If we talk over each other, that makes it hard for him to take down. Also, I want to make**

Page 6

**sure that you understand my question so that we're kind of on the same -- same wavelength when we -- when we have question and answer. Because I want -- if -- if you don't understand my question, I may not understand your answer. So if you don't understand it, ask me to clarify it.**

A. Okay.

**Q. We won't be here all day, but if we need a break, if you feel like you need a break, it's fine to take a break as long as there's not a question on the table. You -- try to make your answers verbal. Because -- since he's taking it down, if you shake your head or nod your head, that's hard for him sometimes. The reporter will say nods head, but it's better if you just say yes or no. And Mr. Cooper may make some objections to my questions. If he does, for the most part, that's just for the record. In a rare circumstance, he might say. Tell you not to answer, but I doubt that will happen. What's your current position?**

A. I am the human resources director for the Kansas State Department of Education.

**Q. How long have you been in that position?**

A. I've been in that position for about 12

Page 7

years.

**Q. All right, so you started --**

A. I started in March of 2014.

**Q. Okay. What's your educational background?**

A. I have a bachelor's degree in public administration.

**Q. Where'd you get that and when?**

A. Washburn University, May of 1992.

**Q. Do you have any graduate degrees?**

A. No. I do not.

**Q. Do you have -- what kind of HR training do you have?**

A. 30 years of experience in state HR. I -- there were a few classes in my bachelor's degree that covered human resources. Other than that, it's been conferences, trainings, that kind --

**Q. Okay.**

A. -- of thing.

**Q. Is there any kind of HR certification?**

A. I do not have one.

**Q. Okay. Is there a kind that you don't have?**

A. There are, yes.

**Q. Before you came to the department of**

Page 8

**education in 2014, did you do HR -- HR work then, too?**

A. Yes.

**Q. Where did you work before?**

A. Prior to that, I was the HR director for the Kansas Corporation Commission, again, for 12 years.

**Q. So you -- you work now for the department of education. Do you also work for the board of education?**

A. No. I do not.

**Q. That's a separate thing.**

A. That is a separate thing.

**Q. Who does the HR for the board?**

A. There is not a specific HR person for the board.

**Q. They probably don't have many employees, is that right? Two employees.**

A. Yeah. They're an elected body, yes. And they --

**Q. They have an administrative assistant.**

A. Yes.

**Q. Okay. Is there another employee?**

A. The only other person that I would say reports to the board would be the commissioner of

education.
**Q. All right. In -- in your work or in conferences or in any kind of training, do you have any experience in legal issues?**
A. I don't understand.
**Q. Have you ever received any legal kind of training?**
A. As it pertains to human resources. Yes. I can't -- I don't recall specific courses --
**Q. Let me be a little bit more specific. What have -- have you learned through your work or in conferences or any -- in any kind of program about First Amendment issues and how they apply in the workplace?**
A. Somewhat. But I would always defer those questions to the general counsel or other legal staff.
**Q. Did you hire Katie Allen?**
A. The agency hired Katie Allen. Yes.
**Q. How did that come about?**
A. The position was created. The team director made the recommendation.
**Q. The team director being Beth Fultz?**
A. Being Beth Fultz. Yes.
**Q. Made the recommendation for the position**



**to be created --**
A. Uh-huh.
**Q. -- and the recommendation to hire --**
A. Yes.
**Q. -- Katie Allen.**
A. Yes.
**Q. All right. Why did she -- if you know, why did she recommend that the position be created?**
A. The legislature had required the agency to have positions focused on at-risk funding, and the -- the position was needed, thus it was created.
**Q. And who interviewed Katie Allen?**
A. I do not know who interviewed Katie Allen.
**Q. You did not.**
A. No. I was not involved in the interview for Katie Allen.
**Q. What was your involvement in bringing her on board?**
A. I received the recommendation. My staff did the background check, reference checks, and then my role in new hires is to make the job offer.



**Q. When she came, did you do any kind of on-boarding or training or anything like that?**
A. One of my staff members did the on-boarding for Katie when she started.
**Q. What did that consist of?**
A. Reviewing policies, health insurance. Just general information for a new employee.
**Q. I'd like to have you look at what was previously marked as Exhibit 10. And I'm not --**
MR. DUGAN: These are just the ones from yesterday, right?
MR. COOPER: Uh-huh.
MR. DUGAN: Okay. I've got a copy of that here.
THE WITNESS: Okay.
MR. DUGAN: I -- I don't have another one --
MR. COOPER: That's all right. I have 'em.
BY MR. DUGAN:
**Q. Who -- this is a job description for Katie Allen's position.**
A. Yes. This is a job description for Katie Allen.
**Q. I'm a little confused about -- in the**



**upper right corner of the first page, it says --**
A. Uh-huh.
**Q. -- current classification for job title --**
A. Uh-huh.
**Q. -- and proposed job title --**
A. Uh-huh.
**Q. -- one is research analyst and one is senior education research analyst. What's the difference?**
A. The position previously with the previous incumbent was a research analyst, and Beth suggest -- or recommended that the position be retitled.
**Q. So when Beth Fultz created the position, she created it as senior education research analyst?**
A. That is correct.
**Q. And was that Katie Allen's title?**
A. That is correct. Yes.
**Q. Why -- do you know why she changed the title?**
A. No. I don't.
**Q. All right. And on the second page of this exhibit -- before we get to that --**
A. Uh-huh.

THE REPORTER: You're saying uh-huh --
THE WITNESS: I'm sorry.
THE REPORTER: -- even during his questions, which interrupts the transcript.
THE WITNESS: Okay.
THE REPORTER: Just try to avoid that.
THE WITNESS: Thank you.
MR. DUGAN: It's easy to be conversational.
BY MR. DUGAN:
**Q. How much do you know about Katie Allen's work, substantively?**
A. Katie was employed with the agency for approximately three weeks. I was not aware of her work performance at that time -- or during that duration of her employment.
**Q. Okay. And -- and to refine my question a little bit. Is your knowledge of -- whatever knowledge of her that you have, does it pertain to what her job was specifically, or does it pertain primarily to your HR function with respect to her?**
A. I understand. Primarily my HR function.
**Q. Okay. Do you have an understanding of what her job was?**
A. I have a vague understanding of what the



job was.
**Q. What's your vague understanding?**
A. That it was her response -- was going to be her responsibility to provide technical assistance to school districts in the area of at-risk funding.
**Q. Technical assistance meaning what?**
A. Visiting with school districts to assist them in -- in whatever issues they may have regarding at-risk funding.
**Q. Is she actually doing research, or there are other people who are doing the research?**
A. I do not know the specifics of who was conducting research.
**Q. Is there an either formal or informal policy in the department of education about use of social media by employees?**
A. No. There is not a social media policy with regard to personal use.
**Q. Is there any expectation about people's personal use of social media?**
A. There is no expectation.
**Q. Have you ever disciplined anyone for their use of social media?**
A. No.



