IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

KATIE ALLEN,
Plaintiff,
vs. Case No. 2:25-cv-02556-EFM-JBW
RANDY WATSON, KANSAS
COMMISSIONER OF EDUCATION, in his
official and individual capacities,
Defendant.

DEPOSITION OF
ELIZABETH ANN FULTZ,

taken on behalf of the Plaintiff, pursuant to Notice to Take Deposition, beginning at 12:47 p.m. on the 1st day of May, 2026, at the law offices of Fisher Patterson Sayler & Smith, 3550 S.W. 5th Street, in the City of Topeka, County of Shawnee, and State of Kansas, before Douglas R. Stone, RPR, Kansas CCR No. 1518, Missouri CCR No. 1035.



APPEARANCES

ON BEHALF OF THE PLAINTIFF:

Mr. Mark V. Dugan
Dugan Schlozman, L.L.C.
8826 Santa Fe Drive
Suite 307
Overland Park, Kansas 66212
913-322-3528
mark@duganschlozman.com

ON BEHALF OF THE DEFENDANT:

Mr. David R. Cooper
Ms. Crystal B. Moe
Fisher, Patterson, Sayler & Smith
3550 S.W. 5th Street
Topeka, Kansas 66606
785-232-7761
dcooper@fpsslaw.com
cmoe@fpsslaw.com



ALSO PRESENT:

Mr. Scott Gordon, General Counsel
Kansas State Board of Education



INDEX

Certificate ----------------------------- 34

WITNESS

ON BEHALF OF THE PLAINTIFF: PAGE
ELIZABETH ANN FULTZ
Direct-Examination by Mr. Dugan 5

Page 5

ELIZABETH ANN FULTZ,
called as a witness on behalf of the Plaintiff,
was sworn and testified as follows:
DIRECT-EXAMINATION
BY MR. DUGAN:
**Q. Could you state your name for the record, please?**
A. Elizabeth Ann Fultz.
**Q. And where do you live?**
A. I live at 3731 Southwest Warwick Town Road in Topeka, Kansas.
**Q. Have you ever had your deposition taken before?**
A. No.
**Q. Okay. Well, we've just been talking about how it goes. He's taking down what you and I say, and so we need to make sure that you and I try not to talk over each other and also that you speak in words as opposed to nodding your head or something like that.**
**Please make sure that you understand my question. If my question is not clear, ask me to clarify it so that we can have a clear record about that. I don't think we'll be here too long today, but if you need a break, let me know.**

Page 6

**Mr. Cooper may make some objections to my questions. Those are generally for the record, and you can go ahead and answer the question unless you're told otherwise. All right. What's your current position?**
A. I'm the Director of Career Standards and Assessment Services at the Kansas Department of Education.
**Q. How long have you been in that position? Long time.**
A. No. I'm trying to calculate.
**Q. Oh.**
A. Three -- three-plus years. I took -- can I clarify?
**Q. Sure.**
A. The -- the director passed away and I took over his responsibilities.
**Q. Were you in the department before that?**
A. Yes.
**Q. What was your job?**
A. Assistant director. Same team.
**Q. When did you become assistant director?**
A. In 2014.
**Q. That was -- was that before Randy Watson became commissioner?**

Page 7

A. About the same time.
**Q. What did you -- sorry.**
A. For the record, I've been at the agency since August of 2000.
**Q. That was my next question. What did you do between 2000 and 2014?**
A. So I started in 2000 on the teacher licensure team. In 2007, I moved to the CSAS team as the national assessment.
**Q. What is that team called?**
A. Career Standards Assessment, CSAS.
**Q. Okay.**
A. Okay. In 2007, I moved from teacher testing to student testing and ran the national assessment for educational progress. In 2014, I got promoted to assistant director of assessments, and I don't remember what year Scott passed away, but three plus -- three, four years, I moved into the director position.
**Q. Okay. Were you in education before 2000?**
A. Not most recently, but I have an education degree.
**Q. Okay. What are your degrees?**
A. My -- I have a degree in a -- a bachelor's degree in fine arts from Emporia State, in speech communication, business, and economics. Then I went back to KU and got my teaching degree, a bachelor's degree in -- call it social studies. And then I got a master's degree in curriculum instruction and reading.

