**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

KATIE ALLEN,

                                    Plaintiff,

v.                                                          **Case No. 2:25-cv-02556-EFM-JBW**

RANDY WATSON, in his offical and individual
capacity,

AND

JAKE STEELE, KANSAS COMMISSIONER OF
EDUCATION, in his official capacity,

                                    Defendants.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION FOR**
**PARTIAL SUMMARY JUDGMENT AS TO DEFENDANTS' LIABILITY**

Randy Watson violated Katie Allen's First Amendment rights when he terminated her

shortly after she posted a Facebook comment critical of Charlie Kirk, an activist who was shot

and killed while visiting a college campus to engage in political discussions with students.

Bowing to the "heckler's veto," Watson acquiesced to the crowd of persons who, stirred up by

politicians' Facebook posts, called and emailed Watson's office demanding that Allen be fired for

her comment. Had Allen not posted about Kirk, she would not have been terminated.

The facts here are limited, simple, and straightforward, and in all material respects

undisputed. Because Allen posted on social media regarding a matter of public concern unrelated

to her work for the Kansas Department of Education, the First Amendment protects her right to

freedom of speech. That right has been well established for decades. Allen's Facebook comment

caused no significant disruption in the workplace that would counterbalance her constitutionally

protected right to speech, so Defendants do not enjoy qualified immunity for terminating Allen. Allen is entitled to partial summary judgment as to Defendants'[1] liability.

### PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Katie Allen was hired as a senior research analyst for the Kansas State Department of Education ("KSDE") and began work on August 20, 2025; Exhibit 2, Deposition of Wendy Fritz 12:14-19; Exhibit 4, Deposition of Katie Allen 32:9-11.

2. Allen was part of the Career Standards and Assessment Services department, headed by Director Beth Fultz. Exhibit 1, Deposition of Randy Watson 18:19-21; Exhibit 3, Deposition of Beth Fultz 6:4-8, 9:2-11:9.

3. Allen's job was to pertained to state funding for school districts for students considered at-risk and help ensure that district used the money on evidence-based programs. Exhibit 4, Allen Dep. 26:21-27:25.

4. Defendant Randy Watson was Commissioner of the Kansas State Department of Education from 2014 until his retirement on June 1, 2026. Exhibit 1, Watson Dep. 8:2-8.

**The Facebook Post and the Outrage**

5. On September 10, 2025, after conservative activist Charlie Kirk was shot, a Facebook friend of Allen's posted a comment referencing Kirk's earlier comment that some deaths by guns were the price for Second Amendment Freedoms. Exhibit 5, Facebook post.

6. Allen, seeing the comment as she walked to her car after work, commented, "well deserved." *Id.*

---

[1] Plaintiff initially sued Watson in both his individual and official capacities. Watson retired on June 1, 2026, and the new Education Commissioner is Jake Steele, so the current defendants are Watson in his individual capacity and Steele in his official capacity.

7. When Allen made her post, she knew that Kirk had been shot, but she did not know that he had died. Exhibit 4, Allen Dep. 56:18-24.

8. By the time Allen reached her car, she thought better of her comment, so she deleted it and posted an apology. Exhibit 4, Allen Dep. 57:2-23; Exhibit 6, Apology Post.

9. Even though Allen's comment was only up for approximately five minutes, someone saw it, took a screen shot of it, and began to spread it. Exhibit 4, Allen Dep. 61:18-62:16.

10. Soon public officials, including Kansas State Senator and gubernatorial candidate Ty Masterson and Kansas State Senator Brad Starnes posted on social media that Allen should be fired for her comment. Exhibit 7, public post from Starnes and Masterson.

11. Senator Masterson posted Allen's personal phone number on social media, and Allen began to receive anonymous calls on Thursday evening. Exhibit 4, Allen Dep. 61:18-62:13.

12. Watson was aware that Senators Masterson and Starnes were calling for Allen to be terminated. Exhibit 1, Watson Dep. 95:12-15.

**Calls and Emails About Charlie Kirk and Katie Allen**

13. Members of the public began to call and email the Department of Education calling for Allen's termination.

14. Shortly after Allen's Facebook post, Commissioner Watson sent the post to the head of Human Relations at KSDE, Wendy Fritz. Exhibit 3, Fritz Dep. 16:20-17:14.

15. Fritz also received emails from the public during the period from September 10, 2025 to September 15, 2025, requesting that Allen be terminated. Exhibit 2, Fritz Dep. 22:7-23:7.

