# EXHIBIT 1

# ORIGINAL TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

KATIE ALLEN,

Plaintiff,

vs. Case No. 2:25-CV-02556-EFM-JBW

RANDY WATSON, KANSAS COMMISSIONER OF EDUCATION, in his official and individual capacities,

Defendant.

DEPOSITION OF

RANDALL WATSON,

taken on behalf of the Plaintiff, pursuant to Notice to Take Deposition, beginning at 10:03 a.m. on the 30th day of April, 2026, at Fisher, Patterson, Sayler & Smith, LLP, 3550 Southwest Fifth Street, in the City of Topeka, County of Shawnee, and State of Kansas, before Ksenija M. Zeltkalns, RPR, Kansas CCR No. 1461.


Appino & Biggs Reporting Service, Inc.

Technology Specialist in Today's Litigation

800 E. 1st Street, Suite 305
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063

6420 W. 95th Street, Suite 101
Overland Park, KS 66212
913-383-1131

www.appinobiggs.com

that I intend to ask.

What's your current -- are you currently the commissioner of education?

A. Yes.

Q. Are you you're intending to retire?

A. Correct.

Q. When is your intended retirement date?

A. June 1 of 2026.

Q. When did you decide to retire on June 1?

A. I announced to the state board of education at their regular meeting in September of 2025.

Q. When was that? When in September?

A. We meet the second Tuesday and Wednesday of the month so I'd have to look at the calendar, see what that date was.

Q. How long have you been commissioner of education?

A. I'm finishing my 11th year. I was actually hired in 2014. I was still superintendent in November of 2014. I did some work, had some vacation time, and then officially began my duties on July 1 of 2015.

Q. And how did you get that job?

A. I applied for the job and was selected.

A. I don't know who employed her because again, there's some sublets. I just know -- I just call it the Comprehensive Center.

Q. How long have you known her?

A. Without looking at records I don't know, but a number of years.

Q. Were you involved in the hiring of Katie Allen at the department of education?

A. No.

Q. Did you know about it?

A. Yes.

Q. Did you offer input?

A. I offered that she had done good work at the Comprehensive Center and when the position came open, that that might be someone they would be interested in talking to.

Q. Who made the decision to hire her?

A. Beth Fultz and Julie Ewing.

Q. What's Beth Fultz's job?

A. She's the director of career standards in assessment.

Q. What's Julie Ewing's job?

A. She's assistant director of assessments.

Q. Is it your understanding that the two of them made a decision together to hire Katie Allen?

A. Well, I do not. I would assume very little just because of her length of tenure with us.

Q. If she had stayed for a longer period of time, do you know how much contact she would have likely had?

A. Yes. I can tell you what -- the person currently in that job has -- at least 25 percent of their time is directly working with school districts to make sure that they're in compliance with the law and they're in compliance with -- and the law has changed a little bit this year, even, in the legislative session.

Q. Who is the current person in that position?

A. Brooke Wells.

Q. Was she hired from within the agency or from outside?

A. Outside.

Q. Did you ever hear of any complaints about Katie Allen by anyone from school districts that she worked with?

A. No. But again, there's a limited time, but that's not unusual one way or the other.

Q. What's not unusual?

A. No.
Q. When did Wendy Fritz get back to you?
A. Again, I don't know the specific time.
Q. Generally when was it?
A. All three of those people I mentioned would have had conversations with me over the next two or three days at various times.
Q. When Wendy Fritz talked with you about it, what did she tell you about it?
A. The initial was we're still looking into it. Unfortunately, we had a longstanding employee that day that we were all at a funeral at that lasted most of the -- of the day in a celebration of her life, so it was in passing, I know at least one of the conversations as we were actually going to that funeral, that it did appear to be a social media post and kind of collaborating what Denise Kahler told me, that they were still looking into it.
Q. Did she have any recommendation about what should be done?
A. At that -- no. Not at that -- not at that time.
Q. Did she ever?
A. Yes.

Q. What did she say?

A. Are you asking at any time did she give some advice?

Q. Yes?

A. Yes.

Q. And what was her advice?

A. That given the disruption to the agency, that we may want to consider no longer having her employed.

Q. Consider terminating her?

A. Consideration of that would be a possibility.

Q. Did she express a personal opinion about the post?

A. No.

Q. When was it that Wendy Fritz made that recommendation?

A. Sometime between the time that I received this -- or that I'd asked her in the early morning, that Thursday early morning, sometime over the next two or three days.

