# EXHIBIT 2

ORIGINAL TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

KATIE ALLEN,

Plaintiff,

vs. Case No. 2:25-cv-02556-EFM-JBW

RANDY WATSON, KANSAS COMMISSIONER OF EDUCATION, in his official and individual capacities,

Defendant.

DEPOSITION OF

WENDY MICHELLE FRITZ,

taken on behalf of the Plaintiff, pursuant to Notice to Take Deposition, beginning at 10:05 a.m. on the 1st day of May, 2026, at the law offices of Fisher Patterson Sayler & Smith, 3550 S.W. 5th Street, in the City of Topeka, County of Shawnee, and State of Kansas, before Douglas R. Stone, RPR, Kansas CCR No. 1518, Missouri CCR No. 1035.

upper right corner of the first page, it says --

A. Uh-huh.

Q. -- current classification for job title --

A. Uh-huh.

Q. -- and proposed job title --

A. Uh-huh.

Q. -- one is research analyst and one is senior education research analyst. What's the difference?

A. The position previously with the previous incumbent was a research analyst, and Beth suggest -- or recommended that the position be retitled.

Q. So when Beth Fultz created the position, she created it as senior education research analyst?

A. That is correct.

Q. And was that Katie Allen's title?

A. That is correct. Yes.

Q. Why -- do you know why she changed the title?

A. No. I don't.

Q. All right. And on the second page of this exhibit -- before we get to that --

A. Uh-huh.

**THE REPORTER:** You're saying uh-huh --

**THE WITNESS:** I'm sorry.

**THE REPORTER:** -- even during his questions, which interrupts the transcript.

**THE WITNESS:** Okay.

**THE REPORTER:** Just try to avoid that.

**THE WITNESS:** Thank you.

**MR. DUGAN:** It's easy to be conversational.

**BY MR. DUGAN:**

Q. How much do you know about Katie Allen's work, substantively?

A. Katie was employed with the agency for approximately three weeks. I was not aware of her work performance at that time -- or during that duration of her employment.

Q. Okay. And -- and to refine my question a little bit. Is your knowledge of -- whatever knowledge of her that you have, does it pertain to what her job was specifically, or does it pertain primarily to your HR function with respect to her?

A. I understand. Primarily my HR function.

Q. Okay. Do you have an understanding of what her job was?

A. I have a vague understanding of what the

job was.

Q. What's your vague understanding?

A. That it was her response -- was going to be her responsibility to provide technical assistance to school districts in the area of at-risk funding.

Q. Technical assistance meaning what?

A. Visiting with school districts to assist them in -- in whatever issues they may have regarding at-risk funding.

Q. Is she actually doing research, or there are other people who are doing the research?

A. I do not know the specifics of who was conducting research.

Q. Is there an either formal or informal policy in the department of education about use of social media by employees?

A. No. There is not a social media policy with regard to personal use.

Q. Is there any expectation about people's personal use of social media?

A. There is no expectation.

Q. Have you ever disciplined anyone for their use of social media?

A. No.

A. The comments were forwarded to me. I did not find them on my own.
Q. All right. Are you friends with or do you follow Ty Masterson?
A. No. I do not follow --
Q. Do you know --
A. -- Ty Masterson.
Q. Sorry. Do you know Ty Masterson?
A. I know who he is, but I do not know him personally.
Q. Have you ever talked with him?
A. No. I have not talked to Ty Masterson.
Q. I'd like to have you look at Exhibit 26, which I believe is in that pile. This is a document that was produced to us by the department or by Mr. Watson. Have you seen this document before?
A. No. I have not seen this document before.
Q. When you said things were forwarded to you, what -- what was forwarded to you?
A. What was forwarded to me was a screenshot of the post that Katie made.
Q. Okay. Could you turn to the second page of that? Is that the screenshot you're talking

about?

A. I don't know if this was specifically it, but it was something similar to this, yes.

Q. Do you know who took the screenshot that you saw?

A. No. I do not know who.

Q. Do you remember who forwarded it to you?

A. It was forwarded to me -- it was included in an e-mail that was sent to Randy, all the board members, and Beth Fultz. And at the bottom of the e-mail was a smaller version of this screenshot.

Q. And do you remember which particular person forwarded that to you?

A. Randy.

Q. All right. Did -- when Randy did that, around the time that Randy did that, did he have any conversations with you about it?

