# EXHIBIT 3

ORIGINAL TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

KATIE ALLEN,

Plaintiff,

vs. Case No. 2:25-cv-02556-EFM-JBW

RANDY WATSON, KANSAS COMMISSIONER OF EDUCATION, in his official and individual capacities,

Defendant.

DEPOSITION OF

ELIZABETH ANN FULTZ,

taken on behalf of the Plaintiff, pursuant to Notice to Take Deposition, beginning at 12:47 p.m. on the 1st day of May, 2026, at the law offices of Fisher Patterson Sayler & Smith, 3550 S.W. 5th Street, in the City of Topeka, County of Shawnee, and State of Kansas, before Douglas R. Stone, RPR, Kansas CCR No. 1518, Missouri CCR No. 1035.

Appino & Biggs Reporting Service, Inc.
Technology Specialist in Today's Litigation

800 E. 1st Street, Suite 305
Wichita, KS 67202
316•201•1612

5111 SW 21st Street
Topeka, KS 66604
785•273•3063

6420 W. 95th Street, Suite 101
Overland Park, KS 66212
913•383•1131

www.appinobiggs.com

Mr. Cooper may make some objections to my questions. Those are generally for the record, and you can go ahead and answer the question unless you're told otherwise. All right. What's your current position?

A. I'm the Director of Career Standards and Assessment Services at the Kansas Department of Education.

Q. How long have you been in that position? Long time.

A. No. I'm trying to calculate.

Q. Oh.

A. Three -- three-plus years. I took -- can I clarify?

Q. Sure.

A. The -- the director passed away and I took over his responsibilities.

Q. Were you in the department before that?

A. Yes.

Q. What was your job?

A. Assistant director. Same team.

Q. When did you become assistant director?

A. In 2014.

Q. That was -- was that before Randy Watson became commissioner?

A. Yes.

Q. Or did you make -- okay. Who -- who else was involved in hiring her?

A. So along with career and tech ed, standards and assessments, I'm also -- part of my responsibility is research and evaluation. And the group, the research and evaluation group, did the first interview. And then the policy that I have on my team is that then I do a follow-up interview with the individual to make sure that all of us are in agreement. So they interviewed her first, and then I interviewed her following that.

Q. So when you interviewed her, did you already know that they liked her enough at least to bring her back in?

A. No. No. Because they're concurrent. They're -- so they interview the person, literally someone from that group walks them, literally, to my office and I interview.

Q. I see. It was all the same day?

A. It was all on the same day.

Q. Okay. And then you decided to hire her or recommend her hiring.

A. Not at that point in time. The -- we --


800 E. 1st Street N
Suite 200
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

Q. Okay. Would Katie Allen have those roles, too?
A. Yes.
Q. All right. But would she be the only one that would have the guidance to school districts on use of at-risk funds?
A. No. But she would be -- was going to be the lead on it.
Q. Okay. Okay. So she would be contacting school districts, communicating with school districts about at-risk funding and what they needed to do to make sure that they're protected or obtained their funding? Is that right?
A. That's right. That's correct.
Q. Did you ever hear any complaints from any school districts about Katie Allen?
A. No. I didn't hear anything from anybody about Katie Allen. School districts -- she -- she was new to the job. She was learning.
Q. While she was there, did you have any concerns about her performance?
A. No.
Q. From your observation of people in the office, were there any relationships between Katie Allen and any of her co-workers that were strained

in any way?

A. No.

Q. You're aware, I take it, that after Charlie Kirk was killed, Katie Allen commented on a post about that, and a lot of people got upset about it. Is that right?

A. I was made aware.

Q. When did you learn about that?

A. The -- on September 11th I was at the airport, and I got an e-mail from the commissioner saying there had been a problem.

Q. Did he say what the problem was?

A. No.

Q. Did you e-mail him back?

A. Yes.

Q. What'd you say?

A. I'm at the airport getting ready to get on a plane and I'm not much help.

Q. Did you have a phone conversation with him?

A. No. I -- I don't know. I'm gonna say I don't recall.

Q. Were you taking a vacation or were you traveling for work somehow?

A. Vacation.

about why she was asking that? You're shaking your head. You mean no?

