# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KATIE ALLEN,
Plaintiff,
vs. Case No. 2:25-cv-02556-EFM-JBW
RANDY WATSON, KANSAS COMMISSIONER OF EDUCATION, in his official and individual capacity,
Defendant.

DEPOSITION OF
KATIE ALLEN,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 1:22 p.m. on the 27th day of April, 2026, at the law office of Dugan Schlozman, LLC, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.



APPEARANCES

ON BEHALF OF THE PLAINTIFF:

Mr. Mark V. Dugan
Dugan Schlozman, LLC
8826 Santa Fe Drive, Suite 307
Overland Park, KS 66212
913-322-3528
mark@duganschlozman.com

ON BEHALF OF THE DEFENDANT:

Mr. David R. Cooper
Crystal B. Moe
Fisher, Patterson, Sayler & Smith
3550 S.W. 5th Street
Topeka, KS 66606
785-232-7761
dcooper@fpsslaw.com
cmoe@fpsslaw.com



INDEX

Certificate ------------------------------ 100

WITNESS

ON BEHALF OF THE DEFENDANT: PAGE
KATIE ALLEN
Direct-Examination by Mr. Cooper 5

EXHIBITS

ALLEN DEPO EX. NO: MARKED
No 1 Job Opening 5
No 2 6/8/25 letter to Marisa Seele from Allen 5
No 3 Resume 5
No 4 Confirmation of appointment letter 5
No 5 E-mail string, ALLEN00002-00004 5
No 6 E-mail string, ALLEN00007-00008 5
No 7 E-mail string, ALLEN00015-00016 5
No 8 E-mail string, ALLEN00017-00018 5
No 9 Printouts of Microsoft calendar meetings or invites 5



No 10 Position description 5
No 11 E-mail from Fultz, ALLEN00001 5
No 12 Charlie Kirk text 5
No 13 9/11/25 e-mail to Fultz from Allen, ALLEN00006 5
No 14 9/11/25 e-mail to Fultz from Allen, KSDE_000004 5
No 15 Out of office automatic reply 5
No 16 Text and phone communications 5
No 17 E-mail string, ALLEN0009-00014 5
No 18 Page out of the Rule 26 Disclosures 5
No 19 E-mail string, Re: Retirement letter 5
No 20 E-mail string, Re: Timesheet reminder 5
No 21 E-mail string, Re: Provisional at-risk program 5

Page 25

say three or four individuals. And my recollection, Julie, and I blank on her last name. There was another research analyst. He's -- I apologize, he's Chinese background. I don't know his name. Maybe there were one or two other people in the room, but I just can't remember who it was.

**Q. Was Beth Fultz part of your interview panel?**

A. No. I spoke to her after the interview?

**Q. Are you talking about Julie Ewing?**

A. Yes.

MR. COOPER: E W I N G.

BY MR. COOPER:

**Q. Okay. So you spoke with Beth Fultz before July 22 of 2025 when you expressed your continued interest in a position. Then you spoke with her a second time -- or at least again after you interviewed for the position, true?**

A. I'm sorry, say that again.

**Q. You spoke with her to express your interest before July 22nd. You spoke with her again after your interview?**

A. Correct.

**Q. Any conversations with Beth Fultz between**

Page 26

**those two conversations?**

A. Speaking with her was directly after my panel interview --

**Q. Okay.**

A. -- where she took me around the office and showed me some different things and just gave me a general overview.

**Q. The reason I'm asking is that in Exhibit 5, the top most e-mail is an e-mail from Ms. Fultz telling you that -- actually giving you her cell phone number and saying that she would call you, and I'm wanting to know if that call happened?**

A. I don't recall, but probably.

**Q. What recollection, if any, do you have of speaking with Ms. Fultz about this -- another -- this other opportunity that she's referencing in the e-mail?**

A. My recollection would be just a general she told me what the job is and asked if I would come in for an interview.

**Q. And what's your understanding of what that job would be?**

A. A research analyst. In general, they told me I would be working on at-risk accountability.

Page 27

**Q. Which means what?**

A. There's a statute for the education finance formula, and schools get additional funding for students that are considered at risk. Part of what they have to do with that money is spend it on programs that are evidence-based. KSDE had two post-legislative audits that they did not pass related to at-risk accountability. So they asked me to come help kind of figure out how to move forward, because with the What Works Clearinghouse background, I understand the difference of what's evidence-based and what is not. So, in general, that was what my understanding was. When I actually started the job, there were several pieces of it. One was that they had a list on their website of approved programs that was a little out of date, and I was to fix that. Another was if schools didn't have a program from that list, they could provide their own evidence that it worked. So I was to kind of go through and look and see if they provided proper information and then follow up to ask them to provide what might be needed to get their program approved. So that was the generality of it.