**Q. Do you ever monitor employees' social media?**
A. No. I do not monitor people's social media.
**Q. Are you Facebook friends or otherwise connected with people on -- employees on social media?**
A. No. I am not Facebook friends with any current employees.
**Q. Or Instagram.**
A. No --
**Q. I don't know what it's called.**
A. I'm not friends with or connected to any employee in social media.
**Q. Are you on social media yourself?**
A. Very limitedly.
**Q. Are you on Facebook?**
A. Yes. I do have a Facebook account.
**Q. Did -- then -- I take it you're familiar with the situation when Charlie Kirk was killed and Katie Allen posted a comment about it, and there was an uproar, right?**
A. I am aware.
**Q. Did -- did you see those comments on Facebook?**



A. The comments were forwarded to me. I did not find them on my own.
**Q. All right. Are you friends with or do you follow Ty Masterson?**
A. No. I do not follow --
**Q. Do you know --**
A. -- Ty Masterson.
**Q. Sorry. Do you know Ty Masterson?**
A. I know who he is, but I do not know him personally.
**Q. Have you ever talked with him?**
A. No. I have not talked to Ty Masterson.
**Q. I'd like to have you look at Exhibit 26, which I believe is in that pile. This is a document that was produced to us by the department or by Mr. Watson. Have you seen this document before?**
A. No. I have not seen this document before.
**Q. When you said things were forwarded to you, what -- what was forwarded to you?**
A. What was forwarded to me was a screenshot of the post that Katie made.
**Q. Okay. Could you turn to the second page of that? Is that the screenshot you're talking**

Page 17

**about?**
A. I don't know if this was specifically it, but it was something similar to this, yes.
**Q. Do you know who took the screenshot that you saw?**
A. No. I do not know who.
**Q. Do you remember who forwarded it to you?**
A. It was forwarded to me -- it was included in an e-mail that was sent to Randy, all the board members, and Beth Fultz. And at the bottom of the e-mail was a smaller version of this screenshot.
**Q. And do you remember which particular person forwarded that to you?**
A. Randy.
**Q. All right. Did -- when Randy did that, around the time that Randy did that, did he have any conversations with you about it?**
A. No.
**Q. Do you remember what you thought when you saw the post?**
A. I thought, for someone that was possibly running for political office, that it probably was not the most -- the best advised post to make, but I did not have any personal feelings about the post.

Page 18

**Q. You weren't personally offended by it.**
A. No.
**Q. Did you read the Charlie Kirk quote?**
A. I don't recall reading the -- the quote that he put when I originally received the e-mail.
**Q. Have you read it before today?**
A. No. Honestly, I have not.
**Q. As you read it now, are you offended by it?**
A. I don't know that I really have an opinion one way or the other about the post.
**Q. Before this happened, had you heard of Charlie Kirk?**
A. I had heard of Charlie Kirk before this happened.
**Q. How had you heard of him?**
A. Just -- I had heard of Charlie Kirk in social media, news, that type of thing.
**Q. Is what you'd heard about Charlie Kirk before this primarily positive or negative?**
A. Again, I don't -- I don't recall really having an opinion of him one way or the other.
**Q. All right. I have a Facebook friend who extolled the virtues of Charlie Kirk to me before this happened. And do you have anyone like that**

Page 19

**in your life?**
A. I don't remember having anyone share their opinions positively or negatively about Charlie Kirk before this.
**Q. All right. You know Brad Starnes?**
A. No. I do not know Brad Starnes.
**Q. You know who he is?**
A. No. I do not.
**Q. Have you heard of him?**
A. No. I have not.
**Q. Was your understanding that Ty Masterson was calling for Katie Allen to be fired?**
A. I do remember hearing that that had occurred. Yes.
**Q. And how did you know that?**
A. Through conversations in the office.
**Q. Do you remember who those conversations were with?**
A. I don't remember specifically who -- who told me about it. No.
**Q. Did you talk with Randy Watson about that?**
A. I don't remember a specific conversation with Randy about the post itself, or with what you're referring to with Ty Masterson. But I'm --

Page 20

it occurred, but I -- I don't remember who it was with.
**Q. Did you talk to Beth Fultz about it?**
A. No. I did not.
**Q. What was your first thought or reaction when you heard that Ty Masterson thought that Katie Allen should be fired?**
A. Initially, it was one person's opinion and it really didn't affect, you know, my opinion of -- of the post.
**Q. Did you think she should be fired because of the post?**
A. No. I did not think she should be fired because of the post.
**Q. Did you -- did you think she should not be fired because of the post?**
A. At the time that she made the post, it did not violate a policy because, as I stated previously, we don't have a social media policy within the agency. So at that time, there was no reason for action.
**Q. So is it fair to say that employees of the department of education are free to post whatever they want on social media, however outrageous it is?**

A. There -- again, there is no social media policy --

**Q. All right.**

A. -- that dictates the type of posts that employees make.

**Q. So you wouldn't discipline somebody for that except perhaps if they were advocating a crime or something like that.**

MR. COOPER: Object to form. Go ahead and answer.

THE WITNESS: I'm sorry. I didn't hear you.

MR. COOPER: Doesn't -- you don't need to hear me.

THE WITNESS: Oh, okay.

MR. COOPER: You can answer his question.

MR. DUGAN: As long as he heard.

THE WITNESS: I'm sorry. Could you restate your question again?

MR. DUGAN: I don't know. Could you read my question back, please?

THE REPORTER: So you wouldn't discipline somebody for that, except perhaps if they were advocating a crime or something like that.

THE WITNESS: No. I would not advocate



to -- for any action based on a social media post.

BY MR. DUGAN:

**Q. Were there things that were forwarded to you other than the initial forward of -- that you were just telling me about?**

A. No. Nothing else was forwarded to me.

**Q. Have you since seen any e-mails that came into the department about Charlie Kirk and Katie Allen?**

A. Are you referring to after Ty Masterson's?

**Q. Yes. In the period between September 10th of last year and about September 15th.**

A. There were other e-mails that I saw and received regarding the post.

**Q. And how did you receive them?**

A. Via e-mail.

**Q. Were they forwarded to you, or did they -- did some come to you directly?**

A. I received some directly from the public. I don't recall whether or not I received any via someone forwarding them to me.