Page 8

**Q. When did you get your master's degree?**
A. '84. I can't -- I'm not 100 percent sure. Around '84. My son was born in '85. I had it before he was born.
**Q. Have you taught?**
A. Briefly, when we were -- my husband and I were working on advanced degrees in Lawrence at KU. And then I had a whole career in finance. Finance company, bank, and credit union.
**Q. You know Katie Allen, right?**
A. I met her when I interviewed her for a position at the agency.
**Q. Did you know her before that?**
A. No.
**Q. Did you ever interview her alone or with other people?**
A. I interviewed her alone.
**Q. Why did you hire her? Let -- let me back up. Were you the one who made the decision to hire her?**

Page 9

A. Yes.
**Q. Or did you make -- okay. Who -- who else was involved in hiring her?**
A. So along with career and tech ed, standards and assessments, I'm also -- part of my responsibility is research and evaluation. And the group, the research and evaluation group, did the first interview. And then the policy that I have on my team is that then I do a follow-up interview with the individual to make sure that all of us are in agreement. So they interviewed her first, and then I interviewed her following that.
**Q. So when you interviewed her, did you already know that they liked her enough at least to bring her back in?**
A. No. No. Because they're concurrent. They're -- so they interview the person, literally someone from that group walks them, literally, to my office and I interview.
**Q. I see. It was all the same day?**
A. It was all on the same day.
**Q. Okay. And then you decided to hire her or recommend her hiring.**
A. Not at that point in time. The -- we --

Page 10

we initially -- I had a position and she wasn't offered that job. Further conversation about what her skill set was and her -- her credentials, and then we had a need for another person. We had conversations within the agency and had a position open that was not the same pay grade, and we decided that we could rework that position. And then I called and talked to her about -- we had a Zoom call about a different position than the one she actually had interviewed the first time, and that was all on me. I didn't include the group on that one.
**Q. Okay. What was the position that she was considered for but not offered?**
A. Same title, senior research, whatever the word was --
**Q. How did that -- sorry. I didn't mean interrupt you. How did that differ from the position she was actually hired for?**
A. The -- the position that she initially interviewed for was more straightforward data requests that come into the agency and how -- and filling those. People want to know various questions from our database, and it was more specifically working with just the data that way.

Page 11

And the position that she ended up being hired for was really working with the new at-risk legislation and helping schools understand, which was her experience, how to write goals, how to look at the interventions they were using, and if students are improving to meet what the legislature is asking us to do with at-risk students. So, it was a position created basically for her.
**Q. Based on the new statute, you said. When was that statute enacted?**
A. A couple years ago.
**Q. I want to show you what --**
A. -- a couple years to -- I mean, we've been working on this legislation for a couple years.
**Q. I want to show you what was marked previously as Exhibit 10. This is a position description for -- position that Katie Allen was hired for. Is that right?**
A. Uh-huh.
MS. COOPER: Say yes.
THE WITNESS: Yes. I'm sorry. Yes.
BY MR. DUGAN:
**Q. Yeah. Did you write this?**

Page 12

A. Yes.
**Q. Did you write it specifically for Katie Allen?**
A. Yes. Specific, like -- the at-risk in there provides guidance to Kansas School District in the use of at-risk funds and ensures KSD is following statutory at-risk requirements. That was added specifically for her position. The others -- the others are what the rest of the team would do.
**Q. How many on that team?**
A. We had four, and then this was the 5th position.
**Q. Who were the four on that team, to the best of your recollection?**
A. Are first names acceptable?
**Q. Sure.**
A. Okay. Sheng, S-H-E-N-G. Haley, H-A-Y-L-E-Y. Brooke and Emmit.
**Q. Now, is -- did Brooke come after Katie left?**
A. No.
**Q. Okay. What is Brooke's job?**
A. The first -- so all of the positions are going to have the first three and the last one.

Page 13

**Q. Okay. Would Katie Allen have those roles, too?**
A. Yes.
**Q. All right. But would she be the only one that would have the guidance to school districts on use of at-risk funds?**
A. No. But she would be -- was going to be the lead on it.
**Q. Okay. Okay. So she would be contacting school districts, communicating with school districts about at-risk funding and what they needed to do to make sure that they're protected or obtained their funding? Is that right?**
A. That's right. That's correct.
**Q. Did you ever hear any complaints from any school districts about Katie Allen?**
A. No. I didn't hear anything from anybody about Katie Allen. School districts -- she -- she was new to the job. She was learning.
**Q. While she was there, did you have any concerns about her performance?**
A. No.
**Q. From your observation of people in the office, were there any relationships between Katie Allen and any of her co-workers that were strained**

Page 14

**in any way?**
A. No.
**Q. You're aware, I take it, that after Charlie Kirk was killed, Katie Allen commented on a post about that, and a lot of people got upset about it. Is that right?**
A. I was made aware.
**Q. When did you learn about that?**
A. The -- on September 11th I was at the airport, and I got an e-mail from the commissioner saying there had been a problem.
**Q. Did he say what the problem was?**
A. No.
**Q. Did you e-mail him back?**
A. Yes.
**Q. What'd you say?**
A. I'm at the airport getting ready to get on a plane and I'm not much help.
**Q. Did you have a phone conversation with him?**
A. No. I -- I don't know. I'm gonna say I don't recall.
**Q. Were you taking a vacation or were you traveling for work somehow?**
A. Vacation.