16.     Telephone calls from members of the public came in to various employees at KSDE, including the Review and Assessment Team, HR, the Commissioner's assistant, the teacher licensure staff, and the secretary to the State Board of Education. Exhibit 2, Fritz Dep. 27:8-29:19.

17.     All of the individuals who received calls about Charlie Kirk and Katie Allen answered calls from members of the public about different issues as part of their regular job duties. Exhibit 1, Watson Dep. 121:6-15; Exhibit 2, Fritz Dep. 35:11-16.

18.     The persons receiving calls from angry members of the public had been trained to handle calls from upset persons. Exhibit 1, Watson Dep. 127:11-15.

19.     Calls from angry members of the public were "a fairly regular occurrence" at KSDE. Exhibit 1, Watson Dep 126:8-14.

20.     HR Director Wendy Fritz directed that staff send all calls to her office. Exhibit 3, Fultz Dep. 22:23-23:9.

21.     Fritz directed staff not to answer calls coming it, but to allow them to go to voicemail, to listen to the voicemails, not to respond to the calls about Charlie Kirk, and to forward other voicemails to the appropriate persons. Exhibit 2, Fritz Dep. 36:18-37:16.

22.     Watson received numerous emails from members of the public who were angry about Allen's Facebook post. Exhibit 1, Watson Dep. 114:2-12.

23.     KSDE generally did not respond to emails that came in concerning Kirk and Allen. Exhibit 1, Watson Dep. 119:4-9, 122:7-10.

24.     One email Watson received from someone who signed his email "Very upset and angry American" stated, "if she is not removed, I will make it my job to spread the physical address of your immediate family and ALL innocent young females in your family. We will not

4

tolerate this shit and if you don't think we are serious then please don't remove Katie." Exhibit 10, Gaertner email.

25.    At 11:45 am on September 11, 2025, Danny Zeck, a member of the Kansas State Board of Education forwarded an email regarding Allen Facebook post to Watson and said, "Randy, we need to visit today about this email." Exhibit 8, Zeck email.

26.    That afternoon, Michelle Dombrowsky, another member of the State Board of Education, forwarded an email from a constituent demanding and the Board "investigate and immediately terminate" Allen to other members of the Board and to Watson, adding her own comment that, "I personally would like to see it addressed. Sooner rather than later." Exhibit 9, Dombrowsky email.

27.    Watson was unaware of anyone who needed services from the Department who was unable to get through to the Department. Exhibit 1, Watson Dep. 137:4-12.

28.    Staff forwarded all business-related calls, as opposed to calls about Charlie Kirk and Katie Allen, to the appropriate person. Exhibit 2, Fritz Dep. 39:15-40:4.

29.    Watson was unable to identify any work of the agency that had gone undone because of the calls concerning Charlie Kirk and Katie Allen. Exhibit 1, Watson Dep. 129:16-130:19.

30.    Fritz was unable to identify any particular work that did not get done because of the calls coming in about Kirk and Allen and could identify no long-term deficiencies in the Department's work. Exhibit 2, Fritz Dep. 31:22-32:15.

31.    When asked whether any work did not get done because of the calls coming in, Fritz testified, "I do not know." Exhibit 2, Fritz Dep. 35:8-10.

32.      Watson and the Department were unaware of anyone outside the agency who worked with Allen who was upset about her Facebook post about Charlie Kirk. Exhibit 1, Watson Dep. 32:20-24; Exhibit 2, Fritz Dep. 62:21-63:2; Exhibit 3, Fultz Dep. 13:15-14:2, 28:23-29:2.

33.      No one within the agency raised concerns about Allen's Facebook post. Exhibit 1, Watson Dep. 130:20-131:15; Exhibit 2, Fritz Dep. 63:3-14.

34.      to HR Director Fritz, "there was no disruption based on the post that Katie made. It was purely the disruption of hundreds of calls that were coming in and the nature of the messages that people were sharing in those phone calls." Exhibit 2, Fritz Dep. 69:16-25.

35.      According to Watson's sworn testimony, no one was unable to do their jobs because of Allen's Facebook post, and any disruption was caused by calls and emails that came in from members of the public to KSDE. Exhibit 1, Watson Dep. 139:7-18.

36.      KSDE did not keep records of the calls coming in about Kirk and Allen, and has no way to verify how many such calls came in. Exhibit 2, Fritz Dep. 30:11-19, 39:11-14.

**Katie Allen's Response**

37.      Allen also received calls, including death threats, on her personal cell phone, after Masterson published her number. Exhibit 4, Allen Dep. 61:18-62:16, 66:8-67:15.