Q. So her first reaction -- first report to you she just said this is a social media post and she didn't have any particular recommendation, but later then she did have a recommendation. Is

why she was seeking specifically legal counsel.

**BY MR. DUGAN:**

Q. And in that first conversation did you ask her to resign?

A. I don't believe I did. I don't have --

Q. You asked her to resign in at least one of those conversations; correct?

A. I -- no, not explicitly.

Q. Tell me why you say not explicitly?

A. Are you asking about the second conversation now?

Q. Either conversation did you ask her to resign or suggest that she should resign?

**MR. COOPER:** Object to form. That's compound. Go ahead.

A. Okay. That's a different question. I told her in the second phone call that we were going to separate from service and if she wanted, she had the opportunity to resign and we would take that under consideration but that we were going to separate from service.

**BY MR. DUGAN:**

Q. Okay. You're saying either way you're going to separate from service, but you were giving her the opportunity essentially to save

remember what my first question was.

A. I'll wait then.

Q. What question did you intend to answer?

A. Well, you asked me what was the end of the conversation, I think.

Q. Yeah. Okay. What was the end of the conversation?

A. I turned it over to Wendy Fritz who then walked her through what -- what do you have in the office. What, you know, what personal belongings if any do you have, and there were some conversations about those type of things.

Q. And why did you turn it over to Wendy Fritz?

A. Because she's our director of HR.

Q. And the reason that you turned the conversation over to the director of HR was because there needed to be arrangements for a separation from service?

A. Well, it was first did she have our devices at her home, because sometimes people take their laptop and things home. So it was more of what did she have here and what did we have there, and yes, at some point we were going to move to separation of service.

Q. The HR person had to take care of essentially the logistical aspects of separation from service?

A. That is correct.

Q. Did she tell you in either conversation that she was receiving death threats?

A. In the first conversation yes. To her and her family.

Q. Did you think at that point that there was anything that you could do to protect her from that?

A. I -- I didn't think in those terms of protecting her from -- from those threats. I didn't see there was anything I could do to, to protect her from those threats. Certainly had empathy for her.

Q. When talking with her about the need that she be separated from service, did you say that that needed to happen quickly?

A. No. I was giving her time to decide if she wanted to resign.

Q. How much time did you intend to give her?

A. We didn't specify a time.

Q. Did you tell her at the end of the conversation that she would be receiving a letter

comments to you about Katie Allen's separation from service?

A. Yes.

Q. What did she say?

A. That at some point, again, I don't know if there were other conversations, she -- she let me know that Katie had resigned previously.

Q. Okay. I'm going to show you Exhibit -- what we'll mark as Exhibit 25.

(THEREUPON, the court reporter marked Watson Deposition Exhibit No 25 for identification.)

**BY MR. DUGAN:**

Q. This is -- well, first of all you've been handed the document. What is it?

A. What is it?

Q. Yeah.

A. I have no idea what it is.

Q. Do you know somebody named David F.?

A. Yes.

Q. Who is that?

A. I know a David Fernkoph.

Q. Fernkoph? How do you spell that?

A. F-E-R-N-K-O-P-H. I don't know. I may be butchering that name.

Q. He's a friend of yours?
A. He -- he was an employee of ours.
Q. At the time, or a former employee?
A. I don't know when this was sent.
Q. Well, that was one of my questions too. I don't know either. Presumably it was sent sometime after Katie Allen's separation because there's a reference to that. He says, "It has been crazy here. The amount of teachers that have been having issues has definitely risen. Freedom of speech has not gone away but it's definitely being treated differently." Do you remember what he was talking about?
A. I think you'd have to ask David that.
Q. Well, my question though is about your memory of it.
A. I -- I have no memory of this until you presented this to me.
Q. Now that I've presented it to you, does it refresh your recollection about this conversation with him?
A. Yes. In general.
Q. What was the context?
A. He was asking to meet with me. David was asking for a meeting with me.