A. No.

Q. Do you remember what you thought when you saw the post?

A. I thought, for someone that was possibly running for political office, that it probably was not the most -- the best advised post to make, but I did not have any personal feelings about the post.

to -- for any action based on a social media post.

**BY MR. DUGAN:**

Q. Were there things that were forwarded to you other than the initial forward of -- that you were just telling me about?

A. No. Nothing else was forwarded to me.

Q. Have you since seen any e-mails that came into the department about Charlie Kirk and Katie Allen?

A. Are you referring to after Ty Masterson's?

Q. Yes. In the period between September 10th of last year and about September 15th.

A. There were other e-mails that I saw and received regarding the post.

Q. And how did you receive them?

A. Via e-mail.

Q. Were they forwarded to you, or did they -- did some come to you directly?

A. I received some directly from the public. I don't recall whether or not I received any via someone forwarding them to me.

Q. Do you know how the public had your e-mail?

A. No. I do not.

Q. Do you often get e-mails from the public?
A. No. It's not a regular occurrence, but it does happen from time to time.
Q. Do you remember the nature of the e-mails that you received?
A. Requesting that Katie Allen be terminated.
Q. Were there some in support of Katie Allen?
A. No. There were not.
Q. Were a lot of the e-mails that came to you similar, or was there a lot of variance?
A. There was variance in the communication that I received.
Q. Did you feel like most of them were written personally by people? You know what I mean, other than cut and pasted.
A. It did not seem like there was a template that had been distributed that people were using. They seemed -- there was a variety.
Q. Did you have a sense that they were coming from a particular source, like from Ty Masterson or -- or someone else?
A. I had no indication of the source of the e-mails.

A. The disruption that the hundreds of calls that our agency was receiving caused such a disruption in what we were doing that we needed to take different action.

Q. Was the word you used there destruction or distraction?

A. Disruption.

Q. Disruption.

A. Uh-huh.

Q. Okay. So you came to the conclusion -- conclusion that she should be terminated because of the disruption that arose from this post.

**MR. COOPER:** Object to form. Misstate's testimony.

**BY MR. DUGAN:**

Q. Did -- did I misstate your testimony?

A. No.

Q. Then is that right? Did you come to the conclusion that she should be terminated because of the disruption that arose from the reaction to her post?

A. Terminated is not what I said. She needed to be separated from the agency.

Q. What is the distinction there?

A. It was my advice that she be given the

Q. What caused the turning point, in your opinion, when you came -- when you landed on that conclusion?

A. Again, it was the disruption that -- the hundreds of calls that we were receiving to the agency, and the inability of our employees to function normally.

Q. Who did the calls come to?

A. I don't know everyone that they came to, but I am aware that they came to my staff person that was the agency receptionist, myself.

Q. And who was that?

A. Her name is Mady Carpenter. She is no longer with the agency.

**MR. COOPER:** M-A-D-D?

**THE WITNESS:** M-A-D-Y.

**MR. DUGAN:** M-A-D-Y.

**BY MR. DUGAN:**

Q. Do you know where she is now?

A. Indiana.

Q. Do you know what she's doing?

A. No. I do not.

Q. You know why she moved to Indiana?

A. Personal reasons.

Q. Okay. So back to the question. Who --

who is receiving these calls? Mady received some of these calls, you received some of these calls. Who else?

A. My other staff person, Marissa Seele.

Q. S-E-E-L-E.

A. S-E-E-L-E. Yes.

Q. What's her position?

A. She is the human resource professional.

Q. How many people in the HR department?

A. Three.

Q. The three of you --

A. Uh-huh.

Q. -- Marissa, and Mady.

A. Uh-huh.

Q. Okay.

**MR. COOPER:** Yes.

**THE WITNESS:** Yes. Yes. There are three people on our staff.

**BY MR. DUGAN:**

Q. And then you were starting to say somebody else? Randy.

A. Randy Watson's assistant.

Q. Randy. Okay. And that is?

A. Makayla.

Q. M-A-K-A-Y --

A. M-A -- M-A-K-A-Y-L-A.

Q. And her last name?

A. Auldridge. A-U-L-D-R-I-D-G-E. Deborah Bremer, the board secretary. I know our teacher licensure staff were receiving phone calls.