A. No.

Q. Okay.

A. Not that I recall anything more than that. It was a brief conversation. I was on a train.

Q. Okay. Could I have you look at Exhibit 36? Okay. Put in front of you Exhibit 36. Have you seen -- if you haven't seen this document in particular, have you seen these e-mails?

A. This originated from me to the HR director.

Q. Okay. So the bottom here is an e-mail from Katie Allen to you on September 11th saying, please accept my resignation. Right?

**MS. COOPER:** Words.

A. Yes.

**BY MR. DUGAN:**

Q. And you said you -- on September 16th, which was Tuesday in the afternoon, you e-mailed that to Wendy Fritz and said, hi, Wendy, I'm just now checking e-mails while sitting at the airport. And then you sent -- you forwarded that to Wendy Fritz, right?

A. Yes.

Q. Did you have a conversation with Wendy Fritz at that point?

A. Not that I recall.

Q. All right. And then you -- you flew back to Kansas City on the 16th. You were in the airport then.

A. Yes.

Q. And then you went back to the office on the 17th.

A. Yes.

Q. Before you went back to the office, did you have conversations with anyone in the office?

A. Yes.

Q. Who did you talk with?

A. One of my -- one or more of my assistant directors. At the airport.

Q. What were those conversations about?

A. What have I missed? What do I need to know? I'm coming back to work tomorrow.

Q. And what did you learn?

A. That Katie was no longer employed.

Q. Did you ask why?

A. Probably.

Q. Did you -- how did you respond to that?

A. Okay. I --
Q. You were just --
A. -- just interesting.
Q. You were just taking information.
A. I was taking it.
Q. Okay. When did you go to work the next day?
A. When?
Q. What time?
A. I don't know.
Q. What time do you usually go to work?
A. Sometime between seven and 8:30.
Q. When you went back to work on the 17th, which I believe is a Wednesday, did you talk with anyone about Katie Allen?
A. Probably.
Q. Do you remember talking with Randy Watson about Katie Allen?
A. No.
Q. Do you remember talking with Wendy Fritz about Katie Allen?
A. Not specifically.
Q. Do you remember specifically talking with anyone about Katie Allen?
A. I remember many people having their

version of what happened the week I was gone.
Q. What were the different versions that you heard?
A. That they had trouble reaching her when she didn't show up for work and finally got a confirmation that she was gone. And Wendy directed staff to send all the phone calls that were coming into her office, and people were just generally unsettled.
Q. What do you mean by unsettled?
A. Anytime someone leaves unexpectedly, people are curious and concerned.
Q. Was anyone, as far as you remember, upset with Katie?
A. Can you define upset?
Q. Angry.
A. No. I would say a better word would be disappointed.
Q. How did they express that disappointment?
A. I can't believe she did it. What was she thinking? We enjoyed working with her.
Q. When you say they can't believe she did it, do you mean the post itself or not coming into work?
A. Both. Well --

directed to her. Is that right?

A. Some -- I -- HR told people that were answering the phones to send the calls somewhere else. I -- I can't say if they were to her personally or not.

Q. Do you know where the calls were directed?

A. No.

Q. So as far as you could tell, did the office function normally when you came back to work?

A. Yes. The -- I just want to clarify. The office, by my team.

Q. Okay.

A. Okay. I have no idea about the general whole office. My team was functioning when I came back -- that week when I came back.

Q. All right. Another -- then the disappointment you described earlier, you didn't have any complaints from people on your team about Katie Allen.

A. No.

Q. And you didn't hear any complaints from school districts about Katie Allen.

A. No. She had not been employed long

enough to have contact with very many people. She was still learning the job.

Q. And you didn't have any conversations or e-mails with members of the public who were upset about her when you came back to work?

A. Personally, no.

**MR. DUGAN:** That's all I have. Thank you.

**MS. COOPER:** No questions. Read and sign.

(THEREUPON, the deposition concluded at 1:21 p.m.)