Page 28

**Q. What do you recall your conversation with Beth Fultz after your interview panel?**

A. Can you say that again?

**Q. What do you recall of your conversation with Beth Fultz after the interview with the panel?**

A. Just in general, optimism and she was showing me around the office and just gave me a little bit of update on projects. I don't remember specific parts of the conversation.

**Q. Had you been offered the job at that point in time?**

A. No.

**Q. Okay. Did you have an expectation based on your encounter with Ms. Fultz that you were going to be offered the position?**

A. I was uncertain.

**Q. I'm going to give you what's been marked as Allen Deposition Exhibit 6. There's two e-mails in Exhibit 6, the first being from Wendy Fritz to you on August 14, 2025 and then the top most is you replying the next day, true?**

A. Yes.

**Q. And handing you what's been marked as Exhibit 4. Okay. Is Exhibit 4 a copy of a**

Page 29

**letter dated August 14, 2025 to you confirming your appointment as a research analyst?**
A. Yes.
**Q. Okay. Now, to be clear, Exhibit 4 is not in the form in which it was e-mailed to you, true? In other words, it didn't come to you with your signature on it?**
A. Correct.
**Q. But it came to you as an attachment to the e-mail that we marked as Exhibit 6?**
A. Correct.
**Q. And you later signed the letter acknowledging your acceptance of the position, the appointment?**
A. Yes.
**Q. Is that something you printed and mailed back or did you go to the -- go into the office to sign?**
A. I printed it and most likely I took a picture and sent it back, but I don't recall. I have a printer at home.
**Q. Okay. Your signature is dated 20 August, 2025?**
A. Yes.
**Q. Okay. I'm going to give you what's been**

Page 30

**marked as Exhibit 10 which is is Exhibit 10 a copy of the position description that you signed on August 20, 2025?**
A. It's signed August 5th.
**Q. Well, I want you to look at your signature in the last page?**
A. Oh, correct, August 20th.
**Q. The August 5 signature is by Ms. Fritz, true?**
A. Correct.
**Q. Okay. Is Exhibit 10 a true and correct position -- copy of the position description for the job that you were hired to by the Department of Education?**
A. This is the job description I was given.
**Q. Okay. On page 1 of Exhibit 10, we can probably -- we'll probably have to bounce back and forth between documents. There's a box that says Position, classified and unclassified, and unclassified is checked, top third, left side. Do you see where I'm at?**
A. Yes.
**Q. Sing you agree it says the position is unclassified?**
A. Correct.

Page 31

**Q. What understanding, if any, do you have as to what an unclassified position is?**
A. In that case, my understanding is it's the difference between hourly and salary based on your level of work.
**Q. How about FLSA status exempt versus non-exempt? Do you have an understanding what the difference there is?**
A. Yes.
**Q. What's that? What's your understanding?**
A. Exempt meant that I wasn't paid overtime if I worked past 40 hours a week.
**Q. In your prior employment with K-State, were you a classified or unclassified position, if you know?**
A. Unclassified.
**Q. And do you understand that a classified position differs from an classified position in that classified positions are covered by the Civil Service Act?**
A. No.
**Q. Okay. Do you have any understanding of what the Civil Service Act is or does for state employees?**
A. No.

Page 32

**Q. Did you understand that as an unclassified employee you were an employee at will?**
A. Yes.
**Q. In Exhibit 4, the appointment letter, the rate of pay, bi-weekly rate of pay is in the second paragraph, true?**
A. Yes.
**Q. And it noted that your appointment was effective August 20, 2025, true?**
A. Yes.
**Q. The second bullet point addresses being paid via direct deposit. I skipped over the first one about Forms I-9. The third one explains that this is an exempt position and the fact that you would not be paid overtime, true?**
A. Yes.
**Q. Then the fourth bullet point speaks to being on a one-year probationary period based on the -- an administrative regulation. Did you go look up and read that regulation?**
A. No.
**Q. Okay. It's the fifth bullet point speaks about eligibility for health insurance day one of employment, true?**