**Q. Do you know how the public had your e-mail?**

A. No. I do not.



**Q. Do you often get e-mails from the public?**

A. No. It's not a regular occurrence, but it does happen from time to time.

**Q. Do you remember the nature of the e-mails that you received?**

A. Requesting that Katie Allen be terminated.

**Q. Were there some in support of Katie Allen?**

A. No. There were not.

**Q. Were a lot of the e-mails that came to you similar, or was there a lot of variance?**

A. There was variance in the communication that I received.

**Q. Did you feel like most of them were written personally by people? You know what I mean, other than cut and pasted.**

A. It did not seem like there was a template that had been distributed that people were using. They seemed -- there was a variety.

**Q. Did you have a sense that they were coming from a particular source, like from Ty Masterson or -- or someone else?**

A. I had no indication of the source of the e-mails.



**Q. I'm gonna have you look at Exhibit 22, which is in the pile there. This is a printout of a post, I believe on Facebook, by Katie Allen. Have you seen this before?**

A. I don't recall seeing this before.

**Q. Had you heard that she had put out an apology for her words?**

A. Yes. I had heard that she had put out an apology for the post that she had made.

**Q. How did you hear that?**

A. Through conversation.

**Q. You remember with whom?**

A. No. I do not.

**Q. Okay. Did the fact that she had put out an apology make a difference in how you treated her in the workplace as an HR professional?**

A. No. The apology did not have an effect.

**Q. Why do you say it didn't have an effect?**

A. I had heard of it, but I hadn't read it.

**Q. Did you come at some point to the belief that she should be terminated?**

A. Yes. I -- my -- yes. I did come to the point where her separation from the agency was my advice.

**Q. Why did you come to that point?**

Page 25

A. The disruption that the hundreds of calls that our agency was receiving caused such a disruption in what we were doing that we needed to take different action.
**Q. Was the word you used there destruction or distraction?**
A. Disruption.
**Q. Disruption.**
A. Uh-huh.
**Q. Okay. So you came to the conclusion -- conclusion that she should be terminated because of the disruption that arose from this post.**
MR. COOPER: Object to form. Misstate's testimony.
BY MR. DUGAN:
**Q. Did -- did I misstate your testimony?**
A. No.
**Q. Then is that right? Did you come to the conclusion that she should be terminated because of the disruption that arose from the reaction to her post?**
A. Terminated is not what I said. She needed to be separated from the agency.
**Q. What is the distinction there?**
A. It was my advice that she be given the

Page 26

decision or the option of resigning.
**Q. Did you think she should be given the option of staying?**
A. Not at that time. No.
**Q. When did you come to that conclusion?**
A. Again, when the disruption to the agency's work was to the point where staff was unable to -- to function normally as they normally would.
**Q. If we can put that kind of in the time frame. The post was on September 10th, I believe --**
A. Uh-huh.
**Q. -- which was a Wednesday, and she had -- and we'll come to this later. She had conversations with you and Randy Watson on Monday the 15th.**
**Do you know where in that time span -- when in that time span you came to the conclusion that she should be separated?**
A. It would have been Monday.
**Q. You did not come to that conclusion before Monday.**
A. I don't remember specifically when my opinion began to change.

Page 27

**Q. What caused the turning point, in your opinion, when you came -- when you landed on that conclusion?**
A. Again, it was the disruption that -- the hundreds of calls that we were receiving to the agency, and the inability of our employees to function normally.
**Q. Who did the calls come to?**
A. I don't know everyone that they came to, but I am aware that they came to my staff person that was the agency receptionist, myself.
**Q. And who was that?**
A. Her name is Mady Carpenter. She is no longer with the agency.
MR. COOPER: M-A-D-D?
THE WITNESS: M-A-D-Y.
MR. DUGAN: M-A-D-Y.
BY MR. DUGAN:
**Q. Do you know where she is now?**
A. Indiana.
**Q. Do you know what she's doing?**
A. No. I do not.
**Q. You know why she moved to Indiana?**
A. Personal reasons.
**Q. Okay. So back to the question. Who --**

Page 28

**who is receiving these calls? Mady received some of these calls, you received some of these calls. Who else?**
A. My other staff person, Marissa Seele.
**Q. S-E-E-L-E.**
A. S-E-E-L-E. Yes.
**Q. What's her position?**
A. She is the human resource professional.
**Q. How many people in the HR department?**
A. Three.
**Q. The three of you --**
A. Uh-huh.
**Q. -- Marissa, and Mady.**
A. Uh-huh.
**Q. Okay.**
MR. COOPER: Yes.
THE WITNESS: Yes. Yes. There are three people on our staff.
BY MR. DUGAN:
**Q. And then you were starting to say somebody else? Randy.**
A. Randy Watson's assistant.
**Q. Randy. Okay. And that is?**
A. Makayla.
**Q. M-A-K-A-Y --**

A. M-A -- M-A-K-A-Y-L-A.
**Q. And her last name?**
A. Auldridge. A-U-L-D-R-I-D-G-E. Deborah Bremer, the board secretary. I know our teacher licensure staff were receiving phone calls.
**Q. How many on the licensure staff?**
A. Approximately 10 employees are on our licensure staff. Then our -- this -- career standards and assessment services, which is the team that Katie was a member of, that assistant received phone calls.
**Q. Who's that assistant?**
A. Gayle Hook. And then our special ed and title services team received calls. Because on our website it's just complaints@ksd.gov and a phone number, so -- and -- or the public that was looking for a way into our agency saw that. So I'm sure there were others, but those are the ones that I am familiar with.
**Q. Are there people who are just switchboard operators?**
A. That is part of Mady's position. That is not entirely her position.
**Q. Tell me what the switchboard is. Is that, like, when you think of an old movie where**



**you have a bunch of people sitting at a switchboard? Is it like that?**
A. No. It is a phone with multiple lines. She answers the phone and then transfers them appropriately.
**Q. Okay. So that's part of Mady's job. Who else does that?**
A. That is -- others back Mady up, but that is -- she is the primary receptionist for the agency that takes callers and walk-ins.
**Q. Did people keep records of the calls that came in?**
A. Not that I am aware of. I don't know that people kept records. There were too many coming in to keep accurate records.
**Q. Did they keep a count of the calls coming in?**
A. Again, there were too many coming in for anyone to keep count.
**Q. Do you know or have an estimate of how many calls Mady Carpenter took?**
A. Hundreds of calls is what Mady received. They were non-stop.
**Q. Do you think hundreds could be an exaggeration?**



A. No. I do not think hundreds is an exaggeration at all.
**Q. Do you know how many calls Marissa Seele took?**
A. No. I do not know how many calls Marissa took.
**Q. Do you have a sense of how many?**
A. No. I do not.
**Q. Do you have a sense of how many calls Makayla Auldridge took?**
A. No. I do not know how many calls specifically she took.
**Q. Did Makayla talk with you about the calls that came in?**
A. Yes. Makayla did talk to me about the calls that came in.
**Q. What'd she tell you?**
A. That they were non -- she was receiving non-stop calls and could not keep up with the calls, and it was preventing her from doing any other of her duties that she had to do that day.
**Q. Did she tell you what duties she was unable to do?**
A. No. She did not specifically tell me the duties that she was not able to perform.