Page 15

**Q. In California.**
A. Yes.
**Q. So you left on September 11th and came back on the 17th. Is that right?**
MS. COOPER: You need to give -- give a verbal answer.
A. I know I left on September 11th because my kid said, why are we flying on 9/11? I came back whatever day my calendar said I came back.
MR. DUGAN: Okay.
BY MR. DUGAN:
**Q. So you learned from Randy Watson that there was a problem, but he didn't say what it was.**
A. Not in the e-mail.
**Q. When did you learn what the problem was?**
A. I mean, that morning, I -- I don't have any memory of a conversation, but I did know that there was some problem with the Facebook post.
**Q. Did you know what the Facebook post was?**
A. I knew it had to do with Charlie Kirk because I didn't know who that person was.
**Q. Did you find out who Charlie Kirk was?**
A. I Googled it.
**Q. What'd you learn when you Googled Charlie**

Page 16

**Kirk?**
A. That he had been killed. I -- maybe I saw on the TV at the airport. I can't answer that. I didn't -- I didn't, I had no awareness of who Charlie Kirk was. It was on the news. Whether I was reading it on my news feed, on the phone, I can't tell you.
**Q. Have you since learned more about who he was and what he did?**
A. Yes.
**Q. Have you seen the post that Katie Allen commented on?**
A. No. I don't believe so.
**Q. I mean, could you look at Exhibit 26, which is in this bio? You have Exhibit 26 in front of you. Is this the document -- a document you've ever seen before?**
A. I don't recall reading it. I don't recall anyone sending it to me to read.
**Q. Okay. Could you look at the second page? On the second page, there's an image of a social media post by Courtney Jane Hochman. That's a picture of Charlie Kirk. Have you seen this post before?**
A. Not that I recall.

Page 17

**Q. Have you heard this quote that -- the Charlie Kirk quote about his picture?**
A. At the bottom.
**Q. No. The one -- I think it's -- he says -- this is a quote of him from 2023. I think it's worth -- to have a cost of, unfortunately, some gun deaths every single year so that we can have the Second Amendment -- Second Amendment to protect our god-given -- our other god-given rights. Have you ever seen that quote?**
A. Not that I recall.
**Q. And did you learn that Katie Allen commented, well-deserved?**
A. I heard that.
**Q. Who'd you hear that from?**
A. I don't -- I don't recall who.
**Q. What was your reaction when you heard it?**
A. That's unfortunate that she said that.
**Q. Do you see any indication in this post that Charlie Kirk had died at that point?**
A. No.
**Q. Did you ever have a conversation with Katie Allen about it?**
A. No.
**Q. Did you hear that she had posted an apology?**

Page 18

A. Yes.
**Q. Did you see her apology?**
A. No.
**Q. What did you hear about it?**
A. I heard that she made an unfortunate comment. She realized it was seen by more people than she had intended, and she took it down and posted an apology.
**Q. But you're not sure who told you that.**
A. No.
**Q. Did you have an understanding of how long her comment stayed up?**
A. Less than an hour.
**Q. And then you learned that there was a strong reaction from the public.**
A. I did when I returned from vacation.
**Q. You didn't know anything about what was going on while you were on vacation.**
A. No.
**Q. Did you have -- that's probably a good thing, but I just wanted to ask you about it.**
**Did you have any conversations with people other than the exchange you described earlier with Randy Watson while you were on vacation?**