38.      Because of those threats, Allen feared for her life. Exhibit 4, Allen Dep.66:8-67:15.

39.      On the evening of September 11, 2025, in an attempt to stop the threats, Allen sent an email to her supervisor, Beth Fultz, stating, "Hi Beth, please accept my resignation as of today. When I left for the doctor in MHK at noon, I regrettably posted mean words online (then deleted and later apologized) the other day and have brought on hate from a whole bunch of

6

people. Today has been filled with stress and threats of violence against me, and I don't want to bring that negativity to the agency. My apologies, Katie." Exhibit 11, Allen email to Fultz; Exhibit 4, Allen Dep. 66:8-67:15.

40.     Allen immediately received an auto-response from Fultz's email address, stating, "I'm on vacation and will return to the office on Wednesday, September 17, 2025." Exhibit 11.

41.     Allen sent her September 11 email because "I was just scared for my life and I was thinking, oh, they'd see my badge check out. And if she correlated that, she could tell them that that was the last time I was there. And in my mind, I thought that would stop them from harassing me." Exhibit 4, Allen Dep. 71:8-17.

**The Decision to Terminate Allen**

42.     On Friday, September 12, 2025, Watson and Fritz were concerned about Allen, because no one had heard from her. Exhibit 2, Fritz Dep. 46:19-47:10.

43.     On Monday, September 15, 2025, Fritz came to believe that Allen should be separated from the agency, because of "the hundreds of calls that our agency was receiving." Exhibit 2, Fritz Dep. 24:20-25:4.

44.     Fritz then recommended to Watson that Allen be separated from the agency. Exhibit 1, Watson Dep 49:8-50:2; Exhibit 2, Fritz Dep. 49:2-6.

45.     Fritz believed that Allen should be given the opportunity to resign her position, but did not believe she should be given the opportunity to remain employed. Exhibit 2, Fritz Dep. 25:18-26:4.

46.     Watson heard the recommendations of Fritz and others that Allen be separated, and he agreed with the recommendation. Exhibit 1, Watson Dep. 112:22-113:1 ("ultimately I agreed with that recommendation").

47.     On September 15, 2025, Allen had two telephone conversations with Watson. Exhibit 4, Allen Dep. 77:6-83:9.

48.     During the September 15 conversations, Watson "shared with Katie that her employment with the Kansas State Department of Education needed to be separated." Exhibit 2, Fritz Dep. 57:10-19.

49.     Watson stated that Allen would have the option to be terminated or to resign. *Id.*

50.     Allen responded that Watson would have to fire her. *Id.*; Exhibit 4, Allen Dep. 82:10-18.

51.     During the second September 15 phone call, Watson repeatedly asked Allen to resign, and said, "we need to do something." Exhibit 4, Allen Dep. 81:10-21.

52.     Watson offered to allow Allen to resign, but did not offer her the opportunity to stay. Exhibit 1, Watson Dep. 158:10-16.

53.     During one of the September 15 phone calls involving Watson and Allen, Allen suggested that she receive a suspension rather than a termination, but Watson declined that option. *Id.* 84:20-85:9.

54.     During the second September 15 phone call, Allen repeatedly refused to resign. *Id.*

55.     During the same call, Watson told Allen "that we were going to separate from service." Exhibit 1, Watson Dep. 77:16-21.

56.     Watson ended the conversation with Allen by saying, "we're parting ways," and he handed the phone to Fritz, who discussed with Allen the logistics of separation from service. *Id.*; Exhibit 1, Watson Dep. 81:13-82:4.

57.     Fritz then told Allen a letter would be sent regarding the end of her employment, describing the what needed to happen then, such as the return of Allen's badge. Exhibit 2, Fritz Dep. 82:22-83:9.

58.     During Allen's conversations with Watson and Fritz on September 15, no one mentioned Allen's September 11 email regarding resignation, and Watson and Fritz were both unaware of the email. Exhibit 1, Watson Dep. 161:12-17; Exhibit 2, Fritz Dep. 58:23-59:3; Exhibit 4, Allen Dep. 84:25-85:3.

59.     On September 16, 2025, Fultz, returning from vacation, opened her email, learned of Allen's September 11, 2025 email regarding her resignation, and forwarded the email to Fritz, who then forwarded it to Watson. Exhibit 12, Email string regarding resignation; Exhibit 2, Fultz Dep. 20:20-21:1.

60.     Watson, Fritz, and Fultz all learned of Allen's September 11 email on September 16, 2025. Exhibit 1, Watson Dep. 161:7-11; Exhibit 2, Fritz Dep. 54:13-23, 56:7-10.