Ty Masterson. And on the second page he writes, "Charlie Kirk was killed for sharing his faith and expressing his political views. No one should face violence for their beliefs and no one should celebrate it. Our children deserve leaders who model respect and integrity, not division. Senator Brad Starnes, who represents Manhattan, joins me in calling for accountability and we're calling for Allen's immediate removal from her role as the Kansas Department of Education -- at the Kansas Department of Education."

Did you have an awareness that Ty Masterson and Brad Starnes were asking -- were demanding that Katie Allen be separated from service?

A. Yes. I was aware of that.

Q. How did you become aware of that?

A. Our communications director had indicated that.

Q. What else did she tell you about that?

A. I believe just that, that there had been some kind of communication or social media post or something that came from Senator Masterson and Senator Starnes, I believe also that Senator Starnes may have sent me to me in an e-mail.

Q. We will get to that. While we're here

had -- and that she was not at work and we had not heard from her. That was the early -- early days.

Q. Did you have any conversations with Hopkins, Zeck, or anyone on the board before Katie Allen's separation about whether she should be separated?

A. Not to my knowledge.

Q. Did you have an understanding of what board members thought about whether she should be separated?

A. I don't recall what Cathy and Danny's personal thoughts were, but people were giving me a lot of their personal thoughts during that time.

Q. All the people you mean who were calling and e-mailing?

A. Correct. So they may or they may -- but I don't recall -- I was calling to update them on the process because they were -- because of the volume they were getting and that's -- so they were asking for updates.

Q. You said earlier that it was going to be necessary that there be a separation. Whose decision was that?

A. That was a recommendation to me, and

ultimately I agreed with that recommendation.

Q. A recommendation by Wendy Fritz?

A. And legal counsel.

Q. And you agreed with it, meaning you were the decision maker on that?

A. We were all --

**MR. COOPER:** Object to form.

A. We were all decision makers in that. I would say the final decision we all were a part of that, but obviously discussion with legal counsel was a heavy part of that.

(THEREUPON, the court reporter marked Watson Deposition Exhibit No 31 for identification.)

**BY MR. DUGAN:**

Q. You've now been handed Exhibit 31 which is an e-mail from someone named Anthony Garber -- Gaertner at weber health to you, September 12, Friday, September 12th, 5:45 p.m. Do you remember receiving this e-mail?

A. No.

Q. Do you know who Anthony Gaertner is?

A. No, I do not to the best of my knowledge. And I say that because I meet so many people that it's possible that we would have met somewhere and

I don't remember who that person is.

Q. Anthony Gaertner says, G-A-E-R-T-N-E-R, "If she's not removed, I will make it my job to spread the physical address of your immediate family and all innocent young females in your family. We will not tolerate this shit and if you don't think we are serious, then please don't remove Katie. Thanks, very upset and angry American." Did you receive -- do you remember this e-mail at all?

A. I -- I do not remember this specific e-mail but there were e-mails similar to this.

Q. Were you concerned about this or e-mails similar to this?

A. I can tell you in general the discourse in our state, in America, has made me concerned about myself and my family on various occasions. This would be one of those occasions.

Q. Were you scared about it or did you think it would pass?

A. No, I was -- I mean we take -- take serious precautions.

Q. Did you talk any steps to protect yourself or your family?

A. Yes.

multiple days.

Q. Just about this issue?

A. Just about this issue.

Q. Okay. There've been a lot of documents produced to us but very few that show any responses to any of these complaints. Who was responding to these complaints?

A. I don't believe anyone was responding to the e-mail complaints. The phone complaints were just told that they would -- thank you. Your complaint's being, you know, recognized and if someone deems it necessary, someone may get back in contact with you if you'd like to be contacted. So there was no one directly responding to those complaints. There were too -- and no one could have responded to them.

Q. So when you're talking about people dealing with constituent complaints, you're talking about telephone calls?

A. Telephone calls, e-mails, our main switchboard was overrun.

Q. What do you mean overrun?

A. The phone call after phone call, just hang up, phone was already ringing, hang up, phone was already ringing.

most part in dealing with this. Our communication team was constantly looking at social media and tracking and posting or tracking posts and reporting to HR and then to some extent, you know, my work, but not 100 percent.

Q. Anybody outside of HR besides you and counsel?

A. Switchboard, counsel, our communications team, and then my office. And my office would be myself, Makayla Auldridge and Deborah Bremer.