Q. How many on the licensure staff?

A. Approximately 10 employees are on our licensure staff. Then our -- this -- career standards and assessment services, which is the team that Katie was a member of, that assistant received phone calls.

Q. Who's that assistant?

A. Gayle Hook. And then our special ed and title services team received calls. Because on our website it's just complaints@ksd.gov and a phone number, so -- and -- or the public that was looking for a way into our agency saw that. So I'm sure there were others, but those are the ones that I am familiar with.

Q. Are there people who are just switchboard operators?

A. That is part of Mady's position. That is not entirely her position.

Q. Tell me what the switchboard is. Is that, like, when you think of an old movie where

you have a bunch of people sitting at a switchboard? Is it like that?

A. No. It is a phone with multiple lines. She answers the phone and then transfers them appropriately.

Q. Okay. So that's part of Mady's job. Who else does that?

A. That is -- others back Mady up, but that is -- she is the primary receptionist for the agency that takes callers and walk-ins.

Q. Did people keep records of the calls that came in?

A. Not that I am aware of. I don't know that people kept records. There were too many coming in to keep accurate records.

Q. Did they keep a count of the calls coming in?

A. Again, there were too many coming in for anyone to keep count.

Q. Do you know or have an estimate of how many calls Mady Carpenter took?

A. Hundreds of calls is what Mady received. They were non-stop.

Q. Do you think hundreds could be an exaggeration?

A. No. I do not think hundreds is an exaggeration at all.

Q. Do you know how many calls Marissa Seele took?

A. No. I do not know how many calls Marissa took.

Q. Do you have a sense of how many?

A. No. I do not.

Q. Do you have a sense of how many calls Makayla Auldridge took?

A. No. I do not know how many calls specifically she took.

Q. Did Makayla talk with you about the calls that came in?

A. Yes. Makayla did talk to me about the calls that came in.

Q. What'd she tell you?

A. That they were non -- she was receiving non-stop calls and could not keep up with the calls, and it was preventing her from doing any other of her duties that she had to do that day.

Q. Did she tell you what duties she was unable to do?

A. No. She did not specifically tell me the duties that she was not able to perform.

Q. Did she have any long-term deficiencies that she -- the things that she couldn't get done because of the calls that came in?

A. I am not aware of any long-term deficiencies that she had.

Q. Did Marissa Seele say if there were duties that she couldn't do because of the calls that came in?

A. Marissa shared that she was not able to complete any of her other work that she needed to get done that day.

Q. Do you know what other work she was talking about?

A. No. I don't know specifically what assignment she was referring to.

Q. Okay. Did Deborah Bremer talk with you about calls that came in?

A. Yes. Deborah did talk to me about calls that came in.

Q. Does she sit near you in the -- in --

A. No.

Q. -- office configuration?

A. No. Deborah does not sit next to me.

Q. Where do you sit?

A. I am -- my office is located on the first

staff that is assigned to the special ed title services team.

Q. And did you talk with any of them about how many calls came in about Charlie Kirk and Katie Allen?

A. No. I did not talk to anyone on that team regarding the calls they received.

Q. Are you aware of any work they were unable to get done because of calls that came in?

A. I do not know.

Q. Is it true that part of the job of each of these people that you've described to me is to answer calls from members of the public who call in about different issues?

A. Yes. There is a -- a component to each of those jobs that would include that.

Q. How do people, members of the public, call you? And I ask that because, just for -- for background, it seems to me odd that someone would call HR with a complaint like this. Do you know why people call you?

A. I don't receive calls from the general public very often at all.

Q. And how many did you receive about this?

A. Phone calls.

Q. Yes.
A. Hundreds.
Q. On -- on what days? When did it start?
A. I don't recall getting very many, if at all, on the Thursday. It was Friday, Monday, and into the -- that whole week.
Q. The whole week. They went on through the week.
A. Uh-huh.
Q. When did they --
A. Yes.
Q. -- stop?
A. I don't recall, specifically, the date that I received the last phone call.
Q. Would it have been that week?
A. Yes. It would have been that following week.
Q. How did you handle the calls that came in?
A. We were receiving so many, we did not respond to the calls.
Q. Did you answer the phone and actually talk with people and say you couldn't respond, or did you just not pick up?
A. My direction to my staff, and the

direction that I followed as well, was not to answer the phone. There were too many calls coming in. We could not answer all the calls.