Page 49

**Q. Okay. Tell me what you recall being said during that second meeting with Mr. Watson?**
A. Basically, the same thing that I had told Beth Fultz, that I had had some interest and conversations prior to taking the job. I wasn't really quite sure what I wanted to do, but folks had given me money so I kind of need to figure out. And he said, oh, yeah, he was very encouraging. He started calling me Senator Allen.
**Q. Anything else you remember of that conversation?**
A. That's the most of it.
**Q. Did you discuss with Randy Watson the fact that -- in other words, basically I know I just started here but I may have to -- I'm interesting in running for office?**
A. I did say, yeah, I wasn't sure when I started, but I am interested in exploring because people had encouraged me, but I'm still not sure what I want to do.
**Q. And did you discuss the fact that if you had to open a campaign account that you would resign from your employment?**
A. If I had to open a campaign account?
**Q. Yeah.**

Page 50

A. No.
**Q. Did you discuss with Randy Watson the possibility of resigning employment with the Department of Education to run for office?**
A. I told Randy Watson I was not sure what I wanted to do.
**Q. I appreciate that, but that did not answer my question. Did you discuss with Randy Watson the potential of resigning to run for office?**
A. I never discussed the potential of resigning to run for office.
**Q. Did you discuss the potential of resigning at all?**
A. No.
**Q. What, if any, understanding did you have as to what requirements applied to you as a Department of Education employee running for national office?**
A. My understanding was what Beth Fultz had told me and that there was no conflict and that was the most information that I had.
**Q. Was anybody besides yourself and Randy Watson present for the conversation on -- the second conversation in his office?**

Page 51

A. No.
MR. COOPER: We've been going a little better than an hour. Let's take a short break.
(THEREUPON, a recess was taken.)
BY MR. COOPER:
**Q. All right. We're back after a short break, Ms. Allen. What's your husband do for a living?**
A. He is the head of security at the Eisenhower Presidential Library.
**Q. Who is technically his employer?**
A. It's called ADC Limited.
**Q. How long has he been -- worked there?**
A. Almost 20 years.
Before we proceed, can I clarify from the last question?
**Q. If you feel you need, sure.**
A. You had asked me about a conversation with Randy Watson and discussing my resignation, and I'd like to clarify my response.
**Q. Okay.**
A. When we had a conversation, it wasn't in my idea talking about my resignation. What he said if I decided to move forward with seeking that seat, I would have to quit and I acknowledged

Page 52

that response.
**Q. Okay. Let me give you what's been marked as Allen Deposition Exhibit 19 which is a e-mail string between yourself and Randy Watson on September 10, 2025 originating from Mr. Watson to all department staff advising of his intention to retire, true?**
A. Yes.
**Q. And the top e-mail you replied to him on the same day, true?**
A. Yes.
**Q. Where were you when you replied?**
A. At my desk.
**Q. Okay. Let me give you what's been marked as Allen Deposition Exhibit 21. Exhibit 21 is an e-mail thread originating on September 5, 2025 from you to a Mena Patrone, M E N A, Patrone, P A T R O N E, true?**
A. Yes.
MR. DUGAN: I'm sorry, what's the number on this one?
MR. COOPER: 21. It's on the bottom.
MR. DUGAN: Oh. Thanks.
BY MR. COOPER:
**Q. There's a series of e-mails back and**

Page 53

**forth with Ms. Patrone about scheduling a phone call or a meeting. Who is or was Miss Patrone as you understood it?**
A. I don't know her title, but she clearly worked at USD 287 and was in charge of their at-risk programs.
**Q. Okay. And do you know who or where USD 287 is?**
A. My recollection is it's one of the small schools out west, but I don't really know.
**Q. It's West Franklin. Do you know where West Franklin School District is?**
A. No. I got the west, though.
**Q. I've read this and I don't understand it, so tell me what the conversation, both the e-mails and what the purpose of the conversation was going to be?**
A. So let me look back. Ms. Patrone must have submitted an application to get their program, whatever it was, approved to be on the evidence-based list for at-risk funding. And my recollection was I was given some Excel sheets with a bunch of data that didn't have headers or labels or anything. So the conversation I was going to have with her was helping her understand

Page 54

what the requirements were for submitting evidence to be placed on that provisional list. And so I think we tried to schedule a meeting once, but then her thing on Friday the 5th said she needed more time or more information to prepare which is when I told her at 1:40 what I was doing. And then we tried again to schedule a meeting.
**Q. And essentially, this is schedule a meeting to say here's what I really need?**
A. Correct.
**Q. Okay. And this at-risk program, was it your understanding that part of your responsibilities were going to be in assisting local districts in the tracking of performance of at-risk students over time?**
A. I'm not sure. I think because I was given access to that AMOSS that there may have been something, but it was not clear to me.
**Q. All right. So by September 10, roughly 20 days from when you started, which is a little less than three full work weeks?**
A. Um-hum.
**Q. What had you done in the interim period of time, excluding the Memorial Day holiday?**
A. I updated their at-risk list that's on