**Q. Did she have any long-term deficiencies that she -- the things that she couldn't get done because of the calls that came in?**
A. I am not aware of any long-term deficiencies that she had.
**Q. Did Marissa Seele say if there were duties that she couldn't do because of the calls that came in?**
A. Marissa shared that she was not able to complete any of her other work that she needed to get done that day.
**Q. Do you know what other work she was talking about?**
A. No. I don't know specifically what assignment she was referring to.
**Q. Okay. Did Deborah Bremer talk with you about calls that came in?**
A. Yes. Deborah did talk to me about calls that came in.
**Q. Does she sit near you in the -- in --**
A. No.
**Q. -- office configuration?**
A. No. Deborah does not sit next to me.
**Q. Where do you sit?**
A. I am -- my office is located on the first

floor.
**Q. A lot of these people -- are a lot of these people on the sixth floor?**
A. Of the individuals that I shared, teacher licensures on the first floor, but not in our area. Marissa and Mady's offices are located near mine. Everyone else that I mentioned is located on the 6th floor.
**Q. Do you have a sense of how many calls came to Deborah Bremer?**
A. No. I do not know how many calls came to her.
**Q. Did she tell you that she was able to -- unable to do any part of her job because of the calls that came in?**
A. I don't recall that conversation occurring with Deborah regarding the work she wasn't able to perform.
**Q. Of the 10 people on the licensure staff, do you know how many of them received calls?**
A. No. I do not know.
**Q. Or do you know how many calls came to the licensure staff?**
A. Regarding this issue.
**Q. Yes.**



A. No. I do not know how many calls they received.
**Q. And did you talk with Gayle Hook?**
A. Yes. I did talk to Gayle Hook.
**Q. And what did she tell you?**
A. That she was receiving numerous phone calls, and -- yeah. I think that was the extent of our conversation.
**Q. Did she tell you about anything that she wasn't able to get done?**
A. No. Gayle did not share what she was not able to get done.
**Q. All right. And then you said there's a special education team that received complaints at ksd.gov. So is that a complaint line that people -- or a complaint e-mail that people complain about different things all the time?**
A. I'm not sure exactly what types of complaints they receive via that communication channel.
**Q. Who is on that team?**
A. Who is on what team?
**Q. The special ed -- whoever monitors those complaints that come in.**
A. My understanding is that is the legal



staff that is assigned to the special ed title services team.
**Q. And did you talk with any of them about how many calls came in about Charlie Kirk and Katie Allen?**
A. No. I did not talk to anyone on that team regarding the calls they received.
**Q. Are you aware of any work they were unable to get done because of calls that came in?**
A. I do not know.
**Q. Is it true that part of the job of each of these people that you've described to me is to answer calls from members of the public who call in about different issues?**
A. Yes. There is a -- a component to each of those jobs that would include that.
**Q. How do people, members of the public, call you? And I ask that because, just for -- for background, it seems to me odd that someone would call HR with a complaint like this. Do you know why people call you?**
A. I don't receive calls from the general public very often at all.
**Q. And how many did you receive about this?**
A. Phone calls.



**Q. Yes.**
A. Hundreds.
**Q. On -- on what days? When did it start?**
A. I don't recall getting very many, if at all, on the Thursday. It was Friday, Monday, and into the -- that whole week.
**Q. The whole week. They went on through the week.**
A. Uh-huh.
**Q. When did they --**
A. Yes.
**Q. -- stop?**
A. I don't recall, specifically, the date that I received the last phone call.
**Q. Would it have been that week?**
A. Yes. It would have been that following week.
**Q. How did you handle the calls that came in?**
A. We were receiving so many, we did not respond to the calls.
**Q. Did you answer the phone and actually talk with people and say you couldn't respond, or did you just not pick up?**
A. My direction to my staff, and the

direction that I followed as well, was not to answer the phone. There were too many calls coming in. We could not answer all the calls.
**Q. I'm a little confused. Did you -- you couldn't answer all of them. Did you answer some of them?**
A. We let them all go to voicemail. We listened to the voicemails, and then we forwarded the calls that needed to be addressed due to normal business to the appropriate parties afterwards.
**Q. Okay. What did you do with the voicemails that came in about Charlie Kirk and Katie Allen?**
A. I -- we did nothing with them, with the voicemails that we received.
**Q. Are they still in the system on the phones?**
A. My understanding is the state system does not still have those.
**Q. Why? Why not?**
A. The phone system is not controlled or administered by the department of education. I do not know what their policies are.
**Q. Do you know whether phone messages like**



**that are overridden with time?**
A. Again, they're -- we don't administer the phone system, it's another agency. I do not know what their policies are.
**Q. Who does that?**
A. The --
MR. COOPER: OSIT.
THE WITNESS: OITS. It's just the state's technology team that override -- oversees those functions.
BY MR. DUGAN:
**Q. If --**
MR. COOPER: It's OITS, not OSIT. Sorry.
THE WITNESS: That's okay.
BY MR. DUGAN:
**Q. If you wanted to find and go listen to all those voicemails that came in, who would you ask to do that?**
A. We would ask that OITS group. But again, my understanding is that they no longer exist.
**Q. OITS no longer -- oh, the voicemails no longer exist.**
A. Correct. Voicemails --
**Q. OITS still exists.**
A. Yes. OITS does still exist.



**Q. Had -- what -- why do you understand that the voice messages no longer exist?**
A. I've been told that they don't exist any longer.
**Q. Who told you that?**
A. I do not remember who told me that the voicemails do not exist any longer.
**Q. And how long ago were you told that?**
A. I do not recall how long ago I was told that.
**Q. Okay. So you don't have any way to verify the number of calls that came in.**
A. You are correct. I have no way to verify the number of calls that came in.
**Q. When you listen to the voicemails and you forwarded the calls that were normal business -- if -- if I can, I think, paraphrase you. You forwarded those to the proper people, whoever they were intended for.**
A. That's correct. We forwarded the -- the calls appropriately.
**Q. Do you know of any calls that came in that would have been for regular business, not for this complaint purpose, that were not handled that way?**



A. I am not aware of any calls that --
**Q. Okay.**
A. -- we did not forward appropriately during this time.
**Q. Okay. So if for a call that came in about Charlie Kirk and Katie Owen, where somebody said, this is terrible, that you shouldn't have this person working for you, she should be fired, you would listen to those calls once and then just not return the calls.**
A. That is correct. We would listen to them and then not return the calls.
**Q. Did any of those people ask you to call them back?**
A. I -- I don't remember if callers left contact information to return their calls.
**Q. The protocol of not calling people back, who -- who called with those kinds of messages, was that your suggestion or was that what everybody did?**
A. That was my suggestion to staff.
**Q. To -- you say to staff. To what staff?**
A. If I was asked by someone as to what to do with this onslaught of phone calls that they were receiving, my advice was to let them go to