Page 19

A. Yes.
**Q. What -- what conversations did you have?**
A. On the -- I think towards the end of my trip, I had a text message from the deputy commissioner that said she would like to talk with me. And so I did call.
**Q. Who is the deputy commissioner?**
A. Renee.
**Q. Renee Nugent?**
A. Uh-huh.
MS. COOPER: Yes. Words.
THE WITNESS: Yes.
MR. DUGAN: Yea.
THE WITNESS: So I called her.
BY MR. DUGAN:
**Q. And what did she say?**
A. She said, I need to confirm if you've had any conversation with Katie Allen. And I said, no, I have had no contact. And she said, that's all I needed to know. And that was the extent of our conversation. And she probably said -- I don't know. I could be making this up. I'll catch you up when you get back from vacation. Enjoy the rest of your time.
**Q. So she didn't tell you any specifics about why she was asking that? You're shaking your head. You mean no?**

Page 20

A. No.
**Q. Okay.**
A. Not that I recall anything more than that. It was a brief conversation. I was on a train.
**Q. Okay. Could I have you look at Exhibit 36? Okay. Put in front of you Exhibit 36. Have you seen -- if you haven't seen this document in particular, have you seen these e-mails?**
A. This originated from me to the HR director.
**Q. Okay. So the bottom here is an e-mail from Katie Allen to you on September 11th saying, please accept my resignation. Right?**
MS. COOPER: Words.
A. Yes.
BY MR. DUGAN:
**Q. And you said you -- on September 16th, which was Tuesday in the afternoon, you e-mailed that to Wendy Fritz and said, hi, Wendy, I'm just now checking e-mails while sitting at the airport. And then you sent -- you forwarded that to Wendy Fritz, right?**

Page 21

A. Yes.
**Q. Did you have a conversation with Wendy Fritz at that point?**
A. Not that I recall.
**Q. All right. And then you -- you flew back to Kansas City on the 16th. You were in the airport then.**
A. Yes.
**Q. And then you went back to the office on the 17th.**
A. Yes.
**Q. Before you went back to the office, did you have conversations with anyone in the office?**
A. Yes.
**Q. Who did you talk with?**
A. One of my -- one or more of my assistant directors. At the airport.
**Q. What were those conversations about?**
A. What have I missed? What do I need to know? I'm coming back to work tomorrow.
**Q. And what did you learn?**
A. That Katie was no longer employed.
**Q. Did you ask why?**
A. Probably.
**Q. Did you -- how did you respond to that?**

Page 22

A. Okay. I --
**Q. You were just --**
A. -- just interesting.
**Q. You were just taking information.**
A. I was taking it.
**Q. Okay. When did you go to work the next day?**
A. When?
**Q. What time?**
A. I don't know.
**Q. What time do you usually go to work?**
A. Sometime between seven and 8:30.
**Q. When you went back to work on the 17th, which I believe is a Wednesday, did you talk with anyone about Katie Allen?**
A. Probably.
**Q. Do you remember talking with Randy Watson about Katie Allen?**
A. No.
**Q. Do you remember talking with Wendy Fritz about Katie Allen?**
A. Not specifically.
**Q. Do you remember specifically talking with anyone about Katie Allen?**
A. I remember many people having their

Page 23

version of what happened the week I was gone.
**Q. What were the different versions that you heard?**
A. That they had trouble reaching her when she didn't show up for work and finally got a confirmation that she was gone. And Wendy directed staff to send all the phone calls that were coming into her office, and people were just generally unsettled.
**Q. What do you mean by unsettled?**
A. Anytime someone leaves unexpectedly, people are curious and concerned.
**Q. Was anyone, as far as you remember, upset with Katie?**
A. Can you define upset?
**Q. Angry.**
A. No. I would say a better word would be disappointed.
**Q. How did they express that disappointment?**
A. I can't believe she did it. What was she thinking? We enjoyed working with her.
**Q. When you say they can't believe she did it, do you mean the post itself or not coming into work?**
A. Both. Well --

Page 24

**Q. Did people know why she didn't come in?**
A. No. Well, no. I don't -- I don't believe they did. I --
**Q. Did you ever learn why she didn't come in during that period?**
A. No.
**Q. You don't know now why she didn't come in.**
A. No. Just my own conclusion.
**Q. What's your own conclusion?**
A. I probably wouldn't have either.
**Q. Why not?**
A. Because most people don't like to be the topic of conversation.
**Q. Did you ever have another conversation with Katie Allen?**
A. Never.
**Q. And I take it -- sounds like you didn't really have any conversations with people before September 15th. You -- is it fair to say you didn't have any input into the decision about what should happen to Katie Allen, whether she should stay and resign or be terminated?**
A. 100 percent fair.
**Q. No involvement at all.**