61.     After learning of Allen's September 11 email, Watson directed that the resignation be accepted. Exhibit 2, Fritz Dep. 56:16-57:2.

62.     On September 16, 2025, Fultz emailed Allen purporting to accept Allen's resignation, saying, the Department "has received an accepted your resignation." Exhibit 13. Email from Fritz to Allen.

63.     During her employment at KSDE, Allen had no work performance issues. Exhibit 2, Fritz Dep. 70:18-24; Exhibit 2, Fultz Dep. 13:15-14:2.

64.     Other than Allen's Facebook post, KSDE can identify nothing that would have led to her termination or resignation. Exhibit 2, Fultz Dep. 70:18-71:6.

65.    If Allen had not made her Facebook post, the calls and emails from members of the public would not have occurred. Exhibit 1, Watson Dep. 154:16-23.

## ARGUMENT

Katie Allen, a research analyst for the Kansas Department of Education, made an impolitic comment on social media about the shooting of Charlie Kirk. Many people disagreed with it. When she thought about it for a few minutes, she disagreed with it herself, so she deleted her comment and posted an apology. But it was too late. Someone spread a screenshot of her comment, and a large number of people called or emailed the Department of Education to demand that Allen be fired.

Of course speech does not lose First Amendment protection just because it's objectionable. That is the point, and the beauty, of the First Amendment. Clamoring, enraged voices, however, can be hard to resist. So Education Commissioner Randy Watson terminated Allen to quiet the crowd, to stop the calls and emails from angry members of the public. Faced with a choice between convenience and the Constitution, he chose convenience, forcing Allen to pay for her speech with her job. As shown below, Katie Allen's termination violated her First Amendment rights.

But we turn first to a fundamental question: did she resign or was she terminated? Because the parties never had a meeting of the minds regarding resignation, and because both parties' actions were inconsistent with resignation. Watson's decision to separate Allen from her job was a termination.

### I.    Allen's September 11, 2025 Email Was Not an Effective Resignation, Because There Was No Meeting of the Minds Regarding Resignation.

In a moment of fear, Allen submitted an email to Beth Fultz, Director of the Career Standards and Assessment Services department, offering her resignation. Her email stated,

"please accept my resignation." Plaintiff's Statement of Undisputed Material Facts ("PSOF") ¶ 39. She added, "I regrettably posted mean words online (then deleted and later apologized) the other day and have brought on hate from a whole bunch of people. Today has been filled will stress and threats of violence against me, and I don't want to bring that negativity to the agency. My apologies." *Id.* But Fultz was on vacation in California, and for approximately five days, no one other than Allen knew about the email. PSOF ¶¶ 59-60. During the discussions in the four days after the email, when Watson decided Allen must be separated from the agency, there was no meeting of the minds about Allen's resignation. And by the time KSDE responded to the September 11 email saying that the department "has received and accepted your resignation" (PSOF ¶ 62), Allen had clearly communicated that she did NOT intend to resign, so there was no meeting of the minds at that point, either. There was never a meeting of the minds that Katie Allen would resign.

In these circumstances, Allen's email did not constitute an effective resignation. It has long been the law in Kansas that "resignations take effect on their acceptance by the officer or officers authorized to fill the vacancy . . . and until accepted they are simply offers to resign." *Rogers v. Slonaker*, 32 Kan. 191 (1984). *See also State v. Board of Education of City of Council Grove*, 108 Kan. 101 (1920) (resignation not presented to the decision makers, so "there never has been an unconditional or effective resignation").

More recently, the Kansas Supreme Court addressed the mechanics of resignation of a public school teacher in *United School District No. 446, Independence, Kansas v. Sandoval*, 295 Kan. 278 (2012). In Sandoval, a public school teacher was notified that her contract would not be renewed, and she orally agreed to terms of resignation as of March 28. After the terms of the oral agreement were reduced to writing, the teacher changed her mind and said she wanted to proceed

11

with a due process hearing. She continued teaching beyond the March 28 resignation date and through the end of the school year. The board then decided to non-renew her contract.

The lower courts held that her oral agreement to resign was an enforceable contract, but the Kansas Supreme Court disagreed, holding that the discussions regarding her resignation were essentially preliminary negotiations, and the school district had not shown a meeting of the minds. 295 Kan. at 279.opp

Critically, the Court's analysis went further. Even if the original resignation had been legally effective, it held, it was not enforceable, because the parties actions were inconsistent with resignation. "A contract ceases to be in force," the Court held, when it is rescinded by mutual consent, and the courts will treat a contract as abandoned when one party acquiesces to the acts of another party that are inconsistent with the existence of a contract." 295 Kan. at 285-86. See also *Dickinson v. Lawrence Lodge*, 135 Kan. 87, 90 (1932).