Q. And Deborah Bremer is the board of education administrative assistant?

A. Yes. That is correct.

Q. And you said switchboard. Are there people whose job it is just to handle the switchboard?

A. That's correct. Maddy is the primary person but that -- there are other people that take on that duty when she has to be away for other duties and those could be multiple people, so I don't know who those people would have been.

Q. All right. So answering the phone with constituent comments or complaints is part of their job; right?

A. Correct.

Q. And part of counsel's job is to deal with problems that arise; correct?

A. That is correct.

Q. And part of your job is to deal with problems that arise; right?

A. That is correct.

Q. And most people did not respond to e-mails; correct?

A. No, to my knowledge no one responded to -- responded to the e-mails.

Q. But people were answering the phone. Were they told what to say if somebody calls in and is angry?

A. They have general training about people who are upset.

Q. And that's -- that's not with respect to this; that's general training?

A. That is correct.

Q. Because people call that are upset about various issues; right?

A. That is correct.

Q. I was asking you earlier about some of the e-mails that came in and you said we get a lot of e-mails from people about all kinds of issues; right? Some of which don't have anything

still maintain the social media feed?

A. I think you'd have to ask them that specific question. What was reported to me is, "We're not getting any of our work done. This volume is so massive we're not getting any of our work done." That's what was reported to me by the people I noted to you.

Q. Have you ever been in a similar kinds of situation since you've been commissioner where people get upset about some controversial issue?

A. Yes, I have.

Q. Tell me about that?

A. That's a fairly regular occurrence, that someone is upset about something, so I'm not quite sure how to answer when you ask, "Tell me about that," it's not a --

Q. So it happens frequently in any event?

A. That is correct.

Q. What's an example of a controversial issue that you hear from people about?

A. They may be upset about a law that was passed. They may be upset about, again, something that happened in a school that their child perceived being bullied and they want something to be done about it. Could be a situation around

special ed, complaints of law, so there are multiple reasons.

Q. Lots of things will upset people and when they get upset, they contact the department of education. Is that right?

A. Often -- oftentimes.

Q. Oftentimes.

A. If it's related to education.

Q. When an issue comes up like that and there's a lot of contact, how long does that contact usually last?

A. Usually it's a person or two or three people and it -- it depends. It can last a short, be a one-time incident or it can go on for years and lead to lawsuits. I mean, it depends.

Q. Can you think of any that have gone on for years?

A. Yes.

Q. What?

A. We have lawsuits pending, so those have gone on for years. I would have to defer to legal counsel on the specifics.

Q. Okay. Well, I don't mean to ask necessarily about lawsuits themselves but I'm asking about members of the public calling in to

and they're dissatisfied with a response, so they have a response, then they're dissatisfied with that response so it's -- it evolves over time.

Q. And it's the responsibility of the communications team to deal with those kinds of inquiries?

A. Not always. They often are looking at media inquiries, so if the media is inquiring about something. Social media, so they're looking at social media all the time to ascertain what's being said about the agency or something about that and some of those would come to them, other of those go to HR, some go our legal counsel, some come to me, some go to our deputy commissioners. It's a variety of people.

Q. You said that during there was a certain intense period where people were calling about this Charlie Kirk issue and people were unable to do their jobs. They had to just focus on this. Can you identify any specific tasks that went undone because of it?

A. No, because the reports to me were that they were just not able to do their regular job.

Q. But you're not able to identify anything -- anything specifically that someone did not do

because of this?

A. Well, I don't monitor people's daily work so I couldn't tell you even today what people are -- whether they're doing their normal job or not unless something is reported to me.

Q. Well, do you know or did anyone report to you that anything went undone, any specific thing went undone because of the Charlie Kirk and Katie Allen issue?

A. What was reported to me is that they could not get any other work done because of the volume of correspondence.

Q. Okay. I understand that. I'm trying to drill down a little bit and see if we can find something specific that went undone. And maybe we can't, but can you identify anything specific?