Q. I'm a little confused. Did you -- you couldn't answer all of them. Did you answer some of them?

A. We let them all go to voicemail. We listened to the voicemails, and then we forwarded the calls that needed to be addressed due to normal business to the appropriate parties afterwards.

Q. Okay. What did you do with the voicemails that came in about Charlie Kirk and Katie Allen?

A. I -- we did nothing with them, with the voicemails that we received.

Q. Are they still in the system on the phones?

A. My understanding is the state system does not still have those.

Q. Why? Why not?

A. The phone system is not controlled or administered by the department of education. I do not know what their policies are.

Q. Do you know whether phone messages like

Q. Had -- what -- why do you understand that the voice messages no longer exist?

A. I've been told that they don't exist any longer.

Q. Who told you that?

A. I do not remember who told me that the voicemails do not exist any longer.

Q. And how long ago were you told that?

A. I do not recall how long ago I was told that.

Q. Okay. So you don't have any way to verify the number of calls that came in.

A. You are correct. I have no way to verify the number of calls that came in.

Q. When you listen to the voicemails and you forwarded the calls that were normal business -- if -- if I can, I think, paraphrase you. You forwarded those to the proper people, whoever they were intended for.

A. That's correct. We forwarded the -- the calls appropriately.

Q. Do you know of any calls that came in that would have been for regular business, not for this complaint purpose, that were not handled that way?

A. I am not aware of any calls that --
Q. Okay.
A. -- we did not forward appropriately during this time.
Q. Okay. So if for a call that came in about Charlie Kirk and Katie Owen, where somebody said, this is terrible, that you shouldn't have this person working for you, she should be fired, you would listen to those calls once and then just not return the calls.
A. That is correct. We would listen to them and then not return the calls.
Q. Did any of those people ask you to call them back?
A. I -- I don't remember if callers left contact information to return their calls.
Q. The protocol of not calling people back, who -- who called with those kinds of messages, was that your suggestion or was that what everybody did?
A. That was my suggestion to staff.
Q. To -- you say to staff. To what staff?
A. If I was asked by someone as to what to do with this onslaught of phone calls that they were receiving, my advice was to let them go to

**BY MR. DUGAN:**

Q. I'd like to have you look at some texts between -- I believe between you and Randy Watson. So that'd be in this pile, Exhibits 22, 24, and 37.

A. What were the exhibit numbers?

Q. 22, 24, 37.

**MR. COOPER:** Do you have 22? I don't have 22. I think you meant 23.

**MR. DUGAN:** It's -- it's -- it's --

**MR. COOPER:** Yeah. That's 23. 22 is the Facebook apology.

**MR. DUGAN:** Okay. All right. 23 then.

**BY MR. DUGAN:**

Q. 23 is -- is that a text between you and Randy Watson?

A. Yes. Exhibit 23 is a text with myself and Randy Watson.

Q. The date, two-thirds of the way down, the phone, is Friday, September 12th, 1:33 p.m. Do you know when the texts above that were made?

A. No. I do not know exactly when the previous text was sent.

Q. This is you saying Julie hasn't heard from her today. Is that right?

A. Yes. That is correct. That is me.
Q. And then you say she's going to text you with just the haven't heard from you today question. What did you mean by that?
A. I don't know what I -- other than just what it says. I don't have any other meaning.
Q. Had you had a conversation before that with Randy Watson about where Katie was?
A. We were worried about Katie because no one had heard from her.
Q. Who raised that issue?
A. I don't remember who initially raised the concern for Katie's well-being.
Q. Okay. When you say text her with just the haven't heard from you today question. Did -- the word just makes me think there's another option? Is there another option that you could have texted her with?
A. Not that I recall.
Q. All right. All right. And then at 1:33 on Friday, he says, have we heard from Katie? And you said, just talked to Julie, nothing yet.
Did you have any more conversation with him that day about Katie Allen?
A. There were many conversations going on.

don't recall it specifically --

Q. What conversation did you have with Randy Watson before your call with Katie Allen?

A. That it was my advice that Katie be separated from employment due to this disruption that its -- staff was experiencing.

Q. Did you come to that conclusion on your own, or did you have -- did that -- is that a conclusion that came out of some kind of partnership or committee?