Page 55

their website. I went through every single one of the programs to find evidence that either has to be on the What Works Clearinghouse evidence for ESSA or had to find a study, an independent study online that met the criteria. That took quite a long time. I had a whole Excel sheet where I found the evidence for each program that was already on the list and matched that up. And then I updated their list that they had already on the website because it was full of programs that were not evidence-based, and I remember working with somebody to format that and get it put up there. That was the bulk of what I'd been doing.
**Q. You used an acronym ESSA. Tell us what that is.**
A. Elementary and Secondary -- Elementary and Secondary Act? What is it? Elementary -- it's the federal law, ESSA. Elementary and Secondary Student Act or something like that.
**Q. I was just looking for how many letters is in ESSA. And are they the ones that we think they are, because it's not always the case?**
A. Well, somebody called it Every Student Succeeds Act, and I know that's not true which is why I always get mixed up.

Page 56

**Q. Looking back again on Exhibit 12 (sic), so you had scheduled a meeting for Friday, true?**
A. The last on here I had tried to. I don't think she responded.
**Q. Do you know if you had a meeting scheduled with Ms. Patrone?**
A. My recollection is we had one scheduled, and then she asked to reschedule to have more time to prepare.
**Q. Do you have a recollection one way or the other of actually setting a meeting with Doctor Patrone on Friday afternoon?**
A. I never scheduled a meeting with her.
**Q. Exhibit 12 is an enlargement of -- well, some sort of social media post. What social media platform was it?**
A. Facebook.
**Q. And the post was somebody posting the People Magazine report of Charlie Kirk's death, true?**
A. It says he was shot.
**Q. Okay. Well, did you know that he was dead?**
A. No.
**Q. Okay. And you -- what time of day --**

Page 61

**Q. Because you used it all of three weeks?**
A. Yeah.
**Q. How many paychecks did you get from the State of Kansas for working for the Department of Education?**
A. I don't recall. It was direct deposit, so I never paid attention.
**Q. You left work on Thursday, September 11 for your doctor's appointment, true?**
A. Yes.
**Q. When did you leave work?**
A. I don't really recall. I think it was afternoon. I don't remember if my appointment was like at 2 or 3, but it takes me about an hour to get home. So somewhere, somewhere around that noon, 1, before 2, I think. I don't really recall.
**Q. When did you learn things had blown up over your post on Facebook?**
A. Thursday night.
**Q. Okay. What time-ish?**
A. In the evening. I don't really recall what time.
**Q. How did you learn?**
A. I think I saw -- well, what really

Page 62

happened is there was some threatening things sent to me on Facebook, and then I started getting phone calls and I think that was afternoon, Thursday afternoon.
**Q. Phone calls from?**
A. Anonymous people.
**Q. Any idea how your phone number was out there for people to call?**
A. Yes.
**Q. Tell me?**
A. Ty Masterson gave it to everybody.
**Q. And how do you know that?**
A. I saw it on social media.
**Q. Okay. How do you know Ty Masterson, if you do?**
A. I don't.
**Q. Okay. Do you have any understanding as to how Ty Masterson would know who you are?**
A. Yes.
**Q. And what's your understanding of that?**
A. It's speculation.
**Q. Tell me what you suspect.**
A. Betty Ebert who ran for school board a couple times before and is currently the chair for the Riley County Republicans either contacted him

Page 63

directly or Brad Starnes directly is what I think happened.
**Q. Have you done a postmortem to figure out who screenshotted your comment?**
A. I have a general idea based on what people have said.
**Q. Tell me what -- tell me what you understand, understanding that you don't have personal knowledge.**
A. At public comments at school board meetings, a man named Frank Beer came to public comments. He got three minutes, and he came three or four times and really his whole obsession was that post. And just like you have the timestamps. It didn't match his computer. And he just went on and on and on about this. He's the only person that cared about the screenshots which tells me it was him.
**Q. Any other basis for believing that he's the source of the screenshotting it and circulating it?**
A. General speculation.
**Q. Which is what?**
A. He's part of a Facebook group that, for lack of a better word, likes to harass local women