Page 41

voicemail. Don't answer them. Listen to them later. And it -- appropriately handle the normal business calls.
**Q. And that's what you did with the calls that came to you.**
A. Yes. That is what I did.
**Q. Did you talk with Katie Allen during this period?**
A. Yes. I did talk to Katie Allen during this period.
**Q. When did you talk with her?**
A. I spoke with her on -- on Monday afternoon.
**Q. And that's during phone calls you had with her and Randy Watson.**
A. Two separate phone calls. Yes.
**Q. Had you talked with her before?**
A. I had communicated with her before, but I had not spoken to her. It was via text.
**Q. Was Monday the first time you texted her?**
A. I believe Friday afternoon was the first time that I had texted her.
**Q. And when you talked with her on Monday, what did you tell her?**
A. During which conversation?

Page 42

**Q. Your first conversation with her.**
A. My first conversation with Katie on Monday afternoon was to see if she was available for a conversation with Randy and I later in the day.
**Q. Did you talk with her about any of the calls and e-mails that had come in?**
A. I do not recall that topic coming up during my conversation with Katie.
**Q. Okay. I'd like to show you what was previously marked as Exhibit 16. This is kind of a conglomeration exhibit. There's a number of pictures of texts, and on the last page there's -- look like cell phone copies of pictures of telephone calls.**
**On the first page, it looks like it's text involving other people other than you. The second page is Wendy Fritz. Do you recognize these texts?**
A. Yes. I recognize these texts.
**Q. The first one on the left, on Friday, September 12th at 1:59 p.m. --**
A. Uh-huh.
**Q. -- is that the first contact you had with Katie Allen, after this whole event started?**

Page 43

A. Yes. That -- the text on the left at 1:59 is the first communication I had with Katie.
**Q. Okay. And then this is just continue of it. Thanks for letting me know. That's the direct response to, hi Wendy, I'm okay. Is that right?**
A. Yes.
**Q. Okay. And then Monday morning she texts you, right? She says, hi, Wendy, not sure what to do. If you -- if I need to talk to you, please let me know when a good time to call is. Thank you.**
A. Yes. That is a text I received from Katie on Monday morning.
**Q. Okay. Did you know what she meant when she was asking that or saying that?**
A. No. I did not know what she meant by that text on Monday morning.
**Q. Okay. And then you texted her back, it looks like, at 11:41 a.m. that day, and you said, are you available to talk, if so, give me a call. Why did you want to talk with her?**
A. I was responding to her e-mail from -- or her text from Monday morning.
**Q. And what did you say when you talked with**

Page 44

**her about that?**
A. Just seeing if she was available for a conversation with Randy and I later in the day.
**Q. Okay. And then that's the genesis of your text to her at 1:47. Are you available for a phone call with Randy and I at 2:15.**
A. That is correct.
**Q. What -- were you involved with the phone call with Katie and Randy earlier than that?**
MR. COOPER: Excuse me.
A. No. I was involved in one conversation with Katie and Randy --
BY MR. DUGAN:
**Q. Would you --**
A. -- which was after this text.
**Q. So you -- if I understand this correctly, then you had a conversation, just you and Katie, on Monday, and then there was a conversation involving you, Randy, and Katie. Is that right?**
A. Those are the conversations that I was part of with Katie on Monday.
MR. COOPER: Few pages forward.
BY MR. DUGAN:
**Q. On the last page of this, there -- it looks like records of three phone calls, all on**

**September 15th. The first one is 11:51 a.m. She calls you, is that right? That's the -- is that the call you were just describing to me?**
A. Yes. Because in the text she said she would call me in about 10 minutes, and that was about 10 minutes later. So, yes.
**Q. Okay. And then the middle call is Randy Watson at 12:04 p.m. You were not on that call, right?**
A. No. I was not on a call at noon with Randy.
**Q. And then the last one from the 785 number at 2:15, you were on that call.**
A. Yes. I was on that 2:15 call.
**Q. Were you on a phone or speakerphone?**
A. It was Randy's office phone, so it was on speaker.
**Q. Okay. And this number is Randy's office number.**
A. That number is Randy Watson's office number.
MR. DUGAN: Can we take a short break, please?
MR. COOPER: Okay.
(THEREUPON, a recess was taken.)



BY MR. DUGAN:
**Q. I'd like to have you look at some texts between -- I believe between you and Randy Watson. So that'd be in this pile, Exhibits 22, 24, and 37.**
A. What were the exhibit numbers?
**Q. 22, 24, 37.**
MR. COOPER: Do you have 22? I don't have 22. I think you meant 23.
MR. DUGAN: It's -- it's -- it's --
MR. COOPER: Yeah. That's 23. 22 is the Facebook apology.
MR. DUGAN: Okay. All right. 23 then.
BY MR. DUGAN:
**Q. 23 is -- is that a text between you and Randy Watson?**
A. Yes. Exhibit 23 is a text with myself and Randy Watson.
**Q. The date, two-thirds of the way down, the phone, is Friday, September 12th, 1:33 p.m. Do you know when the texts above that were made?**
A. No. I do not know exactly when the previous text was sent.
**Q. This is you saying Julie hasn't heard from her today. Is that right?**



A. Yes. That is correct. That is me.
**Q. And then you say she's going to text you with just the haven't heard from you today question. What did you mean by that?**
A. I don't know what I -- other than just what it says. I don't have any other meaning.
**Q. Had you had a conversation before that with Randy Watson about where Katie was?**
A. We were worried about Katie because no one had heard from her.
**Q. Who raised that issue?**
A. I don't remember who initially raised the concern for Katie's well-being.
**Q. Okay. When you say text her with just the haven't heard from you today question. Did -- the word just makes me think there's another option? Is there another option that you could have texted her with?**
A. Not that I recall.
**Q. All right. All right. And then at 1:33 on Friday, he says, have we heard from Katie? And you said, just talked to Julie, nothing yet.**
**Did you have any more conversation with him that day about Katie Allen?**
A. There were many conversations going on.