Page 25

A. The commissioner told me to turn off my e-mail and I did.
**Q. When you went on vacation, he said turn off your e-mail, go enjoy your vacation.**
A. That morning, when I told him I was getting ready to get on the airplane, I can't do anything to help, and he said, turn off your e-mail and go on vacation.
**Q. All right.**
A. I did.
**Q. He was saying that for your benefit, it sounds like. Is that right?**
A. I --
**Q. -- to -- to allow you to enjoy your vacation?**
A. I believe that was true.
**Q. You learned either shortly before, when you came back to work, that there had been some disruption in the office. Is that right?**
A. Yes.
**Q. What did you learn about that?**
A. Phone calls.
**Q. How did you learn that?**
A. My assistant took a lot of them.
**Q. And your assistant is?**

Page 26

A. Gayle.
**Q. Did Gayle tell you how many calls she got?**
A. I don't have a number.
**Q. Did she actually talk with people or did she just listen to voicemails?**
A. I can't answer that. I don't know. I didn't ask.
**Q. Did you get any calls about it?**
A. I don't have voicemail on my phone.
**Q. Did you get any direct calls of that? Did you ever -- strike that.**
**Did you ever talk with a member of the public about Charlie Kirk and Katie Allen?**
A. Can you specify a time frame?
**Q. In -- in that week, the week of September 15th, did you get any angry calls from people upset about Katie?**
A. No.
**Q. The week after that.**
A. No.
**Q. Anytime that you remember.**
A. No.
**Q. Did you get e-mails about it?**
A. Not that I recall. I'm sure they would

Page 27

be in your evidence if I had.
**Q. Did you hear that Katie Allen had missed a meeting on Friday the 11th? Sorry. Excuse me. Friday the 12th.**
A. For clarification, do you mean that she didn't show up for a meeting she was scheduled to be at?
**Q. Yes.**
A. No.
**Q. Do you know who Mena Patrone is?**
A. No.
**Q. When you came back in the office on the 17th, and during that week, did you experience any of this -- that disruption yourself from people calling?**
A. Can you rephrase what you're asking me?
**Q. I think you said you didn't talk to people, but were you aware that people were receiving calls or e-mails about Charlie Kirk and Katie Allen during your first week back?**
A. I believe at the point I came back that the calls were all being directed to somebody else.
**Q. Okay. You said a little earlier, I think, that Wendy said the calls should be**

Page 28

**directed to her. Is that right?**
A. Some -- I -- HR told people that were answering the phones to send the calls somewhere else. I -- I can't say if they were to her personally or not.
**Q. Do you know where the calls were directed?**
A. No.
**Q. So as far as you could tell, did the office function normally when you came back to work?**
A. Yes. The -- I just want to clarify. The office, by my team.
**Q. Okay.**
A. Okay. I have no idea about the general whole office. My team was functioning when I came back -- that week when I came back.
**Q. All right. Another -- then the disappointment you described earlier, you didn't have any complaints from people on your team about Katie Allen.**
A. No.
**Q. And you didn't hear any complaints from school districts about Katie Allen.**
A. No. She had not been employed long

enough to have contact with very many people. She was still learning the job.

**Q. And you didn't have any conversations or e-mails with members of the public who were upset about her when you came back to work?**

A. Personally, no.

MR. DUGAN: That's all I have. Thank you.

MS. COOPER: No questions. Read and sign.

(THEREUPON, the deposition concluded at 1:21 p.m.)



SIGNATURE

The deposition of ELIZABETH ANN FULTZ was taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the deponent will read and sign the transcript of said deposition.



AFFIDAVIT

STATE OF ______________________________:

COUNTY/CITY OF ______________________:

Before me, this day, personally appeared, ELIZABETH ANN FULTZ, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition, along with the attached Errata Sheet, if changes or corrections were made.

____________________________

ELIZABETH ANN FULTZ

SUBSCRIBED and SWORN to before me this __________ day of ___________________, 2026 in the jurisdiction aforesaid.

___________________ _________________

My Commission Expires Notary Public



DEPOSITION ERRATA SHEET

RE: APPINO & BIGGS REPORTING SERVICE, INC.

FILE NO.: 79521

CASE: KATIE ALLEN vs.
RANDY WATSON, et al.

DEPONENT: ELIZABETH ANN FULTZ

DEPOSITION DATE: 05/01/2026

To the Reporter:
I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.

PAGE:LINE FROM TO REASON

.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.

SIGNATURE:__________________ DATE:__________

ELIZABETH ANN FULTZ



CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Douglas Stone, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A. 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 15th day of May, 2026.

__________________

Douglas Stone, C.C.R. No. 1518