Here, before anyone at KSDE knew about Allen's email offering to resign, Watson asked Allen to resign, and Allen stated repeatedly that she would not resign. PSOF ¶¶ 51-54. Allen's resignation was "accepted" on September 16, but only after she had clearly articulated to the Commissioner and to HR on September 15 that she would not resign.

Based on *Sandoval*, even if Allen's September 11 email had constituted an effective resignation, the parties' subsequent speech and conduct nullified it. While Watson and Allen were discussing the calls and emails coming in to the office, he asked her to resign, and she refused. Both of these actions – his ask, her refusal – are inconsistent with prior resignation. Watson didn't know about Allen's September 11 email during the September 15 discussions, so his actions were consistent with her status as an employee. And Allen stated clearly that she would

not resign. So there was no meeting of the minds that Allen had resigned. Both parties considered Katie Allen to be an employee as of September 15.

Allen wrote her resignation email in a moment of panic and fear. It was as if she had said it to herself, much like an unhappy employee might mumble "I quit" to himself, unaware that video surveillance was recording him. He then calms down, comes to work the next day, and discusses his work schedule for the next week, and says nothing of his earlier "I quit" comment. No one else knows about it yet, and both parties act as if the worker is still an employee. And under *Sandoval*, he *is* still an employee. If the store manager later sees the surveillance video and tells the worker she accepts his resignation, that employee has not resigned; he has been terminated.

So Watson terminated Allen. As the head of the agency, he had the authority. He told Allen on September 15 that there would need to be a separation of service, and he turned Allen over to the head of HR to discuss the logistics of separation. PSOF ¶¶ 49-56. While Watson offered to permit Allen to resign in lieu of being terminated, she did not accept that offer, and Watson did not offer an option for Allen to stay in her job. *Id*. At that point it was clear: Katie Allen would no longer be an employee at KSDE, but it was not of her own volition.

**II.    Allen's Termination Violated Her First Amendment Rights.**

The First Amendment holds an honored place in American jurisprudence. As the Supreme Court stated in 1949, "the right to speak freely and to promote diversity of ideas and programs is . . . one of the chief distinctions that sets us apart from totalitarian regimes." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). The Court continued, saying that although speech "may strike at prejudices and preconceptions and have profound unsettling effect," it is protected unless it is "likely to produce a clear and present danger of a serious substantive evil that rises far above

public inconvenience, annoyance, or unrest." *Id.* The Court added, "there is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." *Id.* at 4-5; *see also Edwards v. South Carolina*, 372 U.S. 229, 237-38 (1963) (protesters could not be punished just because "their speech stirred people to anger, invited public dispute, or brought about a condition of unrest").

Employees of public agencies do not lose their First Amendment rights by virtue of their employment. When a public official takes actions that restrict an employee's speech on matters of public concern, they violate the employee's First Amendment right to speech. In *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563, 574 (1968), the Supreme Court held that "the threat of dismissal from public employment is . . . a potent means of inhibiting speech" and that, absent proof of false statements made knowingly or recklessly, a public employee's "exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *See also Connick v. Myers*, 461 U.S. 138, 142 (1983); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

The core facts and legal arguments here are not disputed, and the meet the element necessary for First Amendment protection: (1) Katie Allen was a public employee; (2) Away from the workplace, as a private citizen, she commented on a post on social media on a matter of public concern that had nothing to do with her job; and (3) A few days later she was terminated.

### A.  Allen Was a Public Employee.

Plaintiff Katie Allen was a senior research analyst for the Kansas State Department of Education when she was terminated in September 2025. PSOF ¶ 1. There is no dispute that she was a public employee.

### B.  Allen Posted a Facebook Comment as a Private Citizen.

Nor is there any dispute that when Allen posted a comment on Facebook about Charlie Kirk, she was acting not as a public employee, but as a private citizen. After she left work on September 10, 2025, she saw a friend's Facebook post about Charlie Kirk. She commented on the post on the way to her car, deleted it by the time she got to her car, and later posted an apology for her comment. PSOF ¶¶ 6-8. She posted her comment about Kirk while she was away from the office, and it had nothing to do with her job in the Career Standards and Assessment Services department, evaluating state funding for school districts for at-risk students. PSOF ¶¶ 2-3. Thus, there is no question that Allen posted about Charlie Kirk on Facebook as a private citizen.