A. I cannot identify. I think if you interviewed those people, they could possibly tell you within their job duties.

Q. Are there people within the department of education that you know of who were upset with Katie Allen?

A. I don't remember anyone.

Q. You're not aware of her -- of relationships between Katie and anybody else in

the office being ruined or disrupted?
A. I'm not understanding your question. I must have understood it differently the first way. If you could restate your question.
Q. Yeah. Are you aware of anyone, any relationship between Katie Allen and anybody else in the department of education that soured because of what she posted?
A. I don't know what relationships Katie had with anyone in the office.
Q. Is there anyone who said that they couldn't work with Katie in the office?
A. I don't recall anyone having a conversation where anyone said that type of language to me.
Q. No --
A. I did have people outside clearly state that.
Q. Lots of people were upset outside?
A. I -- I had school people express to me concerns.
Q. Okay. Earlier I think I asked about school districts and whether any school districts had reported problems with her and I thought you said you didn't know of that?

**BY MR. DUGAN:**

Q. Do you know why it stopped?

A. No, I do not know.

Q. You said that the people were saying that most of the calls they received were -- concerned this issue. Did anyone outside the agency report to you that they couldn't get through on the phone?

A. Not to me directly.

Q. Do you know whether anybody reported that to anyone?

A. I do not have any knowledge of that.

Q. What's your understanding of what caused this disruption?

A. A -- that there was a some action on social media that Katie had some action with and that people responded to it.

Q. Okay. So the disruption was people calling. It wasn't necessarily the post itself, it was people calling in about the post; correct?

A. I don't know how to answer that, when you say it wasn't the post itself. Post is a -- it's an object isn't it? I don't understand your question.

Q. Can you identify any way in which, aside

analyzed what caused the disruption to that extent. I just know what the disruption was and I know what the events were, but I don't think I've ever analyzed, in your question, what was the specific cause of that disruption. So I've not really thought about that to even answer.

Q. The disruption you cause is people not being able to do their jobs because of the volume of communications coming in; right?

A. That's correct.

Q. Did anyone say, "I can't do my job because I am upset by what Katie Allen said"?

A. No. They said, "I'm upset because" -- upset's not the right word. "I cannot do my job because of the disruption to the environment."

Q. And the disruption to the environment was all the communications that came in?

A. That is correct.

Q. Is there any other disruption to the job that you can identify?

A. I'm not sure I understand that question.

Q. Well, and I don't -- I'm not going for anything in particular. I'm just saying okay, I want to know if there's something else that caused some other disruption in the workplace besides all

work.

Q. The post she made about Charlie Kirk where she said well deserved on that social media post, that post was a primary factor or a substantial factor in the decision --

A. No.

Q. -- to separate her?

A. No. That post had no factor in my decision.

Q. Why do you say that?

A. Because it had no factor in my decision on how to factor -- what was factored in my decision was the impact it was having on the agency and what other people were telling me about the amount of work that was not being done.

Q. All right. Had she never made that post, that impact wouldn't have happened; correct?

A. Well, I mean that's an assumption I think we all can make.

Q. Well, the impact that you saw to the agency came from people who were upset about that post; right?

A. That is correct.

Q. Would you say that 100 percent of the input you got were people who were upset about

resign, termination of service, all those were discussed.

Q. Okay. And I asked this and maybe I didn't -- wasn't clear on your answer. You listed separation from service and termination as separate items. How are those separate?

A. Separation of service for me meant that the reason for separation was left for Katie to determine.

Q. Okay. And she could -- you offered her -- in that context you offered her the opportunity to resign; right?

A. That is correct.

Q. But you didn't offer her the opportunity to stay?

A. That is correct.

Q. Did you consider during this process that you had been suspended three years before?

A. No.

Q. Did you ever consider that in -- did you ever consider whether your situations were parallel?

A. No.

Q. Why did you reject the option to let her stay?

Q. All right. And then Wendy forwarded it to you at 3:20 p.m. on Tuesday; correct?
A. I don't see that.
Q. Up at the top of Exhibit 36?
A. Oh, I apologize. Yes, that's what it says.
Q. So you said a few minutes ago that you think -- you believe you learned of this resignation e-mail on Tuesday the 16th, so that's consistent with what we're seeing here; right?
A. That is correct.
Q. Do you remember what your reaction was when you saw this e-mail?
A. I was surprised.
Q. Why were you surprised?
A. Because that it -- that she hadn't said anything to me when we talked about it.
Q. And in fact she said she -- you'd have to fire her; right?
A. That's what she said on the second phone call, yes, but even the first one she didn't mention anything to me.
Q. And you didn't mention resignation, her resignation either because you didn't know about this e-mail; right?