A. It was -- the decision was made through conversations. There was no committee that was formed to discuss Katie's post.

Q. Yeah. I didn't mean like a formal committee, but conversations -- these conversations you're talking about were with who?

A. Conversations would have been with our general counsel, probably Randy. There may have been others, but I -- I don't remember.

Q. Were you the first one to express to Randy that you thought Katie Allen should be separated?

A. I don't know if I was the first one or not to suggest to Randy that Katie be separated.

Q. Did he suggest that to you?

right?

A. Yes. That is correct.

Q. At 7:55 p.m.

A. Yes.

Q. Beth Fultz was in California at that time.

A. Beth Fultz was on vacation at that time. Yes.

Q. So do you know whether that was nine -- 7:55 Pacific time?

A. I do not know the time between here and California that that e-mail was sent.

Q. All right. Beth Fultz then forwards that to you on September 16th, and she says, hi, Wendy, I'm just now checking e-mails while sitting at the airport. I found this e-mail from Katie. Wish I had looked earlier. See you -- I don't know what that means.

Is this the first you'd ever -- you'd heard that Katie Allen had sent this e-mail?

A. Yes. The e-mail that Beth Fultz sent me on Tuesday was the first that I had heard of Katie's e-mail.

Q. All right. Then you respond about 10 minutes later. You say, thank you for forwarding.

Did you receive any other correspondence from her. Did she respond to that?

A. I -- I thought she had, but -- but maybe she hadn't.

Q. Okay. Well, the top then -- top e-mail then is you forwarding this to Randy Watson saying FYI at --

A. Uh-huh.

Q. -- 3:20 p.m., right?

A. Uh-huh.

**MR. COOPER:** Yes.

**THE WITNESS:** That's correct.

**BY MR. DUGAN:**

Q. Okay. Now if you can go back to 37, which is the text. At 3:21, right after that, he texts you back and says, so she resigned before we called her, right?

A. That is correct.

Q. Right was my word, not his. The -- the bottom text, your response to that, it's -- it's kind of grayed. Can you tell what that says, or do you know?

A. The bottom of Exhibit 37, like you said, it looks grayed. All I can read is the Thursday evening.

Q. Okay. Do I infer correctly that what you're saying to him essentially is that she had sent that e-mail Thursday evening?

A. Yes. That would have been my response, that she had e-mailed her resignation to Beth on Thursday evening.

Q. Okay. And then you and Beth and Randy all find out about it on Tuesday the 16th.

A. Correct. We found out about the e-mail when Beth saw it on Tuesday, September 16th.

Q. After this text with Randy Watson at 3:21 p.m., did you have any further text exchange with him?

A. No. I did not have any other exchanges with Randy after that.

Q. Did -- when I was asking about text, did you have any -- did you speak with him at all?

A. I'm -- I'm sure I probably -- probably did. Yes.

Q. What do you remember about that?

A. I don't remember specifically the conversation that I had with Randy.

Q. What do you remember generally about it?

A. Generally, I would have asked Randy what he wanted our next action to be.

Q. And what did he say?

A. To accept her resignation.

Q. At that point, did you -- did he consider other options, or did you consider other options?

A. No. We had received her resignation four days prior. There had been no further communication to rescind, or that she had second thoughts about that resignation, so we accepted it.

Q. Okay. Let me go back to the phone call that you and Randy and Katie Allen had on September 15th. What do you remember about that call?

A. Randy shared with Katie that her employment with Kansas State Department of Education needed to be separated. It was her option whether or not that was going to be a termination or a resignation. Katie's response was, Randy, you will have to fire me. I responded that we should give everything just a few days, make sure that that was her decision, and that if she changed her mind and decided to resign, that I would accept that resignation on behalf of the agency.

Q. And did she indicate after that that she

changed her mind?

A. No. I had no other communication with Katie prior to Beth forwarding us the e-mail that she had previously resigned.

Q. Okay. And then you responded to that that afternoon, right? You remember that. I'm going to show you -- the -- Exhibit 17.

A. Yes. Exhibit 17 is an e-mail that I sent to Katie Allen.

Q. Okay. So this was at Randy Watson's suggestion that you respond to her by accepting her resignation.

A. Correct. The e-mail was in response to Katie's resignation.

Q. Did you have any conversation with Randy Watson about the difference in her communications between her Thursday evening e-mail and her Monday afternoon statement that she wouldn't resign, that he would have to fire her?