Page 64

and other like elected people.
**Q. Okay.**
A. He also ran for school board as well.
**Q. Who was your opponent in the race again?**
A. It's not necessarily opponents. There -- we have at-large seats, and depending on the cycle, there's either three seats or four. And the year I ran, there was a whole handful, but Frank Beer was in that group and so was Courtney Jane Hochman.
**Q. Other than being a precinct committee woman in both Dickinson and Riley County, and the Riley County Democratic chair, have you been politically active otherwise?**
A. Can you define that?
**Q. Holding office?**
A. I've never held another office, no.
**Q. Okay. Supported candidates?**
A. Yes.
**Q. Other than sending campaign -- as in campaigning for somebody? How did you support people for office?**
A. Mostly by helping with things like knocking on doors or as party chair helping them connect with the right people. I ran my own

campaign, so I've talked to other people before about my own strategy and really suggestions of how to look at data. I've probably donated here and there $25 to a candidate, although I couldn't tell you who it is.

**Q. I'll hand you Deposition Exhibit 13. Is this a true and correct copy of an e-mail that you sent to Beth Fultz, September 11, 2025 at roughly 9:55 p.m., true?**

A. Yes.

**Q. Did you know where Beth Fultz was at the time?**

A. No.

**Q. Had you seen her earlier that day?**

A. I don't recall.

**Q. And why did you direct the e-mail to Beth Fultz?**

A. Because she was the person I had kind of the most relationship with at that organization.

**Q. I'll give you what's been marked as Allen Deposition Exhibit 14 which is that same e-mail, but this one has an KSDE.gov warning about external e-mail on it, true?**

A. Yes.

**Q. In other words, this would be what Miss**



**Fultz' e-mail would have looked like?**

A. Okay.

**Q. Who typed the e-mail that we see as Exhibits 13 and 14?**

A. Me.

**Q. And you sent it to Miss Fultz, true?**

A. Yes.

**Q. I'm going to read it, and I want you to tell me if I read it correctly. The body of the e-mail reads Hi, Beth, Please accept my resignation as of today. When I left for my doctor appointment in MHK at noon, I regrettably posted mean words online (then deleted and apologized) the other day and have brought on the hate from a whole bunch of people. Today's been filled with stress and threats of violence against me, and I don't want to bring that negativity to the agency. My apologies, Katie. Did I read that correctly?**

A. Yes.

**Q. All right. Did you mean what you said when you wrote it?**

A. When I wrote it, I was receiving death threats and I was fearful for my life. And what I thought is if I gave them what I wanted, resign



or die, that maybe they would stop threatening me and my family. And my idea was if I gave them what I wanted and I told Beth, it would all stop, but it didn't because there was an out of office reply and she didn't get the message.

**Q. Okay. I appreciate all that information, but you didn't answer the question I asked. Did you mean it when you wrote it?**

A. When I wrote it?

**Q. Yeah.**

A. I was scared.

**Q. That still doesn't answer my question. Did you mean it when you wrote it?**

A. I meant that I didn't want to be killed and if that's what it took, then yes.

**Q. Okay. Was anybody from the Department of Education threatening your life?**

A. Not that I know of.

**Q. Allen Deposition Exhibit 15 is an out of office reply that you got from Miss Fultz' e-mail account, true?**

A. Yes.

**Q. Allen Deposition Exhibit 17 is an e-mail along with -- actually, it's a pair of e-mails. So I want you to follow along with me so that**



**we're talking the same language. On the lower left-hand side of each of these, there's the deposition exhibit number and a page blank of blank and this is of 6?**

A. Um-hum.

**Q. So pages through -- 1 of 6 through 4 of 6 is one e-mail. 5 of 6 and 6 of 6 is the second e-mail. Do you agree?**

A. Yes.

**Q. Okay. So the first e-mail, meaning pages 1 of 6, is an e-mail to you from Wendy Fritz dated September 16, 2025?**

A. Yes.

**Q. Subject line says resignation confirmation, true?**

A. Yes.

**Q. And there was an attachment to that e-mail which had a benefits checklist for employees leaving, true?**

A. Yes.

**Q. And those -- a printout of that attachment is also -- is pages 3 and 4 of Exhibit 17. Do you agree?**

A. Yes.

**Q. All right. Then the second e-mail is**

Page 69

from Ms. Fritz to you on Monday September 22 inquiring about returning your ID card. Is that true?
A. Yes.
Q. Okay. Did you access your work e-mail, your KSDE.gov e-mail account at any time after leaving the office on September 11, 2025?
A. The only access I had to the e-mail was through the work laptop, and it was at the office.
Q. Okay. So that's a no?
A. Correct.
Q. And so you didn't have your work laptop when you left on September 11?
A. Correct.
Q. And you never had it again after that. Is that a true statement?
A. Correct.
Q. I'll go ahead and give you Allen Deposition Exhibit 16 which when I look at it, it looks like this is basically three different things. The first one are text messages that you had with Julie Ewing, first page?
A. Yes.
Q. Second page is text messages you had with Wendy Fritz. Is that true?