I don't recall if there were any more that occurred after that text was sent.
**Q. Okay. Now, Exhibit 24, I think, which is also in front of you. This is still texting between you and Randy, right?**
A. Yes. Exhibit 24 is a text with Randy.
**Q. Okay. The time is obscured, but it says Monday. So that's Monday, September 15th.**
A. Again, the date is obscured, but I do believe that that is the date.
**Q. Okay. And you say you sent him a text that you received this morning from Katie where Katie says, hi, Wendy, not sure what to do. If I needed to -- to talk to you, please let me know when a good time to call is. Thank you, Katie.**
**He responds with, stop by my office. Did you stop by his office after that?**
A. I would assume if my supervisor asked me to stop by his office that I did, but I don't recall specifically.
**Q. You don't remember going to his office --**
A. I --
**Q. -- before Katie came? Before you had the conversation with Katie.**
A. I go to Randy's office quite often. I

don't recall it specifically --
**Q. What conversation did you have with Randy Watson before your call with Katie Allen?**
A. That it was my advice that Katie be separated from employment due to this disruption that its -- staff was experiencing.
**Q. Did you come to that conclusion on your own, or did you have -- did that -- is that a conclusion that came out of some kind of partnership or committee?**
A. It was -- the decision was made through conversations. There was no committee that was formed to discuss Katie's post.
**Q. Yeah. I didn't mean like a formal committee, but conversations -- these conversations you're talking about were with who?**
A. Conversations would have been with our general counsel, probably Randy. There may have been others, but I -- I don't remember.
**Q. Were you the first one to express to Randy that you thought Katie Allen should be separated?**
A. I don't know if I was the first one or not to suggest to Randy that Katie be separated.
**Q. Did he suggest that to you?**



A. I don't recall exactly how the conversation started as to who initiated that decision.
**Q. Did he question you about it?**
A. We had conversations going back and forth, whether I would say that that was questioning or just having a conversation.
**Q. Was he skeptical about it?**
A. He was -- wanted to be mindful of the decision that he was making, making sure other -- that the options were thorough.
**Q. Is that -- what do you mean by mindful exactly? And you said the options that would be thorough. Is that the extent of what you mean by mindful?**
A. Yes. Randy never makes these types of decisions lightly. You know, it's -- or -- or quick. He always, you know, thinks through these things.
**Q. He's careful and methodical. Is that what you're saying?**
A. Yes. Yes.
**Q. Do you experience him as a very opinionated man?**
A. Randy has his opinions, but he is always



very level-headed and thoughtful before he comes up with a decision.
**Q. Do you know what his opinions are, if he has them? Does he express them, or can you just tell that he has them?**
A. I've worked with Randy for 12 years. You get to know someone. But no. He -- he shares his thoughts.
**Q. Does he share his thoughts about politicians?**
A. I have never had a political conversation with Randy.
**Q. Did -- do you know what his opinion is of Ty Masterson?**
A. No. I do not know his opinion of Ty Masterson.
**Q. Do you know what his opinions are of individual school board members?**
A. No. I do not know.
**Q. You ever talk about school board members with Randy Watson?**
A. Are you referring to state board --
**Q. State board of education. Yes.**
A. Not specifically.
**Q. Does he ever get frustrated with the**



**state board?**
A. Not that he has ever shared with me.
**Q. The state board is the one that hires and could fire him, correct?**
A. Correct. The state board is who can hire and fire the commissioner of education.
**Q. Because of that, does he treat their opinions and thoughts and wants as important?**
MR. COOPER: Object to form. You can answer.
A. Randy takes everyone's opinions before he makes decisions.
BY MR. DUGAN:
**Q. My question, though, is specifically about the board. Are those opinions particularly important to him because they have -- they have the authority to fire him?**
MR. COOPER: Object to form.
A. I don't know that Randy has ever weighted their opinions more than others.
**Q. Did Randy express any opinions about the calls that were coming in from members of the public about Charlie Kirk and Katie Allen?**
A. Just the volume and the disruption that they were causing to our agency.

Page 53

**Q. He didn't express any frustration about these crackpots or anything like that?**
A. I do not recall Randy making any comments regarding the individuals that were calling in.
**Q. I think that's the first time I've ever used the word crackpot in a deposition.**
**Exhibit 37 now is texts later. At 1:50 p.m. when you say, she responded that she's available and I gave her your office number. And then he says, are you coming up? So this is for the phone call that we talked about earlier that happened between -- with you and Randy Watson and Katie Allen at 2:15, right?**
A. Yes. That is in preparation for that phone call at 2:15 with Katie.
**Q. All right. Now keep that exhibit, but if you look at 36 as well. 36 is e-mails.**
A. Okay. I have 36 in front of me.
**Q. Okay. What is 36?**
A. Exhibit 36 is the e-mail exchange when Beth Fultz, Katie's supervisor, sent her resignation e-mail to me on Tuesday, September 16th, at 2:52.
**Q. Okay. The bottom e-mail is an e-mail from Katie Allen to Beth Fultz on September 11th,**

Page 54

**right?**
A. Yes. That is correct.
**Q. At 7:55 p.m.**
A. Yes.
**Q. Beth Fultz was in California at that time.**
A. Beth Fultz was on vacation at that time. Yes.
**Q. So do you know whether that was nine -- 7:55 Pacific time?**
A. I do not know the time between here and California that that e-mail was sent.
**Q. All right. Beth Fultz then forwards that to you on September 16th, and she says, hi, Wendy, I'm just now checking e-mails while sitting at the airport. I found this e-mail from Katie. Wish I had looked earlier. See you -- I don't know what that means.**
**Is this the first you'd ever -- you'd heard that Katie Allen had sent this e-mail?**
A. Yes. The e-mail that Beth Fultz sent me on Tuesday was the first that I had heard of Katie's e-mail.
**Q. All right. Then you respond about 10 minutes later. You say, thank you for forwarding.**

Page 55

**Did you receive any other correspondence from her. Did she respond to that?**
A. I -- I thought she had, but -- but maybe she hadn't.
**Q. Okay. Well, the top then -- top e-mail then is you forwarding this to Randy Watson saying FYI at --**
A. Uh-huh.
**Q. -- 3:20 p.m., right?**
A. Uh-huh.
MR. COOPER: Yes.
THE WITNESS: That's correct.
BY MR. DUGAN:
**Q. Okay. Now if you can go back to 37, which is the text. At 3:21, right after that, he texts you back and says, so she resigned before we called her, right?**
A. That is correct.
**Q. Right was my word, not his. The -- the bottom text, your response to that, it's -- it's kind of grayed. Can you tell what that says, or do you know?**
A. The bottom of Exhibit 37, like you said, it looks grayed. All I can read is the Thursday evening.