### C.  Allen's Post About Charlie Kirk Was on a Matter of Public Concern.

For speech by a public employee to be protected, it generally must be on a matter of public concern. *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1202 (10th Cir. 2007). Speech involves a public concern if it pertains to "'interest to the community, whether for social political, or other reasons.'" *Id.* at 1205. In *Brammer-Hoelter*, the Tenth Circuit determined whether the matters of speech pertained to public matters, such an Academy's code of conduct, charter, and elections (in which case they were protected) and personal complaints (in which case they were not. *Id.* at 1206.

15

The Tenth Circuit has held that the public concern test "is not intended to apply to areas in which the employee does not speak at work or about work," but rather "is intended to weed out speech by an employee speaking *as* an employee upon matters only of personal interest." *Flanagan v. Munger*, 890 F.2d 1557, 1564 (10th Cir. 1989) (emphasis in original). The Tenth Circuit further explained, "[t]he purpose of the public concern test is to avoid raising personal personnel grievances to constitutional cases" and that that purpose is served "by a test which requires cases involving nonverbal expression which is not at work nor about work to involve protected expression." *Id.* at 1365. Although *Flanagan* was addressing nonverbal speech outside the workplace, there is no basis to distinguish verbal speech outside the workplace from nonverbal speech.

In any event, Allen's speech about Charlie Kirk indisputably was speech on a matter of public concern. The shooting of Charlie Kirk captured the attention of the entire nation, with many loud voices either extolling or castigating him for his views. Those voices are in fact evidenced by the calls and emails that came in to KSDE. The President of the United States ordered flags flown at half-staff in honor of Kirk's death, and the Vice President advocated that persons making comments critical of Kirk be called out and fired from their jobs. The shooting of Charlie Kirk was a quintessential matter of public concern. Numerous courts have found that comments on similar issues were matters of public concern. *E.g.*, *Rankin v. McPherson*, 482 U.S. 378, 386 (1987) (comment about the assassination attempt on President Reagan "plainly dealt with a matter of public concern"); *Thomas v. Blanchard*, 548 F.3d 1317 (10th Cir. 2008) (report of potential wrongdoing by a mayor was "quintessentially a matter of public concern); *Reges v. Cauce*, 175 F.4th 1014, 1033 (9th Cir. 2026) (public university's speech mocking land acknowledgments was "unquestionably . . . a matter of public concern); *Noble v. Cincinnati &*

16

*Hamilton County Public Library*, 112 F.4th 373, 381 (6th Cir. 2024) (comment in opposition to "Black Lives Matter" protests was speech on a matter of public concern); *Marquardt v. Carlton*, 972 F.3d 546, 548 (6th Cir. 2020) (Facebook post that expressed satisfaction at the killing of a 12-year-old Black boy was speech on a matter of public concern).

### D. Defendants Do Not Have Qualified Immunity.

#### 1. Defendants' Interest in an Efficient Workplace Does Not Outweigh Allen's First Amendment Interest.

While public employees have the right not to be dismissed for their private speech on matters of public concern, those rights can be limited if the employer can show that its interest in the efficiency of the public services outweighs the employee's interests under the First Amendment. *Pickering*, 391 U.S. at 568. The Court in *Pickering* cautioned, however, that "[t]he public interest in having free and unhindered debate on matters of public importance – the core value of the Speech Clause of the First Amendment – is so great" that public entities are severely restricted in taking action against the speaker. *Id.* at 573. When balancing those rights against the right of the employer to an efficient workplace, considerations include "whether the [expression] impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impeded the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 482 U.S. at 388; *Flanagan*, 890 F.2d at 1565. Absent such a showing by the employer, "the balance must tip in favor of protection." *Flanagan*, 890 F.2d at 1565.

The Tenth Circuit has been particularly critical of claims that an employer's interest in efficient public service outweigh an employee's speech rights, stating, "Arguably, 'the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, *by the speech itself*, of the public employer's *internal*

17

operations and employment relationships." *Flanagan*, 890 F.2d at 1566, *quoting Berger v. Battaglia*, 779 F.2d 992, 1000 (4th Cir. 1985) (emphasis by Tenth Circuit). Similarly, the Tenth Circuit has held that the *Pickering* balancing analysis "requires us to ask whether [the employer] has an efficiency interest which would justify it *in restricting the particular speech at issue.*" *Cragg v. Osawatomie*, 143 F.3d 1343, 1346 (10th Cir. 1998) (emphasis by Tenth Circuit); *Thomas v. City of Blanchard*, 548 F.3d at 1327; *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1207 (10th Cir. 2007).