A. Yes. Randy and I had conversation due to the -- the disagreement or whatever between the two statements.

Q. And what did you say to each other?

A. We were quite confused that she had already resigned but then said that we would have

to fire her. She gave no indication in any conversations that I had with her that she had resigned.

Q. Did you feel any qualms about accepting a resignation after she said she would not resign?

**MR. COOPER:** Object to form. Misstates her testimony. You can answer.

A. No. I did not have any qualms with accepting a resignation that an employee had submitted, what, four days prior and had not communicated a change of mind at all. I was quite confused why she would have -- not have mentioned that prior, but we received it. We had -- there had been ample time for her to change her mind. She had not communicated anything different, so we accepted it.

**BY MR. DUGAN:**

Q. I don't understand what you're saying, that she had not communicated anything different. Because didn't she communicate something different in that telephone call?

A. The telephone call, she said that we would have to fire her. She did not share that she had an e-mail resigning from her position sitting in her supervisor's inbox four days prior.

Katie Allen's calendar.
Q. How did you know that?
A. It was brought up in conversation.
Q. Who brought it up?
A. We looked at Kate -- to the best of my recollection, we looked at Katie's calendar because she had not shown up or called in to work. And I know that there was a meeting on her calendar that had to be rescheduled. I do not know who that meeting was with. I know it was with a school district, but I don't know who specifically it was with.
Q. Do you know who rescheduled it?
A. I don't know specifically who made the phone call to the district to reschedule that meeting.
Q. Do you know what the school district person's response was?
A. No. I do not know what the school district person's response was.
Q. Have you ever heard of, other than the angry calls and letters that came in, any people that Katie Allen worked with outside the agency, school districts, for example, who were upset with Katie about her post on Facebook?

A. I was not made aware of any concerns from school districts.

Q. Are you aware of any concerns within the office about her post? And I don't mean concerns about the calls that were coming in, but concerns specifically about her post.

A. I don't recall anyone bringing any concerns or opinions to my attention regarding her posts.

Q. No one came to you and said, look what she said, this is disgusting, or anything like that?

A. I do not remember anyone saying anything like that to me about her posts.

Q. Can I have you look at Exhibit 33?

A. I have Exhibit 33 in front of me.

Q. Okay. This is an e-mail from Deborah -- Deborah Bremer to Cathy Hopkins.

A. Uh-huh.

Q. Cathy Hopkins is the chair of the state board of education. Is that right?

A. Cathy Hopkins is chair of the state board of education.

Q. Deborah Bremer is the state -- the board's administrative assistant.

I was under the impression that she received more. I do -- I can't answer what she meant by many in this e-mail to Cathy Hopkins on September 15th.

Q. Is it fair to say that what caused the disruption in the office that you've been talking about this morning was the volume of calls that came in and e-mails?

A. The volume of calls created the disruption in the agency.

Q. Okay. Was there any disruption that related to the substance of the post itself?

**MR. COOPER:** Object to form.

A. I guess I'm not understanding exactly what you're referring to.

**BY MR. DUGAN:**

Q. Was there any disruption in the office about what Katie said on that post?

A. No.

Q. She said -- she said, well-deserved. Was there any office disruption about those two words?

A. No. There was no disruption based on the post that Katie made. It was purely the disruption of the hundreds of calls that were coming in and the nature of the messages that people were sharing on those phone calls.

Q. If you could go back in time and -- time machine and change things, if she had not made that post, would any of this have happened?

**MR. COOPER:** Object to form.

A. No. There -- I mean, Masterson would not have done the call to action if she had not made the post. The post created the disruption.

**BY MR. DUGAN:**

Q. Would she have been fired without the post?

**MR. COOPER:** Object to form.

A. Katie Allen was not fired. She resigned and we accepted the resignation.

**BY MR. DUGAN:**

Q. Okay. Without the post, would she have been fired?

A. She was not fired.

Q. I know. I understand that. But I'm saying, would she have been fired if she had never made the post?

**MR. COOPER:** Object to form.

A. I'm not aware of any work performance issues that would have created Katie Allen's termination.

**BY MR. DUGAN:**