Page 70

A. Yes.
Q. And then the last are screenshots of your phone calls with people at KSDE on September 15 of 2025. Is that true?
A. Yes.
Q. Okay. I'm lining these up hopefully so that I understand. So I've got Exhibits 13, 14, 15, 16 and 17, and we can break this down if we need to, but my question is do these exhibits illustrate all of your contacts with anybody from the Department of Education after you left work for your doctor's appointment on September 11th?
A. Yes.
Q. Is there anybody else at the Department of Education you spoke with or communicated with in any way that's outside of this handful of exhibits?
A. I don't recall speaking with anyone else.
Q. Okay. Did you actually speak with Julie Ewing?
A. No.
Q. Did you speak with anybody other than Wendy Fritz and Randy Watson?
A. No.
Q. And you spoke with both Wendy Fritz and

Page 71

Randy Watson, true?
A. Yes.
Q. Okay. Did you ever go back to the office at the Kansas Department of Education after leaving for your doctor's appointment on September 11, 2025?
A. No.
Q. Okay. Your e-mail in Exhibit 13 and 14 says when I left for my doctor appointment in MEK at noon, why did you make your resignation effective at noon as opposed to any other time?
A. I was just scared for my life and I was thinking, oh, they'd see my badge check out. And if she correlated that, she could tell them that that was the last time I was there. And in my mind, I thought that would stop them from harassing me.
Q. Now, on Exhibit 16, page 1 of 4 in Exhibit 16 are screenshots, three screenshots of text messages between yourself and Julie Ewing. Is that correct?
A. Yes.
Q. Julie texted you on Friday September 12 and you didn't respond that day. Is that true?
A. I did respond that day.

Page 72

Q. Okay. And how did you respond to Julie?
A. My first response says who is this?
Q. Okay. If we're looking at this, she reaches out to you --
A. Oh, okay. You're right.
Q. -- on September -- Friday, September 12?
A. Correct.
Q. There's no response from you on that day. She reached out to you again on Monday, September 15, correct?
A. Correct.
Q. And just to close the loop, you had no contact with Julie Ewing between Friday, September 12th and Monday, September 15?
A. Correct. I had to turn off my phone because it was overloaded with spam calls, and so I did not see that message.
Q. And have you had any contact with Julie Ewing -- well, withdraw. Let me ask this. When Julie texted you on Monday, September 15 and you responded who is this and she said sorry, Julie Ewing, there's a long text message after that. Doesn't show that's a different day. How long after, in other words, over what period of time were you exchanging text messages on Monday the

**because if we look at page 3 of 4 in Exhibit 16, there's an exchange about scheduling a call with Randy at 2:15 and she gave you the number that he would be dialing from?**
A. Yes.
**Q. When we look at 4 of 4 in Exhibit 16, the phone call at 12:04 p.m. that appears to be an incoming call, meaning Mr. Watson called you?**
A. Correct. I think that was his cell phone.
**Q. And his name's in your phone?**
A. I put it in afterwards so I would recognize it when they called back thinking that they might have used that same number.
**Q. Okay. From what you've told me thus far, I would conclude that in your call with Wendy Fritz, she gave you Randy Watson's number so that you would know what number he was calling from?**
A. Correct, because I remember telling her I wasn't answering calls unless I knew who they were from.
**Q. So in the phone call with Wendy Fritz, you told her that you weren't answering calls from numbers you didn't recognize. She gave you Randy Watson's number, and you had input it in your**



**phone before Randy called you?**
A. I think after, but I don't recall.
**Q. Okay. Meaning she gave you the number. When you saw that number you --**
A. Answered.
**Q. Okay.**
A. Yes.
**Q. All right. The screenshot says that call was up to 11 minutes. Tell me what -- well, first off, I skipped something on the call with Wendy Fritz. Was anybody else on the line that you know of when you spoke with Wendy?**
A. Not that I know of.
**Q. Okay. So you weren't on speaker phone?**
A. Not that I know of.
**Q. Okay. The next call with Randy Watson at 12:04, was anybody on the line that you know of besides yourself and Mr. Watson?**
A. I'm uncertain.
**Q. Okay. Could you tell whether -- do you know whether either party was on a speaker phone?**
A. I'm certain on the last call I could tell, but this one I'm not sure.
**Q. Okay.**
A. And I don't recall anybody other than