Page 56

**Q. Okay. Do I infer correctly that what you're saying to him essentially is that she had sent that e-mail Thursday evening?**
A. Yes. That would have been my response, that she had e-mailed her resignation to Beth on Thursday evening.
**Q. Okay. And then you and Beth and Randy all find out about it on Tuesday the 16th.**
A. Correct. We found out about the e-mail when Beth saw it on Tuesday, September 16th.
**Q. After this text with Randy Watson at 3:21 p.m., did you have any further text exchange with him?**
A. No. I did not have any other exchanges with Randy after that.
**Q. Did -- when I was asking about text, did you have any -- did you speak with him at all?**
A. I'm -- I'm sure I probably -- probably did. Yes.
**Q. What do you remember about that?**
A. I don't remember specifically the conversation that I had with Randy.
**Q. What do you remember generally about it?**
A. Generally, I would have asked Randy what he wanted our next action to be.

**Q. And what did he say?**
A. To accept her resignation.
**Q. At that point, did you -- did he consider other options, or did you consider other options?**
A. No. We had received her resignation four days prior. There had been no further communication to rescind, or that she had second thoughts about that resignation, so we accepted it.
**Q. Okay. Let me go back to the phone call that you and Randy and Katie Allen had on September 15th. What do you remember about that call?**
A. Randy shared with Katie that her employment with Kansas State Department of Education needed to be separated. It was her option whether or not that was going to be a termination or a resignation. Katie's response was, Randy, you will have to fire me. I responded that we should give everything just a few days, make sure that that was her decision, and that if she changed her mind and decided to resign, that I would accept that resignation on behalf of the agency.
**Q. And did she indicate after that that she**



**changed her mind?**
A. No. I had no other communication with Katie prior to Beth forwarding us the e-mail that she had previously resigned.
**Q. Okay. And then you responded to that that afternoon, right? You remember that. I'm going to show you -- the -- Exhibit 17.**
A. Yes. Exhibit 17 is an e-mail that I sent to Katie Allen.
**Q. Okay. So this was at Randy Watson's suggestion that you respond to her by accepting her resignation.**
A. Correct. The e-mail was in response to Katie's resignation.
**Q. Did you have any conversation with Randy Watson about the difference in her communications between her Thursday evening e-mail and her Monday afternoon statement that she wouldn't resign, that he would have to fire her?**
A. Yes. Randy and I had conversation due to the -- the disagreement or whatever between the two statements.
**Q. And what did you say to each other?**
A. We were quite confused that she had already resigned but then said that we would have



to fire her. She gave no indication in any conversations that I had with her that she had resigned.
**Q. Did you feel any qualms about accepting a resignation after she said she would not resign?**
MR. COOPER: Object to form. Misstates her testimony. You can answer.
A. No. I did not have any qualms with accepting a resignation that an employee had submitted, what, four days prior and had not communicated a change of mind at all. I was quite confused why she would have -- not have mentioned that prior, but we received it. We had -- there had been ample time for her to change her mind. She had not communicated anything different, so we accepted it.
BY MR. DUGAN:
**Q. I don't understand what you're saying, that she had not communicated anything different. Because didn't she communicate something different in that telephone call?**
A. The telephone call, she said that we would have to fire her. She did not share that she had an e-mail resigning from her position sitting in her supervisor's inbox four days prior.



**Q. Those two communications from her are inconsistent, are they not?**
A. Yes. They are inconsistent communications.
**Q. All right. And you decided to accept the earlier communication.**
A. Yes. We did accept her resignation that she submitted on September 11th.
**Q. And you ignored her later communication, right?**
A. The later communication, the conversation after that, was to give her some time to make sure that she wanted to resign -- or she wanted to be fired, not resigned.
**Q. Right. And you -- you essentially ignored that and referred back to her Thursday evening communication and responded to that, right?**
A. Correct. We accepted her resignation that she submitted on Thursday.
**Q. Did you have any conversations with anyone about whether that would constitute an effective resignation?**
A. I'm sorry. I didn't hear your question.
**Q. Did you have any conversations with**

**anyone about whether accepting her resignation e-mail in the way that you did would constitute an actual or proper resignation?**
A. I had conversations as to what the action the agency should take after we became aware of the e-mail.
**Q. Did you consider the legal question about whether she was resigning or not?**
A. I would have had -- I don't recall if I had conversations with our general counsel. But if it had been a legal question, we would have deferred --
**Q. You --**
A. -- to his opinion.
**Q. You don't recall a conversation about that, though.**
A. I don't remember.
**Q. Do you know who Mena Patrone is?**
A. I do not know who Mena Patrone is.
**Q. Have you heard of her?**
A. No. I have not heard of Mena Patrone before today.
**Q. Have you heard anyone say that Katie Allen missed a meeting on Friday the 12th?**
A. I did know that there was a meeting on



Katie Allen's calendar.
**Q. How did you know that?**
A. It was brought up in conversation.
**Q. Who brought it up?**
A. We looked at Kate -- to the best of my recollection, we looked at Katie's calendar because she had not shown up or called in to work. And I know that there was a meeting on her calendar that had to be rescheduled. I do not know who that meeting was with. I know it was with a school district, but I don't know who specifically it was with.
**Q. Do you know who rescheduled it?**
A. I don't know specifically who made the phone call to the district to reschedule that meeting.
**Q. Do you know what the school district person's response was?**
A. No. I do not know what the school district person's response was.
**Q. Have you ever heard of, other than the angry calls and letters that came in, any people that Katie Allen worked with outside the agency, school districts, for example, who were upset with Katie about her post on Facebook?**



A. I was not made aware of any concerns from school districts.
**Q. Are you aware of any concerns within the office about her post? And I don't mean concerns about the calls that were coming in, but concerns specifically about her post.**
A. I don't recall anyone bringing any concerns or opinions to my attention regarding her posts.
**Q. No one came to you and said, look what she said, this is disgusting, or anything like that?**
A. I do not remember anyone saying anything like that to me about her posts.
**Q. Can I have you look at Exhibit 33?**
A. I have Exhibit 33 in front of me.
**Q. Okay. This is an e-mail from Deborah -- Deborah Bremer to Cathy Hopkins.**
A. Uh-huh.
**Q. Cathy Hopkins is the chair of the state board of education. Is that right?**
A. Cathy Hopkins is chair of the state board of education.
**Q. Deborah Bremer is the state -- the board's administrative assistant.**



A. Deborah Bremer is the assistant to the state board.
**Q. It's -- it's Bremer as opposed to Bremer?**
A. Bremer.
**Q. Okay. She says -- first of all, have you seen this e-mail before?**
A. It's the first time I've seen this e-mail.
**Q. Okay. This is dated September 15th at 8:56 in the morning. She says, lots of closed-door meetings around her. Do you know -- around here. Do you know what that means?**
A. I do not know what Deborah was referring to.
**Q. Do you remember there being lots of closed-door meetings on the morning of September 15th?**
A. There were meetings behind closed doors on September 15th.
**Q. Were you involved in any of those?**
A. Yes. I was involved.
**Q. Who did you have closed-door meetings with?**
A. I don't recall specifically who was in all of the meetings. Randy would have been in the