Defendants say the disruption in the workplace from calls and emails complaining about Katie Allen's post was significant, but when placed under oath, Commissioner Watson and HR Director Fritz admitted that the disruptions were actually quite limited. Both admitted that the persons answering calls about Charlie Kirk and Katie Allen answered calls from members of the public as part of their regular job duties, and they had been trained to handle such calls. PSOF ¶¶ 17-18. And calls from angry members of the public were a "fairly regular occurrence." PSOF ¶ 19. So while Defendants may contend that the calls kept state employees from performing their jobs, in fact the opposite was true. Far from being disrupted, the employees answering calls form the public were merely doing their jobs.

Moreover, because of the volume of calls concerning Charlie Kirk, KSDE instituted processes to minimize any workplace disruption. HR Director Fritz directed that staff send calls to her office, then directed HR staff not to answer the calls, but to listen to the voicemails, not respond to Kirk-related calls, and forward other voicemails to the appropriate persons. PSOF ¶¶ 21. 21. And Watson testified that KSDE generally did not respond to emails that came in regarding Kirk and Allen. PSOF ¶ 29.

18

And the Department's work did not go undone. Non-Kirk-related calls were sent the appropriate persons (PSOF ¶¶ 21, 28), no one complained that they were unable to get through to KSDE (PSOF ¶ 27), and neither Watson nor Fritz could identify any work that went undone because of the calls and emails about Kirk and Allen (PSOF ¶¶ 29-30). When asked whether any work went undone, Fritz stated simply, "I do not know." PSOF ¶ 31.

As the Supreme Court stated in *Rankin v. McPherson*, the critical inquiry when balancing the agency's interest against the employee's speech interest is whether the speech impeded performance or negatively affected working relationships. There is no evidence here that it did. Watson and Fritz both testified that they were unaware of anyone outside the agency who worked with Allen who was upset about her Facebook post. PSOF ¶ 32. Nor were they able to identify anyone within the agency who raised concerns about Allen's post. PSOF ¶ 33. The critical evidence to support Defendants in this inquiry simply does not exist.

*Jorjani v. New Jersey Institute of Technology*, 151 F.4th 135 (3rd Cir. 2025) is similar to this case. There, a public university lecturer "formed the Alt Right Corporation" and argued that "'human racial equality' is a 'left-wing myth.'" 151 F.4th at 138. His speech resulted in a large number of complaints made by phone and email, causing some level of disruption for the employer. The court held that any disruption to the employer's operations "does not outweigh even minimal interest in Jorjani's speech." 151 F.4th at 144.

Further, while KSDE was able to minimize any disruption from calls and emails about Kirk and Allen, in fact there was no disruption caused by Allen's Facebook post itself, as the Tenth Circuit requires. *Flanagan*, 890 F.2d at 1566; *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d at 1207. As HR Director Fritz stated, "there was no disruption based on the post that Katie made. It was purely the disruption of hundreds of calls that were coming in and

19

the nature of the message that people were sharing in those phone calls." PSOF ¶ 34. Watson likewise testified that any disruption resulted from the calls and emails. PSOF ¶ 35.

Thus, under the law, the speech and the resulting outcry must be differentiated. The Tenth Circuit has noted that [t]he Supreme Court has squarely rejected what it refers to as the 'heckler's veto' as a justification for curtailing 'offensive' speech in order to prevent public disorder. *Flanagan*, 890 F.2d at 1566, *citing Edwards v. South Carolina*, 372 U.S. 229 (1963) and *Terminiello v. Chicago*, 337 U.S. 1 (1949). And "heckler's veto is precisely what Defendants rely on here. Defendants' witnesses agreed that Allen's speech itself had no effect on the workplace, Defendants lean on the outcry from politicians and activists to justify their termination decision. The law does not allow it.

Even if workplace disruption were attributed to Allen's Facebook post by downstream causation (which the Tenth Circuit does not permit in First Amendment cases), Allen's First Amendment rights strongly outweigh Defendants' rights to an efficient workplace. First Amendment Rights, as noted above, are heavily valued by the Supreme Court and the Tenth Circuit. As for Watson and KSDE, people whose job it was to answer phones and emails from members of the public had to answer more calls, or more accurately, listen to voicemails without responding, for a brief period of time. While some work might have been delayed because of the volume of calls, no one could identify any work that went undone. Defendants' interest in people doing their jobs, but just more of it for a while, does not outweigh Allen's rights under the First Amendment.