Randy Watson talking on that call, but that's just my recollection.
**Q. Meaning the call at 12:04?**
A. Correct.
**Q. And so that this will make sense when we read this later, the third call happened at 2:15 p.m.?**
A. Correct.
**Q. And that one you believe he was on a speaker phone?**
A. Correct.
**Q. Did you know whether anybody else was in the room with him?**
A. Wendy Fritz.
**Q. Okay. And how do you know that?**
A. I think he told me and I heard her talk.
**Q. Fair enough. I'm going to now for the 12:04 call with Randy Watson, I want you to tell me everything you remember being said during that conversation.**
A. The general beginning of it, I was trying to describe to him what was happening on my end and the threats that I had received and why I hadn't been back, I mean that I was scared, that I had had death threats coming my way, that what I



was seeing, like I'm not sure what's happening on my end. The phone calls were all anonymous or spoofed. The e-mails that I saw were just all kinds of -- some of them were real, some of them weren't, some of them were just, hey, you need to resign, some of them were awful. So I didn't know what he had seen and what he had experienced. And I remember letting him know like I'm getting death threats, and he was pretty indifferent about it. And I remember telling him that I'm not sure what is going on. I wanted to talk to legal counsel. And he was asking me like how long is that going to take, and I said I don't know. I don't have anybody to call. He was trying to tell me that he had had thousands of calls and e-mails. And when I was describing to him like what I was experiencing, that it was some kind of harassment and a lot of fake stuff. He told me he, oh, he'd verified everything that had came to him, every phone call, every e-mail and he's going to need to do something quickly. How soon could I talk to somebody, legal counsel. I kept telling him I don't know. And he said something to the effect, well, I'll let you figure that out and then we'll talk again soon. That was the basis of the

Page 81

conversation. I don't recall anything else other than him telling me he's got to do something quickly. And we did not speak about anything with a resignation, nothing. It was just about what had happened and how to move forward.

**Q. Okay. Did you take any notes of the conversation?**

A. I probably did.

**Q. Do those notes still exist?**

A. Maybe. I've got a whole pile of different little scrap paper here and there all over my office.

**Q. Okay. Did you record the call with Randy Watson?**

A. No.

**Q. The 2:15 call, did you record that call?**

A. No.

**Q. This is closing a loop, so it's going to sound like a dumb question. Did you hear anybody else's voice during your 2 -- 12:04 phone call with Randy Watson?**

A. I don't recall anyone else.

**Q. Okay. I've got a text message from Wendy Fritz at 1:47 asking to schedule a call from -- or with Randy at 2:15, true?**

Page 82

A. Yes.

**Q. And you got a call from the number Wendy Fritz told you he would be calling from?**

A. It wasn't that number. But because it was 2:15, I answered it.

**Q. Did you hear any voices besides Randy Watson's and Wendy Fritz' during the 2:15 phone call?**

A. Not to my recollection, no.

**Q. Okay. Tell me everything you remember being said during the 2:15 phone call.**

A. It was pretty brief. Randy was saying we're going to have to do something. You need to resign. And I said, no, I'm not resigning. He said, well, we need to do something. I need to do something quickly. I said I'm not resigning. And that went back and forth for just a couple minutes. He kept telling me you need to resign, and I said no. And then he just ended it with we're parting ways, and he handed the phone over to Wendy.

**Q. Okay. What else was said when he handed the phone over to Wendy?**

A. That they would send me a letter today or that day about my end of my employment. And I

Page 83

asked them, well, what are you going to put in that letter, and he refused to tell me but he said I would get it at the end of the day. And then he had Wendy start telling me about things that needed to happen to end my employment. Beyond the letter, she needed my badge back and was there anything in my office that I needed, and I told them there was some food there that was in the drawers but I didn't want it back.

**Q. When you say he handed the phone to Wendy, again, was it --**

A. He stopped talking.

**Q. You anticipated my question. Thanks.**

A. Sorry.

**Q. That's fine. On page 4 of 4 of Exhibit 16, across all of the screenshots on that page, the voice mail icon shows 43 voice mails. Is that typical for you?**

A. I typically have some, but there were way more in here, because some of them people threatening me did leave voice mails.