Page 65

meetings. Our general counsel would have been in the meetings. I would have been. I'm sure there were probably others, but I do not specifically remember who else might have been in those meetings.
**Q. And what was the topic of those meetings?**
A. The disruption that the post had created within the agency. And that by Monday we were starting to have conversations regarding Katie's separation from our agency.
**Q. Do you remember who first suggested Katie's separation?**
A. No. I do not recall who first commented that Katie's employment should be separated.
**Q. You said you came to the opinion that she should be separated, and Randy Watson agreed with you, right?**
A. That is correct.
**Q. Did other people voice agreement with that?**
A. Others would have agreed.
**Q. You say others would have agreed. Do you know -- do you remember whether they did?**
A. I don't recall exactly who was in that -- those meetings to know who may have been asked

Page 66

their opinion or not.
**Q. But do you think that others did agree?**
A. Yes. I think others did agree.
**Q. And did they -- do you think that others voiced that agreement?**
A. I -- again, I don't know who was in the meetings to have known who may have agreed.
**Q. Do you remember anyone voicing agreement with that besides Randy Watson?**
A. Yes. I remember others that agreed that Katie's employment should be separated.
**Q. Did some people voice an opinion that she shouldn't be separated?**
MR. COOPER: Object to form on that one. Vague as to the point in time. You can answer.
BY MR. DUGAN:
**Q. To be clear, I'm talking about these closed-door meetings on September 15th.**
A. I do not recall anyone having an opinion other than Katie's employment needed to be separated.
**Q. Do you remember how many people were involved in closed-door meetings that morning?**
A. No. I do not recall the specific number of people that were involved in those meetings.

Page 67

**Q. Okay. Based on your knowledge of the office, who would be -- likely to be involved in meetings like that?**
A. Myself, our general counsel, Randy, more than likely her director. Or I'm sorry. Her deputy commissioner would have been involved. Her Director was on vacation.
**Q. Who's her deputy commissioner?**
A. Renee Nugent. N-U-G-E-N-T. Our comms director may have been involved. Like I said, I -- I don't remember specifically who was in the room.
**Q. The comms director is who?**
A. Denise Kahler. K-A-H-L-E-R.
**Q. Did you have conversations with Renee Nugent?**
A. I don't remember any specific conversations with Renee and I, and specifically just the two of us.
**Q. Do you remember conversations that Renee was part of and you were part of but may have included other people?**
A. Yes. I do recall those conversations that Renee was included in the group.
**Q. Do you remember if she said anything?**

Page 68

A. I'm sure she said something, but I don't recall specifically what she said during those meetings.
**Q. Did you have conversations with Denise Kahler?**
A. Yes. I had conversations with Denise Kahler.
**Q. What was the nature of those conversations?**
A. From Denise, as our communications director, it would have been just how to or not to respond to any media requests or requests from the public.
**Q. What was her recommendation?**
A. To not have a response.
**Q. The same thing that you were describing to me earlier.**
A. Uh-huh.
MR. COOPER: Yes.
THE WITNESS: Yes. Yes.
BY MR. DUGAN:
**Q. Deborah Bremer then says, I haven't had many calls complaining about Katie Allen, just one this morning. Did you talk with her about that?**
A. Generally, the calls that she received.

Page 69

I was under the impression that she received more. I do -- I can't answer what she meant by many in this e-mail to Cathy Hopkins on September 15th.

**Q. Is it fair to say that what caused the disruption in the office that you've been talking about this morning was the volume of calls that came in and e-mails?**

A. The volume of calls created the disruption in the agency.

**Q. Okay. Was there any disruption that related to the substance of the post itself?**

MR. COOPER: Object to form.

A. I guess I'm not understanding exactly what you're referring to.

BY MR. DUGAN:

**Q. Was there any disruption in the office about what Katie said on that post?**

A. No.

**Q. She said -- she said, well-deserved. Was there any office disruption about those two words?**

A. No. There was no disruption based on the post that Katie made. It was purely the disruption of the hundreds of calls that were coming in and the nature of the messages that people were sharing on those phone calls.

Page 70

**Q. If you could go back in time and -- time machine and change things, if she had not made that post, would any of this have happened?**

MR. COOPER: Object to form.

A. No. There -- I mean, Masterson would not have done the call to action if she had not made the post. The post created the disruption.

BY MR. DUGAN:

**Q. Would she have been fired without the post?**

MR. COOPER: Object to form.

A. Katie Allen was not fired. She resigned and we accepted the resignation.

BY MR. DUGAN:

**Q. Okay. Without the post, would she have been fired?**

A. She was not fired.

**Q. I know. I understand that. But I'm saying, would she have been fired if she had never made the post?**

MR. COOPER: Object to form.

A. I'm not aware of any work performance issues that would have created Katie Allen's termination.

BY MR. DUGAN:

Page 71

**Q. Would she have been asked to resign without that post?**

MR. COOPER: Object to form.

A. I'm not aware of a reason why she would have resigned without the post and the disruption that the hundreds of calls created to the agency.

MR. DUGAN: I'm about done. Let's take a short break, five minutes, so let me go over my notes and then we can wrap up.

(THEREUPON, a recess was taken.)

MR. DUGAN: I have no further questions. Thanks for your time today. Mr. Cooper may. I don't know.

THE WITNESS: Thank you.

MR. COOPER: Read and sign.

(THEREUPON, the deposition concluded at 10:05 a.m.)

Page 72

SIGNATURE

The deposition of WENDY MICHELLE FRITZ was taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the deponent will read and sign the transcript of said deposition.

AFFIDAVIT

STATE OF ______________________________:
COUNTY/CITY OF ______________________:

Before me, this day, personally appeared, WENDY MICHELLE FRITZ, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition, along with the attached Errata Sheet, if changes or corrections were made.

____________________________
WENDY MICHELLE FRITZ

SUBSCRIBED and SWORN to before me this __________ day of ___________________, 2026 in the jurisdiction aforesaid.

___________________ _________________
My Commission Expires Notary Public



DEPOSITION ERRATA SHEET

RE: APPINO & BIGGS REPORTING SERVICE, INC.

FILE NO.: 79521

CASE: KATIE ALLEN vs.
RANDY WATSON, et al.

DEPONENT: WENDY MICHELLE FRITZ

DEPOSITION DATE: 05/01/2026

To the Reporter:
I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.



PAGE:LINE FROM TO REASON

SIGNATURE:___________________ DATE:__________
WENDY MICHELLE FRITZ



CERTIFICATE
STATE OF KANSAS
COUNTY OF SHAWNEE

I, Micalyn Scott-Thompson, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A. 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the parties, and attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 15th day of May, 2026.

____________________
Micalyn Scott-Thompson, C.C.R. No. 1716