### 2. Public Employees' First Amended Rights Are Clearly Established.

The Supreme Court has long held that a public employer may not terminate an employee because of the employee's speech rights under the First Amendment. *Pickering*, 391 U.S. at 568;

*Connick v. Myers*, 461 U.S. at 142 (1983); *Perry v. Sindermann*, 408 U.S. at 597; *Rankin v. MsPherson*, 482 U.S. 378, 383 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constituti9onally protected interest in freedom of speech.").

More specifically, in *Rankin*, the Supreme Court addressed an extremely similar situation. In that case, a public employee commented on the assassination attempt on President Reagan, saying, "shoot, if they go for him again, I hope they get him." 482 U.S. at 381. The Supreme Court held that comment about the assassination attempt on President Reagan "plainly dealt with a matter of public concern" because "it came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention." *Id.* at 386. And it found that the employee's interest in his rights under the First Amendment outweighed the employer's interest in the efficient functioning of the workplace. *Id.* at 388-89. The Court therefore held that the employee's discharge was improper. *Id.* at 392.

The facts here are extremely similar. Watson discharged Allen because she commented as a private citizen on the assassination attempt[2] of a public figure, resulting in numerous calls and emails to KSDE by persons outraged by Allen's comment. With such parallel facts between Allen's case and *Rankin*, and with the long-standing law regarding the protection of public employees from actions that infringe on their First Amendment rights, including termination from employment, it is clear that the law has been firmly established for decades, and any public employer should have been aware of their employees' constitutional protections.

---

[2] When Allen posted her comment about Kirk, she was unaware that he had died.

**E.  Allen Would Not Have Been Terminated But For Her Facebook Post.**

To establish a First Amendment violation, it is also necessary to show that the speech at issue was a "substantial" or "motivating" factor in Watson's decision to terminate Allen. *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1203 (10th Cir. 2007); *Thomas v. City of Blanchard*, 548 F.3d at 1327 (employee's speech was "at least one 'motivating' factor in decision to terminate). An employer can demonstrate that the speech at issue was not a motivating factor in the termination by showing that "it would have taken the same action against the employee even in the absence of the protected speech." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d at 1203. Courts also examine whether the adverse action would deter a reasonable person from exercising their First Amendment rights. *Id.* at 1208.

Allen's Facebook post prompted persons to put pressure on Watson to terminate Allen. One person, who called himself a "very angry and upset American," told Watson that if Allen were not removed for her comment, he would "make it my job to spread the physical address of your immediate family and ALL innocent young females in your family." PSOF ¶ 24. Watson also received emails from members of the Kansas State Board of Education, which has authority over Watson, demanding to talk about the situation, forwarding a demand that Allen be terminated, and saying the matter should be addressed soon. PSOF ¶¶ 25, 26.

No other factors explain Allen's termination. Allen had no performance issues while she worked at KSDE. PSOF ¶ 23. No one Allen worked with, inside or outside the agency, complained about her post. PSOF ¶¶ 32, 33. Other than Allen's Facebook post, Watson and Fritz could not identify any factor that would have led to Allen's termination or resignation. PSOF ¶ 64. As Watson admitted, had Allen not posted her comment about Charlie Kirk, the calls and emails coming in to the agency would not have occurred. PSOF ¶ 65.

22

In short, had Allen not made her Facebook post, there is no reason to speculate that she might have been terminated or asked to resign. The post was therefore a significant and motivating factor in her termination. Had she not made the post, she would not have been terminated.

## CONCLUSION

Katie Allen's termination from her research analyst position at the Kansas Department of Education checks all the boxes for First Amendment protected speech:

- She was a public employee;

- She posted on Facebook as a private citizen;

- Her Facebook post was on a matter of public concern;

- Her interest in constitutionally-protected speech outweighs Defendants' interest in preventing a temporarily increased workload for some of its employees;

- Her First Amendment rights have been well established for decades; and

- She would not have been terminated has she not posted on Facebook about Charlie Kirk.

Based on the undisputed facts, Allen should be granted partial summary judgment as to Defendants' liability, leaving the issue of damages for trial.

Respectfully submitted,

**DUGAN SCHLOZMAN LLC**

 /s/ *Mark V. Dugan*
Heather J. Schlozman, KS Bar # 23869
Mark V. Dugan, KS Bar # 23897
heathis@duganschlozman.com
mark@duganschlozman.com
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
Telephone:  (913) 322-3528

23

Facsimile:   (913) 904-0213

**Counsel for Plaintiff**


## CERTIFICATE OF SERVICE


I certify that the foregoing was filed through the court's electronic filing system on July 1, 2026, providing notice to all counsel of record.


/s/ *Mark V. Dugan*
**Counsel for Plaintiff**