**Q. Okay. So what's typical for the number of accumulated voice mails on your phone versus what we see at the 43?**

A. I have a friend that likes to leave a

Page 84

voice message every few days, and I usually check it once a week. I don't clear them off very often. Sometimes I read them and I don't clear them. I don't know. At least 20 or so voice mails.

**Q. I'm looking at mine. I've got 31 right now.**

A. Yeah. Text messages, I've got a thousand something.

**Q. But on mine, my desk also rings over to my cell phone, and if I don't pick it up, my voice mail is the caller you are, I get the voice mail notification, so I have dozens of those things, probably three of them today.**

**You said you were going to -- the conversation entailed getting a letter by the end of the day. Did you get a letter by the end of the day?**

A. No.

**Q. Okay. Was there any discussion in either phone call about a suspension?**

A. I asked for one.

**Q. Okay. In which phone call?**

A. I don't remember.

**Q. Did you mention in any of your phone**

Page 85

**calls on September 15 the fact that you had e-mailed a resignation to Beth Fultz on the 11th?**
A. No.
**Q. Okay. Why not?**
A. Because I got that out of office reply. And by Saturday when I realized what had really happened with Ty Masterson and others doxing me, I realized that I didn't have to resign because I wasn't actually going to be killed.
**Q. Do you have any basis for the suggestion that Randy Watson knew of your resignation e-mail to Beth Fultz when you were talking to him on the phone on the 15th?**
A. No.
**Q. Do you have any reason to suggest that Wendy Fritz knew of your resignation e-mail to Beth Fultz when you spoke with her on the 15th?**
A. No.
**Q. Okay. When we look at Exhibit 17, this one, page 1 of 6 on Exhibit 17, Ms. Fritz' e-mail to you on September 16 and it's timestamped at 4:47, the text, the first paragraph in the body of the e-mail, the Kansas State Department of Education has received and accepted your resignation which you submitted to your director**

Page 86

**via e-mail on Thursday, September 11, 2025 at 7:55 p.m. Central Time, you submitted your resignation at 9:55 p.m., true?**
A. Correct.
**Q. So 7:55 would have been Pacific time?**
A. Probably, yeah.
**Q. Do you know where Beth was?**
A. No.
**Q. Did you know she was on the West Coast?**
A. No.
**Q. Okay. How long after September 10, 2025 did people address your comment at school board meetings at Manhattan?**
A. I'm sorry, can you say that again?
**Q. How long did people address your Facebook post during school board meetings?**
A. There were four different meetings where at least one person commented.
**Q. Okay. So each meeting for two months? You meet twice a month?**
A. Correct.
**Q. Allen Deposition Exhibit 18, this is a page out of the Rule 26 Disclosures provided to me by your counsel. At the top of Exhibit 18, it's No. 4, this appears to be a screenshot and**

Page 87

**enlargement of a, I still call it a tweet, from Ty Masterson's account, true?**
A. Yes.
**Q. Okay. And it's referring to a vote by the school board asking you to resign. Is that the first school board meeting after the events of September 10 and 11?**
A. Yes.
**Q. Okay. So at the first board meeting back, the board voted to ask you to resign, true?**
A. They passed a resolution.
**Q. Okay. Did you resign?**
A. No.
**Q. Did you resign any position on the board?**
A. Vice president.
**Q. Okay.**
MR. COOPER: Let's take another short break. I'm going to pull up another set of questions. This is going to be a topic shift for you. So don't need a long break.
(THEREUPON, a recess was taken.)
BY MR. COOPER:
**Q. Back on the record after a break. What effort at reemployment did you make aside from securing your current part-time employment at the**

Page 88

**American Institute of Research?**
A. I applied for jobs that whole time. I couldn't tell you how many different resumes I put in, but mostly through LinkedIn and Indeed. I had been previously connected to a group called Hiring Our Heroes for military spouses, and they had provided like different things you could read for tailoring your resume, how to get your resume seen through AI, those kinds of things, just the general what kind of help can I get to figure out how to get a job and applying through LinkedIn, maybe Indeed.
**Q. How many applications did you put in?**
A. A wild guess, 20 to 30.
**Q. Doing what?**
A. Most everything, I tried to find something that was related to my professional background, so working in education, but there's not much left. So there was some Ed tech things I applied for. Anything that was kind of online, remote work that was research related. I think there was a job at Gallop. Once I applied for a place called -- I forget what it was but it's Jonathan Haidt. He wrote the Anxious Generation. He has a non-profit. I applied for that. Amazon